IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

DAVID BLISS,

          Plaintiff,

    vs.

BNSF RAILWAY COMPANY,

          Defendant.

**4:12CV3019**

**MEMORANDUM AND ORDER**

INTRODUCTION

This case is pending before me for final resolution,[1] and was previously scheduled for trial beginning on July 22, 2013. (Filing No. 74). On July 3, 2013, the defendant, BNSF Railway Company ("BNSF" or "the Railroad"), filed a motion for separate trials. (Filing No. 107). The court promptly convened a telephonic conference to discuss the bifurcation motion, and any other issues that may impact the trial proceedings and the parties' (and court's) ability to be ready for trial by July 22, 2013. During the call, the parties explained their respective positions on the motion for separate trials, and further explained they were each planning to file several motions in limine. Neither party mentioned filing, or needing additional time to file, motions to dismiss or motions for summary judgment.

After conferring with the parties on July 5, 2013, and with their agreement, the court continued the trial to October 7, 2013 to afford time for considering and resolving the Railroad's pending motion challenging the admissibility of testimony to be offered by Plaintiff's expert, Gary Namie, Ph.D.; the Railroad's motion for separate trials; and the parties' anticipated of motions in limine. The court set July 19, 2013 as the deadline for filing any additional pretrial motions.

---

[1] See the parties' consent to final determination by a magistrate judge (Filing No. 10, at CM/ECF p. 9, ¶ H), and 28 U.S.C. § 636(c).

The following are now pending, and effective August 23, 2013, were fully submitted:

| | |
|---|---|
| Filing No. 101: | Motion to Exclude Testimony of Gary Namie, Ph.D; |
| Filing No. 107: | Motion for Separate Trials; |
| Filing No. 112: | Motion in Limine (Defendant's); |
| Filing No. 114: | Motion in Limine to Bar Election of Remedy Affirmative Defense; |
| Filing No. 116: | Motion in Limine (Plaintiff's); |
| Filing No. 118: | Motion in Limine to Add Witness, I.E. Defendant's Expert Witness Dr. Ripa; |
| Filing No. 121: | Motion in Limine to Exclude BNSF/OSHA Accord; |
| Filing No. 125: | Motion in Limine for Supplemental Additional Authority for the Motion to Bar Election of Remedies Defense; |
| Filing No. 143: | Motion to Strike Plaintiff's Amended Expert Disclosures; and |
| Filing No. 144: | Motion to Strike BNSF's Exhibit A From BNSF's Brief in Opposition to Plaintiff's Motion to Bar BNSF Election of Remedy Affirmative Defense. |

The trial of this case was again continued on September 10, 2013 so the plaintiff could pursue additional medical treatment. The court entered an order setting a new pretrial conference and trial date, but except as to the testimony of Dr. Thomas Brooks as limited by the court's order, no other progression deadlines were extended. (Filing No. 151).

For the reasons discussed below: 1) the plaintiff's motion to strike the election of defendant's election of remedies defense will be denied; 2) the plaintiff's motion for

2

leave to add Dr. Ripa as plaintiff's expert will be granted; 3) the defendant's motion to exclude any reference to the BNSF/OSHA Accord will be granted; 4) the defendant's Daubert motion to exclude Dr. Namie's testimony will be granted; 5) the defendant's motion for separate trials will be granted in part as discussed below; 6) the plaintiff's motions in limine to bar defendant's claim for apportionment and to prohibit reference to prior injuries or medical conditions is denied; and 7) all other motions in limine are denied without prejudice to re-asserting at the pretrial conference.


## Table of Contents

INTRODUCTION ................................................................................................ 1

ANALYSIS ......................................................................................................... 4

    Election of Remedies Defense ........................................................................ 4

    Plaintiff's Use of Defendant's Expert Witness, Dr. Ripa ................................. 5

    Admissibility and Reference to the BNSF/OSHA Accord ............................. 8

    Testimony of Gary Namie, Ph.D. ................................................................. 11

        A.  Evidentiary Record ............................................................................ 11

            1.  Opinions outlined in Dr. Namie's expert report ............................... 11

            2.  Dr. Namie's testimony. ................................................................... 13

        B.  Admissibility under Rule 702 and Daubert. ...................................... 19

    Trial Motions ............................................................................................... 24

        A.  Apportionment ................................................................................... 25

        B.  Trial Trifurcation ............................................................................... 26

ANALYSIS

<u>Motion in Limine to Bar Election of Remedy Affirmative Defense;</u>
<u>Motion to File Supplemental Authority on Motion to Bar Election of Remedies Defense;</u>
<u>Motion to Strike BNSF's Exhibit A From BNSF's Opposition to Plaintiff's Motion</u>
(Filing No. 114; Filing No. 125; Filing No. 144)

The plaintiff has moved to bar the Railroad from asserting an election of remedies defense.  The motion is titled "motion in limine."  "A motion in limine is 'any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered.' "  Louzon v. Ford Motor Co., 718 F.3d 556, 561 (6th Cir. 2013) (quoting Luce v. United States, 469 U.S. 38, 40 n. 2 (1984)).  A motion in limine is used "to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions;" in contrast, a motion for summary judgment is a mechanism for resolving non-evidentiary matters prior to trial.  Louzon, 718 F.3d at 561.  Courts should not effectively convert a motion in limine into one for summary judgment:  Bypassing the procedural protections of Rule 12(b)(6) and Rule 56, and delaying a ruling on potentially dispositive issues until the eve of trial, may prejudice the non-moving party's ability to respond to the motion and develop or refine its trial strategy and preparation.  Louzon, 718 F.3d at 562 (collecting cases).

The plaintiff's motion to bar the election of remedies defense does not challenge the admissibility of evidence at trial.  Instead, it raises an issue of law that is properly decided by motion to dismiss or by motion for summary judgment.  See, e.g., Reed v. Norfolk Southern Ry. Co., 2013 WL 1791694, 2 (N.D. Ill. 2013) (considering the issue on summary judgment); Ratledge v. Norfolk Southern Ry. Co., 2013 WL 3872793, 4 (E.D.Tenn. 2013) (considering the issue on a Rule 12(b)(6) motion converted to a Rule 56 motion by the introduction of evidence).  The court's amended progression order entered on December 21, 2012 set a June 3, 2013 dispositive motion deadline.  (Filing No. 74).  That deadline was never extended by the court.

4

Pursuant to Rule 16(b)(4), a case management order setting progression deadlines "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The movant's level of diligence and the degree of prejudice to the parties are both factors to consider when assessing if good cause warrants extending a case management deadline, with the movant's diligence being the first consideration and the extent of prejudice to either party considered only following a requisite threshold finding of due diligence. Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 716-17 (8th Cir. 2008); Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 759 (8th Cir. 2006).

The plaintiff did not request an extension of the June 3, 2013 deadline for filing motions for summary judgment or motions to dismiss. He has provided no explanation for failing to timely file his motion for a judicial ruling barring the elections of remedies defense. Accordingly, Plaintiff's Motion in Limine to Bar Election of Remedy Affirmative Defense, (Filing No. 114), will be denied as untimely. Plaintiff's motion to submit additional authority, and his motion to strike the Railroad's evidence opposing the motion to bar the election of remedies defense, (Filing No. 125; Filing No. 144), will be denied as moot.

<u>Plaintiff's Motion in Limine to Add Defendant's Expert Witness, Dr. Ripa</u>
<u>Motion to Strike Plaintiff's Amended Expert Disclosures</u>
(Filing No. 118; Filing No. 143)

The Railroad designated Dr. Daniel Ripa as an expert witness on October 29, 2012, (Filing No. 118), but later decided not to use him as a trial expert. Now the plaintiff seeks to add Dr. Ripa as his expert witness, and the Railroad objects.

Dr. Ripa is not a treating physician, and did not examine the plaintiff at the Railroad's request. His opinions are based on a medical records review, and those

opinions were disclosed to the plaintiff as part of the defendant's expert disclosures in October of 2012. (Filing Nos. 129, 132-3).

Dr. Ripa was scheduled to be deposed for trial on December 7, 2012, (Filing Nos. 52 & 60), but those depositions were re-scheduled at defense counsel's request. Dr. Ripa's trial deposition was re-scheduled to be taken on June 21, 2013, (Filing No. 95), but it was cancelled by the defendant on June 19, 2013. On June 21, 2013, defense counsel advised plaintiff's counsel that the Railroad would not be calling Dr. Ripa to testify at trial. (Filing No. 118, ¶ 5). Although the deposition deadline was June 28, 2013, the plaintiff waited until July 19, 2013 to move to add Dr. Ripa to his witness list.

The Railroad opposes this supplemental designation, (Filing No. 129), arguing the disclosure is untimely and the plaintiff has failed to disclose the opinions Dr. Ripa will offer at trial. The defendant argues:

> Plaintiff knew about the cancellation of Dr. Ripa's deposition on June 19, 2013. . . . Plaintiff was aware that BNSF did not plan on calling Dr. Ripa at trial by June 21, 2013. . . . Plaintiff had one week before the June 28, 2013 deposition deadline to request an extension. Instead, plaintiff waited almost a month before bringing the issue to the attention of the Court with his present motion. Plaintiff was not diligent in attempting to meet the progression order's requirements.
>
> Plaintiff's failure to disclose Dr. Ripa as an expert witness is in violation of the Court's progression order and Fed. R. Civ. P. 26(a)(2). In his motion, plaintiff does not explain why he failed to previously identify Dr. Ripa as a witness. If plaintiff seeks to use Dr. Ripa to support his claims, then **he must separately disclose Dr. Ripa as an expert witness and include the subject matter on which Dr. Ripa is expected to testify** as required by Fed. R. Civ. P. 26. Since BNSF disclosed Dr. Ripa as an expert on October 29, 2012 (Filling No. 51), plaintiff has had every opportunity to identify and disclose Dr. Ripa as an expert witness.

(Filing No. 129, at CM/ECF p. 4) (emphasis in original).

6

The defendant does not cite, and the court has not located, any law stating that a party who wants to present the opinions of the adverse party's expert must separately disclose that expert or be barred from calling the witness at trial.  The purpose of the expert disclosure rule is to facilitate preparation for expert testimony.  "Disclosure of experts' identities, and their conclusions (reflected in their reports), is essential if lawyers . . . are to prepare intelligently for trial.  Disclosure also permits lawyers to ask for other experts' views on the soundness of the conclusions reached by the testimonial experts." S.E.C. v. Koenig, 557 F.3d 736, 744 (7th Cir. 2009).  Irrespective of which party discloses an expert report, once that disclosure is made, the purpose of requiring expert disclosures is met.  Requiring both parties to disclose the expert and the expert's report if both parties intend to offer that expert's testimony would sacrifice "just, speedy, and inexpensive" case progression in favor of redundancy.  See Fed. R. Civ. P. 1.

Once Dr. Ripa's identity and report were disclosed, he was available to be deposed and called at trial by either Bliss or BNSF.

> A witness identified as a testimonial expert is available to either side; such a person can't be transformed after the report has been disclosed, and a deposition conducted, to the status of a trial-preparation expert whose identity and views may be concealed. . . . Disclosure of the report ends the opportunity to invoke confidentiality.

S.E.C. v. Koenig, 557 F.3d 736, 744 (7th Cir. 2009)(holding the non-disclosing party need not even provide notice of its intent to call the opposing party's expert to testify at trial); Hartford Fire Insurance Company, Inc. v. Transgroup Express, Inc., 264 F.R.D. 382, 383 (N.D. Ill. 2009)(holding a party could not re-designate a testifying expert as a non-testifying after the expert's deposition was scheduled, but before it was conducted, and after the expert's reports were disclosed); House v. Combined Ins. Co. of America 168 F.R.D. 236 (N.D. Iowa 1996) (holding that once a party designates and discloses a

trial expert, even if that designation is withdrawn, the opposing party may depose the expert and call that expert at trial).

The plaintiff's motion to add Dr. Ripa as a testifying expert, (Filing No. 118), will be granted, and the defendant's motion to strike that designation, (Filing No. 143), will be denied.

Motion in Limine to Exclude BNSF/OSHA Accord
(Filing No. 121)

The Railroad moves for an order "excluding all evidence of, argument concerning, exhibits identifying, and reference to the January 11, 2013, BNSF/OSHA Accord Regarding BNSF Policies ("Accord") and its background, including the revision and elimination of BNSF's employment policies, and to order counsel to so instruct his witnesses." (Filing No. 121). If granted, the motion would prohibit Bliss from mentioning or introducing directly, or as the basis of expert testimony, a settlement agreement entered into between BNSF and OSHA, the "BNSF/OSHA Accord." (Filing No. 123-4). The plaintiff opposes the Railroad's motion, arguing his expert, Dr. Gary Namie, has relied on the settlement in formulating his opinion that the Railroad's injury reporting policies were retaliatory, and if the Railroad disputes that opinion, the Accord can be used for impeachment.

Bliss claims his employment was terminated because he sustained and reported a work-related injury, and that his termination violated the FRSA. According to the termination notice he received, the plaintiff was terminated pursuant to the Railroad's Policy for Employee Performance Accountability (PEPA) (effective March 1, 2011). (Filing No. 131-4). The PEPA is a progressive discipline policy which outlines several factors the Railroad may consider in determining whether an employee should be disciplined, to include dismissed, for violating the Railroad's rules. Under the PEPA,

both dishonesty and violating a work procedure designed to protect from injury can result in discipline up to and including the termination of Railroad employment.  (Filing No. 123-3, at CM/ECF pp. 5-6).

The plaintiff claims he was terminated for reporting a work-related injury; the Railroad claims Bliss was terminated for dishonesty.  If the jury believes Bliss, he may recover for unlawful retaliation in violation of the Federal Railroad Safety Act, 49 U.S.C. § 20109; if the jury believes the Railroad, Bliss's retaliation claim will be denied.

During the time period relevant to this case, the PEPA was used in conjunction with the Personal Performance Index ("PPI"), which assessed points for on-duty injuries, with the point total used to determine whether an Employee Review Process ("ERP") was warranted.  The PEPA, PPI and ERP programs came under scrutiny by OSHA.  OSHA is responsible for investigating employee complaints under the FRSA, including complaints that employees are retaliated against for reporting workplace injuries.

OSHA received and apparently agreed to pursue claims on behalf of 36 BNSF employees, not including the plaintiff, who asserted their rights under the anti-retaliation provisions of the FRSA were violated by the PEPA, PPI and ERP programs.  The Railroad ultimately settled the 36 claims, with the terms of the settlement documented in the "BNSF/OSHA Accord."  (Filing No. 123-4).  Under the terms of the Accord, the Railroad did not admit that the PEPA, PPI and ERP programs violated 49 U.S.C. § 20109.  The Accord states:

> It is understood and agreed that this Accord does not in any manner constitute an Admission of liability or wrongdoing on BNSF's part.  BNSF expressly denies any such liability or wrongdoing and enters into this Accord in compromise and voluntary resolution of disputed claims for the sole purpose of avoiding further litigation and expense.

(Filing No. 123-4, at CM/ECF p. 2).  The Accord further provides:

9

Except to the extent necessary to enforce the terms and provisions of this Accord as part of an enforcement action brought by OSHA, the parties agree that neither this Accord nor any part of it may be construed, used, or admitted into evidence in any judicial, administrative, or arbitral proceedings.

(Filing No. 123-4, at CM/ECF p. 2).

The Railroad claims the settlement of 36 employee claims, through OSHA, is irrelevant and unduly prejudicial, and admitting it or relying upon it as evidence in this case would violate the terms of the Accord and Rule 408 of the Federal Rules of Evidence.  The plaintiff argues that even if the Accord is not admissible to prove liability, is may be admissible for other reasons such as impeachment or the feasibility of precautionary measures.  (Filing No. 131).

Assuming the Railroad will deny that its PEPA, PPI, and ERP policies violated the FRSA, the Accord cannot be used to impeach that statement:  The Accord does not include any Railroad admission of wrongdoing.  An Accord for the settlement of 36 other claims is not relevant to this plaintiff's claims.   "Settlement terms are normally compromised positions taken by each party and in no way forecast the appropriate remedy for a case that has advanced to litigation."  U.S. v. Quality Built Const., 358 F.Supp.2d 487, 490 (E.D.N.C. 2005)(holding a consent decree settling FHA claims between the government and a similarly situated defendant was not relevant).  And even if relevant, the substantial prejudice of showing the jury that the Railroad settled 36 claims, the allegations of which may or may not be similar to the plaintiff's, would outweigh any probative value of presenting, mentioning, or discussing the Accord before the jury.

The language of the Accord itself includes a clause prohibiting its use in any trial. While Bliss was admittedly not a party to the Accord, violating its negotiated terms on a

lawsuit-by-lawsuit basis would certainly chill any incentive for employers to settle with government-represented OSHA claimants in the future.  The Accord is a settlement document and as such, is inadmissible under Rule 408.  U.S. v. Contra Costa County Water Dist., 678 F.2d 90, 91 (9th Cir. 1982)(affording additional importance to the fact that a third party's settlement agreement was at issue; preventing settlements from being admitted as evidence encourages full and open disclosure and the policy toward settlement); Quality Built Const., 358 F.Supp.2d at 490 ("[U]nder Fed. R. Evid. 408, evidence of offers of settlement is inadmissible, even those settlements between a party and a non-party.").

The Railroad's motion to prohibit the plaintiff from offering, mentioning, or using the BNSF/OSHA Accord for the purpose of presenting evidence and arguments to the jury in this case, (Filing No. 121), is granted.

<u>Motion to Exclude Testimony of Gary Namie, Ph.D.</u>
(Filing No. 101)

The defendant moves to exclude the testimony of Gary Namie, Ph.D., arguing his testimony will not assist the jury, is not reliable or based on scientifically reliable methodologies, and invades the province of the jury.

A.    Evidentiary Record.

1.    Opinions outlined in Dr. Namie's expert report.

Dr. Namie's report identifies the following expert opinions:

1.    [BNSF] terminated plaintiff Mr. Bliss on false grounds (either manufactured or distorted evidence) in order to retaliate against Mr. Bliss for reporting his work injury.  This appears to violate the FRSA 20109 (c) (2) Discipline section that clearly prohibits all of the actions taken by BNSF against Mr. Bliss.

11

2.  The defendant failed to have an appropriate review of the discipline charges brought against the plaintiff and the decision to terminate Mr. Bliss, including review by legal counsel and upper management so as not to infringe upon any employment rights of unionized worker Mr. Bliss. Instead, managers in the direct chain of command within Mr. Bliss's Havelock plant served as testifiers and adjudicators.

3.  The company failed to have an appropriate review of the discipline charges brought against the plaintiff and the decision to terminate, in that the charging and the disciplinary officer(s) who dismissed Mr. Bliss communicated with the claims department creating an environment that incentivized managers who retaliated against him.

4.  BNSF improperly allowed the claims/legal process and the managerial disciplinary review process to overlap, which incentivized retaliation actions by managers and supervisors, including Griesen and Roberts, to attempt to limit the wage loss claim associated with Mr. Bliss's injury.

5.  BNSF failed to have an appropriate review of the discipline charges brought against Mr. Bliss and the decision to terminate Mr. Bliss, in that the charging and disciplinary officer(s) who dismissed Mr. Bliss was the brother of the supervisor of Mr. Bliss on the date of injury. BNSF practiced biased nepotism.

6.  The company failed to have an appropriate review of the discipline charges brought against Mr. Bliss and the decision to terminate Mr. Bliss, in that the charging and disciplinary officer(s) who dismissed Mr. Bliss failed to have a medical assessment of their biased opinion of whether Mr. Bliss's activities on the surveillance video contradicted Mr. Bliss's note and the doctor's note regarding the pain and medicine disrupting and affecting his ability to think clearly and participate meaningfully in the investigation.

7.  BNSF incentivized retaliation actions by managers and supervisors, including Griesen and Roberts, by linking management performance review, including monetary bonuses and promotions, to the report of on the job injuries.

8.  BNSF incentivized retaliation actions by managers and supervisors by implementing a PEPA policy that encouraged rule violations charges and discipline against injured workers including Mr. Bliss in order to discourage the reporting of personal injuries.

9.  BNSF failed to implement its own anti-retaliation policy.

12

   10.   Supervisor Stauffer violated he FELA (45 USC 51 et seq.) Sec. 54 by attempting to shift the assumption of risk from BNSF, the common carrier, to the employee, Mr. Bliss.

(Filing No. 102-2, at CM/ECF pp. 14-15.

BNSF moves to exclude the foregoing opinions.  It argues that Dr. Namie is not qualified to offer the opinions he intends to offer, and his opinions are not the product of scientific, technical or other specialized knowledge that will assist the jury, are not based on scientifically valid principles, and are improper and inadmissible legal conclusions. (Filing No. 101).  The defendant has filed Dr. Namie's deposition as evidence in support of its motion.


   2.   Dr. Namie's testimony.


Dr. Namie has a doctorate in social psychology.  "Social psychology is the study of the influence of situational factors on human performance and in the broadest sense[, it] also includes group dynamics, organizational politics, organizational communication." (Filing No. 102-3, at CM/ECF pp. 19-20).


Dr. Namie has taught at the university level for 21 years.  (Filing No. 102-3, at CM/ECF pp. 6, 8).  He has provided consulting and training to businesses since 1985, and creates employer policies focused on alleviating or remedying psychological violence in the workplace.  (Filing No. 102-3, at CM/ECF pp. 6, 8, 19).  According to Dr. Namie, "the field of organizational dysfunction of negative destructive leadership," "the dark side of the world of work," is a "burgeoning field" which studies "abuse of supervision," "psychological violence at work," and  "emotional abuse."  (Filing No. 102-3, at CM/ECF p. 41).

Dr. Namie does not provide psychological counseling, and he does not perform psychological, neuropsychological or psychoeducational testing to measure, assess, or evaluate psychological issues in the workplace. (Filing No. 102-3, at CM/ECF p. 18). He has never been a consultant for a railroad, or any entity within the transportation industry. And prior to becoming involved in this case, had never performed a health or safety analysis on any entity in the railroad industry. (Filing No. 102-3, at CM/ECF pp. 21, 23, 32).

Before preparing his opinions, Dr. Namie spoke with the plaintiff for thirty minutes over the telephone, spoke with Plaintiff's counsel for four hours, and reviewed documents provided by Plaintiff's counsel. (Filing No. 102-3, at CM/ECF pp. 8-9). The documentation included copies of the FELA statutes, (45 U.S.C. §§ 51, 54, & 55) and FRSA 20109, (Filing No. 102-3, at CM/ECF p. 24); transcripts of depositions taken for this lawsuit, (Filing No. 102-3, at CM/ECF p. 30); emails exchanged between members of BNSF's management, (Filing No. 102-3, at CM/ECF p. 52), a copy of the OSHA Accord between OSHA and BNSF dated January 10, 2013, (Filing No. 102-3, at CM/ECF p. 52; Filing No. 102-4); two OSHA investigation reports for persons other than the plaintiff, (Filing No. 102-3, at CM/ECF p. 50); and the transcript of the plaintiff's disciplinary hearing, (Filing No. 102-3, at CM/ECF p. 55).

Dr. Namie knows nothing about the facts underlying the OSHA Accord other than those stated in the document itself. (Filing No. 102-3, at CM/ECF p. 53). He did not read, or even see, the PEPA, PPI or ERP source documents. (Filing No. 102-3, at CM/ECF pp. 31-32). He has not read the collective bargaining agreement that governs the plaintiff's work, and is not familiar with the formal investigation and grievance process described in the collective bargaining agreement. (Filing No. 102-3, at CM/ECF pp. 50, 58). He not seen or reviewed the OSHA investigation, interviews or statements for the plaintiff's incident. (Filing No. 102-3, at CM/ECF p. 86). With the exception of

14

his education and experience, and his 30-minute phone call with the plaintiff, all of the information Dr. Namie relied on was provided Plaintiff's counsel.  (Filing No. 102-3, at CM/ECF p. 43).

Dr. Namie states there is a "standard protocol for onsite evidence-based organizational improvement" used by social psychologists to analyze workplace dynamics.  (Filing No. 102-3, at CM/ECF p. 27).  Although it is an "unwritten" protocol; Dr. Namie claims professionals in his field agree on the steps and methodology.  (Filing No. 102-3, at CM/ECF pp. 28, 30).  But he did not perform the full protocol when evaluating Plaintiff's workplace at BNSF.  Instead, he applied a "truncated and remote" methodology he considers suitable for "legal case analysis."  (Filing No. 102-3, at CM/ECF p. 32).

The truncated version is an "incomplete task list for the methodology," (Filing No. 102-3, at CM/ECF p. 34), which is not published anywhere, (Filing No. 102-3, at CM/ECF p. 36), and has not been peer-reviewed.  (Filing No. 102-3, at CM/ECF p. 38). For example, although identified as a step within the full and accepted protocol, Dr. Namie performed no empirical assessment of the prevalence of any organizational problems at the Railroad.  (Filing No. 102-3, at CM/ECF p. 33).  He did not study the organizational behavior or safety culture of BNSF on either a system-wide level or as it exists at the Havelock Shops in Lincoln, Nebraska.  (Filing No. 102-3, at CM/ECF p. 31, 50-51).  Dr. Namie has never been in Lincoln, Nebraska or on Railroad property.  (Filing No. 102-3, at CM/ECF p. 42).  He spoke to no one at BNSF, (Filing No. 102-3, at CM/ECF p. 32), including any of Plaintiff's co-workers or supervisors, (Filing No. 102-3, at CM/ECF p. 43), relying instead on the transcripts of depositions taken by plaintiff's counsel.  (Filing No. 102-3, at CM/ECF p. 34).  Dr. Namie acknowledges that deposition transcripts do not reflect the whole story, and are not impartial, but argues his opinions

based on those transcripts are nonetheless reliable and valid because "he is doing the best he can" with information available.  (Filing No. 102-3, at CM/ECF p. 34, 40).

From the information reviewed, Dr. Namie decided the credibility of the deposed witnesses using "triangulation to determine truthfulness," which determines the truth by looking at the pattern of statements made, who made them, and how many people have said or observed a fact.  (Filing No. 102-3, at CM/ECF pp. 46-47).  "[W]hen veracity is dubious," he gives greater consideration to those "who have the least to gain from untruthfulness."  (Filing No. 102-3, at CM/ECF p. 48).  He acknowledges this credibility assessment "is just common sense."  (Filing No. 102-3, at CM/ECF p. 49).

After reviewing the information provided to him, and assessing the credibility of the deposed witnesses, Dr. Namie concluded that BNSF's Havelock location lacks "positive constructive leadership" which has "opened the door to missteps and misconduct."  (Filing No. 102-3, at CM/ECF p. 45).  He believes his testimony can assist the Court to understand that although railroading is a distinct and unique business, that "doesn't excuse them from misconduct or malice towards employees or disrespectful policies or practices."  (Filing No. 102-3, at CM/ECF p. 45).  He asserts that BNSF management engaged in collusion against the plaintiff, (Filing No. 102-3, at CM/ECF pp. 51-52), and "operated abusively at the strategic macro-organizational level."  (Filing No. 102-3, at CM/ECF p. 52).  Dr. Namie's deposition includes a lengthy explanation of why he believes, after reviewing the evidence, that Plaintiff is being truthful and the BNSF grievance proceedings were a "kangaroo court" designed to characterize the plaintiff's statements and conduct as dishonest with the goal of terminating his employment.  (Filing No. 102-3, at CM/ECF pp 53-58).  Although he never read or saw the program provisions, he believes the Railroad's PEPA, PPI, and ERP programs "had the effect of punishing employees who reported injuries."  (Filing No. 102-3, at CM/ECF p. 52).

16

Dr. Namie claims his opinions arise from the "science of justice" (which includes "procedural fairness"), and the "science of fear of retaliation."  (Filing No. 102-3, at CM/ECF pp. 59-61).  Applying the science of fear of retaliation, he explains that the deep concern with retaliation compels people to act in a manner that may be harmful to their own interests.  Dr. Namie claims his testimony will help jurors because they lack the knowledge or training to understand human, group, and organizational behavior.  (Filing No. 102-3, at CM/ECF p. 61).  He describes his role as educating the jury by explaining that people engage in behaviors which contradict a layperson's commonsense beliefs and are counter intuitive within an organization, but nonetheless "informed by science." (Filing No. 102-3, at CM/ECF p. 81).  Dr. Namie states his testimony will help the jury "triangulate on truthfulness," understand the "big picture," and see how a corporation's policies can destroy someone's career and livelihood.  (Filing No. 102-3, at CM/ECF p. 81).

After conducting his truncated and remote version of his profession's standard protocol for evaluating workplace dysfunction, Dr. Namie concluded:

- BNSF incentivized retaliation actions by managers and supervisors against employees when it implemented the PEPA policy; a policy Dr. Namie did not read.  His opinion is based, at least in part, on the language of the OSHA Accord. (Filing No. 102-3, at CM/ECF p. 84).

- BNSF failed to implement policies to prohibit retaliation for reporting employee injuries; which is based on his belief that Bliss was subject to retaliation, along with the "hundreds" of others underlying the OSHA Accord.  He has no knowledge of the "31-ish" cases actually underlying the Accord.  (Filing No. 102-3, at CM/ECF pp. 85-86).

- His opinions are valuable from a science-based perspective because the Court and jury need to understand that Bliss was reluctant to report his injury because he feared being ostracized by co-workers—a reaction which is supported by science; people weigh the risk of reporting against the risk of not reporting a real injury before making the report.  While the company "says they have a safety culture" which promotes injury reporting without the risk of retaliation, "at the very top

17

somewhere [it] crafted this [PEPA] policy" which serves to terminate, punish, and discipline the injured worker.  (Filing No. 102-3, at CM/ECF pp. 62, 64).

- Dr. Namie believes plaintiff's version of the events and not that of his supervisors and co-workers, explaining that after applying the principle of triangulation for truth, he finds "corporate management has the most to gain for being untruthful. You don't lie about debilitating pain at . . . your work. . . ."  (Filing No. 102-3, at CM/ECF p. 65), and based on research, "coworkers do not come to someone else's rescue in this situation lest they be the next one."  (Filing No. 102-3, at CM/ECF p. 65).

- BNSF created a "fear-fostering troika," (Filing No. 102-3, at CM/ECF p. 66); a fear of being terminated through unfair disciplinary proceedings.  But Dr. Namie knows nothing about the collective bargaining agreement and its provisions which governed the disciplinary charges and proceedings against Bliss, (Filing No. 102-3, at CM/ECF p. 68).

- BNSF failed to appropriately review the disciplinary charges and the decision to terminate Bliss' employment.  But Dr. Namie acknowledges he does not know whether the disciplinary decision was reviewed by upper management and the legal department.  (Filing No. 102-3, at CM/ECF pp. 70-71).

- The claims department created an environment that incentivized managers to retaliate against the plaintiff when it ordered surveillance of the plaintiff and shared that surveillance with those involved in the disciplinary proceeding against Bliss.  (Filing No. 102-3, at CM/ECF p. 72).

- BNSF managers have an incentive to retaliate against an injured employee because they are punished if employee injuries occur.  (Filing No. 102-3, at CM/ECF p. 73).

- BNSF has a systematic design to retaliate against employees with personal injuries; an opinion based on his review of three employee files and the OSHA Accord.  (Filing No. 102-3, at CM/ECF pp. 75-76).

- Those who presided over the disciplinary hearing should have accepted the opinion of Bliss' treating medical provider, and upon seeing the surveillance film, should have obtained another medical assessment before deciding Bliss was dishonest when making statements about his inability to attend previously scheduled disciplinary hearings.  However, during the hearing, Bliss admitted he did not attend for reasons other than his alleged injury.  (Filing No. 102-3, at CM/ECF pp. 78-79).

18

- Dr. Namie regularly serves as an expert witness in toxic work environment cases; those arising from a "psychologically unhealthy workplace" "characterized by abuse of supervision on coworkers" which causes "stress related health complications," and his opinions have never been excluded by a court.  (Filing No. 102-3, at CM/ECF pp. 89).  However, Dr. Namie's opinions were stricken or disregarded on Daubert grounds in Jonassen v. Port of Seattle,  2012 WL 3812016, 3 (2012).

      B.     Admissibility under Rule 702 and Daubert.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.   The court must assume a gatekeeping function to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Dow Pharmaceutical, 509 U.S. 579, 589 (1993).   To carry out this function, the court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)

> A witness can be qualified as an expert by "knowledge, skill, experience, training, or education," Fed.R.Evid. 702, and it is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case.  See Kumho Tire, 526 U.S. at 156, 119 S.Ct. 1167.  Once initial expert qualifications and usefulness to the jury are established, however, a district court must continue to perform its gatekeeping role by ensuring that

the actual testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable under Rule 702, Kumho Tire, and related precedents.

Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 715 (8th Cir. 2001).

Dr. Namie is unquestionably sufficiently educated to provide expert testimony. The real question is whether he is qualified, by virtue of his education and experience, to provide the opinions he intends to offer. Dr. Namie has provided consulting work for businesses, but he has never studied or reviewed the negotiated contracts and rules underlying the interaction between workers and management working for a railroad, including the collective bargaining agreements that govern work assignments, opportunities to perform specific job assignments, disciplinary proceedings, worker representation at those proceedings, pay and benefits. He has never reviewed information on these topics on either a national or a local level. He never even entered onto Railroad property, including the Havelock Shops, before formulating his conclusions.

Dr. Namie opines that the Railroad's PEPA, PPI, and ERP programs are evidence that the Railroad punishes employees who report work-related injuries, but has never read these documents, relying instead on the OSHA Accord. And as previously stated, that document cannot provide or be used to provide evidence of fault in any lawsuit.

Having no knowledge of the Railroad's contractual duties and rights under the collective bargaining agreement governing the plaintiff's employment, and no reliable and admissible basis for discussing the policies and rules he intends to attack, Dr. Namie is not qualified to offer any suggestions on how the Railroad should have managed the plaintiff's employment. His doctorate in organizational psychology does not automatically make him qualified to testify about the strengths, weaknesses, and alleged management foibles or abuses of every organization or workplace, and he has made no

20

real attempt to educate himself about the plaintiff's position at Burlington Northern.  As to the topics he intends to address in this case, Dr. Namie's testimony does not rest "on a reliable foundation . . . relevant to the task at hand."  Kumho Tire, 526 U.S. at 141.  See e.g., Wheeling Pittsburgh Steel Corp., 254 F.3d at 575 (reversing the trial court and holding an expert hydrologist in flood risk management who lacked education, employment, or practical experience in operating a river freight warehouse, and did not study the topic to better inform his opinions, could not testify as an expert on safe warehousing practices); Jaurequi v. Carter Mfg. Co., Inc., 173 F.3d 1076, 1084 (8th Cir. 1999) (holding engineer who had never attempted to construct, draw, or test the utility or compatibility of a safety device or the warnings for the current device on a combine could not testify that his proposed device was needed or that the current warnings were insufficient).

Many of Dr. Namie's opinions address which witnesses are credible, using "triangulation for truth" to decide who is lying about the underlying events and work environment.  He formed his opinions without personally speaking to any BNSF management employee, relying only on their depositions--which he admits tell only part of the story.  The above-captioned case will be tried to a jury.  That jury will be responsible for determining the credibility of the witnesses and the facts of the case.  As stated in proposed instruction 3.03 of the Eighth Circuit's Model Jury Instruction (Civil):

> In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe.  You may believe all of what a witness said, or only part of it, or none of it.
>
> You may consider a witness' intelligence; the opportunity the witness had to see or hear the things testified about; a witness' memory, knowledge, education, and experience; any reasons a witness might have for testifying a certain way; how a witness acted while testifying; whether a witness said something different at another time; whether a witness' testimony sounded reasonable; and whether or to what extent a witness' testimony is consistent with other evidence you believe.

Dr. Namie's opinion that BNSF terminated plaintiff Mr. Bliss on false grounds, and that it was biased during its review of the discipline charges brought against the plaintiff, pose "the very real danger that the proffered expert testimony could either confuse the jury or cause it to substitute [Dr. Namie's] credibility assessment for its own. U.S. v. Kime  99 F.3d 870, 884 (8th Cir. 1996) (relying on United States v. Dorsey, 45 F.3d 809, 815 (4th Cir. 1995) ("[E]xpert testimony can be properly excluded if it is introduced merely to cast doubt on the credibility of other eyewitnesses, since the evaluation of a witness' credibility is a determination usually within the jury's exclusive purview.").  Dr. Namie's credibility opinions invade the province of the jury and are inadmissible.

Even assuming Dr. Namie was qualified to render opinions on how a railroad location should be managed, his opinions are nonetheless not sufficiently based on scientific principles to be reliable, relevant, and admissible.  The opinion of a qualified expert witness is admissible if:  1) it is based on sufficient facts or data; 2) it is the product of reliable principles and methods; and 3) the expert has reliably applied the principles and methods to the facts of the case.   Kuhn v. Wyeth, Inc., 686 F.3d 618, 625 (8th Cir. 2012).  "When scientists, including social scientists, testify in court, they must bring the same intellectual rigor to the task that is required of them in other professional settings."  Wessmann v. Gittens, 160 F.3d 790, 805 (1st Cir. 1998).  "An expert witness can only deviate from accepted methods of scientific inquiry in ways that are consistent with the practices and usages of the scientific community."  Id.

Assuming, as Dr. Namie testifies, that there is an unwritten yet universally followed protocol for analyzing abusive tactics and management in the workplace, Dr. Namie did not follow that protocol in reaching the opinions he intends to offer.  Dr. Namie's only excuse for failing to follow the standard protocols was that a thorough

study would have required more information than he had available. That explanation does not render the testimony admissible.  Wessmann, 160 F.3d at 805.

Instead of using the standard protocol, Dr. Namie followed a "truncated and remote" version, which relies on conferring with the plaintiff and his counsel rather than all parties to the case, reading the testimony of the BNSF management received in response to the questioning of only the plaintiff's counsel, reviewing the files of three anecdotal cases (including the plaintiff's) of alleged workplace abuse, and reading the OSHA Accord and other documents selected by plaintiff's counsel for Dr. Namie's consideration.   This "truncated and remote" version of the protocol has not been published or peer reviewed and, upon first blush, is highly unlikely to withstand any serious assessment of scientific bias.  Reliance on anecdotal evidence, whether garnered from the complaints filed by three people or those referenced in the OSHA Accord is highly problematic.  Such reports, without any statistical evidence to provide context, do not "tend to show that a problem is pervasive;" a central theme of Dr. Namie's testimony which he uses to explain why Railroad employee injuries are not reported and why co-workers are reluctant to assist an injured employee by providing truthful testimony. Wessmann, 160 F.3d at 805.

Upon review of Dr. Namie's opinions and testimony, the court finds that in many respects, Dr. Namie's opinions represent his analysis of the evidence plaintiff's counsel disclosed to him, his determination of the respective witness' credibility, and his resulting conclusions on the ultimate issues of fact.  Such testimony does not assist, but rather invades the province of, the jury.  To the extent Dr. Namie's opinions are purportedly based on a sociological expert evaluation of the Havelock workplace and its impact on employee safety, injury reporting, witness testimony, and retaliation, his "truncated and remote" methodology—a shortcut he uses for formulating trial opinions—has never been deemed reliable or even reviewed within his profession.  In performing his analysis for

this litigation, Dr. Namie admittedly did not "employ[] . . . the same level of intellectual rigor that characterizes the practice of an expert" in his field.  Kumho Tire Co., 526 U.S. at 152.  "[T]here is simply too great an analytical gap" between the methodology and data he relied upon for creating his trial opinions and the accepted sociological processes for performing organizational and workplace evaluations.  General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  BNSF's motion to exclude Dr. Namie's opinions, (Filing No. 101), will be granted in its entirety.

<u>Trial Motions</u>

<u>Motion for Separate Trials</u>-(Filing No. 107)
<u>Motions in Limine</u>-(Filing Nos. 112 and 116)

The defendant has filed a motion for separate trials, (Filing No. 107), the defendant has filed a motion in limine with 45 numbered paragraphs, (Filing No. 112), and the plaintiff has filed a motion in limine with seven numbered paragraphs, (Filing No. 116).  These motions were filed when the start of trial was imminent.

In this memorandum and order, the court will rule on the Motion for Separate Trials; the plaintiff's motion in limine to prohibit the defendant from arguing that the plaintiff's back injury should be apportioned between the injury caused by the alleged negligence at issue in this case and any pre-existing conditions or post-accident events, and the plaintiff's motion in limine to prohibit the defendant from presenting evidence of plaintiff's pre-existing injuries, medical conditions, or settlements.  But as to all other motions in limine filed by either party, the court will deny the motions in limine without prejudice to re-filing them at prior to the pretrial conference.

A.    Apportionment.

The plaintiff claims the Railroad must be prohibited from presenting evidence or arguing the jury should apportion between Bliss' prior injuries and the injury at issue in this litigation.  The plaintiff claims that under Norfolk & Western. R.R. Co. v. Ayers, 538 U.S. 135, 141 (2003), BNSF is not entitled to an apportionment of damages between Railroad and non-Railroad causes of an injury.  The Railroad argues Ayers is inapplicable in that Ayers discussed apportioning between multiple parties responsible for a single injury (mesothelioma), while the issue in this case is apportioning between separate injuries:  the injuries caused by the events alleged in this lawsuit and those that were not.

The Railroad's position is correct.  Under the FELA, a plaintiff's is entitled to recover for only those injuries that were caused by the defendant's alleged negligence. Brooks v. Union Pacific R. Co., 620 F.3d 896, 899 (8th Cir 2010) (granting summary judgment for the railroad where the plaintiff offered no expert testimony that his back injury was caused by the railroad's alleged negligence).   Ayers does not prohibit the Railroad from presenting evidence that all or part of the injuries claimed by the plaintiff were not caused by the acts or omissions being litigated.   Villa v. Burlington Northern and Santa Fe Railway Co., 397 F.3d 1041, 1044 (8th Cir. 2005) (noting Ayers and holding the parties may argue and leave the jury to decide the extent of damages caused by the accident at issue and a post-injury stroke); Paul v. Missouri Pacific R. Co., 963 F.2d 1058, 1061 (8th Cir. 1992).    Provided it presents evidence to support apportionment between Bliss' pre-existing injuries and those caused by the Railroad's alleged negligence, the Railroad remains entitled to make that argument.   Rust v. Burlington Northern and Santa Fe Ry. Co., 308 F.Supp.2d 1230, 1231 (D. Colo. 2003)(relying on Sauer v. Burlington Northern Railroad Co., 106 F.3d 1490 (10th Cir. 1996)).

As to that evidence, the plaintiff claims the Railroad should be prohibited from referring to medical conditions, prior injuries and/or prior settlements with the Railroad that are unrelated to his spine.  The Railroad argues that plaintiff's prior conditions, injuries, and settlements are relevant if they contributed in any way to his current functional limitations.

The court agrees that conditions and injuries to other parts of the plaintiff's body may be relevant when considering the damages attributable to the negligence at issue in this case, but is not convinced that evidence of prior settlements received for those injuries or conditions is relevant for that purpose.  The court also agrees that if the Bliss argues he was retaliated against for submitting prior injury claims, the Railroad is entitled to present evidence of those prior claims and how they were resolved.

Accordingly, the Railroad will not be prohibited, in limine, from arguing or introducing evidence to support a claim for apportioning damages to pre-existing conditions, from introducing evidence of injuries or conditions (spinal or otherwise) that may support that apportionment argument, and from introducing evidence of plaintiff's prior work-related injury claims and settlements if that evidence is responsive to plaintiff's claim of retaliation for reporting a work-related injury.

B.     Trial Trifurcation.

The defendant has moved for an Order granting BNSF separate trials on the separate liability claims: specifically the FRSA claim first, then the FELA claim second, followed by a separate trial on the issues of damages, including compensatory and punitive damages.  (Filing No. 107).  The Railroad claims this trial trifurcation will be

convenient, avoid prejudice, and promote the expeditious and efficient determination of the parties' dispute.   (Filing No. 108).

Under Rule 42(b) of the Federal Rules, the court, "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross claim, counterclaim, or third party claim, or of any separate issue . . . ." F.R.C.P 42(b).  A party seeking severance has the burden of proving that separate trials will (1) promote convenience, (2) expedite the proceedings, or (3) avoid unfair prejudice to a party.  To decide whether bifurcation of a trial is appropriate, the court must evaluate the parties' claims and defenses.  Koch Fuels, Inc. v. Cargo of 13,000 Barrels of No. 2 Oil,  704 F.2d 1038, 1042 (8th Cir. 1983).  The trial court has considerable discretion in deciding the most efficient and effective method of disposing of the issues in a case, so long as a party is not prejudiced.  Rolscreen Co. v. Pella Products of St. Louis, Inc., 64 F.3d 1202, 1209 (8th Cir. 1995).

Based on the evidence presented, the plaintiff alleges that on February 2, 2011, he sustained a back injury while using a heavy hydraulic ram.  In the FELA claim, the plaintiff alleges his injury resulted, in whole or in part, from the Railroad's negligence; the Railroad claims the injury was caused, in whole or in part, by the plaintiff's negligence, including his violation of Railroad safety rules.  See Norfolk Southern Ry. Co. v. Sorrell, 127 S. Ct. 799 (2007) (holding a single standard of causation applies when assessing both the negligence of a railway company and the contributory negligence of a railroad employee in a cause of action under the FELA).

Following the accident, the Railroad initiated a formal investigation under Bliss' Collective Bargaining Agreement, charging Bliss with violating the Railroad's safety rules, including failing to follow instructions and failing to use proper lifting mechanics. The investigation was originally scheduled for February 23, 2011, but Bliss requested and

received several continuances due to his ongoing back problems, the fifth postponement occurring on July 18, 2011.  The investigation hearing was eventually held on August 17, 2011, and discipline was imposed on August 31, 2011 for violating Railroad safety rules.

The Railroad's claims department, which manages Bliss' FELA work-related injury claim, apparently suspected Bliss was exaggerating his injury and contracted to obtain surveillance of Bliss.  A video recording was made on July 16, 2011.  The recording was later provided to managers at the Havelock Shop who, upon review of the recording, questioned why Bliss stated he could not attend the investigation on July 18, 2011.  A second formal investigation was scheduled for October 24, 2011 to determine whether Bliss was dishonest when he requested the July 18, 2011 postponement.  As a result of that hearing, Bliss was terminated for alleged dishonesty; an offense listed as warranting immediate dismissal under the PEPA. The plaintiff claims the investigation hearings and his dismissal were in retaliation for reporting a work-related injury in violation of the FRSA.

If the defendant is found liable under the FELA, the plaintiff can recover compensatory damages, but not punitive damages.  If the defendant is found liable under the FRSA, the Railroad can be liable for both compensatory and punitive damages.  If the defendant is found liable under the FELA, but not under the FRSA, the jury's assessment of FELA compensatory damages, particularly in for lost wages and future earning capacity may be impacted.  If the Railroad is found liable under the FELA and the FRSA, the defendant may be liable for compensatory damages, but particularly in the area of lost wages and future earning capacity, the damage recovery could easily overlap.  And if all liability and damage issues are tried together, the jury will hear evidence on the amount of punitive damages to award before it collectively decides if the Railroad is liable under either the FRSA or the FELA.

Having considered the issues and the anticipated evidence and witnesses for the FELA and FRSA trials, (See Filing No. 152-1 (parties' proposed Final Pretrial Conference Order)), the court finds there is overlap on the liability and compensatory damages issues such that trying the FELA and FRSA cases separately will delay the resolution of the parties' dispute, require witnesses to testify more than once, and possibly confuse the jury.  For example, the surveillance video recording and the reason it was requested may be relevant on the issue of damages in the FELA case, and is relevant on the issue of liability in the FRSA case.  Witnesses discussing the safety rules at issue, and whether the plaintiff was aware of and followed these rules, will testify in both the FELA and FRSA cases on liability issues.  And the extent of plaintiff's back injury—particularly during the summer of 2011—is relevant to the issue of damages in the FELA case and liability in the FRSA case.   Accordingly, the court finds that as to liability and damages, other than punitive damages, the FRSA and FELA claims will be tried together.

However, the court finds the issue of punitive damages should be tried separately. "The decision of whether to isolate the punitive damages phase of the trial is within the sound discretion of the trial court."  Thorne v. Welk Inv., Inc., 197 F.3d 1205, 1214 (8th Cir. 1999).

The vast majority of the evidence in this case will be focused plaintiff's accident and the nature and extent of his injuries—the FELA case.  Any recovery under the FELA is limited to pecuniary losses; that is, punitive damages cannot be recovered.  Miles v. Apex Marine Corp., 498 U.S. 19 (1990).  Therefore, by allowing the punitive damages issue to be tried with the FELA case, the court will open the door to areas of evidence and argument that are not relevant to the claim that will predominate the trial time.  If, in the first trial phase, the jury finds the Railroad violated the FRSA, the same jury will be re-convened to consider the issue of punitive damages.  But evidence presentations and argument on the punitive damages issue will be unnecessary if the Railroad prevails on

the FRSA claim.  Laboratory Skin Care, Inc. v. Limited Brands, Inc., 757 F.Supp.2d 431, 442 (D. Del. 2010)("Judicial resources may be conserved through bifurcation, as liability may not be found.").  Therefore, postponing that trial phase may result in a shorter trial.  Any additional evidence on the punitive damages issue will likely require few, if any, witnesses to testify in both the first trial and the punitive damages trial and, at most, bifurcation will extend the trial by two days.  So issues of inconvenience and extended trial time are not substantial concerns weighing against bifurcation.  But the risk of prejudice is significant and, with no substantial countervailing convenience or time to be gained by trying all issues together, accepting the risk of prejudice is unnecessary.  In addition, by separating the punitive damage phase from the liability and compensatory damage phase, counsel may now have a far clearer understanding of what can and cannot be argued at the first trial.  Bowen v. W.R. Grace & Co.--Conn., 781 F.Supp. 682, 683 (D. Mont. 1991) (holding "evidence relating solely to the punitive damages issue may not be introduced or mentioned during the liability portion of the trial.").

The potential for undue prejudice may not arise in every case where FELA and FRSA claims are alleged in the same lawsuit.  But having reviewed the parties' arguments and evidence in all the foregoing motions, including the plaintiff's arguments for punitive damages as outlined within his brief,[2] the court concludes that in this case, the punitive damages issue will be tried if, and after, the jury finds the Railroad liable under the FRSA.  Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 374 (2d Cir. 1988) (holding "it would be prejudicial to a defendant to attempt to litigate its financial

---

[2] The brief states:

Defendant, a publicly traded, multi-billion dollar, massive, national scope corporation, is currently waging a national television advertising campaign, in which it touts itself as the "engine that connects us", implicitly asserting that the nation's economy and people are bound together by the Railroad's beneficial activities.  Indeed, BNSF is one of the key sponsors of the "PBS News hour with Jim Lehrer".  Prominently featured in each of its ads are numerous pictures of the dedicated employees who help that "engine" run. Yet, when push comes to shove, Defendant puts its own profit and convenience far above the needs, health and safety of its loyal employees.  (Filing No. 130, at CM/ECF pp. 7-8).

condition during the trial on the issues of liability and compensatory damages," therefore the "preferred method" is to delay the punitive damages claim until the issues of liability and compensatory damages have been tried).  See also Robert Bosch, LLC v. Pylon Mfg. Corp., 719 F.3d 1305, 1319-1320 (D.C. Cir. 2013) ("district courts, in their discretion, may bifurcate willfulness and damages issues from liability issues in any given case"); Mattison v. Dallas Carrier Corp., 947 F.2d 95, 110 (4th Cir. 1991) ("[W]hen it is determined that the evidence relevant to the appropriate amount of punitive damages will be prejudicial to the jury's consideration of liability or compensatory damages, bifurcation of the trial under Fed.R.Civ.P. 42(b) remains an available solution."); Emerick v. U.S. Suzuki Motor Corp., 750 F.2d 19 (3d Cir. 1984) (affirming district court's decision that plaintiffs were not entitled to submit issue of punitive damages to jury until they first established liability for compensatory damages).  See also John P. Rowley III; Richard G. Moore, Bifurcation of Civil Trials, 45 U. Rich. L. Rev. 1, 12 (November 2010) (explaining the state court trend toward requiring the bifurcation of punitive damages claims).

For the reasons discussed above, the court will deny the Railroad's motion to separate the trial into the following three phases:  FRSA liability, FELA liability; and damages.  The court will, however, separate the punitive damages issue for a separate, second phase, trial to be held only if the jury's verdict in the first phase imposes FRSA liability on the Railroad.

Accordingly,

IT IS ORDERED:

1)    Defendant's motion to exclude the opinions of Dr. Gary Namie, Ph.D., (Filing No. 101), is granted.

2)    Defendant's motion for separate trials, (Filing No. 107), in granted in part. As to the liability and compensatory damages issues, the FELA and FRSA claims will be tried together, but the punitive damages issue will be tried separately and only if and after the jury finds the Railroad liable under the FRSA.

3)    Defendant's motions is limine, (Filing No. 112), are denied without prejudice to timely re-filing those motions seven (7) days prior to the pretrial conference.

4)    Plaintiff's Motion in Limine to Bar Election of Remedy Affirmative Defense, (Filing No. 114), is denied.

5)    As to Plaintiff's motions in limine, (Filing No. 116):

        a.    Plaintiff motion to prohibit the defendant from arguing that the plaintiff's back injury should be apportioned between the injury caused by the alleged negligence at issue herein and any pre-existing conditions or post-accident events is denied.

        b.    Plaintiff's motion to prohibit the defendant from presenting evidence of plaintiff's pre-existing injuries or medical conditions is denied.

        c.    In all other respects, Plaintiff's motions in limine are denied without prejudice to timely re-filing those motions seven (7) days prior to the pretrial conference.

6)    Plaintiff's motion to add Dr. Ripa as a testifying expert, (Filing No. 118), is granted.

7)    Defendant's motion to prohibit the plaintiff from offering, mentioning, or using the BNSF/OSHA Accord at trial, (Filing No. 121), is granted.

8)    Plaintiff's motion to submit additional authority, (Filing No. 125) is denied as moot.

9)    Defendant's motion to strike plaintiff's designation of Dr. Ripa as an expert witness, (Filing No. 143), is denied.

10)    Plaintiff's motion to strike the Railroad's evidence opposing the motion to bar the election of remedies defense, Filing No. 144), is denied.

11)    The pretrial conference previously scheduled to be held by WebEx conferencing is re-scheduled, and will be held on the record in the Courtroom 2, Federal Building, Lincoln, Nebraska on February 25, 2014 at **2:00 p.m**.  Two hours are set aside for the conference.

October 9, 2013.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.