IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

DAVID BLISS,

                    Plaintiff,                              **4:12CV3019**

          vs.

BNSF RAILWAY COMPANY,                                      **ORDER**

                    Defendant.


          IT IS ORDERED that the defendant's deposition objections, (Filing No. 190), are granted in part and denied in part as set forth in the attached transcripts.


          May 16, 2014.


                                        BY THE COURT:

                                        _s/ Cheryl R. Zwart_
                                        United States Magistrate Judge

DEPOSITION OF


DR. DANIEL RIPA



NCRA
ETHICS FIRST

Condensed Transcript and Concordance
Prepared By:

**LORI McGOWAN, RDR, CCR, CRR**
*Certified Realtime Reporter*


*LATIMER REPORTING*
*latimer-reporting.com*
*528 S. 13th St., Suite 1*
*Lincoln, NE 68508*

**Phone: (402) 476-1153**
*(877) 567-5669*
*Fax: (402) 476-3853*

1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF NEBRASKA
 3
 4    DAVID BLISS,              )
 5              Plaintiff,      )CASE NO. 4:12CV-3019
 6         vs.                  )DEPOSITION TAKEN IN
 7    BNSF RAILWAY COMPANY,     )BEHALF OF PLAINTIFF
 8              Defendant.      )
 9
10
11
12    DEPOSITION OF:  DR. DANIEL R. RIPA
13    DATE:  February 24, 2014
14    TIME:  7:01 a.m.
15    PLACE:  575 South 70th Street, Suite 200,
16    Lincoln, Nebraska
17
18
19
20
21
22
23
24
25
```

3

```
 1                      I-N-D-E-X
 2    WITNESS        Direct  Cross  Redirect  Recross
 3    DR. DANIEL RIPA  4      13      --        --
 4
 5    EXHIBITS                      Marked  Offered
 6    78C  10-4-12 Opinion Letter to
      Luers from Ripa                 4      --
 7
 8    78D  Curriculum Vitae           4      --
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2

```
 1              A P P E A R A N C E S:
 2    APPEARING FOR THE PLAINTIFF:
      (Appearing Telephonically)
 3
 4         Mr. William J. McMahon
           Attorney at Law
 5         542 South Dearborn
           Suite 200
 6         Chicago, IL 60605
           wmcmahon@hoeyfarina.com
 7
      APPEARING FOR THE DEFENDANT:
 8
           Mr. Thomas C. Sattler
 9         Attorney at Law
           701 P Street
10         Suite 301
           Lincoln, NE 68508
11         tcs@sattlerbogen.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

1     S-T-I-P-U-L-A-T-I-O-N-S

2     It is hereby stipulated and agreed by and

3  between the parties that:

4     Notice of taking said deposition is

5  waived; notice of delivery of said deposition

6  is waived.

7     Presence of the witness during the

8  transcription of the stenotype notes is waived.

9     Taken pursuant to the Federal Rules of

10 Civil Procedure.

11        (Exhibit Nos. 78C and 78D

12        marked for identification.)

13        DR. DANIEL R. RIPA,

14 Of lawful age, being first duly cautioned and

15 solemnly sworn as hereinafter certified, was

16   examined and testified as follows:

17        DIRECT EXAMINATION

18 BY MR. McMAHON:

19 Q.     Doctor, could you please state your name

20 for the jury.

21 A.     Daniel Ray Ripa.

22 Q.     And what's your profession or

23 occupation?

24 A.     I'm an orthopedic surgeon, a physician,

25 orthopedic surgeon.

Dr. De Rosa

**5**

1    Q.       And showing you what's been marked as
2    78D, exhibit, is this a true and accurate copy
3    of your curriculum vitae?
4    A.       It is, correct.
5    Q.       Would you tell the jury a little bit
6    about your educational background and training
7    to be an orthopedic surgeon?
8    A.       Well, I went to the University of
9    Nebraska Medical Center for my medical
10   doctorate degree.
11          And then did a flexible internship and
12   residency at Scott & White Memorial Hospital in
13   Temple, Texas.
14          And after that, did a one-year spine
15   fellowship that was split between New Orleans
16   and Chicago, the latter part at Northwestern in
17   Chicago on the regional spinal cord injury
18   unit.
19   Q.       And are you in private practice?
20   A.       Correct.
21   Q.       And could you give the jury an idea
22   about the nature of your practice, what type of
23   conditions you treat, how many surgeries or
24   patients you treat on a weekly or monthly
25   basis, that type of thing?

**6**

1    A.       Well, we're -- or I am a member of a 12-
2    or 13-man orthopedic group.  And we see
3    patients all week long and do surgery all week
4    long, a mixture of about half clinic, half
5    surgery.
6          And I treat a variety of neck and low
7    back disorders, scoliosis, fractures of the
8    spine.
9          I also do a fair amount of work in
10   artificial joint replacement.
11   Q.       Okay.  And do you regularly attend
12   medical conferences or continuing medical
13   education to keep up on the issues in your
14   field?
15   A.       I do.
16   Q.       Okay.  And are you published anywhere
17   that we may have heard of in terms of articles
18   or that type of peer-review journals?
19   A.       Not for a long time.  Did some back in
20   the fellowship period.  But not since then.
21   Q.       All right.  Doctor, at BNSF's request,
22   did you perform a medical records review for
23   this case, for Mr. Bliss?
24   A.       That is correct.
25   Q.       All right.  And do you recall what

**7**

1    materials that you reviewed in helping to
2    formulate your opinions and conclusions in this
3    matter?
4    A.       Well, I looked at several MRI scans, a
5    variety of medical records, some therapy notes,
6    some evaluations that the patient had had for
7    their fitness for work and those sorts of
8    things.
9    Q.       All right.  And were these medical
10   records -- they also predated the February
11   incident that centraled this case; correct?
12   A.       Yes.  Some portions of them did.
13   Q.       Okay.  And are these the type of
14   materials, documents that you and other
15   orthopedic surgeons typically rely upon to
16   assist them in formulating their opinions and
17   conclusions as to a person's current medical
18   condition?
19   A.       Yes.
20   Q.       And did you rely upon this information
21   as well as your background and training as an
22   orthopedic surgeon in formulating your own
23   opinions and conclusions in this matter?
24   A.       Yes.
25   Q.       All right.  And if we look at Exhibit

**8**

1    78C.
2    A.       I have it.
3    Q.       Okay.  There's listed here, I believe,
4    seven numbered paragraphs.  Do you see what I'm
5    referring to?
6    A.       Yes.
7    Q.       All right.  Are those the opinions and
8    conclusions that you reached in this matter as
9    far as relates to Mr. Bliss?
10   A.       Yes.
11   Q.       All right.  And if we could, let's just
12   go one by one through them.  And we'll identify
13   them.  And if you could, just explain the basis
14   for those opinions.  All right?
15   A.       Okay.
16   Q.       All right.  So No. 1, could you read it,
17   please?
18   A.       These are responses to the attorney that
19   I believe represented the railroad previously.
20          The first response, I put, "Dr. Noble's
21   release for Mr. Bliss to return to work without
22   restrictions as per the request of Mr. Bliss in
23   July 2010 was too liberal for someone with
24   Mr. Bliss' degenerative spine condition."
25   Q.       Okay.  What's the basis for that

Dr. De Ripa

BNSF objects to the testimony as hearsay without an exception and as not relevant. Fed. R. Evid. 402, 403, 801, and 802.

Ruling:
Overruled

**9**

1  opinion, Doctor?

2  A.    Well, the patient did have some fairly

3  significant abnormalities chronically in his

4  low back.  And in general, we would tend to

5  imply or put upon the patient at least some

6  degree of general restriction against excessive

7  lifting or activities that might be considered

8  likely to cause some degree of difficulty with

9  his back in the future.

10  Q.    Okay.  Do you have any idea what those

11  types of restrictions would be?

12  A.    Well, our more generic restriction for

13  someone with a low back condition is to try and

14  avoid lifting in excess of 50 pounds at any

15  time and, also, to keep repetitive lifting at

16  or below about 25 pounds.

17        Other restrictions might be a bit more

18  specific to the particular work activities.

19  Q.    Okay.  Were you asked to look at the

20  particular work activities in this case or no?

21  A.    Well, I don't recall a specific -- and I

22  stand corrected.

23        I don't recall a specific delineation of

24  the work activities in this person's

25  employment.

**10**

1  Q.    Okay.  And then moving on to No. 2, I

2  guess it's pretty self-explanatory, but just

3  briefly go over the basis for opinion No. 2.

4  A.    Well, this opinion was, "Mr. Bliss was

5  clearly suffering from degenerative disk

6  disease, particularly at the L3 slash 4, L4

7  slash 5 and L5 slash S1 levels prior to

8  February 3rd, 2011."

9  Q.    And the basis for that, was that just

10  the prior medical records and the diagnostic

11  films that you reviewed?

12  A.    Correct.  Specifically the MRI scan.

13  Q.    Okay.  And No. 3, could you read that

14  and explain the basis for your opinion there?

15  A.    This response was, "The change in

16  Mr. Bliss' back condition between the MRI of

17  April 27th, 2010, and March 18th, 2011, showed

18  an increase in degenerative facet joints,

19  foraminal narrowing and increased degenerative

20  bone marrow at L4 slash 5 and L5 slash S1."

21  Q.    Okay.  What -- what -- what does that

22  mean, and what's the basis for that opinion,

23  sir?

24  A.    Well, the basis for that opinion is

25  looking at the two MRIs.  One was prior to the

**11**

1  incident in question.  The other was shortly

2  after it.

3        And basically the MRI scan showed an

4  increase in these degenerative changes rather

5  than any clearcut evidence of an acute, sudden

6  abnormality such as a broken bone or ruptured

7  disk or something of that nature.

8  Q.    Okay.  And then No. 4?

9  A.    No. 4, "The changes noted in the above

10  response, paragraph No. 3, could be the result

11  of the natural progression of a degenerative

12  spinal condition."

13  Q.    All right.  Could the changes that

14  appear in No. 3, could it be in part due to the

15  February 3rd, 2009, incident?

16  A.    Well, I would have to say that I did not

17  see any sudden abnormality such as a ruptured

18  disk, compression fracture or hyperintense zone

19  in the spine that would indicate that there was

20  some, you know, acute traumatic change.

21  Q.    Okay.

22  A.    So I would say that's less likely.

23  Q.    Okay.  And then No. 5?

24  A.    "The Functional Capacity Evaluation of

25  June 30th, 2011, appeared to be a valid

**12**

1  Functional Capacity Evaluation so as to reflect

2  Mr. Bliss' physical capabilities as of that

3  date."

4  Q.    All right.  And then No. 6?

5  A.    No. 6, I responded, "Because of multiple

6  back surgeries and continued natural

7  progression of his degenerative spine condition

8  and past history of knee and shoulder joint

9  degeneration and surgery, it would be

10  reasonable to restrict Mr. Bliss currently to

11  lifting no more than 20 pounds and on

12  occasion -- and only occasional bending,

13  stooping and crawling."

14  Q.    Okay.  And what's the basis for that

15  opinion?

16  A.    Well, that was basically looking at the

17  Functional Capacity Evaluation and the

18  reflection of his physical abilities and

19  basically endorsing that those recommendations

20  were reasonable, based upon the medical record.

21  Q.    Okay.  And lastly, Doctor, No. 7 there.

22  A.    I answered, "From a review of Mr. Bliss'

23  medical history, MRIs and degenerative

24  condition, it was likely that Mr. Bliss --

25  excuse me, Mr. Bliss' back would have continued

13

1  to degenerate after 2004, regardless of his
2  work environment."
3  Q.      All right.  And the basis for that
4  opinion is what, sir?
5  A.      Well, the natural progression of
6  degenerative disk disease creates the
7  appearance of the MRI scan that we saw.  And
8  essentially no matter what you're doing, that
9  type of change in the spine does continue to
10 occur over time.
11 Q.      All right.  And do you hold these
12 opinions to a reasonable degree of orthopedic
13 surgery, Doctor?
14 A.      I -- reasonable degree of medical
15 certainty, yes.
16 Q.      Yes.  Okay.
17         MR. McMAHON:  Thank you, Doctor,
18 that's all I have.
19         CROSS-EXAMINATION
20 BY MR. SATTLER:
21 Q.      Dr. Noble --
22 A.      Dr. Ripa.
23 Q.      I'm sorry.  Dr. Ripa.  I'm sorry.  With
24 respect to the -- some of the medical records
25 that you had available to you, that would have

14

1  included an exhibit that had been marked
2  previously as Exhibit No. 58, which is this
3  statement of job awareness and general duties
4  of a carman.  This was dated and signed by
5  Dr. Noble back in August of 2010.  You would
6  have had that available to you, would you not?
7  A.      Yes.  I believe looking now, that that
8  was included in Dr. Noble's records rather than
9  a specific entry in the files that I have.
10 Q.      Right.  And this would have covered
11 basic activities, anticipated or expected, as
12 general job duties of a carman?
13 A.      Yes.
14 Q.      Now, with respect to this broad category
15 of degenerative disk disease, could you explain
16 to the ladies and gentlemen of the jury what
17 degenerative disk disease is?
18         There's been terms thrown around, like,
19 spondylolisthesis, lumbar spondylosis and then
20 this disk degeneration.  Could you explain what
21 these diseases are?
22 A.      Well, certainly.  Our natural tendency
23 to age takes its toll on our spine.  Generally
24 most everyone is subject to losing moisture in
25 their disk spaces.  The disk spaces are the

15

1  cushions between the vertebrae.
2          As this material loses moisture,
3  it becomes less elastic, less resilient to
4  resisting shock.  And our spine tends to settle
5  somewhat.  So that's why we naturally get a
6  little shorter as we get older.
7          A degenerative disk does not have as
8  good a support between the vertebrae, so it
9  places more load or demand upon the little
10 joints in the back of the spine.
11         And as these joints absorb more load and
12 the cartilages ages in the joints, then those
13 joints wear out.
14         So the term spondylosis, which is sort
15 of a medical term for degenerative change or
16 wear and tear change in the spine, that is a
17 fairly accurate descriptor of what we saw on
18 the MRI scans of the patient.
19         Disk degeneration, another way of
20 describing it, some people will call it
21 osteoarthritis of the spine, which is fairly
22 accurate.
23         You mentioned a word spondylolisthesis.
24 Spondylolisthesis is a term where one vertebra
25 shifts slightly forward on the other.  That is

16

1  a situation where if the disk is degenerated
2  and the facet joints wear out, then there may
3  be some subtle shifting in the spine where
4  either the vertebra goes forward or to the
5  side.
6          And that is a term that was, I believe,
7  mentioned once regarding the spine in this
8  patient between lumbar 4 and lumbar 5.
9  Q.      With respect to the imaging studies that
10 were made available to you during your review,
11 you had the benefit of seeing MRIs dating back
12 to as early as 2002 and then moving up through
13 and past the time of the February 2011
14 timeframe; isn't that correct?
15 A.      That is correct.
16 Q.      So you would have had an opportunity to
17 see the changes that would have occurred as a
18 result of this disease process that you've
19 described?
20 A.      That is correct.
21 Q.      There is reference in the various MRI
22 studies to facet hypertrophy.  Can you explain
23 to the ladies and gentlemen of the jury what
24 the facets are and what that's really

17

1   A.      The facet joints are the little
2   connectors between each vertebra.  So there is
3   a left and a right joint that connects one
4   vertebra to the other.
5           These are small little joints.  They
6   overlap each other, about the size of a
7   fingernail.  And as these joints wear out, the
8   cartilage space decreases or thins.  And then
9   the patient's joints start to enlarge or
10  thicken.
11          The most -- the most easily understood
12  example is someone's knuckles.  If you have a
13  grandmother that has a lot of arthritis in her
14  hands, you'll see that her knuckles have
15  enlarged.  And that's the same thing that's
16  occurring in the spine.  We just can't see it
17  underneath the muscles.
18          The spinal joints enlarge and thicken
19  and get irregular.  And sometimes as those
20  joints enlarge, then they pinch the nerve or
21  narrow the openings for the nerves.
22  Q.      And this facet joint deterioration,
23  based upon the MRI studies that you were able
24  to view, showed this degenerative process over
25  time?

18

18:2 --19:1
BNSF objects
to the
testimony as
not relevant.
Fed. R. Evid.
402 and 403.
**Ruling:**
**Overruled**

1   A.      That is correct.
2   Q.      Doctor, you were asked some questions by
3   counsel for plaintiff related to what type of
4   generic restrictions that you would apply in
5   this discussion of this first opinion related
6   to Dr. Noble's release to return to work
7   without restrictions.
8           I wanted to ask you, you're familiar
9   with -- generally with the process of how
10  employers obtain return to work restrictions
11  from treating physicians?  This is something
12  that's common in your practice; is that true?
13  A.      That is correct.
14  Q.      When you say that the return to work
15  without restrictions by Dr. Noble was too
16  liberal, do you believe that it was reasonable
17  and prudent for an employer in BNSF's position
18  to reasonably rely upon work restrictions
19  established by a treating physician?
20  A.      Yes, I do.
21  Q.      In this case, do you believe that it was
22  reasonable and prudent for the BNSF Railway
23  Company to rely upon this return to work
24  restriction or work -- return to work without
25  restriction that was issued by Dr. Noble?

19

1   A.      Yes.
2           MR. SATTLER:  Those are all the
3   questions I have, Doctor.  Thank you.
4           MR. McMAHON:  Nothing further.
5   Thank you, Dr. Ripa, for your time this
6   morning.
7           THE WITNESS:  I will waive the
8   right to read this.
9           (Deposition concluded at 7:19 a.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

20

1           C-E-R-T-I-F-I-C-A-T-E
2   STATE OF NEBRASKA      )
                           : ss.
3   COUNTY OF LANCASTER   )
4       I, Lori J. McGowan, General Notary Public
5   in and for the State of Nebraska and Registered
6   Professional Reporter, hereby certify that DR.
7   DANIEL RIPA was by me duly sworn to testify the
8   truth, the whole truth and nothing but the
9   truth, that the deposition by him as above set
10  forth was reduced to writing by me.
11      That the within and foregoing deposition
12  was taken by me at the time and place herein
13  specified and in accordance with the within
14  stipulations; the reading and signing of the
15  deposition having been waived.
16      That the foregoing deposition is a true
17  and accurate reflection of the proceedings
18  taken in the above case.
19      That I am not counsel, attorney, or
20  relative of either party or otherwise
21  interested in the event of this suit.
22      IN TESTIMONY WHEREOF, I place my hand and
23  notarial seal this 24th day of February, 2014.
24
25      _____

## 1

**1** [1] - 8:16
**10-4-12** [1] - 3:6
**12** [1] - 6:1
**13** [1] - 3:3
**13-man** [1] - 6:2
**18th** [1] - 10:17

## 2

**2** [2] - 10:1, 10:3
**20** [1] - 12:11
**200** [2] - 1:15, 2:5
**2002** [1] - 16:12
**2004** [1] - 13:1
**2009** [1] - 11:15
**2010** [3] - 8:23, 10:17, 14:5
**2011** [4] - 10:8, 10:17, 11:25, 16:13
**2014** [2] - 1:13, 20:23
**24** [1] - 1:13
**24th** [1] - 20:23
**25** [1] - 9:16
**27th** [1] - 10:17

## 3

**3** [3] - 10:13, 11:10, 11:14
**301** [1] - 2:9
**3019** [1] - 1:5
**30th** [1] - 11:25
**3rd** [2] - 10:8, 11:15

## 4

**4** [7] - 3:3, 3:6, 3:8, 10:6, 11:8, 11:9, 16:8
**4:12CV** [1] - 1:5

## 5

**5** [4] - 10:7, 10:20, 11:23, 16:8
**50** [1] - 9:14
**542** [1] - 2:4
**575** [1] - 1:15
**58** [1] - 14:2

## 6

**6** [2] - 12:4, 12:5
**60605** [1] - 2:5

**68508** [1] - 2:10

## 7

**7** [1] - 12:21
**701** [1] - 2:9
**70th** [1] - 1:15
**78C** [3] - 3:6, 4:11, 8:1
**78D** [3] - 3:8, 4:11, 5:2
**7:01** [1] - 1:14
**7:19** [1] - 19:9

## A

**a.m** [2] - 1:14, 19:9
**abilities** [1] - 12:18
**able** [1] - 17:23
**abnormalities** [1] - 9:3
**abnormality** [2] - 11:6, 11:17
**absorb** [1] - 15:11
**accordance** [1] - 20:13
**accurate** [4] - 5:2, 15:17, 15:22, 20:17
**activities** [5] - 9:7, 9:18, 9:20, 9:24, 14:11
**acute** [2] - 11:5, 11:20
**age** [2] - 4:14, 14:23
**ages** [1] - 15:12
**agreed** [1] - 4:2
**amount** [1] - 6:9
**answered** [1] - 12:22
**anticipated** [1] - 14:11
**appear** [1] - 11:14
**appearance** [1] - 13:7
**appeared** [1] - 11:25
**APPEARING** [2] - 2:2, 2:7
**Appearing** [1] - 2:2
**apply** [1] - 18:4
**April** [1] - 10:17
**arthritis** [1] - 17:13
**articles** [1] - 6:17
**artificial** [1] - 6:10
**assist** [1] - 7:16
**attend** [1] - 6:11
**attorney** [2] - 8:18, 20:19
**Attorney** [2] - 2:4, 2:8

**August** [1] - 14:5
**available** [3] - 13:25, 14:6, 16:10
**avoid** [1] - 9:14
**awareness** [1] - 14:3

## B

**background** [2] - 5:6, 7:21
**based** [2] - 12:20, 17:23
**basic** [1] - 14:11
**basis** [10] - 5:25, 8:13, 8:25, 10:3, 10:9, 10:14, 10:22, 10:24, 12:14, 13:3
**becomes** [1] - 15:3
**BEHALF** [1] - 1:7
**below** [1] - 9:16
**bending** [1] - 12:12
**benefit** [1] - 16:11
**between** [7] - 4:3, 5:15, 10:16, 15:1, 15:8, 16:8, 17:2
**bit** [2] - 5:5, 9:17
**BLISS** [1] - 1:4
**Bliss** [7] - 6:23, 8:9, 8:21, 8:22, 10:4, 12:10, 12:24
**Bliss'** [6] - 8:24, 10:16, 12:2, 12:22, 12:25
**BNSF** [2] - 1:7, 18:22
**BNSF's** [2] - 6:21, 18:17
**bone** [2] - 10:20, 11:6
**briefly** [1] - 10:3
**broad** [1] - 14:14
**broken** [1] - 11:6
**BY** [2] - 4:18, 13:20

## C

**capabilities** [1] - 12:2
**Capacity** [3] - 11:24, 12:1, 12:17
**carman** [2] - 14:4, 14:12
**cartilage** [1] - 17:8
**cartilages** [1] - 15:12
**case** [5] - 6:23, 7:11, 9:20, 18:21, 20:18
**CASE** [1] - 1:5
**category** [1] -

14:14
**cautioned** [1] - 4:14
**Center** [1] - 5:9
**centraled** [1] - 7:11
**certainly** [1] - 14:22
**certainty** [1] - 13:15
**CERTIFICATE** [1] - 20:1
**certified** [1] - 4:15
**certify** [1] - 20:6
**change** [5] - 10:15, 11:20, 13:9, 15:15, 15:16
**changes** [4] - 11:4, 11:9, 11:13, 16:17
**Chicago** [3] - 2:5, 5:16, 5:17
**chronically** [1] - 9:3
**Civil** [1] - 4:10
**clearcut** [1] - 11:5
**clearly** [1] - 10:5
**clinic** [1] - 6:4
**common** [1] - 18:12
**COMPANY** [1] - 1:7
**Company** [1] - 18:23
**compression** [1] - 11:18
**concluded** [1] - 19:9
**conclusions** [4] - 7:2, 7:17, 7:23, 8:8
**condition** [7] - 7:18, 8:24, 9:13, 10:16, 11:12, 12:7, 12:24
**conditions** [1] - 5:23
**conferences** [1] - 6:12
**connectors** [1] - 17:2
**connects** [1] - 17:3
**considered** [1] - 9:7
**continue** [1] - 13:9
**continued** [2] - 12:6, 12:25
**continuing** [1] - 6:12
**copy** [1] - 5:2
**cord** [1] - 5:17
**correct** [10] - 5:4, 5:20, 6:24, 7:11, 10:12, 16:14, 16:15, 16:20, 18:1, 18:13
**corrected** [1] -

9:22
**counsel** [2] - 18:3, 20:19
**COUNTY** [1] - 20:3
**COURT** [1] - 1:1
**covered** [1] - 14:10
**crawling** [1] - 12:13
**creates** [1] - 13:6
**Cross** [1] - 3:2
**CROSS** [1] - 13:19
**CROSS-EXAMINATION** [1] - 13:19
**current** [1] - 7:17
**Curriculum** [1] - 3:8
**curriculum** [1] - 5:3
**cushion** [1] - 15:2
**cushions** [1] - 15:1

## D

**Daniel** [1] - 4:21
**DANIEL** [4] - 1:12, 3:3, 4:13, 20:7
**date** [1] - 12:3
**DATE** [1] - 1:13
**dated** [1] - 14:4
**dating** [1] - 16:11
**DAVID** [1] - 1:4
**Dearborn** [2] - 2:4
**decreases** [1] - 17:8
**Defendant** [1] - 1:8
**DEFENDANT** [1] - 2:7
**degenerate** [1] - 13:1
**degenerated** [1] - 16:1
**degeneration** [3] - 12:9, 14:20, 15:19
**degenerative** [14] - 8:24, 10:5, 10:18, 10:19, 11:4, 11:11, 12:7, 12:23, 13:6, 14:15, 14:17, 15:7, 15:15, 17:24
**degree** [5] - 5:10, 9:6, 9:8, 13:12, 13:14
**delineation** [1] - 9:23
**delivery** [1] - 4:5
**demand** [1] - 15:9
**Deposition** [1] - 19:9
**deposition** [6] - 4:4, 4:5, 20:9, 20:11, 20:15, 20:16

**DEPOSITION** [2] - 1:6, 1:12
**described** [1] - 16:19
**describing** [2] - 15:20, 16:25
**descriptor** [1] - 15:17
**deterioration** [1] - 17:22
**diagnostic** [1] - 10:10
**difficulty** [1] - 9:8
**Direct** [1] - 3:2
**DIRECT** [1] - 4:17
**discussion** [1] - 18:5
**disease** [5] - 10:6, 13:6, 14:15, 14:17, 16:18
**diseases** [1] - 14:21
**disk** [12] - 10:5, 11:7, 11:18, 13:6, 14:15, 14:17, 14:20, 14:25, 15:7, 15:19, 16:1
**disorders** [1] - 6:7
**DISTRICT** [2] - 1:1, 1:2
**Doctor** [5] - 9:1, 12:21, 13:13, 13:17, 19:3
**doctor** [3] - 4:19, 6:21, 18:2
**doctorate** [1] - 5:10
**documents** [1] - 7:14
**DR** [4] - 1:12, 3:3, 4:13, 20:6
**Dr** [10] - 8:20, 13:21, 13:22, 13:23, 14:5, 14:8, 18:6, 18:15, 18:25, 19:5
**due** [1] - 11:14
**duly** [2] - 4:14, 20:7
**during** [2] - 4:7, 16:10
**duties** [2] - 14:3, 15:12

## E

**early** [1] - 16:12
**easily** [1] - 17:11
**education** [1] - 6:13
**educational** [1] - 5:6
**either** [2] - 16:4,

20:20
  elastic [1] - 15:3
  employer [1] -
18:17
  employers [1] -
18:10
  employment [1] -
9:25
  endorsing [1] -
12:19
  enlarge [3] - 17:9,
17:18, 17:20
  enlarged [1] -
17:15
  entry [1] - 14:9
  environment [1] -
13:2
  essentially [1] -
13:8
  established [1] -
18:19
  Evaluation [3] -
11:24, 12:1, 12:17
  evaluations [1] -
7:6
  event [1] - 20:21
  evidence [1] - 11:5
  EXAMINATION [2]
- 4:17, 13:19
  examined [1] -
4:16
  example [1] -
17:12
  excess [1] - 9:14
  excessive [1] - 9:6
  excuse [1] - 12:25
  exhibit [2] - 5:2,
14:1
  Exhibit [3] - 4:11,
7:25, 14:2
  EXHIBITS [1] - 3:5
  expected [1] -
14:11
  explain [5] - 8:13,
10:14, 14:15, 14:20,
16:22
  explanatory [1] -
10:2

**F**

  facet [5] - 10:18,
16:2, 16:22, 17:1,
17:22
  facets [1] - 16:24
  fair [1] - 6:9
  fairly [3] - 9:2,
15:17, 15:21
  familiar [1] - 18:8
  far [1] - 8:9
  February [6] - 1:13,
7:10, 10:8, 11:15,

16:13, 20:23
  Federal [1] - 4:9
  fellowship [2] -
5:15, 6:20
  field [1] - 6:14
  files [1] - 14:9
  films [1] - 10:11
  fingernail [1] - 17:7
  first [3] - 4:14,
8:20, 18:5
  fitness [1] - 7:7
  flexible [1] - 5:11
  follows [1] - 4:16
  FOR [3] - 1:2, 2:2,
2:7
  foraminal [1] -
10:19
  foregoing [2] -
20:11, 20:16
  formulate [1] - 7:2
  formulating [2] -
7:16, 7:22
  forth [1] - 20:10
  forward [2] - 15:25,
16:4
  fracture [1] - 11:18
  fractures [1] - 6:7
  Functional [3] -
11:24, 12:1, 12:17
  future [1] - 9:9

**G**

  General [1] - 20:4
  general [4] - 9:4,
9:6, 14:3, 14:12
  generally [2] -
14:23, 18:9
  generic [2] - 9:12,
18:4
  gentlemen [2] -
14:16, 16:23
  grandmother [1] -
17:13
  group [1] - 6:2
  guess [1] - 10:2

**H**

  half [2] - 6:4
  hand [1] - 20:22
  hands [1] - 17:14
  heard [1] - 6:17
  helping [1] - 7:1
  hereby [2] - 4:2,
20:6
  herein [1] - 20:12
  hereinafter [1] -
4:15
  history [2] - 12:8,
12:23

  hold [1] - 13:11
  Hospital [1] - 5:12
  hyperintense [1] -
11:18
  hypertrophy [1] -
16:22

**I**

  idea [1] - 5:21, 9:10
  identification [1] -
4:12
  identify [1] - 8:12
  IL [1] - 2:5
  imaging [1] - 16:9
  imply [1] - 9:5
  IN [3] - 1:1, 1:6,
20:22
  incident [3] - 7:11,
11:1, 11:15
  included [2] - 14:1,
14:8
  increase [2] -
10:18, 11:4
  increased [1] -
10:19
  INDEX [1] - 3:1
  indicate [1] - 11:19
  information [1] -
7:20
  injury [1] - 5:17
  interested [1] -
20:21
  internship [1] -
5:11
  irregular [1] -
17:19
  issued [1] - 18:25
  issues [1] - 6:13

**J**

  job [2] - 14:3,
14:12
  joint [4] - 6:10,
12:8, 17:3, 17:22
  joints [2] - 10:18,
15:10, 15:11, 15:12,
15:13, 16:2, 17:1,
17:5, 17:7, 17:9,
17:18, 17:20
  journals [1] - 6:18
  July [1] - 8:23
  June [1] - 11:25
  jury [5] - 4:20, 5:5,
5:21, 14:16, 16:23

**K**

  keep [2] - 6:13,
9:15

  knee [1] - 12:8
  knuckles [2] -
17:12, 17:14

**L**

  L3 [1] - 10:6
  L4 [2] - 10:6, 10:20
  L5 [1] - 10:7, 10:20
  ladies [2] - 14:16,
16:23
  LANCASTER [1] -
20:3
  lastly [1] - 12:21
  latter [1] - 5:16
  Law [2] - 2:4, 2:8
  lawful [1] - 4:14
  least [1] - 9:5
  left [1] - 17:3
  less [3] - 11:22,
15:3
  Letter [1] - 3:6
  levels [1] - 10:7
  liberal [2] - 8:23,
18:16
  lifting [4] - 9:7,
9:14, 9:15, 12:11
  likely [3] - 9:8,
11:22, 12:24
  Lincoln [2] - 1:16,
2:10
  listed [1] - 8:3
  load [2] - 15:9,
15:11
  look [2] - 7:25,
9:19
  looked [1] - 7:4
  looking [3] - 10:25,
12:16, 14:7
  Lori [1] - 20:4
  loses [1] - 15:2
  losing [1] - 14:24
  low [3] - 6:6, 9:4,
9:13
  Luers [1] - 3:6
  lumbar [3] - 14:19,
16:8

**M**

  March [1] - 10:17
  Marked [1] - 3:5
  marked [3] - 4:12,
5:1, 14:1
  marrow [1] - 10:20
  material [1] - 15:2
  materials [2] - 7:1,
7:14
  matter [4] - 7:3,
7:23, 8:8, 13:8
  McGowan [1] -

20:4
  McMahon [4] - 2:3,
4:18, 13:17, 19:4
  mean [1] - 10:22
  Medical [1] - 5:9
  medical [13] - 5:9,
6:12, 6:22, 7:5, 7:9,
7:17, 10:10, 12:20,
12:23, 13:14, 13:24,
15:15
  member [1] - 6:1
  Memorial [1] - 5:12
  mentioned [2] -
15:23, 16:7
  might [2] - 9:7,
9:17
  mixture [1] - 6:4
  moisture [1] -
14:24, 15:2
  monthly [1] - 5:24
  morning [1] - 19:6
  most [3] - 14:24,
17:11
  moving [2] - 10:1,
16:12
  MR [5] - 4:18,
13:17, 13:20, 19:2,
19:4
  MRI [6] - 7:4,
10:12, 10:16, 11:3,
13:7, 15:18, 16:21,
17:23
  MRIs [3] - 10:25,
12:23, 16:11
  multiple [1] - 12:5
  muscles [1] -
17:17

**N**

  name [1] - 4:19
  narrow [1] - 17:21
  narrowing [1] -
10:19
  natural [4] - 11:11,
12:6, 13:5, 14:22
  naturally [1] - 15:5
  nature [1] - 5:22,
11:7
  NE [1] - 2:10
  NEBRASKA [2] -
1:2, 20:2
  Nebraska [3] -
1:16, 5:9, 20:5
  neck [1] - 6:6
  nerve [1] - 17:20
  nerves [1] - 17:21
  New [1] - 5:15
  NO [1] - 1:5
  Noble [4] - 13:21,
14:5, 18:15, 18:25
  Noble's [3] - 8:20,

14:8, 18:6
  Northwestern [1] -
5:16
  Nos [1] - 4:11
  notarial [1] - 20:23
  Notary [1] - 20:4
  noted [1] - 11:9
  notes [2] - 4:8, 7:5
  nothing [1] - 19:4,
20:8
  Notice [1] - 4:4
  notice [1] - 4:5
  numbered [1] - 8:4

**O**

  obtain [1] - 18:10
  occasion [1] -
12:12
  occasional [1] -
12:12
  occupation [1] -
4:23
  occur [1] - 13:10
  occurred [1] -
16:17
  occurring [1] -
17:16
  OF [5] - 1:2, 1:7,
1:12, 20:2, 20:3
  Offered [1] - 3:5
  older [1] - 15:6
  once [6] - 5:14,
8:12, 10:25, 15:24,
17:3
  one-year [1] - 5:14
  openings [1] -
17:21
  Opinion [1] - 3:6
  opinion [9] - 9:1,
10:3, 10:4, 10:14,
10:22, 10:24, 12:15,
13:4, 18:5
  opinions [6] - 7:2,
7:16, 7:23, 8:7,
8:14, 13:12
  opportunity [1] -
16:16
  Orleans [1] - 5:15
  orthopedic [7] -
4:24, 4:25, 5:7, 6:2,
7:15, 7:22, 13:12
  osteoarthritis [1] -
15:21
  otherwise [1] -
20:20
  overlap [1] - 17:6
  own [1] - 7:22

## P

paragraph [1] - 11:10
paragraphs [1] - 8:4
part [2] - 5:16, 11:14
particular [2] - 9:18, 9:20
particularly [1] - 10:6
parties [1] - 4:3
party [1] - 20:20
past [2] - 12:8, 16:13
patient [5] - 7:6, 9:2, 9:5, 15:18, 16:8
patient's [1] - 17:9
patients [2] - 5:24, 6:3
peer [1] - 6:18
peer-review [1] - 6:18
people [1] - 15:20
per [1] - 8:22
perform [1] - 6:22
period [1] - 6:20
person's [2] - 7:17, 9:24
physical [2] - 12:2, 12:18
physician [2] - 4:24, 18:19
physicians [1] - 18:11
pinch [1] - 17:20
PLACE [1] - 1:15
place [2] - 20:12, 20:22
places [1] - 15:9
plaintiff [1] - 18:3
Plaintiff [1] - 1:5
PLAINTIFF [2] - 1:7, 2:2
portions [1] - 7:12
position [1] - 18:17
pounds [3] - 9:14, 9:16, 12:11
practice [3] - 5:19, 5:22, 18:12
predated [1] - 7:10
Presence [1] - 4:7
pretty [1] - 10:2
previously [2] - 8:19, 14:2
private [1] - 5:19
Procedure [1] - 4:10
proceedings [1] - 20:17
process [3] -

16:18, 17:24, 18:9
profession [1] - 4:22
Professional [1] - 20:6
progression [3] - 11:11, 12:7, 13:5
prudent [1] - 18:17, 18:22
Public [1] - 20:4
published [1] - 6:16
pursuant [1] - 4:9
put [2] - 8:20, 9:5

## Q

questions [2] - 18:2, 19:3

## R

railroad [1] - 8:19
RAILWAY [1] - 1:7
Railway [1] - 18:22
rather [2] - 11:4, 14:8
Ray [1] - 4:21
reached [1] - 8:8
read [3] - 8:16, 10:13, 19:8
reading [1] - 20:14
really [1] - 16:24
reasonable [6] - 12:10, 12:20, 13:12, 13:14, 18:16, 18:22
reasonably [1] - 18:18
recommendations [1] - 12:19
record [1] - 12:20
records [6] - 6:22, 7:5, 7:10, 10:10, 13:24, 14:8
Recross [1] - 3:2
Redirect [1] - 3:2
reduced [1] - 20:10
reference [1] - 16:21
referring [1] - 8:5
reflect [1] - 12:1
reflection [2] - 12:18, 20:17
regarding [1] - 16:7
regardless [1] - 13:1
regional [1] - 5:17
Registered [1] - 20:5
regularly [1] - 6:11

related [2] - 18:3, 18:5
relates [1] - 8:9
relative [1] - 20:20
release [2] - 8:21, 18:6
rely [4] - 7:15, 7:20, 18:18, 18:23
repetitive [1] - 9:15
replacement [1] - 6:10
Reporter [1] - 20:6
represented [1] - 8:19
request [2] - 6:21, 8:22
residency [1] - 5:12
resilient [1] - 15:3
resisting [1] - 15:4
respect [3] - 13:24, 14:14, 16:9
response [3] - 8:20, 10:15, 11:10
responses [1] - 8:18
restrict [1] - 12:10
restriction [4] - 9:6, 9:12, 18:24, 18:25
restrictions [8] - 8:22, 9:11, 9:17, 18:4, 18:7, 18:10, 18:15, 18:18
result [2] - 11:10, 16:18
return [6] - 8:21, 18:6, 18:10, 18:14, 18:23, 18:24
review [6] - 6:18, 6:22, 12:22, 16:10
reviewed [2] - 7:1, 10:11
Ripa [5] - 3:6, 4:21, 13:22, 13:23, 19:5
RIPA [4] - 1:12, 3:3, 4:13, 20:7
Rules [1] - 4:9
ruptured [2] - 11:6, 11:17

## S

S1 [2] - 10:7, 10:20
Sattler [1] - 2:8
SATTLER [2] - 13:20, 19:2
saw [2] - 13:7, 15:17
scan [3] - 10:12,

11:3, 13:7
scans [2] - 7:4, 15:18
scoliosis [1] - 6:7
Scott [1] - 5:12
seal [1] - 20:23
see [6] - 6:2, 8:4, 11:17, 16:17, 17:14, 17:16
seeing [1] - 16:11
self [1] - 10:2
self-explanatory [1] - 10:2
set [1] - 20:9
settle [1] - 15:4
seven [1] - 8:4
several [1] - 7:4
shifting [1] - 16:3
shifts [1] - 15:25
shock [1] - 15:4
shorter [1] - 15:6
shortly [1] - 11:1
shoulder [1] - 12:8
showed [3] - 10:17, 11:3, 17:24
showing [1] - 5:1
side [1] - 16:5
signed [1] - 14:4
significant [1] - 9:3
signing [1] - 20:14
situation [1] - 16:1
size [1] - 17:6
slash [2] - 10:6, 10:7, 10:20
slightly [1] - 15:25
small [1] - 17:5
solemnly [1] - 4:15
someone [2] - 8:23, 9:13
sometimes [1] - 17:19
somewhat [1] - 15:5
sorry [2] - 13:23
sort [1] - 15:14
sorts [1] - 7:7
South [2] - 1:15, 2:4
space [1] - 17:8
spaces [1] - 14:25
specific [4] - 9:18, 9:21, 9:23, 14:9
specifically [1] - 10:12
specified [1] - 20:13
spinal [3] - 5:17, 11:12, 17:18
spine [14] - 5:14, 6:8, 8:24, 11:19, 12:7, 13:9, 14:23, 15:4, 15:10, 15:16,

15:21, 16:3, 16:7, 15:24
split [1] - 5:15
spondylolisthesis [3] - 14:19, 15:23, 15:24
spondylosis [2] - 14:19, 15:14
ss [1] - 20:2
stand [1] - 9:22
start [1] - 17:9
state [1] - 4:19
STATE [1] - 20:2
State [1] - 20:5
statement [1] - 14:3
STATES [1] - 1:1
stenotype [1] - 4:8
stipulated [1] - 4:2
stipulations [1] - 20:14
STIPULATIONS [1] - 4:1
stooping [1] - 12:13
Street [2] - 1:15, 2:9
studies [3] - 16:9, 16:22, 17:23
subject [1] - 14:24
subtle [1] - 16:3
sudden [1] - 11:5, 11:17
suffering [1] - 10:5
suit [1] - 20:21
Suite [3] - 1:15, 2:5, 2:9
support [1] - 15:8
surgeon [4] - 4:24, 4:25, 5:7, 7:22
surgeons [1] - 7:15
surgeries [1] - 5:23, 12:6
surgery [4] - 6:3, 6:5, 12:9, 13:13
sworn [2] - 4:15, 20:7

## T

TAKEN [1] - 1:6
tcs@ sattlerbogen.com [1] - 2:10
tear [1] - 15:16
Telephonically [1] - 2:2
Temple [1] - 5:13
tend [1] - 9:4
tendency [1] - 14:22
tends [1] - 15:4

term [4] - 15:14, 15:15, 15:24, 16:6
terms [2] - 6:17, 14:18
testified [1] - 4:16
testify [1] - 20:7
TESTIMONY [1] - 20:22
Texas [1] - 5:13
THE [5] - 1:1, 1:2, 2:2, 2:7, 19:7
therapy [1] - 7:5
thicken [2] - 17:10, 17:18
thins [1] - 17:8
Thomas [1] - 2:8
thrown [1] - 14:18
TIME [1] - 1:14
timeframe [1] - 16:14
toll [1] - 14:23
training [2] - 5:6, 7:21
transcription [1] - 4:8
traumatic [1] - 11:20
treat [3] - 5:23, 5:24, 6:6
treating [2] - 18:11, 18:19
true [3] - 5:2, 18:12, 20:16
truth [2] - 20:8, 20:9
try [1] - 9:13
two [1] - 10:25
type [6] - 5:22, 5:25, 6:18, 7:13, 13:9, 18:3
types [1] - 9:11
typically [1] - 7:15

## U

underneath [1] - 17:17
understood [1] - 17:11
unit [1] - 5:18
UNITED [1] - 1:1
University [1] - 5:8
up [2] - 6:13, 16:12

## V

valid [1] - 11:25
variety [2] - 6:6, 7:5
various [1] - 16:21
vertebra [4] -



15:24, 16:4, 17:2,
17:4
  **vertebrae** [2] -
15:1, 15:8
  **view** [1] - 17:24
  **vitae** [1] - 5:3
  **Vitae** [1] - 3:8
  **vs** [1] - 1:6

## W

  **waive** [1] - 19:7
  **waived** [4] - 4:5,
4:6, 4:8, 20:15
  **wear** [4] - 15:13,
15:16, 16:2, 17:7
  **week** [2] - 6:3
  **weekly** [1] - 5:24
  **WHEREOF** [1] -
20:22
  **White** [1] - 5:12
  **whole** [1] - 20:8
  **William** [1] - 2:3
  **WITNESS** [2] - 3:2,
19:7
  **witness** [1] - 4:7
  **wmcmahon@**
**hoeyfarina.com** [1] -
2:6
  **word** [1] - 15:23
  **writing** [1] - 20:10

## Y

  **year** [1] - 5:14

## Z

  **zone** [1] - 11:18



St. Elizabeth Medical Plaza
575 South 70th Street
Suite 200
Lincoln, NE 68510
Ph: (402) 488-3322
Fax: (402) 488-1172

**EMERITUS**
William F. Garvin, M.D.

**PHYSICIANS**
Patrick E. Clare, M.D.
David P. Helser, M.D.
Ronald O. Schwab, M.D.
Donald J. Walla, M.D.
Thomas M. Helser, M.D.
Daniel R. Ripa, M.D.
Scott E. Strasburger, M.D.
David J. Clare, M.D.
James W. Gallentine, M.D.
Steven J. Volin, M.D.
Justin D. Harris, M.D.
Scott A. Swanson, M.D.
Daniel B. Cullan II, M.D.
Aaron M. Bott, M.D.

**PHYSICIAN ASSISTANTS**
Steve L. Gabriel, P.A.-C
Jill A. Haveman, P.A.-C
Megan M. Heldtbrink, P.A.-C
Brian J. Herbin, P.A.-C
Christopher S. Kudron, P.A.-C
Marilyn J. Mannschreck, APRN
John R. McPhail, P.A.-C
Erin N. Moses, P.A.-C
John P. Nickolite, P.A.-C
Patrick J. Peters, P.A.-C
Bradley A. Rief, P.A.-C
Amanda L. Young, P.A.-C
Austin V. Young, P.A.-C

**BUSINESS MANAGER**
Melissa Buessing

**CLINICAL MANAGER**
Teresa Finegan

October 4, 2012

James B. Luers
Wolfe, Snowden, Hurd, Luers & Ahl, LLP
1248 O Street
Lincoln, NE 68508-1424

RE:   David Bliss V BNSF Railway Company
      (Your File No. 961205.604)

Dear Mr. Luers:

This letter is in response to the review of records regarding David Bliss. The following are opinions based on a reasonable degree of medical certainty.

1.  Dr. Noble's release for Mr. Bliss to return to work without restrictions as per the request of Mr. Bliss in July 2010 was too liberal for someone with Mr. Bliss' degenerative spine condition.

2.  Mr. Bliss was clearly suffering from degenerative disk disease, particularly at L3/4, L4/5, and L5/S1, prior to February 3, 2011.

3.  The change in Mr. Bliss' back condition between the MRI of April 27, 2010, and the MRI of March 18, 2011, showed an increase in degenerative facet joints, foraminal narrowing and increased degenerative bone marrow at L4/5 and L5/S1.

4.  The changes noted in paragraph #3, could be the result of the natural progression of a degenerative spinal condition.

5.  The Functional Capacity Evaluation (FCE) of June 30, 2011, appeared to be a valid FEC so as to reflect Mr. Bliss' physical capabilities as of that date.

6.  Because of multiple back surgeries and continued natural progression of his degenerative spine condition and past history of knee and shoulder joint degeneration and surgery, it would be reasonable to restrict Mr. Bliss currently to lifting no more than 20 pounds and only occasional bending, stooping and crawling.



EXHIBIT
78-C
2-24-14

EXHIBIT
C

RE:   David Bliss v. BNSF Railway Company
Page 2

7. From a review of Mr. Bliss' medical history, either MRI's, and degenerative   condition, it was likely that Mr. Bliss' back would have continued to degenerate after 2004 regardless of his work environment.

Please contact us if further information is required.

Sincerely,

Daniel R. Ripa, M.D.

DRR/mrr

# Daniel R. Ripa, M.D.

Nebraska Orthopaedic and Sports Medicine, P.C.
575 South 70th Street, Suite 200
Lincoln, Nebraska 68510
402-488-3322

## PERSONAL:
Date of Birth: August 1, 1958
Home Town:  Wilber, Nebraska
Family:      Wife – Geralyn
             Children – Madeline & Elizabeth

## EDUCATION AND MEDICAL TRAINING:
Undergraduate:
University of Nebraska – Lincoln                          1976-1979

Medical School:
University of Nebraska College of Medicine               1979-1983
42nd & Dewey Avenue
Omaha, Nebraska 68105
    Bachelor of Science in Medicine, May 1983
    Doctor of Medicine, May 1983

Flexible Internship:
Scott & White Memorial Hospital
Temple, Texas                                            1983-1984

Orthopaedic Residency:
Scott & White Memorial Hospital
Temple, Texas                                            1984-1988

Fellowships:
Spinal Surgery Fellowship
    Under the direction of Dr. S. Henry LaRocca
    Elmwood Industrial Medical Center
    Jefferson, Louisiana (New Orleans)          July 1988 – December 1988

Fellowship in Spinal Cord Injury Treatment
    Under the direction of Dr. Paul R. Meyer
    Midwest Regional Spinal Cord Injury Unit
    Northwestern Memorial Hospital
    Chicago, Illinois                          January 1989 – June 1989



EXHIBIT
78-D
2-24-14

EXHIBIT
D

SPECIALIZED MEDICAL TRAINING
- Surgery of the Spine, Artificial Joint Replacement of the Knee and Hip
  *BIRMINGHAM HIP Resurfacing System*

CERTIFICATIONS:
- Board certification in Orthopaedic Surgery – July 1991
  Recertified in 2001
- Nebraska State Medical License - # 16549

HOSPITAL AFFILIATIONS:

St. Elizabeth Regional Medical Center
555 South 70th Street
Lincoln, Nebraska

BryanLGH-East
1600 South 48th Street
Lincoln, Nebraska

Lincoln Surgical Hospital
1710 South 70th Street
Lincoln, Nebraska

BryanLGH-West
2300 South 16th Street
Lincoln, Nebraska   (courtesy staff)

Madonna Rehabilitation Hospital
5401 South Street
Lincoln, Nebraska  68506  (courtesy staff)

PROFESSIONAL AFFILIATIONS
- Member of Lancaster County Medical Society
- Nebraska Medical Association
- American Medical Association
- Member of the North American Spine Society
- American Academy of Orthopaedic Surgeons

PUBLICATIONS:
- "Series of 93 Cervical Spine Injuries treated by Anterior Spinal Plating",   Spine, 1990 – Ripa, Meyer, Et Al.

Condensed Transcript

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DAVID BLISS, | ) | CASE NO. 4:12-CV-3019 |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEPOSITION OF |
| vs. | ) | DR. KEITH R. LODHIA |
| | ) | TAKEN ON BEHALF OF |
| BNSF RAILWAY COMPANY, | ) | THE DEFENDANT |
| | ) | |
| Defendant. | ) | |

Taken at Midwest Neurosurgery & Spine Specialists,
8005 Farnam Drive, Suite 305,
Omaha, Nebraska, October 16, 2012, at 1:18 p.m.


A P P E A R A N C E S

For the Plaintiff:        MR. WILLIAM J. McMAHON
                          HOEY & FARINA
                          542 South Dearborn
                          Suite 200
                          Chicago, Illinois 60605

For the Defendant:        MR. JAMES B. LUERS
                          WOLFE SNOWDEN HURD LUERS
                           & AHL LLP
                          1248 "O" Street
                          Suite 800
                          Lincoln, Nebraska 68508


Job No. CS1540360

*Lodtho*

4-18 -

4-34          ( 4-36
35 Light 3    ( 37 1-2 )

possibly some re-direct - depending upon what - of
your Class-report you want !

Page 2

I N D E X

                        Page

Appearances . . . . . . . . . . . . .  1

Stipulations  . . . . . . . . . . . .  3

Reporter's Certificate  . . . . . . . .  46

WITNESS:

DR. KEITH R. LODHIA

   Direct Examination by Mr. Luers . . . .  4

   Cross-Examination by Mr. McMahon . . .  37

   Redirect Examination by Mr. Luers . . .  44

EXHIBITS:                  Marked

56. Exam note from 6/24/10 visit  . . . . . .  4

57. Note to Dr. Noble from Mr. Bliss  . . . .  4

58. Statement of job awareness  . . . . . . .  4

59. Medical records . . . . . . . . . . . .  4

60. Physical therapy records  . . . . . . . .  4

Page 3

S T I P U L A T I O N S

It is stipulated and agreed by and between the parties hereto:

  1.  That the deposition of DR. KEITH R. LODHIA may be taken before Lisa G. Grimminger, Registered Merit Reporter, Certified Realtime Reporter, General Notary Public, at the time and place set forth on the title page hereof.

  2.  That the deposition is taken pursuant to notice.

  3.  That the original deposition will be delivered to Mr. James B. Luers, Attorney for the Defendant.

  4.  That all objections except as to form and foundation shall be made at the time of the deposition.

  5.  That the testimony of the witness may be transcribed outside the presence of the witness.

  6.  That the signature of the witness to the transcribed copy of the deposition is waived.

* * * * * * * *

Page 4

(Exhibit Nos. 56 through 60 were marked for identification.)

DR. KEITH R. LODHIA, Being first duly cautioned and solemnly sworn as hereinafter certified, was examined and testified as follows:

(Witness's response to oath:  "Yes.")

DIRECT EXAMINATION
BY MR. LUERS:

    Q.   Doctor, would you state your full name and spell your last, please.

    A.   Keith R., Raman, Lodhia, L-O-D-H-I-A.

    Q.   And your business address, Doctor?

    A.   It's 8005 Farnam, Suite 305, Omaha, Nebraska.

    Q.   You are a physician?

    A.   Yes.

    Q.   And you have a specialty, sir?

    A.   Yes, neurosurgery.

    Q.   Any subspecialties?

    A.   Spine, spinal neurosurgeries, neurosurgery of the brain, spine, peripheral nerve.

    Q.   And is -- I presume you're board

Page 5

certified, is that the -- board certified as a neurosurgeon.  Are you board certified in the subspecialty as well?

    A.   We don't have board certification in our spine specialty, and I'm board eligible.  I still have to take the oral boards which are part of our secondary process.  I've passed the written boards sometime at the end of residency, or actually at the beginning -- middle of residency, and then we take them, typically, in our fifth year out.  I'm actually out beyond that, but I've applied over a year ago.  It takes a long time for them to kind of get you on the list.

    Q.   I understand.  How long have you been practicing a neurosurgeon, Doctor?

    A.   Six years.

    Q.   And you are licensed in the State of Nebraska?

    A.   Uh-huh.

    Q.   Anywhere else?

    A.   Iowa and Michigan.

    Q.   All right.  Have you had your deposition taken before?

    A.   Well, I think so.  I know I've been recorded before.  I assume it was a deposition.

Veritext Corporate Services

800-567-8658                                973-410-4040

1      Q.  All right.  Are you acquainted as
2  you sit here today -- well, strike that.
3          Are you acquainted with a patient by the
4  name of David Bliss?
5      A.  Yes.
6      Q.  As you sit here today, do you have
7  an independent recollection of that patient?  In
8  other words, can you picture him?  Do you recall
9  seeing him and talking to him?
10     A.  Yes.
11     Q.  All right.  Do you recall who you
12  were -- who referred Mr. Bliss to you or to your
13  office?
14     A.  No.
15     Q.  Let's look at -- the first time you
16  saw him, at least according to my records, would
17  have been June 8th of 2011; is that right?
18     A.  Probably right.  I've got a note
19  there, yes.  That's the earliest note I have.
20     Q.  I'm sorry?
21     A.  That's the earliest note that I
22  have.
23     Q.  Okay.  And it looks like on that
24  particular date you saw him, and you then sent a
25  letter to Dr. Kreshel, which is also dated June 8th

1  of 2011; correct?
2      A.  Yes.
3      Q.  All right.  As of that first
4  consultation, if you recall, Doctor, do you remember
5  what sort of medical history, if any, you were
6  provided, either prior or contemporaneously with
7  that consultation?
8      A.  He was a gentleman, I guess, who had
9  previous surgery at a couple of disk levels.
10     Q.  The information that's contained in
11  that June 8th letter, is that the history,
12  basically, that you were provided?
13     A.  Yes.
14     Q.  And would that have been a history
15  that was provided by the patient as opposed to
16  separate medical records?
17     A.  Looks like we just heard from the
18  patient.  We did review an MRI scan, however.
19     Q.  Okay.  Do you remember which?
20     A.  It says lumbar spine from 3-18,
21  2011, so there would have been a report there, but
22  it was before his last surgery, I guess.
23     Q.  All right.  As of that particular
24  first visit, Doctor, in June of 2011, were you aware
25  that the patient had had both knee surgeries and

1  shoulder surgeries?
2      A.  I don't have that printout.  They
3  usually have the patient's -- the full record that
4  gets printed out here wasn't printed out.  We have
5  all the little stuff that they fill in, the patients
6  fill in, themselves.  They didn't print that out
7  so --
8      Q.  Like patient information?
9      A.  Yeah.
10     Q.  Would that --
11     A.  Would that have affected --
12     Q.  Yeah.  I guess at this point you
13  weren't directed to that particular -- or any of
14  those problems; is that right?
15     A.  No.
16     Q.  You do reference that he had
17  previous back surgery.  Do you recall or do you know
18  when those were?
19     A.  Just what was stated.  He had one
20  done April of that year, which was only probably a
21  couple months before I saw him, redo diskectomy at
22  L3/4, and then it looked like he had some surgery
23  before L3/4.  He must have mentioned then there was
24  one at L5/S1 and one at L2/3.
25     Q.  Do you happen to know, Doctor, from

1  reviewing the MRI whether that information was
2  accurate or not in terms of the location of those
3  surgeries and what they did?
4      A.  It doesn't say from here.  It wasn't
5  in the report, but it doesn't sometimes show up,
6  depending on how small the bones were taken.
7      Q.  When he reported to your office in
8  June of 2011, what was the purpose of your
9  consultation?
10     A.  He came -- it says he came here with
11  pain in his legs and back, and I guess he had some
12  atrophy in his legs.
13     Q.  And just seeking some relief, or
14  what was the purpose of your visit?
15     A.  Typically.  Just says in
16  consultation.  It usually says why, but it's
17  obviously for the symptoms.  The next thing we talk
18  about after his surgery is that he had pain in his
19  legs and back before surgery.  He was achy and
20  stiff, limited lifting because of this.
21     Q.  Did he tell you --
22     A.  Correction.  I think he had some
23  difficulty on the job or so because of this.
24     Q.  Did he tell you anything about his
25  job or how he had gotten hurt?

3 (Pages 6 - 9)

Page 10

1    A.  If he did, I don't recall the
2  specifics on that.  I don't remember him saying
3  anything about that.  I knew he worked for the
4  railroad because he knows a friend of mine from the
5  railroad, just happenstance, because they work for
6  the same company, and he was one of his supers at
7  some point or something like that but -- so I knew
8  that he had a very physical job.  I guess that's
9  about the extent of it.
10    Q.  All right.  Were you aware, Doctor,
11  that the he had claimed an injury in February,
12  February 3rd of 2011, on the railroad?
13    A.  It's not listed in there so, no, I
14  guess I wasn't aware of that, that he had previous
15  surgery, so he must have complained to somebody
16  about that.
17    Q.  Okay.  I take it, Doctor, since you
18  didn't see him until at least four months after what
19  he's claiming was his injury, you're not in a
20  position to render an opinion in this case as to the
21  cause of his injury or how it happened?
22    A.  No.
23    Q.  All right.  When you examined the
24  patient on June 8, 2011, what did you find?
25    A.  At that time he had some incisions

Page 11

1  on his back, it looks like.  It looked like he was
2  neurologically intact, meaning his strength and
3  sensation were good.  Reflexes were notable.  Eyes
4  were both equal, and he said he did have some
5  atrophy in his left thigh compared to the right
6  thigh, which I guess is what he had complained
7  about, but other than that it didn't look like it
8  was very remarkable exam.
9    Q.  Okay.  What did you recommend, if
10  anything?
11    A.  At that time he had just had a
12  recent surgery, and because of that we ended up
13  recommending an MRI to see what had been done and
14  what was left over, whether any of that was
15  contributing to his left leg symptoms, back pain,
16  and so we recommended MRI, and then it says
17  something about a functional capacity evaluation,
18  'cause he obviously felt limited in what he could
19  do, and so we talked about possibly at some point
20  down the line getting an FCE to evaluate what his
21  limitations might be.
22    Q.  And that's -- I read that under the
23  letter of June 8, 2011, as part of the plan.
24    A.  Uh-huh.
25    Q.  Did you order an FCE at that time

Page 12

1  or --
2    A.  No, I don't think we did.  I don't
3  recall.  I'd have to look down there, but I don't
4  think that was ordered.
5    Q.  If you'd had --
6    A.  It would be in our computer orders
7  somewhere if he did.
8    Q.  What kind of back surgery did he
9  have in April?
10    A.  Well, it was mentioned as a redo
11  diskectomy.
12    Q.  And was there any -- did you have
13  any medical records or anything to verify that, or
14  was that just based on what he told you?
15    A.  I suspect it was based on what he
16  told us.  I mean, until we got the MRI, which it
17  looks like we got also on June 8th, so that was done
18  on June 8th too, so we did get an MRI, but that
19  wouldn't have been known that day, as we wouldn't
20  have seen those results probably until later.
21    Q.  What did you see on the MRI, if
22  anything of significance?
23    A.  The MRI showed changes, surgical
24  changes, it looked like, at L5/S1, L4/5, and L3/4,
25  as we talked about those levels, I think, being a

Page 13

1  component.  I think he said L2/3, but he may have
2  meant L3/4.  I don't know, because those levels that
3  was dictated in here are different than what are
4  showing up on the scan, those three levels.
5    Q.  Okay.  So he might have been off on
6  what the levels of the diskectomies were?
7    A.  Uh-huh.
8    Q.  But, at any rate, the MRI, and that
9  was dated June 8th of 2011 also.  What other
10  significant findings were on that particular report?
11  Significant to you, Doctor.
12    A.  Well, basically, he had a lot of
13  marrow changes, meaning degenerative changes, at
14  really three levels.  All three of those levels were
15  levels where he probably had his herniation, since
16  he had surgery in those areas.  He had what they
17  call posterior retrospondylolisthesis, meaning a
18  little bit of tipping back of the vertebrae at one
19  of the levels.  That typically indicates some level
20  of instability, so basically we saw a lot of
21  degenerative changes in the lower lumbar spine.
22    Q.  Now, this gentleman was -- I'm
23  sorry?
24    A.  And postoperative changes.
25    Q.  All right.  This gentleman was

4 (Pages 10 - 13)

Page 14

1  55 years old when you saw him. Were the
2  degenerative changes that you saw in that particular
3  spine of Mr. Bliss significantly different than
4  other 55-year-olds?
5      A.  Yeah.
6      Q.  And in what regard, other than the
7  surgeries?
8      A.  There was more extensive
9  degeneration of the discs. You typically don't see
10 a spondylolisthesis or instability or that kind of
11 alignment changes in a normal adult. You may see
12 some mild degenerative changes in the joints or the
13 discs with aging, but this would be what I'd
14 consider beyond that.
15     Q.  Okay. Were these degenerative
16 changes the type of changes that, nevertheless, can
17 be long term, ongoing, as opposed to traumatically
18 induced?
19     A.  Yes.
20     Q.  Was there any way to know as you
21 looked at either the individual, himself, or the MRI
22 as to whether they were the result of trauma or just
23 simple degenerative long term?
24     A.  No. I don't think there was
25 anything, at least from the MRI that we had seen

Page 15

1  that we had ordered, that we could tell whether that
2  was acute or a chronic type of --
3      Q.  After that June 8th visit, did you
4  order or prescribe any particular restrictions for
5  the patient? In other words, did you place him on
6  any restrictions activity wise?
7      A.  I don't -- once again, if I had
8  to -- if we did, we may have had a sheet we would
9  have filled out for him. It's not referenced in the
10 note --
11     Q.  You don't recall any?
12     A.  -- so I don't recall that. That's
13 probably why we made the comments of the functional
14 capacity evaluation. Typically, if we're going to
15 give restrictions that aren't in the short term that
16 we don't know how long they're going to go and we
17 would tend to think it's a chronic condition, I
18 would order a functional capacity evaluation.
19     Q.  And that would be typically like
20 before you impose restrictions?
21     A.  Uh-huh.
22     Q.  Is that a yes?
23     A.  Especially if they're long term. On
24 a chronic patient I've seen once, I'm not going to
25 make restrictions on a patient like that unless they

Page 16

1  came in with an acute problem that needed acutely
2  fixing and I just needed to keep them out for a
3  prescribed period of time.
4      Q.  All right. I gotcha. Doctor, are
5  you familiar with Dr. Noble from -- I guess he was
6  in Lincoln.
7      A.  I don't know him personally, but
8  I've seen some of his patients.
9      Q.  All right. Do you know if your
10 clinic or you, personally, were ever provided with
11 any records of Mr. Bliss from Dr. Noble's office
12 from 2010?
13     A.  I'm not aware of that. We don't
14 have any reference that we did look at that, whether
15 they were scanned in or not. We must not have seen
16 them at the time of our visits.
17     Q.  All right. I can tell you that he
18 had had a surgery in 2010, and Dr. Noble was the
19 surgeon, and I'm going to provide you what's been
20 marked as Exhibit 56 and ask you just to review that
21 briefly for me. That's a note from Dr. Noble
22 regarding the surgery and then a release to return
23 to work. Now, that's dated what, Doctor? Do you
24 see that, top of the page?
25     A.  June 24th, 2010.

Page 17

1      Q.  All right. I can show you, then,
2  Exhibit 58, which is another note from Dr. Noble,
3  ask you if you've seen this exhibit before? It's
4  dated August 5th of 2010.
5      MR. McMAHON:  Fifty-eight?
6      MR. LUERS:  Yeah.
7      A.  I don't recall seeing that.
8      Q.  (BY MR. LUERS) All right. Doctor,
9  Dr. Noble, after that surgery in 2010, released the
10 patient to full duty with the railroad for the tasks
11 that were set forth in that particular exhibit. If
12 you'd peruse that very briefly or quickly and tell
13 me, based upon your physical exam and the MRI that
14 you did in 2011 of Mr. Bliss, if at that time he
15 would have been capable of returning to that type of
16 activity.
17     A.  Yeah, I would suspect so.
18     Q.  You would think he would?
19     A.  Uh-huh.
20     Q.  And that would have been even --
21     A.  Basically, you're talking about
22 after his diskectomy at the time when I would have
23 seen him?
24     Q.  Correct.
25     A.  Yes, he had the functional abilities

5 (Pages 14 - 17)

Page 18

1  to be able to do that. It was a matter of his
2  description of pain.
3       Q.  All right.  So even though there
4  was -- at least one of the tasks is may lift, carry,
5  push, and pull objects weighing between 25 and
6  50 pounds --
7       A.  50 pounds some of the time.
8       Q.  25 pounds frequently, 50 pounds
9  occasionally, those would not be unreasonable in
10  terms of --
11       A.  I don't think so.
12       Q.  And even though --
13       A.  Based on his size, muscle strength.
14  His back MRI really didn't show anything, any gross
15  instabilities, just that little base of trace
16  retrospondylolisthesis, which usually isn't a high
17  grade instability.
18       Q.  Okay.  So at least as of June of
19  2011, that would be the case too?
20       A.  Yes, I believe he could have done
21  that.
22       Q.  After that June of 2011 visit,
23  according to the records I have, Doctor, you saw
24  him -- well, you spoke to him on June 13, 2011.  Do
25  you have that one?

Page 19

1       A.  Myself or my PA?  I don't have
2  June 13th.
3       Q.  Well, this is the PA.  I'm sorry.
4  John Calabro?
5       A.  Yes.  No, I don't have that.  I have
6  July 13th.  Did you say June or July?
7       Q.  I said June.
8       A.  I have a July 13th.
9       Q.  Okay.  I'm going to show you part of
10  Exhibit 59, and actually it's on page --
11       A.  Oh, I take it back.  Here it is.
12  Here's the June 13th.  They were out of order.  Yes,
13  got it.
14       Q.  Just read that briefly, and
15  that's -- obviously, it's a note from John Calabro,
16  which is your PA?
17       A.  Yes.
18       Q.  And by then you had suggested the
19  FCE?
20       A.  Uh-huh.
21       Q.  Is that right?
22       A.  Yes.
23       Q.  All right.  Then did you see the FCE
24  when it came in?
25       A.  Yes.

Page 20

1       Q.  All right.  And at least as of the
2  date when that arrived, you saw that they did his
3  physical or functional testing, and they concluded
4  that he could work at the demand level of a job
5  categorized as heavy.  Is that your understanding?
6       A.  Yeah.
7       Q.  Okay.  Was there anything about that
8  FCE that you found to be invalid?
9       A.  Not necessarily.  They just said he
10  developed some pain.
11       Q.  Right, but I'm talking about just
12  the testing results, itself, at this point.  Is
13  there anything in there that jumped out at you?
14       A.  Well, they didn't say anything about
15  it being invalid or that he didn't pass any of the
16  tests, so no.  I would say no.
17       Q.  Okay.  So then you saw him on
18  June 13th; is that right?  Or, excuse me, July 13th.
19       A.  Yes.
20       Q.  And would you have actually seen him
21  on that day, or would Mr. Calabro have?
22       A.  We probably both saw him, I'm
23  guessing.
24       Q.  And that's when he came back
25  complaining of additional pain after the FCE; is

Page 21

1  that right?
2       A.  Yes, or I don't know if it's because
3  of the FCE but --
4       Q.  No.  I understand.
5       A.  Yeah.  Increasing pain, yes.
6       Q.  What did you attribute that
7  increased pain to, any particular thing?
8       A.  No.  Just the exacerbation of
9  degenerative changes.  You know, anything can flare
10  that up, sometimes minor things.  I wasn't sure what
11  would cause that.
12       Q.  All right.  And you ordered another
13  MRI at that time?
14       A.  Right, and an EMG.
15       Q.  And an EMG?
16       A.  He had pain in a new distribution, I
17  guess, is what he was complaining of.
18       Q.  Okay.  Tell me what you found with
19  either of those test results.
20       A.  Let's see.  I don't know if I have
21  those actual tests.  I have a phone note based on
22  our tests.  I don't print up --
23       Q.  I think that's the EMG.
24       A.  That's the MRI.  I've got that, so
25  that didn't show anything essentially different than

6 (Pages 18 - 21)

Page 22

1 the previous one. There's the EMG. Okay. And the
2 EMG showed a chronic right L5 radiculopathy. That's
3 what John was talking about in the July 15th note.
4     Q. So let me back up just a moment. So
5 the repeat MRI that would have been done on July 13,
6 2011, basically, you didn't see anything
7 significantly different from the MRI that you'd
8 looked at when you first saw him in June?
9     A. Right.
10     Q. Correct?
11     A. Right, correct.
12     Q. So you couldn't attribute -- at
13 least from the results of the MRI, you couldn't
14 attribute the reason for the additional pain?
15     A. The additional pain, right, correct.
16     Q. Then, the EMG, what is the purpose
17 of that?
18     A. The EMG is to look for acute nerve
19 compression versus old nerve compression versus
20 location, be it peripheral nerve or maybe pinched at
21 the lumbar spine, so it's a way to help us quantify
22 whether something's acute, chronic, and maybe what
23 location, which nerve, et cetera.
24     Q. And what did you find again?
25     A. The EMG showed that right L5 chronic

Page 23

1 radiculopathy, meaning it's -- that would be
2 consistent with an old injury.
3     Q. Okay. "Old" meaning --
4     A. Not acute, something that's not
5 healing further. It's nothing new that's ongoing or
6 a new injury. There's no re-innervation occurring,
7 meaning the nerve is not trying to heal or in the
8 process of denervating. It's just stably or
9 chronically impaired.
10     Q. Is there a -- what type of
11 condition, injury or degeneration can result in
12 those kinds of findings on the EMG?
13     A. You can have nerve damage from, say,
14 a herniated disk or some other form of pinching of
15 the nerve.
16     Q. Can that be degenerative in nature
17 also, or does it have to be an acute injury?
18     A. Typically, it was a result of
19 something that had injured it, so at some point it
20 probably was an acute injury, but it could be
21 anything from a stretch to a compressive phenomenon,
22 meaning, you know, nerve stretch or actual physical
23 compression on the nerve. Maybe it was a herniated
24 disk, maybe it was a bone spur that he'd had
25 previously from other operations that was taken off,

Page 24

1 and the nerve may or may not heal.
2     Q. So that may have been a condition
3 that was there from as early as 2003, when he was
4 having these first back symptoms?
5     A. Possibly.
6     Q. Okay. No way to really know on
7 that?
8     A. No, and we don't even know if the
9 chronic EMG finding correlates even with his
10 increased pain at the time.
11     Q. Okay.
12     A. May very well not.
13     Q. And how significant was the EMG
14 finding? In other words --
15     A. It was mild.
16     Q. -- you said mild? Okay.
17     A. Which may or may not even cause
18 symptoms in some people so --
19     Q. And then you or your physician's
20 assistant spoke with David Bliss's wife on July 15;
21 correct?
22     A. Yes.
23     Q. All right.
24     A. Got that.
25     Q. And then who sent the patient to

Page 25

1 Madonna, was that you, for some rehab?
2     A. I don't know if he went to Madonna.
3 We may have. I don't know if he did physical
4 therapy or not.
5     Q. Let me show you a report that I got,
6 Doctor. I think that's from Madonna.
7     A. It looks like we did.
8     Q. And that's dated what?
9     A. 7-26, 2011.
10     Q. Okay. So assuming that you guys
11 sent him for rehab, do you recall what you were
12 hoping to gain at that point in time through that
13 rehab? If you want to look at this record,
14 that's --
15     A. What date was that again?
16     Q. That was July 26th, is the date of
17 service.
18     A. Okay. Was that before or after his
19 functional capacity evaluation?
20     Q. Actually, it was after.
21     A. That was after his FCE?
22     Q. Yeah. The FCE was dated June 30th.
23     A. Okay. My guess is we were just
24 trying something nonoperative as opposed to a three
25 level fusion or something.

7 (Pages 22 - 25)

Veritext Corporate Services

800-567-8658                    973-410-4040

Page 26

1    Q.  Do you know offhand, Doctor, or do
2  your records reflect any follow-up to that rehab?
3  In other words, I can't recall at the conclusion of
4  that report whether they recommended anything
5  further or --
6    A.  He believed he was at maximum
7  medical improvement and deferred to either of us.
8  He said, Use the information in the FCE as well as
9  the physical exam to recommend future work
10  restrictions, and he didn't recommend any work
11  restrictions today with him, so he kind of basically
12  said whatever we said.
13    Q.  Then keep going in that.  And you're
14  looking at exhibit -- what's the number on the front
15  of that exhibit, Doctor?
16    A.  Exhibit 59.
17    Q.  All right.  And keep going, and I
18  think there's -- the next, is it August 25th, 2011,
19  either report or --
20    A.  Uh-huh.
21    Q.  What is that?  Is that from Madonna
22  again?
23    A.  Yes.
24    Q.  And at that point in time, were they
25  recommending any further plan for Mr. Bliss?

Page 27

1    A.  No follow-up, just continue physical
2  therapy is something he recommended.  No narcotics,
3  took the anti-inflammatories, nonnarcotic medicines.
4    Q.  At some point in time, I thought I
5  read in one of those Madonna reports work hardening
6  or condition program.  Do you know whether or not
7  there was any follow-up in that regard or whether he
8  engaged in any, Mr. Bliss?
9    A.  I'm not aware of that.
10    Q.  Let me take a quick look at it,
11  Doctor.  I'm sorry.  I'm looking at page -- it's
12  MRH5 of Exhibit 59 in the second-to-the-last
13  paragraph.  Do you know it references work hardening
14  and some conditioning program?
15    A.  Yes, yes.  It says something about
16  continuing to advance to more functional
17  conditioning and work hardening, especially if
18  there's no surgery planned.
19    Q.  All right.  And at that point in
20  time, there was no surgery planned, I take it?
21    A.  No.
22    Q.  Do you know if there was any
23  follow-up in that regard by either the rehab people
24  or Mr. Bliss?
25    A.  Not that I'm aware of.

Page 28

1    Q.  Okay.  Put that exhibit back
2  together.  Then your next -- the next time you
3  actually saw Mr. Bliss would have been when?
4    A.  September 2nd.
5    Q.  Okay.  What was the purpose of that
6  visit?
7    A.  We saw him in consultation, reviewed
8  his notes, I suppose, and re-review his complaints
9  that he was having -- he was talking about when he
10  got there.
11    Q.  Now, at that point in time, your
12  physical exam noted that basically it was unchanged
13  except with some depressed reflexes and now some S1
14  radicular symptoms; correct?
15    A.  Uh-huh.
16    Q.  And that's yes?
17    A.  Yes.
18    Q.  Other than that, as far as his
19  physical exam, was that pretty much the same as it
20  was when you first saw him in June of 2011?  And I
21  realize his subjective complaints were different
22  but --
23    A.  Yes.
24    Q.  Okay.  You say down there on -- down
25  at the last paragraph of that first page of that

Page 29

1  September 2nd, 2011 report, it says he can't
2  function at his job with his current pain level and
3  would need to be in a light-duty situation.  I take
4  it, Doctor, and you correct me if I'm wrong, but
5  basically what you're saying is if you could
6  eliminate his pain or reduce it, then that -- then
7  he could function at more than a light level; is
8  that what you were saying?
9    A.  Pain is what limited his
10  functioning.
11    Q.  All right.  And the pain, obviously
12  those -- not to diminish it, but those are
13  subjective complaints.  You can't measure that;
14  correct?
15    A.  Correct.
16    Q.  Otherwise, his physical exam was
17  virtually the same?
18    A.  Correct.
19    Q.  What did you recommend, if anything,
20  at that point in time?
21    A.  Still wasn't sure what was causing
22  his pain based on our physical exam and our imaging
23  and our EMG; so, therefore, we wanted to see if
24  maybe his pain source was in the joints, the facet
25  joints, themselves, in those three levels that had

8 (Pages 26 - 29)

Page 30

1  that degeneration, and so we recommended maybe facet
2  blocks or possibly facet rhizolysis.  If facet
3  blocks helped, they were a longer term solution.
4      Q.  And the rhizotomy, is that different
5  than the facet blocks?
6      A.  No.
7      Q.  Same thing?
8      A.  Well, they actually are different.
9  Usually, one's referred to as using medications.
10  The rhizolysis is typically something they use a
11  radiofrequency generator to actually create a lesion
12  not chemically, but electrically.
13      Q.  Okay.  And you recommended that, and
14  I take it, then, he followed through on that, as far
15  as you know; correct?
16      A.  Yes.
17      Q.  Your next visit was when, Doctor?
18      A.  Well, I guess we spoke to him on the
19  phone, but we didn't see him until November 2011.
20      Q.  That would be November 7th?
21      A.  Yes.
22      Q.  What did you do on that particular
23  visit?
24      A.  We discussed his MRI findings with
25  him, we discussed what he had done since I'd seen

Page 31

1  him, which at that time he had rhizolysis after
2  having had his injections, still complained of some
3  burning symptoms in the back of his heels and feet
4  with walking.
5      Q.  According to that November 7th
6  letter you have, he actually had an excellent
7  response to the rhizolysis with near complete
8  resolution of his lumbar back pain; is that correct?
9      A.  Right.
10      Q.  And he had the heels and lateral
11  foot pain if he walked for 20 minutes or more;
12  correct?
13      A.  He was complaining more from what
14  I'd say is nerve-like symptoms as opposed to just
15  the mechanical back symptoms.
16      Q.  But those symptoms were located now
17  in the feet; correct?
18      A.  And the legs.  He complained of some
19  aching in the hips too, but, yes, it looks like they
20  were in the feet and legs.
21      Q.  At least from a physical standpoint,
22  at that point in time -- or from a functional
23  standpoint, it would have been improved, then, could
24  you conclude, because of the lack of lumbar pain?
25      A.  Yes.  I think his back pain he was

Page 32

1  suggesting had improved significantly, but his
2  nerve-like symptoms that he had were still bothering
3  him, and, as he said, were limiting him.
4      Q.  And I think in that report, Doctor,
5  you indicate that at that point in time you didn't
6  think fusion would do any good for him?
7      A.  Correct.
8      Q.  You were not?
9      A.  He didn't seem to have mechanical
10  low back pain that he had before, and I told him
11  that a fusion is mainly for mechanical low back pain
12  unless you have some nerves to decompress, which we
13  did not based on our MRI or EMG studies.
14      Q.  Do you know at that point in time
15  what kind of pain prescription he was on, or had you
16  prescribed pain medication?  Was that -- was he
17  getting that from somewhere else?
18      A.  I suspect he would have gotten that
19  from somebody else.  Typically, we don't prescribe
20  pain medications unless we've done surgery.  We let
21  their other doctors take care of that.
22      Q.  Do you know if you ever have seen
23  him since November of 2011?
24      A.  I don't believe I have.
25      Q.  Okay.

Page 33

1      A.  Not from my notes.
2      Q.  So as you sit here today, you don't
3  know what his condition is; correct?
4      A.  Correct.
5      Q.  I take it, then, you would agree
6  with me, Doctor, that at least from the first time
7  you saw him until the last time you saw him, if
8  anything, his condition improved?
9      A.  Correct.
10      Q.  And you would agree with me that at
11  least from a cursory examination of Exhibit 58, you
12  still think he would be able to perform those types
13  of tasks with his physical condition?
14      A.  I'm not sure.
15      Q.  Okay.  Which one would cause you
16  some hesitancy?
17      A.  Well, to do a half a day of sitting
18  or standing when he said he couldn't stand or
19  couldn't walk for more than 20 minutes or so.
20      Q.  Okay.  But you don't -- do you know
21  the reason that he couldn't walk for 20 minutes?
22      A.  No.  I had no objective evidence of
23  why he couldn't do that.
24      Q.  Okay.  Doctor, do you agree that
25  Mr. Bliss was clearly suffering from degenerative

9 (Pages 30 - 33)

Page 34

1  disk disease at that L3/4 through L5/S1 as of the
2  time you saw him first in June of 2011?
3      A.  Yes.
4      Q.  And any changes you noted in MRIs
5  from the -- well, strike that.
6          Did you ever see any MRI results from
7  anything before June of 2011?
8      A.  Yes.
9      Q.  Was there -- can you tell me what,
10  if any, significant changes there were between those
11  two MRIs and which -- let me back up.  Which MRI did
12  you see that was before 2000 and --
13      A.  March 18th, 2011.
14      Q.  Okay.  And then, at least from
15  March 18, 2011, through the last MRI you took, there
16  wasn't any real significant changes; is that right?
17      A.  Well, the March -- there was a
18  change from the March 18th one from the MRIs that I
19  saw, because he had surgery between these two.
20      Q.  Okay.  Which two are we talking
21  about?  I'm sorry.  I'm confused.
22      A.  You asked if I saw an MRI before
23  June, and the answer is yes.  We saw the March 18th
24  one, which was done before his April surgery, and he
25  had a recurrent disk herniation at L3/4 on that

Page 35

1  study.
2      Q.  Okay.  I gotcha.
3      A.  In June that wasn't mentioned there
4  anymore so --
5      Q.  Gotcha.  That was repaired by the
6  time the June MRI was taken care of?
7      A.  Right, yes.
8      Q.  Other than that change was there any
9  significant change?
10      A.  No.
11      Q.  And did you see any MRIs taken prior
12  to March of 2011?
13      A.  No.
14      Q.  Okay.  Doctor, are you aware that
15  you were identified as an expert witness because you
16  were one of the treating physicians in this
17  particular case that Mr. Bliss has against the
18  railroad?
19      A.  Yes.
20      Q.  Okay.  You're aware of that now, at
21  any rate; right?
22      A.  Yeah.
23      Q.  You've not recommended any
24  restrictions, either temporary or permanent, for
25  Mr. Bliss; correct?

Page 36

1      A.  Correct.
2      Q.  And you've not rendered any opinions
3  or been asked to render any opinions as to any
4  temporary or permanent restrictions for Mr. Bliss;
5  correct?
6      A.  Correct.
7      Q.  And other than your physical exam
8  and the MRI and EMG testing that you've done for
9  Mr. Bliss, you don't know what his current condition
10  is or his functional limitations or his medication
11  requirements are?
12      A.  No.
13      Q.  And you have not been asked, nor
14  have you rendered any opinion or have any opinion as
15  to whether or not Mr. Bliss should return to any
16  particular job or not return to any job; correct?
17      A.  Correct.
18      Q.  And as far as his conditions,
19  whatever they are right now, you don't know whether
20  they're temporary or permanent?
21      A.  Correct.
22      Q.  And, again, I think I already asked
23  you this, but whatever his conditions are, you have
24  no opinions, nor have you been asked as to what the
25  cause of those conditions are?

Page 37

1      A.  No.
2      Q.  Doctor, I have no further questions.
3          CROSS-EXAMINATION
4  BY MR. McMAHON:
5      Q.  Doctor, just briefly, going back to
6  the September 2nd, 2011, note, at the bottom there
7  in Recommendations --
8      A.  Uh-huh.
9      Q.  -- it seems that you and David had a
10  long discussion about the conditions, and at that
11  time you stated that he certainly can't function at
12  his job with the current pain level and he would
13  need to be in a light-duty situation?
14      A.  Yes, and that was related to his
15  pain.
16      Q.  Okay.  And so, depending on his pain
17  level, he may or may not still be at that light-duty
18  situation that you thought he was that was
19  appropriate in September 2nd, 2011?
20      A.  Correct.  I told him -- basically,
21  he was telling me that the work was bothering him or
22  repetitive type of twisting and movement and he
23  couldn't function in his job.  When he talked to me,
24  he basically said he couldn't do these certain
25  things and it was causing -- it was because of pain,

37:5
--39:9
BNSF
objects to
the
testimony
as hearsay
without an
exception
and as not
relevant.
Fed. R.
Evid. 402,
403, 801
and 802.
**Ruling:**
**Overruled**

**Page 38**

1    and I said, "Well, if you can't do those things, you
2    can't do those things," and so that was in reference
3    to that, that maybe light duty might be more helpful
4    because of his pain doing his current -- you know,
5    his current job description, but I was not -- I did
6    not prescribe him any light duty.
7        Q.   Okay.  And you weren't asked by the
8    railroad?
9        A.   I don't believe so.
10       Q.   All right.
11       A.   I don't have any forms that I recall
12   filling out.
13       Q.   All right.  And then, in the
14   November 7, 2011, note, you stated at the bottom
15   that he would likely needed to continue on
16   medications, at least in some form, as needed
17   indefinitely unless he gets some relief with the
18   spinal cord stimulator?
19       A.   Uh-huh.
20       Q.   What was this recommendation about?
21       A.   Basically, he had been placed on
22   anti-inflammatories and other medicines for his pain
23   which was used to manage that, and I felt that his
24   pain was probably chronic and he was likely going to
25   need to be on medications if this didn't work for

**Page 39**

1    his nerves, and we wouldn't know how long or what
2    medicines those might be, but there may be nothing
3    else, in other words, for him.
4        Q.   And did you make the referral to
5    Dr. Donovan at that time, do you know?
6        A.   For the spinal cord stimulator?
7        Q.   Right, for the consult.
8        A.   Yes, we probably would have at that
9    time.  I don't know if he went or not.
10       Q.   But from the November 7, 2011, note,
11   it seems that you were making the referral to more
12   of a pain management treatment plan; is that fair to
13   say?
14       A.   Yes.  He was having nerve pain at
15   that time, so sending him to a pain manager or
16   somebody that could maybe identify whether he would
17   even be a candidate for something like that spinal
18   cord stimulator for some chronic nerve type of
19   damage or pain, and that was my thought, is that
20   that might be an option for him.
21       Q.   And the procedure, I guess it was
22   done by Dr. Devney, is that correct --
23       A.   Uh-huh.
24       Q.   -- in October of 2011, the
25   rhizolysis?

**Page 40**

1        A.   Rhizolysis, yeah.
2        Q.   Rhizolysis?  Did that work in
3    correcting some of the symptoms that Mr. Bliss had?
4        A.   Yes.  That's what he reported, that
5    it helped him with his low back pain significantly.
6        Q.   All right.  And how?  What's the --
7    how does that work?  How does the rhizolysis
8    function to alleviate the low back pain?
9        A.   Basically, it's -- I would say it's
10   a newer procedure, the idea being if you take away
11   the painful innervation of the joints in the back,
12   the facet joints, by basically destroying or
13   disrupting one of the nerves through heat or some
14   other type of injury that you can numb that joint
15   innervation; therefore, if you have pain in that
16   joint, you won't feel the pain in the back, and so
17   it's a pain-relieving procedure by basically
18   destroying part of the sensory portions of the
19   nerves to those joints.
20       Q.   And is it a permanent fix for
21   patients like Mr. Bliss?
22       A.   Most of the pain doctors consider it
23   a semi permanent or longer term but not permanent,
24   necessarily.  Although some people supposedly get
25   permanent relief, most of the doctors, I think,

**Page 41**

1    suggest that it may be a year to two years, tops.
2        Q.   And that's because the nerves
3    regenerate themselves?
4        A.   Yes, the sensory branches can
5    regenerate.
6        Q.   And if the sensory branches
7    regenerate in that area where the rhizolysis was
8    performed, is that the risk, is that the symptoms
9    then will come back, the mechanical back pain
10   symptoms will return?
11       A.   Yes.
12       Q.   Is that correct?
13       A.   Yes.
14       Q.   Okay.  And then, in those patients
15   where the nerve is regenerated and the symptoms of
16   mechanical back pain have returned, if those
17   patients return to see you, is there -- can you do
18   another rhizolysis?  What's the course of treatment
19   at that time?
20       A.   That, I typically would leave up to
21   the pain doctors, but I have heard of patients going
22   back and getting another rhizolysis if they have
23   good relief, but it does reoccur.  I don't know what
24   the success rate of that is for a repeat procedure
25   like that.

11 (Pages 38 - 41)

Page 42

1    Q.  All right.  Now, there's been some
2  mention in your records about a fusion, and in
3  Mr. Bliss' case was it that he was a candidate for a
4  three-level fusion?
5    A.  That's what I offered him.  If we
6  were going to do a fusion, we were going to have to
7  address all three of those degenerative levels, any
8  one of or all of those three contributing to his
9  pain, potentially.
10    Q.  And fusion surgery, just by its own
11  nature, is a permanent -- you're addressing a
12  permanent type of fix for someone with mechanical
13  back pain; correct?
14    A.  Correct.
15    Q.  And people that undergo the
16  rhizolysis procedure, are they also candidates for
17  fusion surgeries if the mechanical back pain
18  symptoms return after the nerves regenerate?
19    A.  Sometimes.
20    Q.  All right.  And is there anything
21  about the rhizolysis procedure that excludes
22  patients from future fusion surgery?
23    A.  Not necessarily.
24    Q.  Okay.
25    A.  I'd say not from the procedure,

Page 43

1  itself.
2    Q.  That's what I meant.  Is there
3  something that would then sort of --
4    A.  If the procedure were done and it
5  gave no relief at a level that they did it, then I
6  would suspect that I wouldn't fuse a level that
7  didn't work from the other procedure either if I was
8  using that as a diagnostic procedure, but typically
9  those would be done with a block and not a
10  rhizolysis.
11    Q.  Okay, all right.  'Cause then fusion
12  obviously wouldn't help those symptoms if the
13  rhizolysis, or the block, didn't help those
14  symptoms; correct?
15    A.  Typically.
16    Q.  So the thinking goes; right?
17    A.  Yes, and in his case I think the
18  joints were a big component of his pain.  The other
19  issue is the disk and the nerve, which isn't
20  addressed by rhizolysis because that's -- we're
21  talking about a little more anterior and different
22  portions of the nerve, not the nerve innervation to
23  the joint, so it gets a little complex using them to
24  totally decide whether you're going to do that
25  surgery or not.

Page 44

1    Q.  I understand.  Thank you, Doctor.
2       REDIRECT EXAMINATION
3  BY MR. LUERS:
4    Q.  But just so we're clear, Doctor, you
5  didn't recommend and even told him in the November
6  letter that the fusion would not make him any
7  better, and you didn't recommend that procedure?
8    A.  Based on his constellation of
9  symptoms that he had at that time, which were almost
10  all nerve related, which I couldn't pinpoint, I had
11  no target.  Before our target was back pain and
12  generation back pain.  The symptoms sounded like
13  they got significantly better, and I couldn't
14  improve upon that with fusion, at least when I saw
15  him, and that's why I told him that.
16    Q.  I gotcha.  And you've not seen
17  anything that changed your opinion in that regard?
18    A.  No.
19    Q.  And you're not aware of any medical
20  doctor at this point advising him to get a fusion?
21    A.  No.
22    Q.  Doctor, I don't think I asked you,
23  and I just very quickly will ask you if you ever saw
24  this letter that Mr. Bliss wrote to Dr. Noble, and
25  that is Exhibit 57.  I'm doubting you've ever seen

Page 45

1  it.
2    A.  No.
3    Q.  You've never seen it?
4    A.  No.
5    Q.  I take it that the language in here
6  where he says, when I go to work as a carman even
7  after January of 2011, it's not a heavy load, was
8  that different than what he told you about his
9  carman duties?
10    A.  I was under the impression that he
11  had some heavy physical labor involved in it.  I
12  don't know the specifics, but that was a physical
13  job.
14    Q.  Did you ever -- did he ever talk
15  specifics with you in terms of how heavy or how
16  physical?
17    A.  I don't recall that conversation.
18       MR. LUERS:  I have nothing further.
19       MR. McMAHON:  I have nothing further.
20       MR. LUERS:  Doctor, you have a right to
21  read and review the transcribed deposition, or you
22  can waive that right.
23       THE WITNESS:  That's fine.  Waive it.
24          (Deposition concluded at 2:07 p.m.)
25

12 (Pages 42 - 45)

Page 46

```
 1              C E R T I F I C A T E
 2       I, Lisa G. Grimminger, RMR, CRR, General
 3   Notary Public, duly commissioned, qualified, and
 4   acting under a general notarial commission within
 5   and for the State of Nebraska, do hereby certify
 6   that:
 7            DR. KEITH R. LODHIA
 8   was by me first duly sworn to tell the truth, the
 9   whole truth, and nothing but the truth; that the
10   foregoing deposition was taken by me at the time and
11   place herein specified and in accordance with the
12   within stipulations; that I am not counsel,
13   attorney, or relative of either party or otherwise
14   interested in the event of this suit.
15       IN TESTIMONY WHEREOF, I have hereunto set my
16   hand officially and attached my notarial seal at
17   Lincoln, Nebraska, this 24th day of October, 2012.
18
19       _____
             General Notary Public
20
21
22
23
24
25
```

13 (Page 46)

| & |
| --- |
| **&** 1:9,13,17 |

| 1 |
| --- |
| **1** 2:3 3:4 |
| **1248** 1:17 |
| **13** 18:24 22:5 |
| **13th** 19:2,6,8,12 |
| 20:18,18 |
| **15** 24:20 |
| **15th** 22:3 |
| **16** 1:10 |
| **18** 34:15 |
| **18th** 34:13,18,23 |
| **1:18** 1:10 |

| 2 |
| --- |
| **2** 3:9 |
| **20** 31:11 33:19,21 |
| **200** 1:14 |
| **2000** 34:12 |
| **2003** 24:3 |
| **2010** 16:12,18,25 |
| 17:4,9 |
| **2011** 6:17 7:1,21,24 |
| 9:8 10:12,24 11:23 |
| 13:9 17:14 18:19,22 |
| 18:24 22:6 25:9 |
| 26:18 28:20 29:1 |
| 30:19 32:23 34:2,7 |
| 34:13,15 35:12 37:6 |
| 37:19 38:14 39:10 |
| 39:24 45:7 |
| **2012** 1:10 46:17 |
| **24th** 16:25 46:17 |
| **25** 18:5,8 |
| **25th** 26:18 |
| **26th** 25:16 |
| **2:07** 45:24 |
| **2nd** 28:4 29:1 37:6 |
| 37:19 |

| 3 |
| --- |
| **3** 2:4 3:11 |
| **3-18** 7:20 |

| 3019 1:2 |
| --- |
| **305** 1:9 4:16 |
| **30th** 25:22 |
| **37** 2:9 |
| **3rd** 10:12 |

| 4 |
| --- |
| **4** 2:8,12,13,14,15,16 |
| 3:13 |
| **44** 2:10 |
| **46** 2:5 |
| **4:12** 1:2 |

| 5 |
| --- |
| **5** 3:16 |
| **50** 18:6,7,8 |
| **542** 1:14 |
| **55** 14:1,4 |
| **56** 2:12 4:1 16:20 |
| **57** 2:13 44:25 |
| **58** 2:14 17:2 33:11 |
| **59** 2:15 19:10 26:16 |
| 27:12 |
| **5th** 17:4 |

| 6 |
| --- |
| **6** 3:18 |
| **6/24/10** 2:12 |
| **60** 2:16 4:1 |
| **60605** 1:15 |
| **68508** 1:18 |

| 7 |
| --- |
| **7** 38:14 39:10 |
| **7-26** 25:9 |
| **7th** 30:20 31:5 |

| 8 |
| --- |
| **8** 10:24 11:23 |
| **800** 1:18 |
| **8005** 1:9 4:16 |
| **8th** 6:17,25 7:11 |
| 12:17,18 13:9 15:3 |

| a |
| --- |
| **abilities** 17:25 |
| **able** 18:1 33:12 |

| |
| --- |
| **accurate** 9:2 |
| **aching** 31:19 |
| **achy** 9:19 |
| **acquainted** 6:1,3 |
| **acting** 46:4 |
| **activity** 15:6 17:16 |
| **actual** 21:21 23:22 |
| **acute** 15:2 16:1 |
| 22:18,22 23:4,17,20 |
| **acutely** 16:1 |
| **additional** 20:25 |
| 22:14,15 |
| **address** 4:15 42:7 |
| **addressed** 43:20 |
| **addressing** 42:11 |
| **adult** 14:11 |
| **advance** 27:16 |
| **advising** 44:20 |
| **aging** 14:13 |
| **ago** 5:12 |
| **agree** 33:5,10,24 |
| **agreed** 3:2 |
| **ahl** 1:17 |
| **alignment** 14:11 |
| **alleviate** 40:8 |
| **answer** 34:23 |
| **anterior** 43:21 |
| **anti** 27:3 38:22 |
| **anymore** 35:4 |
| **appearances** 2:3 |
| **applied** 5:11 |
| **appropriate** 37:19 |
| **april** 8:20 12:9 |
| 34:24 |
| **area** 41:7 |
| **areas** 13:16 |
| **arrived** 20:2 |
| **asked** 34:22 36:3,13 |
| 36:22,24 38:7 44:22 |
| **assistant** 24:20 |
| **assume** 5:25 |
| **assuming** 25:10 |
| **atrophy** 9:12 11:5 |
| **attached** 46:16 |

| |
| --- |
| **attorney** 3:12 46:13 |
| **attribute** 21:6 22:12 |
| 22:14 |
| **august** 17:4 26:18 |
| **aware** 7:24 10:10,14 |
| 16:13 27:9,25 35:14 |
| 35:20 44:19 |
| **awareness** 2:14 |

| b |
| --- |
| **b** 1:16 3:12 |
| **back** 8:17 9:11,19 |
| 11:1,15 12:8 13:18 |
| 18:14 19:11 20:24 |
| 22:4 24:4 28:1 31:3 |
| 31:8,15,25 32:10,11 |
| 34:11 37:5 40:5,8 |
| 40:11,16 41:9,9,16 |
| 41:22 42:13,17 |
| 44:11,12 |
| **base** 18:15 |
| **based** 12:14,15 |
| 17:13 18:13 21:21 |
| 29:22 32:13 44:8 |
| **basically** 7:12 13:12 |
| 13:20 17:21 22:6 |
| 26:11 28:12 29:5 |
| 37:20,24 38:21 40:9 |
| 40:12,17 |
| **beginning** 5:9 |
| **behalf** 1:5 |
| **believe** 18:20 32:24 |
| 38:9 |
| **believed** 26:6 |
| **better** 44:7,13 |
| **beyond** 5:11 14:14 |
| **big** 43:18 |
| **bit** 13:18 |
| **bliss** 1:2 2:13 6:4,12 |
| 14:3 16:11 17:14 |
| 26:25 27:8,24 28:3 |
| 33:25 35:17,25 36:4 |
| 36:9,15 40:3,21 |
| 42:3 44:24 |

Page 2                                                    [bliss's - dictated]

**bliss's**  24:20
**block**  43:9,13
**blocks**  30:2,3,5
**bnsf**  1:5
**board**  4:25 5:1,2,4,5
**boards**  5:6,8
**bone**  23:24
**bones**  9:6
**bothering**  32:2
  37:21
**bottom**  37:6 38:14
**brain**  4:24
**branches**  41:4,6
**briefly**  16:21 17:12
  19:14 37:5
**burning**  31:3
**business**  4:15

**c**

**c**  1:12 46:1,1
**calabro**  19:4,15
  20:21
**call**  13:17
**candidate**  39:17
  42:3
**candidates**  42:16
**capable**  17:15
**capacity**  11:17
  15:14,18 25:19
**care**  32:21 35:6
**carman**  45:6,9
**carry**  18:4
**case**  1:2 10:20 18:19
  35:17 42:3 43:17
**categorized**  20:5
**cause**  10:21 11:18
  21:11 24:17 33:15
  36:25 43:11
**causing**  29:21 37:25
**cautioned**  4:5
**certain**  37:24
**certainly**  37:11
**certificate**  2:5
**certification**  5:4

**certified**  3:6 4:6 5:1
  5:1,2
**certify**  46:5
**cetera**  22:23
**change**  34:18 35:8,9
**changed**  44:17
**changes**  12:23,24
  13:13,13,21,24 14:2
  14:11,12,16,16 21:9
  34:4,10,16
**chemically**  30:12
**chicago**  1:15
**chronic**  15:2,17,24
  22:2,22,25 24:9
  38:24 39:18
**chronically**  23:9
**claimed**  10:11
**claiming**  10:19
**clear**  44:4
**clearly**  33:25
**clinic**  16:10
**come**  41:9
**comments**  15:13
**commission**  46:4
**commissioned**  46:3
**company**  1:5 10:6
**compared**  11:5
**complained**  10:15
  11:6 31:2,18
**complaining**  20:25
  21:17 31:13
**complaints**  28:8,21
  29:13
**complete**  31:7
**complex**  43:23
**component**  13:1
  43:18
**compression**  22:19
  22:19 23:23
**compressive**  23:21
**computer**  12:6
**conclude**  31:24
**concluded**  20:3
  45:24

**conclusion**  26:3
**condition**  15:17
  23:11 24:2 27:6
  33:3,8,13 36:9
**conditioning**  27:14
  27:17
**conditions**  36:18,23
  36:25 37:10
**confused**  34:21
**consider**  14:14
  40:22
**consistent**  23:2
**constellation**  44:8
**consult**  39:7
**consultation**  7:4,7
  9:9,16 28:7
**contained**  7:10
**contemporaneously**
  7:6
**continue**  27:1 38:15
**continuing**  27:16
**contributing**  11:15
  42:8
**conversation**  45:17
**copy**  3:19
**cord**  38:18 39:6,18
**correct**  7:1 17:24
  22:10,11,15 24:21
  28:14 29:4,14,15,18
  30:15 31:8,12,17
  32:7 33:3,4,9 35:25
  36:1,5,6,16,17,21
  37:20 39:22 41:12
  42:13,14 43:14
**correcting**  40:3
**correction**  9:22
**correlates**  24:9
**counsel**  46:12
**couple**  7:9 8:21
**course**  41:18
**court**  1:1
**create**  30:11
**cross**  2:9 37:3
**crr**  46:2

**cs1540360**  1:25
**current**  29:2 36:9
  37:12 38:4,5
**cursory**  33:11
**cv**  1:2

**d**

**d**  2:1 4:14
**damage**  23:13 39:19
**date**  6:24 20:2 25:15
  25:16
**dated**  6:25 13:9
  16:23 17:4 25:8,22
**david**  1:2 6:4 24:20
  37:9
**day**  12:19 20:21
  33:17 46:17
**dearborn**  1:14
**decide**  43:24
**decompress**  32:12
**defendant**  1:5,6,16
  3:12
**deferred**  26:7
**degeneration**  14:9
  23:11 30:1
**degenerative**  13:13
  13:21 14:2,12,15,23
  21:9 23:16 33:25
  42:7
**delivered**  3:11
**demand**  20:4
**denervating**  23:8
**depending**  9:6 37:16
**deposition**  1:4 3:4,9
  3:11,15,19 5:23,25
  45:21,24 46:10
**depressed**  28:13
**description**  18:2
  38:5
**destroying**  40:12,18
**developed**  20:10
**devney**  39:22
**diagnostic**  43:8
**dictated**  13:3

**different** 13:3 14:3
    21:25 22:7 28:21
    30:4,8 43:21 45:8
**difficulty** 9:23
**diminish** 29:12
**direct** 2:8 4:9
**directed** 8:13
**discs** 14:9,13
**discussed** 30:24,25
**discussion** 37:10
**disease** 34:1
**disk** 7:9 23:14,24
    34:1,25 43:19
**diskectomies** 13:6
**diskectomy** 8:21
    12:11 17:22
**disrupting** 40:13
**distribution** 21:16
**district** 1:1,1
**doctor** 4:11,15 5:15
    7:4,24 8:25 10:10
    10:17 13:11 16:4,23
    17:8 18:23 25:6
    26:1,15 27:11 29:4
    30:17 32:4 33:6,24
    35:14 37:2,5 44:1,4
    44:20,22 45:20
**doctors** 32:21 40:22
    40:25 41:21
**doing** 38:4
**donovan** 39:5
**doubting** 44:25
**dr** 1:4 2:7,13 3:4 4:4
    6:25 16:5,11,18,21
    17:2,9 39:5,22
    44:24 46:7
**drive** 1:9
**duly** 4:5 46:3,8
**duties** 45:9
**duty** 17:10 29:3
    37:13,17 38:3,6

**e**

**e** 1:12,12 2:1 46:1,1

**earliest** 6:19,21
**early** 24:3
**eight** 17:5
**either** 7:6 14:21
    21:19 26:7,19 27:23
    35:24 43:7 46:13
**electrically** 30:12
**eligible** 5:5
**eliminate** 29:6
**emg** 21:14,15,23
    22:1,2,16,18,25
    23:12 24:9,13 29:23
    32:13 36:8
**ended** 11:12
**engaged** 27:8
**equal** 11:4
**especially** 15:23
    27:17
**essentially** 21:25
**et** 22:23
**evaluate** 11:20
**evaluation** 11:17
    15:14,18 25:19
**event** 46:14
**evidence** 33:22
**exacerbation** 21:8
**exam** 2:12 11:8
    17:13 26:9 28:12,19
    29:16,22 36:7
**examination** 2:8,9
    2:10 4:9 33:11 37:3
    44:2
**examined** 4:6 10:23
**excellent** 31:6
**excludes** 42:21
**excuse** 20:18
**exhibit** 4:1 16:20
    17:2,3,11 19:10
    26:14,15,16 27:12
    28:1 33:11 44:25
**exhibits** 2:11
**expert** 35:15
**extensive** 14:8
**extent** 10:9

**eyes** 11:3

**f**

**f** 46:1
**facet** 29:24 30:1,2,2
    30:5 40:12
**fair** 39:12
**familiar** 16:5
**far** 28:18 30:14
    36:18
**farina** 1:13
**farnam** 1:9 4:16
**fce** 11:20,25 19:19
    19:23 20:8,25 21:3
    25:21,22 26:8
**february** 10:11,12
**feel** 40:16
**feet** 31:3,17,20
**felt** 11:18 38:23
**fifth** 5:10
**fifty** 17:5
**fill** 8:5,6
**filled** 15:9
**filling** 38:12
**find** 10:24 22:24
**finding** 24:9,14
**findings** 13:10 23:12
    30:24
**fine** 45:23
**first** 4:5 6:15 7:3,24
    22:8 24:4 28:20,25
    33:6 34:2 46:8
**fix** 40:20 42:12
**fixing** 16:2
**flare** 21:9
**follow** 26:2 27:1,7
    27:23
**followed** 30:14
**follows** 4:6
**foot** 31:11
**foregoing** 46:10
**form** 3:13 23:14
    38:16
**forms** 38:11

**forth** 3:7 17:11
**found** 20:8 21:18
**foundation** 3:14
**four** 10:18
**frequently** 18:8
**friend** 10:4
**front** 26:14
**full** 4:11 8:3 17:10
**function** 29:2,7
    37:11,23 40:8
**functional** 11:17
    15:13,18 17:25 20:3
    25:19 27:16 31:22
    36:10
**functioning** 29:10
**further** 23:5 26:5,25
    37:2 45:18,19
**fuse** 43:6
**fusion** 25:25 32:6,11
    42:2,4,6,10,17,22
    43:11 44:6,14,20
**future** 26:9 42:22

**g**

**g** 3:5 46:2
**gain** 25:12
**general** 3:6 46:2,4
    46:19
**generation** 44:12
**generator** 30:11
**gentleman** 7:8 13:22
    13:25
**getting** 11:20 32:17
    41:22
**give** 15:15
**go** 15:16 45:6
**goes** 43:16
**going** 15:14,16,24
    16:19 19:9 26:13,17
    37:5 38:24 41:21
    42:6,6 43:24
**good** 11:3 32:6
    41:23
**gotcha** 16:4 35:2,5
    44:16

**gotten**  9:25 32:18
**grade**  18:17
**grimminger**  3:5
    46:2
**gross**  18:14
**guess**  7:8,22 8:12
    9:11 10:8,14 11:6
    16:5 21:17 25:23
    30:18 39:21
**guessing**  20:23
**guys**  25:10

**h**

**h**  4:14
**half**  33:17
**hand**  46:16
**happen**  8:25
**happened**  10:21
**happenstance**  10:5
**hardening**  27:5,13
    27:17
**heal**  23:7 24:1
**healing**  23:5
**heard**  7:17 41:21
**heat**  40:13
**heavy**  20:5 45:7,11
    45:15
**heels**  31:3,10
**help**  22:21 43:12,13
**helped**  30:3 40:5
**helpful**  38:3
**hereinafter**  4:5
**hereof**  3:8
**hereto**  3:3
**hereunto**  46:15
**herniated**  23:14,23
**herniation**  13:15
    34:25
**hesitancy**  33:16
**high**  18:16
**hips**  31:19
**history**  7:5,11,14
**hoey**  1:13
**hoping**  25:12

**huh**  5:19 11:24 13:7
    15:21 17:19 19:20
    26:20 28:15 37:8
    38:19 39:23
**hurd**  1:16
**hurt**  9:25

**i**

**idea**  40:10
**identification**  4:3
**identified**  35:15
**identify**  39:16
**illinois**  1:15
**imaging**  29:22
**impaired**  23:9
**impose**  15:20
**impression**  45:10
**improve**  44:14
**improved**  31:23
    32:1 33:8
**improvement**  26:7
**incisions**  10:25
**increased**  21:7
    24:10
**increasing**  21:5
**indefinitely**  38:17
**independent**  6:7
**indicate**  32:5
**indicates**  13:19
**individual**  14:21
**induced**  14:18
**inflammatories**  27:3
    38:22
**information**  7:10
    8:8 9:1 26:8
**injections**  31:2
**injured**  23:19
**injury**  10:11,19,21
    23:2,6,11,17,20
    40:14
**innervation**  23:6
    40:11,15 43:22
**instabilities**  18:15
**instability**  13:20
    14:10 18:17

**intact**  11:2
**interested**  46:14
**invalid**  20:8,15
**involved**  45:11
**iowa**  5:21
**issue**  43:19

**j**

**j**  1:13
**james**  1:16 3:12
**january**  45:7
**job**  1:25 2:14 9:23
    9:25 10:8 20:4 29:2
    36:16,16 37:12,23
    38:5 45:13
**john**  19:4,15 22:3
**joint**  40:14,16 43:23
**joints**  14:12 29:24
    29:25 40:11,12,19
    43:18
**july**  19:6,6,8 20:18
    22:3,5 24:20 25:16
**jumped**  20:13
**june**  6:17,25 7:11,24
    9:8 10:24 11:23
    12:17,18 13:9 15:3
    16:25 18:18,22,24
    19:2,6,7,12 20:18
    22:8 25:22 28:20
    34:2,7,23 35:3,6

**k**

**keep**  16:2 26:13,17
**keith**  1:4 2:7 3:4 4:4
    4:13 46:7
**kind**  5:12 12:8
    14:10 26:11 32:15
**kinds**  23:12
**knee**  7:25
**knew**  10:3,7
**know**  5:24 8:17,25
    13:2 14:20 15:16
    16:7,9 21:2,9,20
    23:22 24:6,8 25:2,3
    26:1 27:6,13,22
    30:15 32:14,22 33:3

**33:20 36:9,19 38:4
    39:1,5,9 41:23
    45:12
**known**  12:19
**knows**  10:4
**kreshel**  6:25

**l**

**l**  3:1 4:14
**l2/3**  8:24 13:1
**l3/4**  8:22,23 12:24
    13:2 34:1,25
**l4/5**  12:24
**l5**  8:24 12:24 22:2
    22:25 34:1
**labor**  45:11
**lack**  31:24
**language**  45:5
**lateral**  31:10
**leave**  41:20
**left**  11:5,14,15
**leg**  11:15
**legs**  9:11,12,19
    31:18,20
**lesion**  30:11
**letter**  6:25 7:11
    11:23 31:6 44:6,24
**level**  13:19 20:4
    25:25 29:2,7 37:12
    37:17 42:4 43:5,6
**levels**  7:9 12:25 13:2
    13:4,6,14,14,15,19
    29:25 42:7
**licensed**  5:17
**lift**  18:4
**lifting**  9:20
**light**  29:3,7 37:13,17
    38:3,6
**limitations**  11:21
    36:10
**limited**  9:20 11:18
    29:9
**limiting**  32:3
**lincoln**  1:18 16:6
    46:17

line   11:20
lisa   3:5 46:2
list   5:13
listed   10:13
little   8:5 13:18 18:15
    43:21,23
llp   1:17
load   45:7
located   31:16
location   9:2 22:20
    22:23
lodhia   1:4 2:7 3:4
    4:4,13 46:7
long   5:12,14 14:17
    14:23 15:16,23
    37:10 39:1
longer   30:3 40:23
look   6:15 11:7 12:3
    16:14 22:18 25:13
    27:10
looked   8:22 11:1
    12:24 14:21 22:8
looking   26:14 27:11
looks   6:23 7:17 11:1
    12:17 25:7 31:19
lot   13:12,20
low   32:10,11 40:5,8
lower   13:21
luers   1:16,16 2:8,10
    3:12 4:10 17:6,8
    44:3 45:18,20
lumbar   7:20 13:21
    22:21 31:8,24

**m**

madonna   25:1,2,6
    26:21 27:5
making   39:11
manage   38:23
management   39:12
manager   39:15
march   34:13,15,17
    34:18,23 35:12
marked   2:11 4:2
    16:20

marrow   13:13
matter   18:1
maximum   26:6
mcmahon   1:13 2:9
    17:5 37:4 45:19
mean   12:16
meaning   11:2 13:13
    13:17 23:1,3,7,22
meant   13:2 43:2
measure   29:13
mechanical   31:15
    32:9,11 41:9,16
    42:12,17
medical   2:15 7:5,16
    12:13 26:7 44:19
medication   32:16
    36:10
medications   30:9
    32:20 38:16,25
medicines   27:3
    38:22 39:2
mention   42:2
mentioned   8:23
    12:10 35:3
merit   3:5
michigan   5:21
middle   5:9
midwest   1:9
mild   14:12 24:15,16
mine   10:4
minor   21:10
minutes   31:11 33:19
    33:21
moment   22:4
months   8:21 10:18
movement   37:22
mrh5   27:12
mri   7:18 9:1 11:13
    11:16 12:16,18,21
    12:23 13:8 14:21,25
    17:13 18:14 21:13
    21:24 22:5,7,13
    30:24 32:13 34:6,11
    34:15,22 35:6 36:8

mris   34:4,11,18
    35:11
muscle   18:13

**n**

n   1:12 2:1 3:1
name   4:12 6:4
narcotics   27:2
nature   23:16 42:11
near   31:7
nebraska   1:1,10,18
    4:17 5:18 46:5,17
necessarily   20:9
    40:24 42:23
need   29:3 37:13
    38:25
needed   16:1,2 38:15
    38:16
nerve   4:24 22:18,19
    22:20,23 23:7,13,15
    23:22,23 24:1 31:14
    32:2 39:14,18 41:15
    43:19,22,22 44:10
nerves   32:12 39:1
    40:13,19 41:2 42:18
neurologically   11:2
neurosurgeon   5:2
    5:15
neurosurgeries   4:23
neurosurgery   1:9
    4:21,24
never   45:3
nevertheless   14:16
new   21:16 23:5,6
newer   40:10
noble   2:13 16:5,18
    16:21 17:2,9 44:24
noble's   16:11
nonnarcotic   27:3
nonoperative   25:24
normal   14:11
nos   4:1
notable   11:3
notarial   46:4,16

notary   3:7 46:3,19
note   2:12,13 6:18,19
    6:21 15:10 16:21
    17:2 19:15 21:21
    22:3 37:6 38:14
    39:10
noted   28:12 34:4
notes   28:8 33:1
notice   3:10
november   30:19,20
    31:5 32:23 38:14
    39:10 44:5
numb   40:14
number   26:14

**o**

o   1:17 3:1 4:14
oath   4:7
objections   3:13
objective   33:22
objects   18:5
obviously   9:17
    11:18 19:15 29:11
    43:12
occasionally   18:9
occurring   23:6
october   1:10 39:24
    46:17
offered   42:5
offhand   26:1
office   6:13 9:7 16:11
officially   46:16
oh   19:11
okay   6:23 7:19
    10:17 11:9 13:5
    14:15 18:18 19:9
    20:7,17 21:18 22:1
    23:3 24:6,11,16
    25:10,18,23 28:1,5
    28:24 30:13 32:25
    33:15,20,24 34:14
    34:20 35:2,14,20
    37:16 38:7 41:14
    42:24 43:11

Page 6                                                        [old - realtime]

old  14:1 22:19 23:2
  23:3
olds  14:4
omaha  1:10 4:16
once  15:7,24
one's  30:9
ongoing  14:17 23:5
operations  23:25
opinion  10:20 36:14
  36:14 44:17
opinions  36:2,3,24
opposed  7:15 14:17
  25:24 31:14
option  39:20
oral  5:6
order  11:25 15:4,18
  19:12
ordered  12:4 15:1
  21:12
orders  12:6
original  3:11
outside  3:17

**p**

p  1:12,12 3:1
p.m.  1:10 45:24
pa  19:1,3,16
page  2:2 3:8 16:24
  19:10 27:11 28:25
pain  9:11,18 11:15
  18:2 20:10,25 21:5
  21:7,16 22:14,15
  24:10 29:2,6,9,11
  29:22,24 31:8,11,24
  31:25 32:10,11,15
  32:16,20 37:12,15
  37:16,25 38:4,22,24
  39:12,14,15,19 40:5
  40:8,15,16,17,22
  41:9,16,21 42:9,13
  42:17 43:18 44:11
  44:12
painful  40:11
paragraph  27:13
  28:25

part  5:6 11:23 19:9
  40:18
particular  6:24 7:23
  8:13 13:10 14:2
  15:4 17:11 21:7
  30:22 35:17 36:16
parties  3:3
party  46:13
pass  20:15
passed  5:7
patient  6:3,7 7:15
  7:18,25 8:8 10:24
  15:5,24,25 17:10
  24:25
patient's  8:3
patients  8:5 16:8
  40:21 41:14,17,21
  42:22
people  24:18 27:23
  40:24 42:15
perform  33:12
performed  41:8
period  16:3
peripheral  4:24
  22:20
permanent  35:24
  36:4,20 40:20,23,23
  40:25 42:11,12
personally  16:7,10
peruse  17:12
phenomenon  23:21
phone  21:21 30:19
physical  2:16 10:8
  17:13 20:3 23:22
  25:3 26:9 27:1
  28:12,19 29:16,22
  31:21 33:13 36:7
  45:11,12,16
physician  4:18
physician's  24:19
physicians  35:16
picture  6:8
pinched  22:20
pinching  23:14

pinpoint  44:10
place  3:7 15:5 46:11
placed  38:21
plaintiff  1:3,13
plan  11:23 26:25
  39:12
planned  27:18,20
please  4:12
point  8:12 10:7
  11:19 20:12 23:19
  25:12 26:24 27:4,19
  28:11 29:20 31:22
  32:5,14 44:20
portions  40:18
  43:22
position  10:20
possibly  11:19 24:5
  30:2
posterior  13:17
postoperative  13:24
potentially  42:9
pounds  18:6,7,8,8
practicing  5:15
prescribe  15:4
  32:19 38:6
prescribed  16:3
  32:16
prescription  32:15
presence  3:17
presume  4:25
pretty  28:19
previous  7:9 8:17
  10:14 22:1
previously  23:25
print  8:6 21:22
printed  8:4,4
printout  8:2
prior  7:6 35:11
probably  6:18 8:20
  12:20 13:15 15:13
  20:22 23:20 38:24
  39:8
problem  16:1
problems  8:14

procedure  39:21
  40:10,17 41:24
  42:16,21,25 43:4,7
  43:8 44:7
process  5:7 23:8
program  27:6,14
provide  16:19
provided  7:6,12,15
  16:10
public  3:7 46:3,19
pull  18:5
purpose  9:8,14
  22:16 28:5
pursuant  3:9
push  18:5
put  28:1

**q**

qualified  46:3
quantify  22:21
questions  37:2
quick  27:10
quickly  17:12 44:23

**r**

r  1:4,12 2:7 3:4 4:4
  4:13 46:1,7
radicular  28:14
radiculopathy  22:2
  23:1
radiofrequency
  30:11
railroad  10:4,5,12
  17:10 35:18 38:8
railway  1:5
raman  4:13
rate  13:8 35:21
  41:24
read  11:22 19:14
  27:5 45:21
real  34:16
realize  28:21
really  13:14 18:14
  24:6
realtime  3:6

**reason** 22:14 33:21
**recall** 6:8,11 7:4
   8:17 10:1 12:3
   15:11,12 17:7 25:11
   26:3 38:11 45:17
**recollection** 6:7
**recommend** 11:9
   26:9,10 29:19 44:5
   44:7
**recommendation**
   38:20
**recommendations**
   37:7
**recommended**
   11:16 26:4 27:2
   30:1,13 35:23
**recommending**
   11:13 26:25
**record** 8:3 25:13
**recorded** 5:25
**records** 2:15,16 6:16
   7:16 12:13 16:11
   18:23 26:2 42:2
**recurrent** 34:25
**redirect** 2:10 44:2
**redo** 8:21 12:10
**reduce** 29:6
**reference** 8:16
   16:14 38:2
**referenced** 15:9
**references** 27:13
**referral** 39:4,11
**referred** 6:12 30:9
**reflect** 26:2
**reflexes** 11:3 28:13
**regard** 14:6 27:7,23
   44:17
**regarding** 16:22
**regenerate** 41:3,5,7
   42:18
**regenerated** 41:15
**registered** 3:5
**rehab** 25:1,11,13
   26:2 27:23

**related** 37:14 44:10
**relative** 46:13
**release** 16:22
**released** 17:9
**relief** 9:13 38:17
   40:25 41:23 43:5
**relieving** 40:17
**remarkable** 11:8
**remember** 7:4,19
   10:2
**render** 10:20 36:3
**rendered** 36:2,14
**reoccur** 41:23
**repaired** 35:5
**repeat** 22:5 41:24
**repetitive** 37:22
**report** 7:21 9:5
   13:10 25:5 26:4,19
   29:1 32:4
**reported** 9:7 40:4
**reporter** 3:6,6
**reporter's** 2:5
**reports** 27:5
**requirements** 36:11
**residency** 5:8,9
**resolution** 31:8
**response** 4:7 31:7
**restrictions** 15:4,6
   15:15,20,25 26:10
   26:11 35:24 36:4
**result** 14:22 23:11
   23:18
**results** 12:20 20:12
   21:19 22:13 34:6
**retrospondylolisth...**
   13:17 18:16
**return** 16:22 36:15
   36:16 41:10,17
   42:18
**returned** 41:16
**returning** 17:15
**review** 7:18 16:20
   28:8 45:21
**reviewed** 28:7

**reviewing** 9:1
**rhizolysis** 30:2,10
   31:1,7 39:25 40:1,2
   40:7 41:7,18,22
   42:16,21 43:10,13
   43:20
**rhizotomy** 30:4
**right** 5:22 6:1,11,17
   6:18 7:3,23 8:14
   10:10,23 11:5 13:25
   16:4,9,17 17:1,8
   18:3 19:21,23 20:1
   20:11,18 21:1,12,14
   22:2,9,11,15,25
   24:23 26:17 27:19
   29:11 31:9 34:16
   35:7,21 36:19 38:10
   38:13 39:7 40:6
   42:1,20 43:11,16
   45:20,22
**risk** 41:8
**rmr** 46:2

**s**

**s** 1:12 3:1,1
**s1** 8:24 12:24 28:13
   34:1
**saw** 6:16,24 8:21
   13:20 14:1,2 18:23
   20:2,17,22 22:8
   28:3,7,20 33:7,7
   34:2,19,22,23 44:14
   44:23
**saying** 10:2 29:5,8
**says** 7:20 9:10,15,16
   11:16 27:15 29:1
   45:6
**scan** 7:18 13:4
**scanned** 16:15
**seal** 46:16
**second** 27:12
**secondary** 5:7
**see** 10:18 11:13
   12:21 14:9,11 16:24
   19:23 21:20 22:6

   29:23 30:19 34:6,12
   35:11 41:17
**seeing** 6:9 17:7
**seeking** 9:13
**seen** 12:20 14:25
   15:24 16:8,15 17:3
   17:23 20:20 30:25
   32:22 44:16,25 45:3
**semi** 40:23
**sending** 39:15
**sensation** 11:3
**sensory** 40:18 41:4,6
**sent** 6:24 24:25
   25:11
**separate** 7:16
**september** 28:4 29:1
   37:6,19
**service** 25:17
**set** 3:7 17:11 46:15
**sheet** 15:8
**short** 15:15
**shoulder** 8:1
**show** 9:5 17:1 18:14
   19:9 21:25 25:5
**showed** 12:23 22:2
   22:25
**showing** 13:4
**signature** 3:18
**significance** 12:22
**significant** 13:10,11
   24:13 34:10,16 35:9
**significantly** 14:3
   22:7 32:1 40:5
   44:13
**simple** 14:23
**sir** 4:20
**sit** 6:2,6 33:2
**sitting** 33:17
**situation** 29:3 37:13
   37:18
**six** 5:16
**size** 18:13
**small** 9:6
**snowden** 1:16

[solemnly - type]

solemnly  4:5
solution  30:3
somebody  10:15
    32:19 39:16
something's  22:22
sorry  6:20 13:23
    19:3 27:11 34:21
sort  7:5 43:3
sounded  44:12
source  29:24
south  1:14
specialists  1:9
specialty  4:20 5:5
specifics  10:2 45:12
    45:15
specified  46:11
spell  4:12
spinal  4:23 38:18
    39:6,17
spine  1:9 4:23,24
    5:5 7:20 13:21 14:3
    22:21
spoke  18:24 24:20
    30:18
spondylolisthesis
    14:10
spur  23:24
stably  23:8
stand  33:18
standing  33:18
standpoint  31:21,23
state  4:11 5:17 46:5
stated  8:19 37:11
    38:14
statement  2:14
states  1:1
stiff  9:20
stimulator  38:18
    39:6,18
stipulated  3:2
stipulations  2:4
    46:12
street  1:17
strength  11:2 18:13

stretch  23:21,22
strike  6:2 34:5
studies  32:13
study  35:1
stuff  8:5
subjective  28:21
    29:13
subspecialties  4:22
subspecialty  5:3
success  41:24
suffering  33:25
suggest  41:1
suggested  19:18
suggesting  32:1
suit  46:14
suite  1:9,14,18 4:16
supers  10:6
suppose  28:8
supposedly  40:24
sure  21:10 29:21
    33:14
surgeon  16:19
surgeries  7:25 8:1
    9:3 14:7 42:17
surgery  7:9,22 8:17
    8:22 9:18,19 10:15
    11:12 12:8 13:16
    16:18,22 17:9 27:18
    27:20 32:20 34:19
    34:24 42:10,22
    43:25
surgical  12:23
suspect  12:15 17:17
    32:18 43:6
sworn  4:5 46:8
symptoms  9:17
    11:15 24:4,18 28:14
    31:3,14,15,16 32:2
    40:3 41:8,10,15
    42:18 43:12,14 44:9
    44:12

t

t  3:1,1 46:1,1

take  5:6,10 10:17
    19:11 27:10,20 29:3
    30:14 32:21 33:5
    40:10 45:5
taken  1:5,9 3:5,9
    5:23 9:6 23:25 35:6
    35:11 46:10
takes  5:12
talk  9:17 45:14
talked  11:19 12:25
    37:23
talking  6:9 17:21
    20:11 22:3 28:9
    34:20 43:21
target  44:11,11
tasks  17:10 18:4
    33:13
tell  9:21,24 15:1
    16:17 17:12 21:18
    34:9 46:8
telling  37:21
temporary  35:24
    36:4,20
tend  15:17
term  14:17,23 15:15
    15:23 30:3 40:23
terms  9:2 18:10
    45:15
test  21:19
testified  4:6
testimony  3:16
    46:15
testing  20:3,12 36:8
tests  20:16 21:21,22
thank  44:1
therapy  2:16 25:4
    27:2
thigh  11:5,6
thing  9:17 21:7 30:7
things  21:10 37:25
    38:1,2
think  5:24 9:22 12:2
    12:4,25 13:1 14:24
    15:17 17:18 18:11
    21:23 25:6 26:18

    31:25 32:4,6 33:12
    36:22 40:25 43:17
    44:22
thinking  43:16
thought  27:4 37:18
    39:19
three  13:4,14,14
    25:24 29:25 42:4,7
    42:8
time  3:7,14 5:12
    6:15 10:25 11:11,25
    16:3,16 17:14,22
    18:7 21:13 24:10
    25:12 26:24 27:4,20
    28:2,11 29:20 31:1
    31:22 32:5,14 33:6
    33:7 34:2 35:6
    37:11 39:5,9,15
    41:19 44:9 46:10
tipping  13:18
title  3:8
today  6:2,6 26:11
    33:2
told  12:14,16 32:10
    37:20 44:5,15 45:8
top  16:24
tops  41:1
totally  43:24
trace  18:15
transcribed  3:17,19
    45:21
trauma  14:22
traumatically  14:17
treating  35:16
treatment  39:12
    41:18
truth  46:8,9,9
trying  3:7 25:24
twisting  37:22
two  34:11,19,20
    41:1
type  14:16 15:2
    17:15 23:10 37:22
    39:18 40:14 42:12

| | |
|---|---|
| **types**  33:12 | **weighing**  18:5 |
| **typically**  5:10 9:15 | **went**  25:2 39:9 |
| 13:19 14:9 15:14,19 | **whereof**  46:15 |
| 23:18 30:10 32:19 | **wife**  24:20 |
| 41:20 43:8,15 | **william**  1:13 |

| **u** |
|---|

| | |
|---|---|
| **u**  3:1 | **wise**  15:6 |
| **uh**  5:19 11:24 13:7 | **witness**  2:6 3:16,17 |
| 15:21 17:19 19:20 | 3:18 35:15 45:23 |
| 26:20 28:15 37:8 | **witness's**  4:7 |
| 38:19 39:23 | **wolfe**  1:16 |
| **unchanged**  28:12 | **words**  6:8 15:5 |
| **undergo**  42:15 | 24:14 26:3 39:3 |
| **understand**  5:14 | **work**  10:5 16:23 |
| 21:4 44:1 | 20:4 26:9,10 27:5 |
| **understanding**  20:5 | 27:13,17 37:21 |
| **united**  1:1 | 38:25 40:2,7 43:7 |
| **unreasonable**  18:9 | 45:6 |
| **use**  26:8 30:10 | **worked**  10:3 |
| **usually**  8:3 9:16 | **written**  5:7 |
| 18:16 30:9 | **wrong**  29:4 |
|  | **wrote**  44:24 |

| **v** | **x** |
|---|---|

| | |
|---|---|
| **verify**  12:13 | **x**  2:1 |
| **versus**  22:19,19 |  |

| | **y** |
|---|---|

| | |
|---|---|
| **vertebrae**  13:18 | **yeah**  8:9,12 14:5 |
| **virtually**  29:17 | 17:6,17 20:6 21:5 |
| **visit**  2:12 7:24 9:14 | 25:22 35:22 40:1 |
| 15:3 18:22 28:6 | **year**  5:10,12 8:20 |
| 30:17,23 | 14:4 41:1 |
| **visits**  16:16 | **years**  5:16 14:1 41:1 |
| **vs**  1:4 |  |

| **w** |
|---|

| |
|---|
| **waive**  45:22,23 |
| **waived**  3:19 |
| **walk**  33:19,21 |
| **walked**  31:11 |
| **walking**  31:4 |
| **want**  25:13 |
| **wanted**  29:23 |
| **way**  14:20 22:21 |
| 24:6 |
| **we've**  32:20 |

Exhibits



**NOBLE SPINE CENTRE**

DANIEL P. NOBLE, MD
CHRISTOPHER M. MCWILLIAMS, PA-C

PATIENT:   David Bliss
EXAM DATE:   June 24, 2010
PRIMARY CARE PHYSICIAN:   Charles Kreshel, M.D.

**CHIEF COMPLAINT:**
 F/U left L3-4 microdiscectomy.

**HISTORY OF PRESENT ILLNESS:**
 David returns today wishing to return to work.   He feels better at this point than he has in a long time.   He is doing better in all areas.     He does feel he can return to work at this point without any heavy lifting.

**REVIEW OF SYSTEMS:**
 Unremarkable for any recent illnesses or other complaints.

**PHYSICAL EXAMINATION:**
 None today

**DIAGNOSIS:**
1. S/P left L3-4 microdiscectomy, DOS 5-6-10
2. S/P left L4 laminotomy with lateral recess decompression and discectomy, DOS 2-10-03

**RECOMMENDATIONS:**
1. Return to work.  The patient may return to duty effective 6-25-10 with restrictions as outlined on his return to work form.   Restrictions remain in place until 11-6-10.
2. MMI.  I do expect he will be at MMI 11-6-10.
3. Return to clinic 8-12-10.

*[signature]*

Daniel P. Noble, M.D./ap

EXHIBIT NO. 56

OCT 1 6 2012

LISA GRIMMINGER, RMR, CRR

---

PHONE 402.484.0400  FAX 402.484.6625  4220 PIONEER WOODS DR., SUITE B  LINCOLN, NE 68506

NSC00015

EXHIBIT NO. 57

OCT 1 6 2012

LISA GRIMMINGER, RMR, CRR

DR. Noble :

David Bliss, regarding : The Date today
is the 4th of June. I stopped into my
employer yesterday as regards to my status.

My Job is Carman relief write up. So here's
what happens, 90% of the time I write up bills
for the repair of rail Cars. This is walking
around cars and most the day at a desk and
Computer. The relief part is to fill in for
men on vacation or sick eat there are 8 of
These guys and all have 5 weeks vac. and
1 is currently out due to an accident I am
one of 2 men who know the different write
up positions, for each does it different due
To different types of Cars. Im needed sorely
More than likely I won't see any carman work
until at least Jan. of 2011 and then its not
a heavy load. BNSF has a med dept. They are sour
on restrictions I saftey rule is were not to lift
anything over 50# without assistance. I won't have to
go there anyway. Please could you give me a medical
release to go back To work I am off all pain meds
and feel good strength is back in my leg please call
............... any questions 575-4110.

52

  **Medical and Environmental Health Department**

**ATTENTION PROVIDER**
*Due to the work level of the position held by this employee and/or the nature of his condition, please
complete this brief form and fax back to BNSF at 888-488-1250.   Thank you.*

**Statement of Job Awareness
General Job Duties
Carman**

EXHIBIT NO. 58

OCT 1 6 2012

LISA GRIMMINGER, RMR, CRR

**TO PROVIDER:**                    **Dr. Daniel Noble MD**
**Re:**                                    **David Bliss  6/21/1955**

Some of the physical requirements of the position include:

• **Must be able to make quick hand and leg movements** – Due to the nature of the position,
i.e. working around moving and heavy equipment, it is imperative that an individual is aware
of the environment and able to respond quickly to any unsafe condition.

• Perform car and equipment inspections – Requires an individual to proficiently walk on
uneven terrain and ballast to inspect for any unsafe conditions or mechanical defects.

• **Climb on/off equipment** – This involves lifting one foot approximately 3 ft. onto a ladder
while reaching up to grasp the grab irons with both hands and pull their weight up onto the
ladder.

• This carman maintains, replaces and/or repairs air brake pipes, valves or fittings, gaskets, air hoses,
and other equipment as required to maintain a safe train.

• The carman must be able to exhibit physical strength sufficient to lift/carry push and pull objects
weighing between 25 pounds (frequently) to 50 pounds (occasionally); pull, push, and position
equipment or car components when making repairs; occasionally move rail car wheels; bend stoop
occasionally as required when making repairs to freight cars; climbing onto and off of rail cars;
maintain balance while climbing on stairs or ladders to repair rolling stock; perform occasional
overhead work, remain standing or sitting for more than ⅓ of every work day with the opportunity to
periodically change positions for comfort. Some work is performed in below ground workspaces to
access undercarriage of rail car.

• The employee must be able to stoop, bend and twist low back on occasional to frequent basis; must be
able to kneel, crawl and crouch on occasional to frequent basis; must be able to walk on angled and
uneven ground; must be able to climb and work at elevations > 12 feet above ground level; must be
able to remove and replace components on rolling stock (shoes, coupler assembles, air brake
systems), use power tools and non power tools, and conduct inspections of rolling stock (railroad
cars) in a yard or on a track.

I have considered the above job responsibilities in reaching my professional opinion regarding
this employee's medical condition and capability to work.

DANIEL NOBLE, MD     *Daniel Noble* 8/5/10
Physician's Printed Name and Degree      Signature                        Date

EXHIBIT NO. 57

OCT 1 6 2012

LISA GRIMMINGER, RMR, CRR



MIDWEST
NEUROSURGERY & SPINE
*Adult & Pediatric* SPECIALISTS

8006 Farnam Drive, Suite 305
Omaha, Nebraska 68114
ph: (402) 398-9243
fax: (402) 398-9253

Account #: 104768
Requesting MD: Charles L. Kreshel MD
Family MD: Charles Kreshel MD
Case Manager:

David R Bliss
1801 Preamble Lane
Lincoln, NE 68521
(402) 476-9107
06/21/1955

6/8/2011

Dear Dr. Kreshel:

David Bliss is here in the neurosurgery clinic in consultation. Mr. Bliss is a pleasant 55 -year-old who had recent surgery in April including redo diskectomy at L3-4. He has had previous diskectomy at L3-4 as well as what appears to be one at L5-S1, although he says he thought it was L2-3. He has had some pain in his legs and back before surgery. After his last surgery in April he has really had a hard time bouncing back. He has a lot of mechanical back pain. He has had atrophy in his left leg, although it is improving with physical therapy significantly. He has noticed a lot more pain in his back. He is achy and stiff and has limited lifting because of this. He has no numbness. He does have some quadriceps atrophy and weakness overall he says.

The patient is alert, oriented times three and appropriately dressed with normal affect. The neck is supple without masses. Casual gait is symmetrical, with normal heel-toe progression. Heart has regular rhythm, with no murmur. The lungs are grossly clear to auscultation. No carotid bruit is heard. The lower extremities demonstrate normal strength, reflexes, sensation and muscle tone bilaterally. He has mildly decreased muscle bulk when looking at his left thigh compared to his right thigh. No joint instability or crepitus is noted in the lower extremities exam. Patrick's maneuver bilaterally is negative. Straight leg raise is negative bilaterally. Dorsalis pedis and posterior tibialis pulses are regular and full bilaterally. There is no lower extremity edema. There is no clonus at the ankles bilaterally, and Babinski reflexes are absent bilaterally. Range of motion of the spine is full without increased pain. Palpation of the spine is nontender, although he has 2 well healed lumbar dorsal incisions in the midline from his spine surgery.

Imaging was reviewed including MRI of the lumbar spine from 3/18/11. This was preoperative before his last L3-4 diskectomy. There is evidence of recurrent disc herniation at L3-4 with compression to the L3 nerve root. There are modic endplate changes at L3-4 significantly. There are also some endplate changes and disc degeneration at L4-5. There is disc bulging, but no significant nerve root compression. At L5-S1 there appears to be a laminotomy on the right.

Page 2 - David R Bliss

There is facet arthropathy severe at L5-S1 and some foraminal stenosis on that right
side compared to the left, though both sides are having foraminal stenosis. There is also
facet arthropathy at L3-4 and L4-5 that is more minimal. There is hypertrophy of the
facets at L3-4. There is a slight posterior spondylolisthesis at L3-4. The remaining discs
appear fairly normal.

## ASSESSMENT:
1. Lumbar posterior spondylolisthesis L3-4.
2. Lumbar spondylosis L5-S1, L3-4 and L4-5.
3. Previous laminotomies, diskectomies.
4. Disc degeneration.

PLAN: David has continued mechanical back pain. I believe with his job on the railroad
he is going to be somewhat limited given his multiple history of disc degenerations. He
has not had any recent imaging. We will get an MRI of the lumbar spine. I discussed
operations including diskectomy and fusion. We discussed limitations with and without
surgery as well. At this point he would be a candidate for a functional capacity evaluation
to see what his level of ability is. We will get him set up for his studies, and I will contact
him with the results.

Sincerely,

Keith R. Lodhia, MD

*Dictated but not proofread*

MNASS00015

Charles L. Kreshel MD
3100 N 14th St STE 201
Lincoln, NE 68521-2134

RE:  David R Bliss
Account #:  104758
DOB:  06/21/1955
Exam Date:  06/08/11
Ordering Physician:  Keith R. Lodhia, MD
Referring MD:  Charles L. Kreshel MD
Family MD:  Charles Kreshal MD

Dear Dr. Kreshel:

MIDWEST NEUROIMAGING

8005 Farnam Drive, Suite 202
Omaha, Nebraska 68114
402.390.4100
fax: 390-4103

Bruce Baron, DO
Christian Schlaepfer, MD
Erik Pedersen, MD
Don Evans, MD

## MAGNETIC RESONANCE IMAGE OF THE LUMBAR SPINE WITH AND WITHOUT INTRAVENOUS CONTRAST

**CLINICAL INDICATION:** Low back pain, leg pain.

**TECHNIQUE:** Sagittal and axial pre and post contrast T1 weighted images and also T2 weighted FSE images of the lumbar spine were obtained. 20 cc of Magnevist contrast to the normal technique.

**FINDINGS:** Evaluation of the lumbar spine demonstrates a trace of retrospondylolisthesis of L3 on L4. There is noted to be end plate degenerative marrow signal changes at the level of L3-4, L4-5 and L5-S1. No evidence to indicate fracture. The conus medullaris ends at the level of L1-2 and demonstrates normal signal. The visualized sacrum and SI joints are noted to be normal.

At L5-S1 the disc space demonstrates postoperative changes of right hemilaminectomy change. There is a diffuse disc bulge. There is a mild end plate osteophytic ridge. The facet joints demonstrate moderate hypertrophic change. There is mild bilateral foraminal stenosis. No central canal stenosis.

At L4-5 the disc space demonstrates decompressive right and left laminectomy change. The disc space demonstrates mild to moderate loss of height. There are end plate erosions. There is vacuum phenomenon. There is a diffuse disc bulge with an end plate osteophytic ridge. Disc and osteophyte extend into both the right and left foramen. There is moderate left and mild to moderate right foraminal stenosis. No evidence for central canal stenosis. The facet joints demonstrate mild hypertrophic change.

At L3-4 the disc space demonstrates decompressive left laminectomy change. There is a diffuse disc bulge with an end plate osteophytic ridge. There is a focal area of disc protrusion extending to the left paracentral aspect of the canal. This is best viewed on sagittal image #9 and axial image #9. This is effacing the left side of the thecal sac. This is surrounded by areas of granulation tissue. There is no underlying central canal stenosis. No significant foraminal narrowing. The facet joints are mildly hypertrophic.

RE:  David R Bliss

Account #: 104758
DOB: 06/21/1955
Exam Date: 06/08/11
Page 2 – Lumbar MRI

At L1-2 and L2-3 the disc spaces are normal. There is no central or foraminal stenosis.

IMPRESSION:
1) Small left paracentral disc protrusion at L3-4. Correlate clinically with symptoms.
2) Bilateral foraminal stenosis greater on the left than right at L4-5.
3) Mild bilateral foraminal stenosis at L5-S1.
4) No central canal stenosis.
5) Facet hypertrophic changes of the lower lumbar spine.

Thank you for the courtesy of this referral.

Sincerely,

Christian Schlaepfer, MD
CS/ mw
Dictated at Midwest NeuroImaging, 68114  06/08/2011

Electronically approved by: Midwest NeuroImaging    Date: 06/09/11
09:43

MIDWEST NEUROIMAGING

8005 Farnam Drive, Suite 202
Omaha, Nebraska  68114
402.390.4100
fax: 390-4103

Bruce Baron, DO
Christian Schlaepfer, MD
Erik Pedersen, MD
Don Evans, MD

MNASS00017

- 1 -

Account #: 104758
Requesting MD: Charles L. Kreshel MD
Family MD:
Case Manager:

David R Bliss
1801 Preamble Lane
Lincoln, NE 68521
(402) 476-9107
06/21/1955

June 13, 2011

I spoke with Mr. Bliss in regards to his MRI scan showing multi-level
degenerative facet changes. He has a disc herniation which was smaller
than previous surgery in April. Dr. Lodhia did feel that he would be a surgical
candidate consisting of a lumbar fusion L3-4, L4-5 and L5-S1.

At this point he seems to be getting by. Dr. Lodhia has recommended a
functional capacity evaluation for further evaluation of his current work
status. Mr. Bliss will give us a call once this has been completed.

*[signature]* PA-C

John P. Calabro, PA-C

*[signature]*

Keith R. Lodhia, MD
JC/KRL: mw
*Dictated but not proofread*

Electronically approved by: John Calabro    Date: 06/16/11 15:33

MIDWEST NEUROSURGERY

8005 Farnam Drive, Suite 305
Omaha, Nebraska 68114
Phone: 402.398.9243
Fax: 402-398-9253
www.midwestneurosurgery.com

201 Ridge Street, Suite 305
Council Bluffs, IA  51503
Phone: 402-390-4115
Fax: 712-256-3059

Leslie C. Hellbusch, MD
Douglas J. Long, MD
Stephen E. Doran, MD
John S. Treves, MD
Mark J. Puccioni, MD
Wendy J. Spangler, MD
Bradley S. Bowdino, MD
Keith R. Lodhia, MD
Guy M. Music, MD

Julie Walsh, PA-C
Charley Pugsley, PA-C
Michele (Shelley) Julin, PA-C
John Calabro, PA-C
David Siebels, PA-C
Kim Nelson, PA-C
Brittany Lancha, PA-c
Kristin Hennessey, PA-c

John Dunn
Clinic Administrator

MIDWEST NEUROIMAGING

8005 Farnam Drive, Suite 202
Omaha, Nebraska 68114
Phone: 402.390.4100
Fax: 402-390-4103

MNASS00013



**MIDWEST
NEUROSURGERY & SPINE
*Adult & Pediatric* SPECIALISTS**

8005 Farnam Drive, Suite 305
Omaha, Nebraska 68114
ph: (402) 398-9243
fax: (402) 398-9253

Account #:  104768
Requesting MD:  Charles L. Kreshel MD
Family MD:  Charles Kreshel MD
Case Manager:

David R Bliss
1801 Preamble Lane
Lincoln, NE 68521
(402) 476-9107
06/21/1966

07/13/2011

David Bliss is here today in followup and consultation after undergoing functional
capacity evaluation. Mr. Bliss reports having increasing back and leg pain along with
numbness into the balls of his feet. We had previously evaluated him and found his
multi-level degenerative change along with multi-level previous surgeries. We had
recommended the possibility of an L3 through S1 lumbar fusion. Due to his increasing
pain, we are seeing him for further evaluation.

He is alert, oriented times 3, affect was appropriate. Gait was antalgic with a leaning
wide based stance. He has mild decreased bulk into the left thigh as compared to the
right. Motor strength is considered about a 5. Sensation is decreased in non dermatomal
pattern. He has no clonus and Babinski reflexes are absent. Straight leg raise causes
lumbar back pain. He has a well healed lumbar incisional site.

ASSESSMENT:  1)  Bilateral lower extremity pain and lumbar back pain.

PLAN:  David Bliss presents today with worsening symptoms. We have recommend
proceeding with EMG studies of bilateral lower extremities along with a repeat MRI of
the lumbar spine for further evaluation. Mr. Bliss now reports pain in the S1 distribution
which is increased in intensity since previous examination. Therefore we will repeat his
MRI scan. We did briefly discuss surgical intervention consisting of a lumbar fusion L3
through S1. We will plan on seeing him back once the studies have been completed to
further discuss treatment options.

John P. Calabro, PAC

Keith R. Lodhia, MD

*Dictated but not proofread*

MNASS00009

Charles L. Kreshel MD
3100 N 14th St STE 201
Lincoln, NE 68521-2134

RE:  David R Bliss
Account #:  104758
DOB:  06/21/1955
Exam Date:  07/13/11
Ordering Physician:  Keith R. Lodhia, MD
Referring MD:  Charles L. Kreshel MD
Family MD:  Charles Kreshel MD

MIDWEST NEUROIMAGING

8005 Farnam Drive, Suite 202
Omaha, Nebraska  68114
402.390.4100
fax: 390-4103

Bruce Baron, DO
Christian Schlaepfer, MD
Erik Pedersen, MD
Don Evans, MD

Dear Dr. Kreshel:

### MAGNETIC RESONANCE IMAGE OF THE LUMBAR SPINE WITHOUT CONTRAST.

**CLINICAL INDICATION:**  Bilateral leg pain, greater on the left than right, back pain.

**TECHNIQUE:**  Sagittal and axial T1 and T2 weighted FSE images of the lumbar spine were obtained./

**FINDINGS:**  Evaluation of the lumbar spine with comparison to prior examination from 06/08/11. The lumbar spine demonstrates the alignment to remain stable since prior examination. There is a trace of retrospondylolisthesis of L3 on L4. Vertebral body heights demonstrate no areas of new marrow signal abnormality to indicate tumor or infection. There is extensive end plate degenerative marrow signal changes at the level of L3-4, L4-5 and L5-S1. The sacrum remains stable in signal. No new abnormality of the SI joints.

At L5-S1 the disc space demonstrates postoperative changes of right hemilaminectomy change. The disc space demonstrates disc space desiccation. There is a diffuse disc bulge and end plate osteophytic ridge. The facet joints demonstrate moderate hypertrophic change. The appearance of the disc is noted to be similar to prior examination. There is mild bilateral foraminal stenosis. There is no new area of central canal stenosis.

At L4-5 the disc space demonstrates post surgical changes of bilateral laminectomy change. The disc is demonstrating moderate loss of height. There are end plate erosions. There is a diffuse disc bulge and end plate osteophytic ridge. This extends into both the right and left foramen. There is moderate left and mild to moderate right foraminal stenosis. The appearance remains stable. The facet joints are hypertrophic. No new area of central canal stenosis.

At L3-4 the disc space demonstrates postoperative changes of left hemilaminectomy change. There are elements of granulation tissue seen along the thecal sac. The disc is narrowed with a diffuse disc bulge. The small area of disc protrusion within the granulation tissue is noted to be similar to smaller than on prior examination.

RE:  David R Bliss

MNASS00011

Account #:  104758
DOB: 06/21/1955
Exam Date:  07/13/11
Page 2 – Lumbar MRI


Disc and osteophyte extend into both the right and left foramen. There is
noted to be mild inferior foraminal stenosis, similar. There is no new central
canal stenosis.

At L1-2 and L2-3 the disc spaces are noted to be normal. There is no
underlying central or foraminal stenosis.

MIDWEST NEUROIMAGING

IMPRESSION:
1) Bilateral foraminal stenosis greater on the left than right at L4-5,
   stable.
2) Mild bilateral foraminal stenosis at L5-S1, stable.
3) No new central canal stenosis.
4) Post surgical changes at L3-4, stable.

8005 Farnam Drive, Suite 202
Omaha, Nebraska  68114
402.390.4100
fax: 390-4103

Bruce Baron, DO
Christian Schlaepfer, MD
Erik Pedersen, MD
Don Evans, MD

Thank you for the courtesy of this referral.

Sincerely,

Christian Schlaepfer, MD
CS/ mw
Dictated at Midwest NeuroImaging, 68114  07/13/2011


Electronically approved by: Midwest NeuroImaging     Date: 07/14/11
09:29

MNASS00012

JOHN C. GOLDNER, M.D.
RONALD A. COOPER, M.D.
JOEL T. COTTON, M.D.
ROBERT R. SUNDELL, M.D.
DAVID A. FRANCO, M.D.
T. SCOTT DIESING, M.D.

**Neurology**

*Consultation • Electromyography*

PHONE 402 354-2000
FAX 402 354-8645

INDIAN HILLS MEDICAL PLAZA • 8901 WEST DODGE ROAD, SUITE 210 • OMAHA, NEBRASKA 68114-3442

## ELECTROMYOGRAPHY / NERVE CONDUCTION STUDY REPORT

| NAME: David Bliss | DOB: 6/21/1955 | FILE #: 2011-2014 |
|---|---|---|
| PHYSICIAN (S): Keith Lodhia, M.D. | | DATE: 7/13/2011 |

### NERVE CONDUCTION STUDY:

**MOTOR:**

| Nerve | Stimulating | Recording | Distal Latency (msec) | Proximal Latency (msec) | Amplitude (N=Normal) | Distance (cm) | Conduction Velocity (m/sec) | Normal (m/sec) |
|---|---|---|---|---|---|---|---|---|
| Lt. Peroneal | knee-ankle | ext. dig. brevis | 5.3 | 14.5 | N (3.9/3.4) | 9/41 | 46 | 38-65 |
| Rt. Peroneal | knee-ankle | ext. dig. brevis | 5.7 | 14.3 | N (4.0/4.5) | 9/39 | 45 | 38-65 |
| Lt. Tibial | knee-ankle | abd. hallucis | 5.7 | 14.1 | N (7.1/5.9) | 9/42 | 50 | 38-65 |
| Rt. Tibial | knee-ankle | abd. hallucis | 5.6 | 15.0 | N (8.3/8.1) | 9/41 | 44 | 38-65 |

**SENSORY:**

| Nerve | Stimulating | Recording | Latency | Amplitude (N=Normal) | Distance | Normal |
|---|---|---|---|---|---|---|
| Lt. Sural | posterior aspect lower leg | lateral malleolus | 2.8 | N | 14 | |

### ELECTROMYOGRAM:

| Muscle | Fibrillation | Fasciculation | Motor Unit Potentials |
|---|---|---|---|
| Lt. tibialis anterior | 0 | 0 | Normal |
| Lt. medial gastrocnemius | 0 | 0 | Normal |
| Lt. peroneus longus | 0 | 0 | Normal |
| Lt. vastus medialis | 0 | 0 | Normal |
| Lt. tensor fasciae latae | 0 | 0 | Normal |
| Lt. abductor hallucis | 0 | 0 | |
| Rt. tibialis anterior | 0 | 0 | Mildly large, polyphasic motor units |
| Rt. peroneus longus | 0 | 0 | Mildly large, polyphasic motor units |
| Rt. tensor fasciae latae | 0 | 0 | Mildly large, polyphasic motor units |
| Rt. medial gastrocnemius | 0 | 0 | Normal |
| Rt. vastus medialis | 0 | 0 | Normal |

EMG with nerve conduction studies of the lower extremities was done at the request of Dr. Lodhia on a patient with left more than right lower extremity pain and prior back surgeries.
(CONTINUED)

DAVID BLISS
July 13, 2011
PAGE TWO


SUMMARY: The peroneal compound muscle action potentials were normal and symmetric. The tibial compound muscle action potentials were normal and symmetric. The left sural sensory nerve action potential was normal. Needle examination of the left lower extremity was normal. Needle examination of the right lower extremity demonstrated mild chronic stable neuropathic motor unit changes within the right L5 myotome.

IMPRESSION: Abnormal EMG and nerve conduction studies of both lower extremities. There is electrophysiologic evidence of a mild chronic right L5 radiculopathy without evidence of uncompensated or ongoing denervation. No abnormalities were noted in the left lower extremity. Clinical correlation is needed.

                                                              _____ M.D.
                                                              T. Scott Diesing, M.D.
                                                              ELECTROMYOGRAPHER

TSD:pjf

Neurology LLP
8901 West Dodge Road Suite 210
Omaha, Nebraska 68114-3442

Neurology00002

Account #:  104758
Requesting MD:  Charles L. Kreshel
Family MD:  Charles Kreshel
Case Manager:

David R Bliss
1801 Preamble Lane
Lincoln, NE 68521
(402) 476-9107
06/21/1955

July 15, 2011

MIDWEST NEUROSURGERY

8005 Farnam Drive, Suite 305
Omaha, Nebraska  68114
Phone: 402.398.9243
Fax: 402-398-9253
www.midwestneurosurgery.com

201 Ridge Street, Suite 305
Council Bluffs, IA  51503
Phone: 402-390-4115
Fax: 712-256-3059

Leslie C. Hellbusch, MD
Douglas J. Long, MD
Stephen E. Doran, MD
John S. Treves, MD
Mark J. Puccioni, MD
Wendy J. Spangler, MD
Bradley S. Bowdino, MD
Keith R. Lodhia, MD
Guy M. Music, MD

Julie Walsh, PA-C
Charley Pugsley, PA-C
Michele (Shelley) Jutin, PA-C
John Calabro, PA-C
David Siebels, PA-C
Kim Nelson, PA-C
Brittany Lanoha, PA-C
Kristin Hennessey, PA-C

John Dunn
Clinic Administrator

i spoke with David R Bliss's wife in regards to his EMG study showing chronic radiculopathy.  No new or acute changes.  In regards to the MRI scan this shows three-level lumbar disk degeneration as previously noted.  No new disk herniations or listhesis.

John P. Calabro, PA-C

Keith R. Lodhia, MD
JPC/KRL/lmh
*Dictated but not proofread*

Electronically approved by: John Calabro     Date: 07/22/11 08:36

MIDWEST NEUROIMAGING

8005 Farnam Drive, Suite 202
Omaha, Nebraska  68114
Phone: 402.390.4100
Fax: 402-390-4103

1

MNASS00008

MADONNA REHABILITATION HOSPITAL.

OUTPATIENT CLINIC NOTE ON: Bliss, David R

DATE OF SERVICE: 07/26/2011

REFERRING PHYSICIAN: Keith Lohdia, M.D.

REASON FOR REFERRAL: Rehabilitation evaluation and recommendations for chronic low back pain and left leg pain.

TIME IN: 2:00       TIME OUT: 3:15

Over 60 minutes were spent today with David and his wife, the majority of which was in evaluation, case discussion and management, and patient education.

HISTORY OF PRESENT ILLNESS: David Bliss is a pleasant 56-year-old gentleman who was referred here by Dr. Keith Lohdia for evaluation of low back pain. He has a fairly complicated history. In 2003, he underwent an L3-4 laminectomy due to a disk herniation that was causing a lot of left leg symptoms. It sounds like there was weakness in the left leg as well as possible footdrop and significant pain. He responded well to the surgery and had been working with the railroad since that time. This initial surgery was done by Dr. Noble. In the spring of last year, he started to develop similar symptoms going down the leg. He underwent a microdiskectomy in May with a follow-up exploration in April of this year. He still was having some ongoing symptoms and sought an opinion by Dr. Lohdia at Midwest Neurosurgery & Spine Specialists in Omaha. He reviewed the imaging studies and felt that it was primarily mechanical low back pain. They did repeat an MRI and discussed surgical options. He subsequently underwent functional capacity examination here in Lincoln around late June or the beginning of July. He tolerated the test pretty well but the following day was having an increase in his pain, not only the low back but also his left leg symptoms were worse. He saw Dr. Lohdia again who repeated the MRI and obtained electrodiagnostic studies that are discussed later.

After discussing the next surgical option which would essentially be a multilevel fusion, Dr. Lohdia referred David here for further evaluation and recommendations. Today he states that his pain is worse in the low back compared to the leg. He generally feels the best if he is lying flat on his back. Activity, especially frequent bending and lifting, bother him. He also has difficulty with lateral bending, especially to the left. He feels like he has general atrophy and weakness in the legs but that this has gotten somewhat better with physical therapy. He is working with Jeremiah Jurgensen here in town 2 times per week doing a variety of strengthening and stretches along with modalities. Currently for pain control he is primarily taking Tylenol frequently as well as some tramadol that is prescribed through his primary physician, Dr. Kreshel.

As this is work related, David is frustrated with the fact that his previous office job was no longer available after one of his surgeries and he has been doing more manual labor. He has not been back to work since his most recent surgery in April. Dr. Noble felt that it would take at least 3 months to get back to light to

MADONNA REHABILITATION HOSPITAL.
OUTPATIENT CLINIC NOTE

193245  Page 1
Original

NAME: Bliss, David R
SERVICE DATE: 07/26/2011
PATIENT NUMBER: 3002210023
MEDICAL RECORD NUMBER: 13-30-81
PHYSICIAN: Adam T. Kafka, M.D.

MRH00006

medium duty work and 6 months for medium to heavy. David does not feel like he is anywhere near ready to go back to his previously highly physically demanding job.

David's other concern is that he does have quite a bit of fatigue. He thinks it has been worse since his most recent surgery and is unsure whether it is related to the pain or therapy that he has been undergoing. He has had to cut back on social activities as he used to fish quite a bit on his bass boat but is unable to do this. His sleep has been affected as well.

PAST MEDICAL HISTORY:
1. He has asthma that is well controlled and not requiring medications.
2. History of severe GI bleed requiring transfusion. This was thought to be related to aspirin and Mobic.
3. ACL repair in 1998.
4. Laminectomy in 2003.
5. Microdiskectomy in 2010.
6. Microdiskectomy revision in May of 2010 and April of 2011.
7. Multiple knee arthroscopies.
8. Left shoulder arthroscopy.

FAMILY HISTORY: Both parents are deceased, his father of a heart attack and mother of diabetes. He denies any history of diabetes.

SOCIAL HISTORY: David is single but has a significant other. He has occasional alcohol but no tobacco or alcohol exposure. He does not get any regular activity outside of work. He was previously a car man for the railroad.

CURRENT MEDICATIONS:
1. Tylenol max dose daily.
2. Tramadol 2 tabs every 4-6 hours p.r.n.

**ALLERGIES: NEOSPORIN causes rash and THEOPHYLLINE causes GI reflux. He is also sensitive to adhesives.**

REVIEW OF SYSTEMS: Twelve-point review of systems was obtained today and positive for fatigue, mild asthma, and those complaints listed in the HPI. The remainder was negative.

PHYSICAL EXAMINATION:

GENERAL: David is a pleasant, well-appearing, moderately obese gentleman in no distress. He does not exhibit any pain behaviors but is clearly frustrated with his current symptoms and especially as it relates to his occupation.

HEENT: Head is normocephalic, atraumatic. Facies are symmetric.

| | |
|---|---|
| MADONNA REHABILITATION HOSPITAL<br>OUTPATIENT CLINIC NOTE | NAME: Bliss, David R<br>SERVICE DATE: 07/26/2011<br>PATIENT NUMBER: 3002210023<br>MEDICAL RECORD NUMBER: 13-30-81<br>PHYSICIAN: Adam T. Kafka, M.D. |

193245  Page 2
Original

MRH00007

SKIN: Warm and dry throughout.

EXTREMITIES: No swelling, erythema, or ecchymoses.

BACK: Multiple midline incisions all well approximated and healed. He has some flattening of normal lumbar lordosis. He has fairly good flexion and extension, neither of which is particularly painful, but he is weak with extension and has some difficulty getting back to upright posture. He does not have any obvious list or scoliosis. He has pretty good lumbar rotation but sidebending to the left is restricted and quite painful. He has tenderness around the left SI joint as well as lower lumbar facets. This pain is exacerbated by sidebending but not too much by extension. He has no gluteal tenderness or pain around the trochanteric region. Examination of the legs shows symmetric muscle bulk without any obvious atrophy. He has at least 4+/5 strength throughout, and I have difficulty eliciting any obvious strength deficit. He can heel and toe walk without difficulty other than a little bit of balance trouble.

NEUROLOGIC: Absent reflex at the left patella but 2/4 at the right. He has 1+ reflexes at the Achilles, but it seems a bit more diminished on the left compared to the right. Sensory examination to light touch and pinprick is normal to all right lower extremity dermatomes. In the left lower extremity he basically has decreased sensation throughout the entire foot. This is mainly to pinprick which feels more dull compared to the right side, but light touch is preserved. There is no clonus or upper motor neuron signs noted.

IMPRESSION: David Bliss is a 56-year-old gentleman with chronic low back pain, primarily mechanical and axial, with history of multiple lumbar surgeries. He also has radiating symptoms in the left lower extremity that have improved with therapy but persist and are in a nondermatomal pattern. Imaging studies show diffuse degenerative arthritis in the lumbar spine as well as spondylosis at L3-4, L4-5, and L5-S1 with small posterior spondylolisthesis at L3-4. This is based upon the imaging reports as I do not have the images available. I did review the electrodiagnostic studies obtained on 07/13/11 which show some large polyphasic motor units in the right L5 myotome but no evidence of ongoing axonal loss. Also no evidence of peripheral neuropathy or focal neuropathy.

RECOMMENDATIONS: We had a long discussion about possible etiologies of his pain and that this is likely multifactorial. I would obviously defer to Dr. Lohdia as to whether or not he would be appropriate for a fusion, but this may not be a bad option, especially with what appears to be some mild facet-mediated pain, especially on the left which is where the majority of his pain seems to be coming from. Nevertheless, I think an adequate course of physical therapy and some medication management would be reasonable as there is certainly no rush to undergo surgery.

To help with pain control, I was hoping to use antiinflammatories, but with his history of GI bleed, I am a little hesitant to start an oral agent. I have had some luck with Flector patches which have much lower incidence of GI ulceration and therefore gave him a few samples to try; and if the adhesive does not bother him, he can get this script filled. He should apply it to the left low back where the majority of his pain is. Additionally I would like to start him on Lyrica to help with his leg symptoms as well as overall pain modulation in the hopes that he has better baseline control and can cut back on the amount of tramadol that

MADONNA REHABILITATION HOSPITAL
OUTPATIENT CLINIC NOTE

NAME: Bliss, David R
SERVICE DATE: 07/26/2011
PATIENT NUMBER: 3002210023
MEDICAL RECORD NUMBER: 13-30-81
PHYSICIAN: Adam T. Kafka, M.D.

193245  Page 3
Original

MRH00008



he is using.

I did write a prescription to obtain a vitamin D level as low levels have been associated with fatigue as well as pain. Furthermore, this is easy to correct if it is low.

I would like to see him back in 1 month. We will assess how he is responding to physical therapy as well as medication management. It does not appear as though he is going to pursue surgery but needs more intensive chronic pain management. I would recommend consultation with the pain management group here in town who are better equipped to follow long-term pain medication use. However, my thought is that he may not get a whole lot of benefit from chronic opioid use, and given the side effects and marginal efficacy of these in chronic low back pain, I would recommend avoiding them if possible.

I do appreciate this referral. If there are any questions regarding Mr. Bliss's visit, please feel free to contact me.

Adam T. Kafka, M.D.

DD: 07/26/2011
DT: 07/27/2011  8:42 A kp

Date ___7/27/1___   Time ___r___

cc:    Charles L. Kreshel, M.D.
       Keith Lohdja, M.D., 8005 Farnam Drive, Suite 305, Omaha, NE 68114

MADONNA REHABILITATION HOSPITAL
OUTPATIENT CLINIC NOTE

NAME: Bliss, David R
SERVICE DATE: 07/26/2011
PATIENT NUMBER: 3002210023
MEDICAL RECORD NUMBER: 13-30-81
PHYSICIAN: Adam T. Kafka, M.D.

193245  Page 4
Original

MRH00009



# Thygesen
## Physical Therapy

7/30/2011

Keith R. Lodhia, M.D.
Midwest Neurosurgery & Spine Specialists
8005 Farnham Drive, Suite 305
Omaha, NE 68114


Dr. Lodhia


RE: David Bliss


Mr. David Bliss presented to my clinic on 6/30/2011 for Functional Capacity Evaluation testing. A standard 1 day Core FCE was performed which involved a detailed musculoskeletal assessment followed by performance of standardized objective testing to determine his current physical abilites and safe lifting maximum recommendations. No specific job description was provided by the employer therefore determining a definitive job match was not fully possible. The only Information that was communicated to me by his case worker (Eileen Warner) regarding physical job demand information was that the physical demand level of his job is categorized as HEAVY.

Therefore, given this information I have compared his performance on the FCE to physical demand characteristics of HEAVY as classified in the Dictionary of Occupational Titles (DOT). Please refer to the specifics of his performance on the FCE GRID for further details.

If you would have any further need to obtain information pertaining to specific tasks or physical demands testing pertaining to his job I would be more than happy to retest any items you would request. If you have any questions regarding any information on the FCE report please contact me directly at 402-423-7878.


Thank you again for this FCE referral

*Paul Thygesen PT*

Paul Thygesen PT


Thygesen Physical Therapy      5955 South 56th.    Lincoln NE     68516      402-423-7878 Phone      402-423-0272 FAX

MNASS00018

 

MADONNA REHABILITATION HOSPITAL

OUTPATIENT CLINIC NOTE ON: Bliss, David R

DATE OF SERVICE: 08/25/2011

TIME IN: 10:15     TIME OUT: 10:45

Greater than 25 minutes were spent today with Mr. Bliss, the majority of which was in case discussion and management as well as patient education.

INTERIM HISTORY: David returns today for followup regarding his low back pain. The initial visit I had with Mr. Bliss was on 07/26/11 upon referral from Dr. Keith Lohdia in Omaha. Briefly, he has a history of low back pain with several injuries that stem back to 2003, at which point he underwent laminectomy. He has subsequently had microdiskectomy and revision 3 times over the past year and a half or so. These were all done by Dr. Noble, but Dr. Lohdia was discussing possible lumbar fusion as a more definitive treatment. He came to me for any further rehabilitation recommendations that would be nonsurgical in nature. I did not feel that there was much indication for therapeutic injections given the diffuse nature of his axial pain that seemed primarily mechanical in nature. He does have some radicular symptoms with EMG evidence of mild chronic inactive right L5 radiculopathy.

I had recommended David continue with physical therapy and try a neuropathic pain agent. I wrote for Lyrica 50 mg t.i.d., and he is taking it about twice a day. It does help reasonably well with pain control, but it also makes him tired. He still takes tramadol as needed. There has not been a whole lot of change in his symptoms. He continues to work with physical therapy 2 days per week at the Center for Spine & Sport Rehab. It sounds like they are mainly doing some e-stim type activities using the ReBuilder system. He is looking to get this at home.

Most of our discussion today was David expressing his concerns and frustrations over this entire process. He feels as though his pain is significant enough that it is not allowing him to do any sort of physically demanding job. Even chores around the house cause quite a bit of pain. He also had a day at work when he spent most of the day in meetings in a chair and then the next day was having a flare-up of his pain, so sedentary activity also bothers him quite a bit. He has not returned to see Dr. Lohdia since his last visit but does have a scheduled appointment. It is still unclear whether or not he will pursue any further surgical interventions.

PHYSICAL EXAMINATION: On brief exam, David is well appearing and in no distress. He does not visibly appear to be in significant pain, and he walks with a symmetric and nonantalgic gait. No evidence of footdrop is present. Further examination was deferred in favor of case discussion.

IMPRESSION: David Bliss is a 56-year-old gentleman with chronic mechanical low back pain and mild right L5 radiculopathy. This was demonstrated electrodiagnostically, although the pain seems to be primarily on the left leg which was normal.

---

MADONNA REHABILITATION HOSPITAL
OUTPATIENT CLINIC NOTE

NAME: Bliss, David R
SERVICE DATE: 08/25/2011
PATIENT NUMBER: 3002210023
MEDICAL RECORD NUMBER: 13-30-81
PHYSICIAN: Adam T. Kafka, M.D.

196010 Page 1
Original

MRH00004

RECOMMENDATIONS: At this point I do not have a whole lot of further recommendations from a rehabilitation standpoint. If he is to pursue surgery, this will have to be decided between he and Dr. Lohdia; and with presumed segmental instability due to his prior surgeries, he may in fact get good benefit from this. I would obviously have to defer that decision to he and his surgeon.

From a medication standpoint, I would not use any stronger opioids than his tramadol. This is chronic in nature, and given his sensitivity to medications causing him sedation, I would try and escalate the Lyrica as tolerated and otherwise stick to antiinflammatories and other nonnarcotic pain medications.

I would continue with physical therapy. If the ReBuilder system is helping him with symptom relief, I would recommend it. I think it is reasonable to advance to more functional conditioning and work hardening, especially if there is no further surgery planned. This way we could get him at least as functional as possible, even if he does have ongoing pain.

I did not schedule any formal followup. At some point, he will likely be at maximum medical improvement, assuming no surgery is performed. I would have to defer to either Dr. Lohdia or Dr. Noble as to when that point would be. Based on his recent history, he may in fact have already reached that point. Furthermore, since there has been an FCE performed, if this is everyone's opinion, then I would recommend using information from the FCE as well as his physical examination to recommend future work restrictions. I did not address any work restrictions today with Mr. Bliss.

Adam T. Kafka, M.D.

DD: 08/25/2011
DT: 08/30/2011  4:00 P kp

Date _____ 5/31/11 _____   Time ___ ~ ___

cc:   Keith Lohdia, M.D., 8005 Farnam Drive, Suite 305, Omaha, NE 68114
      Workers' Compensation

MADONNA REHABILITATION HOSPITAL
OUTPATIENT CLINIC NOTE

NAME: Bliss, David R
SERVICE DATE: 08/25/2011
PATIENT NUMBER: 3002210023
MEDICAL RECORD NUMBER: 13-30-81
PHYSICIAN: Adam T. Kafka, M.D.

196010  Page 2
Original

MRH00005



**MIDWEST NEUROSURGERY & SPINE SPECIALISTS**

8005 Farnam Drive, Suite 305
Omaha, Nebraska 68114
ph: (402) 398-9243
fax (402) 398-9253

Account #: 104758
Requesting MD: Charles L. Kreshel MD
Family MD: Charles Kreshel MD
Case Manager:

David R Bliss
1801 Preamble Lane
Lincoln, NE 68521
(402) 476-9107
06/21/1955

09/02/2011

Dear Charles Kreshel:

David Bliss was seen today in consultation for forty-two minutes. I reviewed David's studies and discussed results with him. I reviewed his old notes and reviewed Dr. Kafka's notes for physiatry. I looked over his physical therapy notes as well as functional capacity evaluation. He was listed in a physical functional capacity as having no limitations on heavy demand, although he had a lot of pain that developed right after this and has limited him significantly. He has noted more S1 radicular symptoms with numbness and some pain and particularly pain in the back with twisting or movements. If he sleeps he only gets a couple of hours of sleep and then wakes up and has to reposition because of the pain. Any kind of working in awkward positions bothers him as well. He takes Lyrica and Tramadol all the time. This is much more on the left side than the right side and follows an S1 distribution. He was found on EMG to have a chronic and active mild L5 radiculopathy likely related to his previous 3 surgeries.

His MRI showed laminectomy changes at the hemilaminotomy on the right L5-S1, bilateral laminectomy changes L4-5 and left sided L3 hemilaminectomy changes. He has degenerative disc at 3 levels as well as significant facet disease at those 3 levels. The other levels look fairly good in their condition. He has posterior spondylolisthesis Grade I at L3-4.

David's exam is unchanged with the exception of depressed reflexes and S1 radicular symptoms even a little numbness as he was sitting here. He has several well healed dorsal midline incisions and otherwise is not tender in the back. He transitions from sitting to standing with shocks of pain and walks with some mild antalgia.

1) Lumbar spondylolisthesis.
2) Lumbar spondylosis.
3) Lumbar disc degeneration.
4) Lumbar radiculitis.

Recommendations: David and I had a long discussion about his condition. He certainly can't function at his job with his current pain level and would need to be in a light duty situation. He has spondylolisthesis and spondylosis with facet degeneration as well as disc degeneration. I think most of his symptoms probably are facet mediated and may be even causing some of his radicular light complaints.

MNASS00006

Page 2 - David R. Bliss

I would like for him to try some facet blocks both as a diagnostic and possible therapeutic effect and if this seems to help, maybe a facet rhyzolysis might be an option as opposed to a fusion at 3 levels. However I would recommend the posterolateral and interbody fusion at L3 to S1 if he continues to have refractory severe pain. His lifestyle is extremely limited in what he can even do when he's not working. David's questions were answered to his satisfaction and he's in agreement with our plan.

Sincerely,

Keith R. Lodhia, MD

*Dictated but not proofread*

MNASS00007

MIDWEST
NEUROSURGERY & SPINE
*Adult & Pediatric* SPECIALISTS

8005 Farnam Drive, Suite 305
Omaha, Nebraska 68114
ph: (402) 398-9243
fax (402) 398-9253

Account #: 104768
Requesting MD: Charles L. Kreshel MD
Family MD: Charles Kreshel MD
Case Manager:

David R Bliss
1801 Preamble Lane
Lincoln, NE 68521
(402) 476-9107
06/21/1955

11/07/2011

Dear Dr. Kreshel:

David Bliss is here in the neurosurgery clinic in followup. David was seen for 25 minutes in consultation, half of which was in counseling. We discussed findings on his MRI with him and his wife. He had rhyzolysis by Dr. Devney and actually had excellent response to this with near complete resolution of his lumbar back pain, only a little lower sacroiliac region discomfort at times and some occasional upper thoracic, mid-thoracic pain. He still has burning in the back of his heels and on the lateral foot if he walks for 20 minutes or more unless he takes Tramadol or hydrocodone. He gets some "aching" in his anterior hips and at the belt line and a little bit into his knees on occasion. He is worried because he doesn't think he can go back to work. He had a functional capacity evaluation on 07/30/11. He still has difficulty with walking. He can't walk more than 20 minutes which is bothering him the most. He feels like he's not very independent because of this. He would like to seek treatment for this.

I told him for chronic nerve issues I don't really have a good solution surgically with the exception of some possible spinal cord stimulator. He does have chronic mild L5 radiculopathy on the right although the left was normal. His symptoms seem to be more S1 mediated. I do think he would be a possible candidate for spinal cord stimulator and we will get him set up for an evaluation and possible trialing of the spinal cord stimulator. I did tell him that the fusion would not make him any better with regards to his lumbar spine as this seems to have already been improved significantly with his rhizotomy.

He will likely need to continue on medications at least in some form as needed indefinitely unless he gets some relief with the spinal cord stimulator.

Sincerely,

Keith R. Lodhia, MD

*Dictated but not proofread*

MNASS00030



**Thygesen**
**Physical Therapy**

EXHIBIT NO. 60
OCT 1 6 2012
LISA GRIMMINGER, RMR, CRR

7/30/2011

Keith R. Lodhia, M.D.
Midwest Neurosurgery & Spine Specialists
8005 Farnham Drive, Suite 305
Omaha, NE 68114

Dr. Lodhia

RE:  David Bliss

Mr. David Bliss presented to my clinic on 6/30/2011 for Functional Capacity Evaluation
testing.  A standard 1 day Core FCE was performed which involved a detailed
musculoskeletal assessment followed by performance of standardized objective testing to
determine his current physical abilites and safe lifting maximum recommendations.  No
specific job description was provided by the employer therefore determining a definitive
job match was not fully possible. The only information that was communicated to me by his
case worker  (Eileen Warner) regarding physical job demand information was that the
physical demand level of his job is categorized as HEAVY.

Therefore, given this information  I have compared his performance on the FCE to physical
demand characteristics of HEAVY as classified in the Dictionary of Occupational Titles
(DOT).  Please refer to the specifics of his performance on the FCE GRID for further
details.

If you would have any further need to obtain information pertaining to specific tasks or
physical demands testing pertaining to his job I would be more than happy to retest any
items you would request.  If you have  any questions regarding any information on the FCE
report please contact me directly at 402-423-7878.

Thank you again for this FCE referral

Paul Thygesen PT

Thygesen Physical Therapy      5955 South 56th.  Lincoln  NE     68516      402-423-7878  Phone      402-423-0272  FAX

Client Name: David Bliss
FCE Dates: 06/30/2011
Therapist: Paul Thygesen
Thygesen Physical Therapy
5955 S 56th St Ste 1
Lincoln, NE 68510



**WorkWell**
S Y S T E M S. I N C.
*research • science • solutions*

---

## WorkWell FCE History

**Name:** David Bliss
**Dates of FCE Testing:** 06/30/2011
**Date of Birth:** 06/21/1955
**Date of Injury:** 02/04/2011
**Gender:** M
**Address:** 1801 Preamble Ln.
**City/State/Zip:** Lincoln, Nebraska 68521
**Primary Diagnosis:** 722.73
**Area of Injury:** Low Back
**Occupation:** Railroad Carman
**Dept of Labor Category of Work:**
Heavy

**Mechanism/Type of Injury:**
Lifting injury of heavy/awkward piece of equipment.

**Previous Treatment:**
Conservative physical therapy, pain physician evaluatoin and treatment, lumbar surgery x 3,

**Pertinent Surgery/Other Clinical Tests/Past Medical History:**
Lumbar Surgery x 3, Knee surgeries, left RTC.

**Current Medications:**
Tylenol

**Functional Status/ Activity Level:**
Client indicates he is able to perform majority of day to day tasks independently "depending on how his back feels"   Client indicates independence with ADL's.   Client indicates intermittent disruption in sleep pattern due to back pain.

**Chief Complaints/Symptoms:**
Client reports that he has residual left LE weakness following injury and surgeries and continues to experience variable intermittent back pain but tolerates this and "gets on with his life".

**Return to Work Information:**
not working

**Goals:**
Client wishes to remain employed and return to work.

Signature _Paul Thygesen PT_

Date _7-30-11_

MNASS00019

09/26/2011 09:57:43 AM          Remote ID ->          Page 20 / 29

Client Name: David Bliss
FCE Dates: 06/30/2011
Therapist: Paul Thygesen
Thygesen Physical Therapy
5955 S 56th St Ste 1
Lincoln, NE 68510



WorkWell
SYSTEMS, INC.
research • science • solutions

## WorkWell FCE Physical Exam

**Systems Review**

Blood Pressure: 140/90
Height: 65"
Heart Rate (resting): 69
Weight: 220

Gait: WFL's
Posture: Client demonstrates sway back type posture with hips mildly shifted to the left and left shoulder girdle elevated.
Coordination: Client demonstrated functional coordinatoin with no observable deficits.
Movement Characteristics(speed, smoothness, posturing): Client demonstrated functional gait and movement between sitting, standing, and supine position changes with no specific deficit areas.
Atrophy/Edema: None observed in lumbar region
Integumentary: WNL's, well healed midline lumbar incisions observed.
Muscle Tone Spasms: Client demonstrated moderate increase in muscle tone through the bilateral lumbar and lower thoracic paraspinals and additionally at the left superior shoulder involving the muscles of shoulder girdle (scapular) elevation.

**PAR-Q**

| Yes | No | Question |
|-----|-----|----------|
|  | X | 1. Has your doctor ever said that you have a heart condition and that you should only do physical activity recommended by a doctor? |
|  | X | 2. Do you feel pain in your chest when you do physical activity? |
|  | X | 3. In the past month, have you had chest pain when you weren't doing physical activity? |
|  | X | 4. Do you lose your balance because of dizziness or do you ever lose consciousness? |
| X |  | 5. Do you have a bone or joint problem (for example, back, knee or hip) that could be made worse by a change in your physical activity? |
|  | X | 6. Is your doctor currently prescribing drugs (for example, water pills) for blood pressure or heart condition? |
|  | X | 7. Do you know any other reason why you should not do physical activity? |

**Musculoskeletal System**

| Neck | Normal | Range of Motion | Muscle Strength |
|------|--------|-----------------|-----------------|
| Flexion | 45 | WNL | 5 |
| Extension | 45 | WNL | 5 |
| Right Lateral Flexion | 45 | WNL | 5 |
| Left Lateral Flexion | 45 | WNL | 5 |
| Right Rotation | 90 | WNL | 5 |
| Left Rotation | 90 | WNL | 5 |

| Trunk | Normal | Range of Motion | Muscle Strength |
|-------|--------|-----------------|-----------------|
| Flexion | 80 | 55-60 | 4+/5 |
| Extension | 30 | 20-25 | 5 |
| Right Lateral Flexion | 35 | 25-30 | 4+/5 |
| Left Lateral Flexion | 35 | 25-30 | 4+/5 |

Page 1 of 5

MNASS00020

Client Name: David Bliss
FCE Dates: 06/30/2011
Therapist: Paul Thygesen

Thygesen Physical Therapy
5955 S 56th St Ste 1
Lincoln, NE 68510



WorkWell
S Y S T E M S, I N C.
research • science • solutions

| Trunk | Normal | Range of Motion | Muscle Strength |
|---|---|---|---|
| Right Rotation | 45 | 40-45 | 4+/5 |
| Left Rotation | 45 | 35 | 4+/5 |

**Comments/Quality of Motion - Spine**
Client demonstrates AROM decrease in planes of flexion, extension, right and left lateral flexion and rotation. Client demonstrates mild strength decrease in planes of flexion, right and left side flexion and rotation. Client c/o pain and stiffness at the limits of lower trunk extension and left rotation.

| | | Range of Motion | | Muscle Strength | |
|---|---|---|---|---|---|
| Shoulder | Normal | Right | Left | Right | Left |
| Forward Flexion | 180 | WNL | WNL | 5 | 5 |
| Extension | 60 | WNL | WNL | 5 | 5 |
| Abduction | 180 | WNL | WNL | 5 | 5 |
| Internal Rotation | 70 | WNL | WNL | 5 | 5 |
| External Rotation | 90 | WNL | WNL | 5 | 5 |

| | | Range of Motion | | Muscle Strength | |
|---|---|---|---|---|---|
| Elbow | Normal | Right | Left | Right | Left |
| Flexion | 150 | WNL | WNL | 5 | 5 |
| Extension | 0 | WNL | WNL | 5 | 5 |

| | | Range of Motion | | Muscle Strength | |
|---|---|---|---|---|---|
| Forearm | Normal | Right | Left | Right | Left |
| Pronation | 80 | WNL | WNL | 5 | 5 |
| Supination | 80 | WNL | WNL | 5 | 5 |

| | | Range of Motion | | Muscle Strength | |
|---|---|---|---|---|---|
| Wrist | Normal | Right | Left | Right | Left |
| Flexion | 80 | WNL | WNL | 5 | 5 |
| Extension | 70 | WNL | WNL | 5 | 5 |
| Ulnar Deviation | 30 | WNL | WNL | 5 | 5 |
| Radial Deviation | 20 | WNL | WNL | 5 | 5 |

| | | Range of Motion | | Muscle Strength | |
|---|---|---|---|---|---|
| Gross Hand Motion | Normal | Right | Left | Right | Left |
| Composite Motion | | WNL | WNL | 5 | 5 |

| | | Range of Motion | | Muscle Strength | |
|---|---|---|---|---|---|
| Hip | Normal | Right | Left | Right | Left |
| Flexion (knee extd) | 90 | WNL | WNL | 5 | 4+/5 |
| Flexion (knee flxd) | 120 | 110-115 | 110-115 | 4+/5 | 4+/5 |
| Abduction | 45 | WNL | WNL | 4+/5 | 4+/5 |
| Adduction | 30 | WNL | WNL | 4+/5 | 4/5 |

Page 2 of 5

MNASS00021

Client Name: David Bliss
FCE Dates: 06/30/2011
Therapist: Paul Thygesen

Thygesen Physical Therapy
5955 S 56th St Ste 1
Lincoln, NE 68510



WorkWell
S Y S T E M S, I N C.
research • science • solutions

| Hip | Normal | Range of Motion | | Muscle Strength | |
|---|---|---|---|---|---|
| | | Right | Left | Right | Left |
| Extension | 30 | WNL | WNL | 5 | 4+/5 |
| Internal Rotation | 45 | WNL | WNL | 5 | 5 |
| External Rotation | 45 | WNL | WNL | 5 | 5 |

| Knee | Normal | Range of Motion | | Muscle Strength | |
|---|---|---|---|---|---|
| | | Right | Left | Right | Left |
| Flexion | 135 | WNL | WNL | 5 | 4 - 4+/5 |
| Extension | 0 | WNL | WNL | 5 | 4 - 4+/5 |

| Ankle | Normal | Range of Motion | | Muscle Strength | |
|---|---|---|---|---|---|
| | | Right | Left | Right | Left |
| Plantar Flexion | 50 | WNL | WNL | 5 | 5 |
| Dorsiflexion | 20 | WNL | WNL | 5 | 4+/5 |
| Inversion | 35 | WNL | WNL | 5 | 5 |
| Eversion | 15 | WNL | WNL | 5 | 5 |

Other

| Toe Rise Reps | Right | 10 | Left | 10 |
|---|---|---|---|---|
| Knee Squat | 20 | | | |

**Comments/Quality of Motion - Lower Quarter**
Client demonstrated decreased hip ROM in planes of flexion bilaterally. Client demonstrated hip weakness in planes of flexion,extension,abduction,adduction. Client demonstrates muscle weakness to manual muscle testing with bilateral hip flexion, abduction/adduction, left hip extension. Client demonstrates muscles weakness of the left quadriceps and hamstrings. Client demonstrates left dorsiflexion weakness.

**Neuromuscular System**

| Sensory Testing | Client reports chronic decreased sensation of left anteromedial leg (reported from medial malleolar regoin to medial knee/thigh. |
|---|---|
| Reflex Ankle Jerk | Absent left ankle jerk reflex |
| Reflex Knee Jerk | Absent left patellar reflex |
| Reflex Upper Extremities | WNL's |

**Screening for Gross Balance**

| Attribute | Trial 1(Times) | Trial 2(Times) |
|---|---|---|
| Standing on Floor, Eyes Open | 30 | 30 |
| Standing on Floor, Eyes Closed | 30 | 30 |
| Standing on Foam, Eyes Open | 30 | 30 |
| Standing on Foam, Eyes Closed | 30 | 30 |

**First Day Summary of Physical Assessment**
Client demonstrated muscle tone increase in bilateral thoracolumbar paraspinal muscles, left schoulder girdle/scapular elevators. Client demonstrates postural assymetries. Client demonstrates decrease in AROM of trunk flexion, extension, lateral flexion and

Page 3 of 5

MNASS00022

Client Name: David Bliss
FCE Dates: 06/30/2011
Therapist: Paul Thygesen

Thygesen Physical Therapy
5955 S 56th St Ste 1
Lincoln, NE 68510



rotation.   Client demonstrates mild strength deficit in planes of flexion, right and left side flexion and rotation.   Client c/o stiffness/pain at limits of lower trunk extension and left rotation.   Client demonstrates decrease in hip ROM in the planes of flexion bilaterally and muscle weakness in planes of flexion, extension, abduction and adduction. Client demonstrates left quadriceps and hamstrings weakness and left dorsiflexion weakness.   Please refer to the physical exam grid for specific tested ROM and strength values.

Signature _____

Date _____7- 30 – 11____

MNASS00023

Client Name: David Bliss
FCE Dates: 06/30/2011
Therapist: Paul Thygesen

Thygesen Physical Therapy
5955 S 56th St Ste 1
Lincoln, NE 68510



## WorkWell FCE Test Results and Interpretation

The interpretation of WorkWell's standardized functional testing is based on assumptions including normal breaks, basic ergonomic conditions and that the tested functions are not required more than 2/3 of a normal working day. If a function is required continuously, job specific testing should be performed.

Client Name:  David Bliss
Test Date: 06/30/2011

Interpretation of observed function regarding activity during a normal working day

| Frequency | Weighted Activities Observed Effort Level | Position/Ambulation Quantitative + Qualitative Results | % of Workday |
|---|---|---|---|
| NEVER | Contraindicated | Not Possible | 0% |
| RARELY | Maximum | Significant Limitation | 1-5% |
| OCCASIONALLY | Heavy | Some Limitation | 6-33% |
| FREQUENTLY | Low | Slight/No Limitation | 34-66% |
| SELF LIMITED | Client stopped test; submaximum effort level | | Submax percent |

| Lifting, Strength (lbs) | Never | Max Rare 1-5% | Heavy Occ 6-33% | Low Freq 34-66% | Limitations | Recommendations |
|---|---|---|---|---|---|---|
| Waist to Floor (11 in. from floor) | | 85 | 65 | 30 | | |
| Waist To Crown (Handles) | | 50 | 40 | 20 | | |
| Front Carry | | 85 | 50 | 35 | | |

| Posture, Flexibility, Ambulation | Never | Significant Limitation Rare 1-5% | Some Limitation Occ 6-33% | Slight/No Limitation Noted Freq 34-66% | Limitations | Recommendations |
|---|---|---|---|---|---|---|
| Elevated Work (Weighted - 2# cuff on both wrists) | | | | X | | |
| Forward Bending-Standing | | | | X | | |
| Standing Work | | | | X | | |
| Crouch | | | | X | | |
| Kneel - Half Kneel | | | | X | | |
| Stairs | | | | X | | |
| Walk - 6 Min Walk Test | | | | X | | |
| Sitting | | | | X | | |

| Push-Pull (Static) | Force Generated (pounds) | Limitations | Recommendations |
|---|---|---|---|
| | | | |

Page 3 of 9

MNASS00024

Client Name: David Bliss
FCE Dates: 06/30/2011
Therapist: Paul Thygesen

Thygesen Physical Therapy
5955 S 56th St Ste 1
Lincoln, NE 68510



WorkWell
S Y S T E M S, I N C.
*research • science • solutions*

| Push-Pull (Static) | Force Generated (pounds) | Limitations | Recommendations |
|---|---|---|---|
| Push Static | 75 | | |
| Pull Static | 83 | | |

(Numerous variables impact Push/Pull force including load, equipment, surface, etc. These forces do not represent the amount of weight that is moved.)

Signature _____
Date _____7-20-11_____

Page 4 of 9

MNASS00025

Client Name: David Bliss
FCE Dates: 06/30/2011
Therapist: Paul Thygesen

Thygesen Physical Therapy
5955 S 56th St Ste 1
Lincoln, NE 68510



WorkWell
S Y S T E M S, I N C.
research · science · solutions

## WorkWell Functional Capacity Evaluation

**Summary Report**
Name: David Bliss
Test Date: 06/30/2011
Date of Birth: 06/21/1955
Gender: M
Address: 1801 Preamble Ln.
City: Lincoln
State: Nebraska
Zip Code: 68521
Phone: 402-525-6110
Physician: Dr. Keith R. Lodhia
Employer: BNSF Railroad
Primary Diagnosis: 722.73

**Reason for Testing**
Determine ability to return to previous job or other job.
Evaluation to determine functional abilities and limitations

**Description of Test Done**
One day Core WorkWell FCE

**Cooperation and Effort**
Client demonstrated cooperative behavior and was willing to work to maximum abilities in all test items

**Consistency of Performance**
Client gave maximal effort on all test items as evidenced by predictable patterns of movement including increased accessory muscle recruitment, counterbalancing and use of momentum, and physiological responses such as increased heart rate.

**Pain Report**
Client reported discomfort present in lumbar region and hamstrings toward the end of testing during static standing in forward trunk flexed positin, but there was no interference in safety.

**Safety**
Client demonstrated safe performance using appropriate body mechanics throughout all subtests.

**Quality of Movement**
Client demonstrated safe and appropriate changes in body mechanics, including use of accessory muscles, counterbalancing and momentum, as load/force increased.   These changes are expected and consistent with maximal effort.

**Abilities/Strengths**
Client demonstrated significant abilities in grip strength, hand coordination, lifting, and carrying.   Please refer to the FCE GRID for specific information.

**Limitations**
Client demonstated no specific physical limitations pertaining to the test items performed on this Core FCE.

**Physical Return to Work Options Explored**
The client's safe lifting maximums meet the PDL level HEAVY category.    Please refer to the Job Match Grid for details.

**Therapist's Recommendation Regarding Return to Work**
Unable to obtain job description

**US Department of Labor Physical Demand Level**
Heavy

Signature _____

Page 1 of 9

MNASS00026

Client Name: David Bliss
FCE Dates: 06/30/2011
Therapist: Paul Thygesen

Thygesen Physical Therapy
5955 S 56th St Ste 1
Lincoln, NE 68510



Date _ 7-30-11 _____

MNASS00027



Page 1

1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF NEBRASKA

3

   DAVID BLISS,                )

4                              )

               Plaintiff,      ) CASE NO. 4:12CV3019

5                              )

        vs.                    ) DEPOSITION TAKEN IN

6                              )

   BNSF RAILWAY COMPANY,       ) BEHALF OF DEFENDANT

7                              )

               Defendant.      )

8

9

10   DEPOSITION OF:  DR. LIANE E. DONOVAN

11   DATE:  October 4, 2012

12   TIME:  1:05 p.m.

13   PLACE:  6940 Van Dorn Street, Suite 201,

14   Lincoln, Nebraska

15

16   APPEARANCES:

17   Mr. William J. McMahon
     Attorney at Law

18   542 South Dearborn Street
     Suite 200

19   Chicago, IL 60605            for Plaintiff

20   Mr. James B. Luers
     Attorney at Law

21   1248 O Street
     Suite 800

22   Lincoln, NE 68508            for Defendant

23

24

25   Job No. CS1336570

Page 2

1                      I-N-D-E-X

2    WITNESS        Direct  Cross    Redirect  Recross

3    DR. L. DONOVAN  3      46        61         --

4

5


     EXHIBITS                      Marked Offered

6

     51. Spine & Pain Centers Medical

7    Records                          12      --

8    52. Supplemental Doctor's

     Statement                        47      --

9

     53. NPC Follow-Up Clinical

10   Visit Forms                      67      --

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          S-T-I-P-U-L-A-T-I-O-N-S

2          It is hereby stipulated and agreed by and

3     between the parties that;

4          Notice of taking said deposition is

5     waived; notice of delivery of said deposition

6     is waived.

7          Presence of the witness during the

8     transcription of the stenotype notes is waived.

9          All objections are reserved until the time

10    of trial except as to form and foundation of

11    the question.

12               DR. LIANE E. DONOVAN,

13     Of lawful age, being first duly cautioned and

14      solemnly sworn as hereinafter certified, was

15         examined and testified as follows:

16               DIRECT EXAMINATION

17    BY MR. LUERS:

18    Q.     Good afternoon, Doctor.  My name's Jim

19    Luers.

20          Would you state your full name and spell

21    your last name, please.

22    A.     Liane Donovan, D-O-N-O-V-A-N.

23    Q.     And your office address?

24    A.     6940 Van Dorn, Suite 201.

25    Q.     Doctor, you are a physician; is that

```
                                                   Page  4

 1    correct?

 2    A.       Correct.

 3    Q.       Practicing here in Lincoln, Nebraska?

 4    A.       Correct.

 5    Q.       And what is your specialty?

 6    A.       Pain medicine.

 7    Q.       Are you board certified in that

 8    specialty?

 9    A.       Yes.

10    Q.       And how long have you been practicing

11    then?

12    A.       Since '94.

13    Q.       Okay.  Is that with the same clinic

14    here, the Pain -- Spine and -- or the Pain

15    and --

16    A.       I know.  It keeps changing.

17    Q.       What is it?  Okay.

18    A.       Yes.  But that's -- this officially

19    began I think in 2003.

20    Q.       What's the name of it now?

21    A.       Spine and Pain Centers of Nebraska.

22    Q.       Okay.  And you practice with some other

23    specialists?

24    A.       Yes.

25    Q.       How many?
```

Page 5

1    A.      I practice with two other specialists.

2    Q.      What are their names?

3    A.      John Massey and Phil Essay.

4    Q.      Okay.  Is Dr. Devney then in your

5    clinic?

6    A.      No, he is not.

7    Q.      Where does he practice?

8    A.      Omaha.

9    Q.      Okay.  All right.  So he's not

10   associated with you in any way?

11   A.      No.

12   Q.      Doctor, have you had your deposition

13   taken before?

14   A.      Yes.

15   Q.      All right.  So you're familiar with the

16   process?

17   A.      Yes.

18   Q.      Are you acquainted or do you know Mr. --

19   what's his first name?

20   A.      David.

21   Q.      David Bliss?

22   A.      Yes.

23   Q.      Yes.  As we sit here today, do you have

24   an independent recollection of Mr. Bliss?

25   A.      Yes.

1    Q.      All right.  Can you tell me how you

2    first met him?

3    A.       I first met him in an evaluation for

4    spinal cord stimulator.

5    Q.      Okay.  So he came to your office; is

6    that right?

7    A.      Yes.

8    Q.      Had you ever done any treatment on

9    Mr. Bliss prior to that?

10   A.      No.

11   Q.      And had you ever known any other members

12   of his family or treated any other members of

13   his family?

14   A.      No.

15   Q.      All right.

16   A.      Not that I know of.

17   Q.      Do you know who recommended you to him?

18   A.       I think he came in referral from

19   Dr. Lodhia.

20   Q.      And is that -- do you typically get

21   referrals from Dr. Lodhia?

22   A.      Yes.

23   Q.      For pain patients?

24   A.      Yes.

25   Q.      All right.  Are you acquainted with

Page 7

1    Mr. Bliss' attorney?

2    A.      No.

3    Q.      All right.  Never spoken with him?

4    A.      No.

5    Q.      Are you aware, Ma'am, that there is a

6    lawsuit pending in this case involving

7    Mr. Bliss?

8    A.      I'm aware now.

9    Q.      Okay.  You weren't at -- as of recent

10   times?

11   A.      No, I was not.

12   Q.      Okay.  Have you ever, to your knowledge,

13   treated other railroad employees that are

14   involved with pending lawsuits?

15   A.      I assume I probably have.  But I can't

16   think of anybody.

17   Q.      Not familiar?

18   A.      Yes.

19   Q.      Okay.  As we sit here today, are you

20   familiar with specific crafts or job duties of

21   railroad workers?

22   A.      No.  The only thing that I am aware of

23   in general is that unless they are 100 percent,

24   it's hard to return to work, is how I

25   understood it.

1    Q.      Okay.  But you know -- but as you sit

2    here today, for example, you don't know what --

3    job requirements of a carman at the --

4    A.      No.

5    Q.      -- Lincoln shops?

6    A.      I do not.

7    Q.      Okay.  And you are not a voc expert; is

8    that correct?

9    A.      Correct.

10   Q.      So you don't typically render opinions

11   as to whether an individual can return to work

12   or what types of activities that individual can

13   actually engage in in terms of work?

14   A.      No, I do not.

15   Q.      And you don't anticipate offering those

16   kinds of opinions in this case, do you?

17   A.      No, I do not.

18   Q.      How about FCEs?  Do you get involved in

19   your practice in conducting functional capacity

20   evaluations?

21   A.      Rarely.  More often we send them out.

22   Q.      All right.  Are you familiar with

23   typically how they are run?

24   A.      Yes.

25   Q.      And when you send them out, do you

1    generally then look at the report and evaluate

2    them yourself?

3    A.      Yes.

4    Q.      Okay.  Have you ever seen one conducted

5    on Mr. Bliss?

6    A.      I have.

7    Q.      All right.  Do you have that one from

8    WorkWell dated --

9    A.      Yes.

10   Q.      Looks like it's dated --

11   A.      6-30-11.

12   Q.      Correct.  You were provided with that?

13   A.      Yes.

14   Q.      Do you remember when or how?

15   A.      Just before this deposition.

16   Q.      Oh, really?

17   A.      Yes.

18   Q.      How did that come to you?

19   A.      Just came in a form of just past

20   records.

21   Q.      Okay.  Who provided it to you?

22   A.      My work comp nurse.

23   Q.      Okay.  How did you -- did you make a

24   request for that?

25   A.      I, prior to depositions, request prior

Page 10

1    records.

2    Q.      All right.  What other records were

3    provided then just prior to this deposition?

4    A.      I just -- I have Dr. Lodhia's notes.

5    And I have an EMG study.

6    Q.      And could you tell me, please, what date

7    are the noted -- are the notes from Dr. Lodhia?

8    A.      He has one -- and this may have been in

9    the record.  Although, I'm not sure.  This

10   one's from 11-7-11, just a letter to

11   Dr. Kreshel.

12   Q.      Okay.

13   A.      And then I have another one of his that

14   is from 9-2-11.  And that is another letter to

15   Dr. Kreshel.

16   Q.      Okay.

17   A.      And that's all the notes I have.

18   Q.      And then you've got the --

19   A.      I have the EMG.

20   Q.      And when is that dated?

21   A.      That is dated 7-13-11.

22   Q.      From -- and who provided that to you?

23   A.      Actually, I think I had that prior

24   because I was aware of the EMG.

25   Q.      Okay.

Page 11

1    A.      And then I have the functional capacity

2    evaluation from 6-30-11.

3            And then I have an old op report.  But I

4    already had this prior from Dr. Noble from

5    2003.

6    Q.      Very good.  So all of those documents

7    were provided to you -- when you say just

8    prior, is that, like, within the last week?

9    A.      Yes.

10   Q.      Okay.  Prior to that, prior to this past

11   week --

12   A.      Yes.

13   Q.      -- did you have an opportunity to review

14   old medical history of Mr. Bliss?

15   A.      I was aware of his 2003 operation.  And

16   I was aware of Dr. Devney's notes regarding a

17   radiofrequency he had done.

18   Q.      And Dr. Devney actually got involved

19   with this particular client in looks like

20   September of 2011; is that right?

21   A.      Yes.

22   Q.      Okay.  So other than those -- other than

23   those medical records, you're not aware of any

24   other medical history?

25   A.      No, I'm not.

Page 12

1    Q.      All right.  With regards to the WorkWell

2    FCE, did you have an opportunity then in the

3    past week to review that?

4    A.      Yes, I have.

5    Q.      Is there anything in there that jumps

6    out at you that would suggest to you that it's

7    not valid or it wasn't valid at the time it was

8    taken?

9    A.      No, I do not.

10   Q.      All right.  At least as of the date of

11   June 30th, 2011, it appears to be a valid

12   evaluation of his physical -- of Mr. Bliss'

13   physical capabilities?

14   A.      Yes.

15   Q.      Okay.  Dr. Devney saw the patient.

16               MR. LUERS:  I'm going to mark

17   this as an exhibit.

18               (Exhibit No. 51 marked for

19               identification.)

20   Q.      (BY MR. LUERS) Doctor, I've put together

21   what I hope to be a fairly complete compilation

22   of Dr. Devney and then your office notes.  And

23   it's marked as Exhibit 51.

24          It appears that Dr. Devney first saw

25   Mr. Bliss on September 9th of 2011.  Is that

Page 13

1    your understanding?

2    A.      Yes.

3    Q.      When Dr. Devney sent the patient or --

4    no.  Dr. -- I'm sorry.  Dr. Devney didn't refer

5    the patient to you.  Was it -- well, wait a

6    minute.

7    A.      You know, that's --

8    Q.      Strike that.

9    A.      It's a good question.  And I'm trying to

10   remember how he came.  I have it written as

11   Dr. Lodhia.  But I'm not sure whether it might

12   have come through Devney.

13   Q.      I think maybe I did see --

14   A.      Did it come through him?  It's possible.

15   Q.      Well, it doesn't matter.  But at any

16   rate, let me -- let me -- when he -- when

17   Mr. Bliss came to you, you had at least been

18   provided with Dr. Devney's medical records;

19   correct?

20   A.      Yes.

21   Q.      And as of 9-9 of 2011, if you could look

22   at pages -- that initial report of

23   Dr. Devney --

24   A.      Uh-huh.

25   Q.      -- on the second page, the objective --

Page 14

1    looks like a -- sort of a general physical

2    exam --

3    A.      Yes.

4    Q.      -- with the exception of some loss of --

5    slight loss of sensation on the left foot and

6    some reflexes that are absent, would you agree

7    with me, Doctor, that that physical exam was

8    pretty normal?

9    A.      Yes.

10   Q.      And the impression then included a

11   variety of these low back pain, mostly lumbar

12   disc degeneration, facet and probably lumbar

13   spinal stenosis.  Are those -- can all of those

14   be attributed to longstanding spine

15   degeneration?

16   A.      Yes.

17   Q.      Okay.  And is it -- was it your

18   understanding that at least as of that initial

19   report, Dr. Devney didn't impose any

20   restrictions on Mr. Bliss?

21   A.      Not that I am aware of.

22   Q.      All right.  9-19 was his next report.

23   And that begins on page 5.

24           Again, the condition was generally

25   negative except for a few of the -- of the

1    original complaints; correct?

2    A.      Yes.

3    Q.      9-26, they -- he proceeded with a -- is

4    that a rhizotomy?

5    A.      Yes.

6    Q.      Tell me what that is, Doctor.

7    A.      It is a -- it is a alternating current.

8    It's actually a burn of the nerve to the joint,

9    the facet joint in the back.  So he --

10   Q.      What is the purpose of that?

11   A.      It is with the understanding that the

12   pain in the back is related to facet pain or

13   facet-mediated pain so arthritis in the spine

14   and that the intent of the rhizotomy is to

15   remove the sensory portion of what somebody

16   feels with that range of motion in the joint

17   and, therefore, decrease their pain.

18   Q.      Is that -- and like you said, that's

19   done on patients that are suffering from, like,

20   multi-level degenerative spine?

21   A.      Usually multi-level facet degeneration.

22   Q.      Okay.

23   A.      So it only works -- you do the medial

24   branch or the diagnostic block to prove that a

25   good portion of their back pain is related to

Page 16

1    the joint.

2    Q.      Okay.

3    A.      And not a disc or anything else.

4    Q.      So if the pain is alleviated, then it

5    is, at least some of the pain that they're

6    complaining of is related to the facet joint?

7    A.      Yes.

8    Q.      And is the facet joint something that,

9    again, degenerates over time and that can be a

10   normal process?

11   A.      Yes.

12   Q.      On November 7th, which is page 12, up

13   above, mark the pages.

14   A.      Uh-huh.

15   Q.      Under subjective, I think it's the third

16   sentence or fourth sentence, it says, "He

17   reports 95 percent pain reduction."

18   A.      Yes.

19   Q.      So that's -- that's indicative of, like

20   you said, if it's an arthritis-related

21   condition?

22   A.      Yes.

23   Q.      And certainly with that kind of pain

24   reduction, there's no indication that as of

25   November 7th of 2011, there would be any reason

Page 17

```
 1    to impose additional -- or any restrictions;
 2    correct?
 3    A.      Correct.
 4    Q.      And as far as you know, there were no
 5    restrictions?
 6    A.      As far as I know.
 7    Q.      Okay.  Under the objective portion on
 8    that page, 12 --
 9    A.      Uh-huh.
10    Q.      -- it says, toward the bottom, "Lumbar
11    range of motion is full in all directions with
12    mild discomfort.  His neurological assessment
13    remains unchanged.  No edema noted in the lower
14    extremities."  Pretty normal; correct?
15    A.      Yes.
16    Q.      All right.  If we go to November 18th,
17    which is page 14, this is the first time that
18    you actually saw the patient; is that accurate?
19    A.      That is correct.
20    Q.      Okay.  Talk to me a little bit about
21    under the past, family, social, employment
22    history.  There is a line there that says,
23    "Work history" --
24    A.      Yes.
25    Q.      -- "no changes required.  He works at
```

Page 18

1    BNSF as a carman."  Obviously he would have

2    told you -- he would have provided you that

3    information?

4    A.      Yes.

5    Q.      When you -- says no changes required, I

6    take it at that point in time, you're not

7    imposing any restrictions or limitations?

8    A.      It would -- when it says no changes

9    required, it's been updated.  That is how he

10   described his work history.  So it doesn't

11   necessarily talk about restrictions.

12          It's how they say, like, I'm a

13   secretary.  Patient is a secretary.  So it

14   doesn't say currently disabled, currently -- I

15   mean, they usually add that if I -- if I -- a

16   change is required, they say currently disabled

17   is a change, then you would remove the -- it

18   would change that way so --

19   Q.      Okay.  So you would add -- if -- if for

20   some reason either you believed it or the

21   patient believed that he was unable to return

22   to work as a carman, you would add disabled

23   or --

24   A.      Correct.

25   Q.      -- restricted or --

Page 19

```
 1   A.      Yeah.
 2                MR. McMAHON:  Objection.
 3   Foundation as to what Mr. Bliss thinks.
 4   Q.      (BY MR. LUERS) But that information
 5   would be provided to you then, and that might
 6   dictate a change?
 7   A.      Yes.
 8   Q.      Okay.  In this instance, at least as of
 9   November 18th, it was still your understanding
10   that he was working as a carman or would return
11   to work as a carman?
12   A.      Yes.  I do have in his intake -- and I
13   don't -- this is in his writing.  He does say
14   as last date of employment, February 3rd, 2011.
15   Q.      Correct.
16   A.      But --
17   Q.      That's when his alleged injury occurred;
18   correct?
19   A.      Yes.
20   Q.      At least that's your understanding?
21   A.      Yes.
22   Q.      Okay.  And I think that's in your
23   initial pain overview --
24   A.      Yes.
25   Q.      -- paragraph of your report.
```

Page 20

1          Was there any indication in your initial
2     visit here of November 18th, 2011, that
3     Mr. Bliss was having shoulder problems or
4     complaints of pain in his shoulders?
5     A.      No.
6     Q.      Go to 12-21, which I think is the next
7     visit that you had with Mr. Bliss.  That's on
8     page 18?
9     A.      Yes.
10    Q.      Was that your next visit?
11    A.      Yes.
12    Q.      All right.  Again, there's no reference
13    to any change in work history there; correct?
14    A.      Correct.
15    Q.      Is there any indication in that report
16    of any complaints of shoulder pain or shoulder
17    problem?
18    A.      On that date -- December 21st?
19    Q.      Yes.
20    A.      He doesn't say it in his intake with the
21    nurse.
22           But on his picture, his pain diagram, he
23    does draw just a mark across the shoulder
24    there.
25    Q.      Okay.

1    A.     So at that point -- but he didn't --

2    usually what we discuss or address are the

3    things they want to talk about.  So a lot of

4    times with the type of pain patients, we'll

5    often see a whole body covered, but you have to

6    focus on an area.  So sometimes when other

7    places are marked, it doesn't necessarily mean

8    we address it unless a patient wishes to

9    address it.

10    Q.     Okay.  Were you aware at that time that

11    he was treating with any other physicians for

12    shoulder problems?

13    A.     No, I was not.

14    Q.     He never brought that to your attention?

15    A.     No.

16    Q.     Were you aware that he had had surgery

17    on December 5th for his shoulder?

18    A.     No.

19    Q.     Okay.  Would -- did he make any -- give

20    you any indication as of December 21st that he

21    had gone through physical therapy at least four

22    times or three times -- three or four times as

23    of that date for the shoulder?

24    A.     No, I don't have that.

25    Q.     Okay.

Page 22

1    A.      I do see, though, that I have written

2    multiple times that he is in litigation.  I

3    guess I just -- that doesn't tend to be

4    something I focused on.  So when you asked if I

5    was aware he was in litigation, I must have

6    known it.

7    Q.      Oh, no.  That's okay.

8    A.      Yeah, but I never concentrate --

9    Q.      That's fine.  You didn't know he was

10   treating for shoulder problems and had surgery

11   and physical therapy?

12   A.      I was not aware.

13   Q.      Okay.  As of that 12-21 visit, at least

14   according to your history, it looks like his

15   pain has improved?

16   A.      Yes.

17   Q.      And if you look on page 19, down on

18   comments --

19   A.      Yes.

20   Q.      -- you say, "He's -- he's doing

21   considerably better and pain is something he

22   can live with."

23           And then you go on to say, "He is able

24   to work but not likely at full capacity that he

25   had been."

1        What changed -- what, if anything, if

2    you recall, made you make that comment?  First,

3    let me ask you that.

4    A.       Usually when -- that wouldn't

5    necessarily -- the comments wouldn't

6    necessarily be based upon a physical exam

7    finding or a change that way.  It's usually

8    based upon their statement that they have some

9    concern about whether they would be able to

10   continue to work.

11   Q.       Okay.  So is it probable that that

12   statement there is based upon what he told you?

13   A.       Yes.

14   Q.       And then what about, "He would likely be

15   qualified for light or sedentary duty"?  Is the

16   same thing true there?  Is that what he's

17   telling you?

18   A.       I don't recall.  Sometimes -- sometimes

19   when they -- they're unsure whether they would

20   be able to work, we would still say -- my job,

21   kind of my opinion of my job is to keep people

22   going, to have them continue to work in some

23   capacity.

24        When someone has chronic pain, the worst

25   thing you can do is to disable them and let

Page 24

1    them sit at home and not do anything.

2          So most of the time if they can't

3    perform full capacity, such as with a railroad

4    job, is my understanding, light duty or some

5    sort of work to continue to work in some

6    capacity tends to be in a pain patient's best

7    interest and something that we'd recommend or

8    we'd like them to continue.

9    Q.     Okay.  You weren't -- you weren't

10   rendering an opinion there in that sentence

11   based upon, like, the Social Security work

12   categories as to whether he was eligible for

13   light, medium --

14   A.     No.

15   Q.     -- or heavy duty?

16   A.     No, no.  It's not based on specific

17   pounds that he can lift or time that -- no.

18   It's more we believe he should be able to

19   continue to work in some capacity.

20   Q.     Okay.  Whether it be light or medium?

21   A.     Exactly.

22   Q.     Okay.  And you didn't at that time

23   impose any restrictions on him?

24   A.     No.

25   Q.     All right.  Next visit was March 20th;

Page 25

1    is that correct?

2    A.     I believe so.

3    Q.     If you look on the -- page 22, under

4    history, second paragraph, you say -- he says

5    that, "Pain is exacerbated by walking long

6    distance."  Can -- do you recall, perchance,

7    what he referenced as being long distance?

8    A.     No, I don't recall.

9    Q.     Would -- okay.  You also say that he

10   gets 80, 90 percent of relief from meds and

11   that the pain is considerably better; correct?

12   A.     Correct.

13   Q.     Again, when you're doing your physical

14   exam, you note, "No acute distress."  So he's

15   doing pretty well at that point?

16   A.     Yes.

17   Q.     Okay.  Go to April 19th, which is the

18   next visit.  Same thing, physical exam is

19   pretty much unchanged, relatively good;

20   correct?

21   A.     Yes.

22   Q.     Exercise program, I think you're

23   recommending under musculoskeletal on the

24   second -- on page 26 --

25   A.     Yes.

Page 26

1    Q.      -- you say, "Can undergo exercise

2    testing and/or participate in exercise

3    program."  What did you have in mind there,

4    Doctor?

5    A.      That's an interesting thing because the

6    electronic medical record, if you -- when

7    you're going through the record, if you push

8    the normal button, it will put that out.  I'm

9    not sure that's always an accurate statement.

10   But if you look back probably through the

11   record, it says that each time.

12           It's the assumption that -- I will

13   change it if -- the best thing -- the more

14   accurate thing would be normal gait and

15   station, you know, whatever, no -- that sort of

16   thing rather than what comes out on that form.

17   But that's what it implies.

18           So I would say that he would be able to

19   undergo normal exercise and activity, but that

20   is not a new finding.  That's probably how he's

21   been the whole way through.

22   Q.      Okay.  And then what would -- what would

23   normal exercise and activity be?  I mean, in

24   his case, as of April --

25   A.      ADLs, whatever he normally does, his

Page 27

1    activities of daily living.  I didn't get the

2    feeling that he was limited in his ability to

3    do the things that he had been doing all along.

4    Q.      Okay.  And, again, he didn't indicate to

5    you at that time anything changed with regards

6    to his belief that he could -- that he was

7    working as a BNSF carman or could work?

8    A.      Yes, he did not.

9    Q.      May 21st, 2012, which is the next visit,

10   second paragraph under history -- and, quite

11   frankly, on there you have the referral as

12   Dr. Lodhia.

13   A.      It is there?

14   Q.      Yeah.

15   A.      Okay.

16   Q.      It's on page 28.

17   A.      Uh-huh.

18   Q.      Second paragraph under history.

19   A.      Yes.

20   Q.      He talks about, "Pain as stiff and sore

21   first thing in the morning and by noon is

22   feeling great.  By evening the pain is starting

23   to return."   Is that uncommon in this kinds

24   of -- in this kind of condition?

25   A.      No, it is not.

Page 28

1    Q.      Okay.  What -- what is the precipitating

2    factor for someone that starts getting more

3    pain as the day progresses?

4    A.      When we ask about time of day that you

5    have pain, just as a general rule, people who

6    have pain in the morning tend to be more

7    arthritis related, get up in the morning,

8    they're stiff from lying in bed.  And so that

9    would be kind of -- when you're looking at

10   facets or when you're looking at that sort of

11   thing, you always kind of look toward morning

12   pain.

13          Pain as the day progresses or more pain

14   towards the end of the day suggests more disc

15   mediated or other causes for pain.

16          So this would suggest he has some return

17   of the arthritis pain but he may also have

18   his -- the pain related to his spine and what

19   he's had in the past.

20   Q.      Okay.  All right.  It says, "Pain is

21   exacerbated by no meds."  I guess what?  Did he

22   take himself off the meds?  Is that what he's

23   saying?

24   A.      I think he's saying when he's not taking

25   medication, like, if he's saying -- yes, I

Page 29

1    would say if he skips a dose, he notices more

2    pain.

3    Q.      All right.  "Standing in one place or

4    too much activity and long car rides," again,

5    do you have any recollection of what he meant

6    by long car rides there?

7    A.      I do not.

8    Q.      Okay.  That's all right.

9            The pain on the VAS scale, 3 and -- out

10   of 10, what -- tell me how you -- how you rate

11   that and how you present that to the patient.

12   A.      You know what I do have?  Is this May

13   21st?

14   Q.      Yes, Ma'am.

15   A.      He does write on his intake, he says, he

16   is "stiff and slow getting around in the

17   morning and loosens during the day.  Standing

18   for more than 15 to 20 minutes is the limit I

19   have."

20   Q.      Okay.

21   A.      "I have to sit down.  Walking, I can go

22   30 minutes to an hour and then sit down.  By

23   midday, the back pain will leave, and I have no

24   symptoms, but foot pain remains."

25   Q.      Doctor, I didn't ever get those intake

Page 30

1   pages.

2   A.      I can get those to you.  That's just --

3   what we tend to do is when a patient is

4   sitting, about to come back, they'll write, you

5   know, the information that we ask.

6   Q.      I understand.  Did he write anything

7   about driving there?

8   A.      He just mentions --

9   Q.      Long car rides?

10  A.      No.  Just about having to sit down --

11  standing more than -- no, he does not.

12  Q.      Okay.  And then back to my question with

13  regards to the pain, 3 on a scale of 10 --

14  A.      Yes.

15  Q.      -- tell me how that is presented to the

16  patient and how do you analyze that?

17  A.      Well, the more -- the more accurate way

18  to analyze is a lot of times a visual analog

19  scale, people learn it almost like they learn

20  their Social Security number, what's your pain

21  today, it's a 10.  It's, like, that's the worst

22  pain ever, it's a 10.  You know, that's kind of

23  how they are.

24          Really, the more accurate way is to use

25  a scale such as this but, actually, it be, you

1     know, 10 inches or 10 centimeters and where

2     they put their X on the scale should actually

3     be measured.  And then you have a measured

4     reading based upon -- on a line where their

5     pain tends to sit.  And that can help you.  And

6     that's probably a little bit more accurate

7     because where they put it, they don't memorize

8     where they are on the line.

9     Q.     Sure, sure.

10    A.     And that's actually a little bit more

11    accurate than using a number.  But a three is

12    pretty well-controlled pain as a whole.

13    Q.     Okay.  Then the next visit, if I've got

14    this right, is August 22nd.

15    A.     I have it as August 22nd as well.

16    Q.     Okay.  There he's reporting that his

17    functionality has decreased.  Did you do

18    anything in terms of your evaluation that

19    either confirmed or refuted that, or do you try

20    to do that?

21    A.     We use a lot of their report, their

22    self-report as a means of figuring it out.

23           Sometimes when something changes

24    considerably, we will kind of watch what

25    they're doing or whatever.  But we -- we use

Page 32

1    actually functionality more than the VAS, the

2    score, because, again, like you said, one's

3    just a number.  Whereas, I'm not doing -- I

4    hurt more, I haven't been able to do as much, I

5    can't go to the mailbox, I can only get around

6    in the kitchen and I have to sit, that sort of

7    thing.  So a lot of times they'll give us more

8    detailed report.

9           That's pretty vague except for he is now

10   walking with a cane, which looks like that's

11   something different.

12   Q.     When he -- when he reported his

13   functionality was -- has decreased, did he give

14   you any more specifics than that?

15   A.     He writes that he's same to worse, that

16   "Tramadol use goes up with activities.  Hand

17   swelling in fingers hurt.  Low back stiffness.

18   Pain in both heels and balls of feet and

19   grinding teeth," is what he wrote on his intake

20   form.

21   Q.     So you didn't conduct any evaluation or

22   analysis yourself to determine if his

23   functionality had, in fact, decreased?

24   A.     No.

25   Q.     Okay.  And as far as why he was -- why

1    he had bought a cane, do you know what -- what

2    specific physical problem led him to do that?

3    In other words, was it the pain in his feet, do

4    you know?  Was it -- was it his balance?  Was

5    it meds?

6    A.      It's more the foot pain, I believe is

7    why he was using the cane.

8    Q.      He -- you have it that he has a new

9    complaint of bilateral hands and feet.  What

10   would that signify to you, if anything?

11   A.      Well, I guess the one thing you always

12   want to look for is, like, peripheral

13   neuropathy, new onset diabetic, is there some

14   sort of thing going on, is there a vitamin

15   deficiency, you know, causes for peripheral

16   neuropathy as that pain.

17          But other times, when we see pain that

18   kind of is random, sometimes it can also be

19   more related to depression or other changes as

20   they -- again, that's the reason why I like

21   getting them to work sooner or do something

22   because when you sit around and dwell on your

23   pain, you notice more pain.

24   Q.      Were you -- throughout this period of

25   time, do you counsel the patient to get out

Page 34

```
 1   and --
 2   A.      Yes.
 3   Q.      -- engage in exercise?
 4   A.      Always.
 5   Q.      And try to work?
 6   A.      Always.
 7   Q.      Did you -- were you having any success
 8   in Mr. Bliss' --
 9   A.      He -- he -- his problem and the problem
10   pretty much from the beginning is that the
11   medications always helped him, but the sexual
12   side effects was causing a lot of problems in
13   his house.  So every time that he would come
14   in, the main thing that he would be talking
15   about is erectile dysfunction.
16           So we would counsel, you know, getting
17   up and doing things and moving around and how
18   big a deal is this because if it's a big enough
19   deal, it is usually worth changing medication.
20           If a side effect is greater than its
21   benefit, we should absolutely change a
22   medication.
23           So his main focus -- I was never under
24   the impression -- usually when somebody is not
25   functional, he -- he described himself, I mean,
```

Page 35

```
 1    a 3 out of 10 pain, 80 to 90 percent
 2    improvement.  That's a pretty functional
 3    person.  So you're less likely to say, you know
 4    what, you need to get out of your chair and
 5    quit just watching TV.  What do you do in the
 6    day.  And I'll see that more with somebody who
 7    I feel is less functional.  We will spend more
 8    time on that discussion.
 9              In his particular case, he never really
10    described decreased functionality until this
11    visit.  So he was mainly describing the side
12    effects of the medication, although --
13    although, the medications were very helpful to
14    him.
15    Q.      Okay.
16    A.      And it would be more counseling in that
17    direction.
18    Q.      So if I understand you correctly -- and
19    you correct me if I'm wrong -- basically you
20    felt that his activity level was probably high
21    enough that you didn't have to spend a lot of
22    time on encouraging him to work hardening and
23    those kinds of things?
24    A.      Yes.
25    Q.      All right.  There was no indication to
```

Page 36

1    you, at least through your analysis over these

2    months and your physical exams, that he was

3    incapable of engaging in normal activities?

4    A.      No, there was no indication.

5    Q.      All right.  On page 32, under

6    assessment, you do reference encouraging him to

7    attend the YMCA and to increase his activities.

8    So at least there was some indication at that

9    point in time maybe you felt he should increase

10   his activity?

11   A.      Yeah.  And you can kind of see, he comes

12   in.  He says he's less functional.  He's using

13   a cane.  Okay.  How do we get him back, what

14   happened between those three months or the last

15   visit and how do we get him back to doing what

16   he was.

17          There's not a big fall or something that

18   changed significantly.  Sometimes they just

19   need a little push to say, you know what, if

20   you're okay in the water, you're going to start

21   to be okay in land and you get moving again.

22          And he looks like he expresses interest

23   in trying to -- he recognizes it as well.  And

24   is actually saying going to the Y with his son.

25   So he's proactively trying to do something,

Page 37

1    which is also unusual with our patients so --

2    Q.      Did you -- did you follow that up, or do

3    you know if he joined the Y or if he did any

4    aquatherapy?

5    A.      I do not.

6    Q.      Okay.  As of that date of May -- or

7    August 21st -- excuse me, August 22nd, 2012,

8    you still had not imposed any specific

9    restrictions on Mr. Bliss; is that correct?

10   A.      That is correct.

11   Q.      And that -- is that the last time you've

12   seen him?

13   A.      Yes, that I'm aware of.

14   Q.      Okay.  As of that date, what meds were

15   you prescribing for Mr. Bliss?

16   A.      Cymbalta and Lyrica.

17   Q.      And what is Cymbalta for?

18   A.      Cymbalta is -- what it does is it

19   increases serotonin and norepinephrine, some

20   neurotransmitters that get depleted with pain.

21   It is an antidepressant, but we don't use it --

22   its indication is more for neuropathic pain.

23   And most of the time people in pain also have

24   some depression associated with it.

25   Q.      He says he's taking up to six Tramadol a

Page 38

1    day.   Where is he getting that prescription?

2    A.       That must be through his primary care.

3    Q.       And what is Tramadol?

4    A.       Tramadol is a -- it is a pain medication

5    that works at a narcotic receptor.  It is --

6    it's schedule -- I don't remember its schedule

7    dosing.

8            But it doesn't -- it's not like

9    hydrocodone.  So people sometimes will have

10   samples in their office or things like that.

11   It's a lot less regulated.  But all intents and

12   purpose, it's a narcotic.

13   Q.       Okay.  And Lyrica?

14   A.       Lyrica's an anticonvulsant.  It works at

15   something called an alpha 2 delta receptor.  So

16   what it's supposed to do is stabilize the way a

17   nerve sends a pain signal.

18           If you -- if you block the calcium

19   channel through there, you don't have pain.

20   So, again, it's for neuropathic pain is what we

21   use it for.  Although, it's a anticonvulsant.

22   Q.       How do you monitor his use of this

23   narcotic drug in conjunction with what you're

24   trying to do with your other drugs?

25   A.       I -- I tend not -- I tend not to

1    prescribe narcotics very often for chronic

2    pain.  How -- the only way that we tend to

3    monitor it is on an intake, asking the patient

4    what are they taking.

5            I don't try to second guess necessarily

6    their primary care unless I see a red flag or a

7    reason that they should be a little more aware

8    of something.

9            If I'm giving them a pain medication and

10   I find out someone else is, that's a definite

11   red flag.  And that would be a reason.

12           But I've never given him as such a pain

13   pill.  And so what his primary care is doing is

14   kind of between them.

15   Q.      Okay.  So this Tramadol, 100 milligrams,

16   four to six tablets daily --

17   A.      That's an outrageous amount in my

18   personal opinion.  But, again, I try not to

19   judge.  It almost makes me question whether

20   that is the correct number or not.  Because

21   that is a really high dose.

22   Q.      I understand.  And I guess that was my

23   question.  Is -- is there any concern at this

24   point --

25   A.      Yes.

Page 40

1    Q.      Okay.

2    A.      See, initially on my initial ones, he

3    was on 100 milligrams.  And this is another --

4    the way an extended-release medication works is

5    it is supposed to be slowly released by

6    whatever -- whatever substance that you want to

7    use to cause it over a certain period, whether

8    it be 12-hour, 24-hour.

9            I'm amazed by how often the medication

10   is not prescribed correctly.  As 100 milligram,

11   that's an extended-release medication.  Most

12   people, you'd never give that person in a 50

13   milligram form, whatever -- 10, 15 of those.

14   And, yet, you're somewhat doing that when

15   you're giving them three a day of 100

16   milligrams or six a day of a 100-milligram

17   pill.

18           Again, I question the judgment of that.

19   But I -- I'll just leave it at that.

20   Q.      Okay.  I understand.  All right.  You

21   didn't have any -- any -- you don't recall any

22   specific visits that you had with Mr. Bliss

23   concerning his narcotic medications?

24   A.      No, I did not.

25   Q.      Okay.  All right.

Page 41

1    A.      The other thing that's really hard is

2    that oftentimes when they come from a

3    neurosurgeon or they come from a surgical

4    consult or standpoint, we're not necessarily

5    monitoring the primary care's care.  So we're

6    just handling that part of it.  So Dr. Lodhia

7    wasn't prescribing it, we're not prescribing

8    it, it is of concern.

9    Q.      I understand.  Do you know who's

10   prescribing it?  I mean, for sure or --

11   A.      I assume Dr. Kreshel because that's who

12   his primary care is.  But I don't -- I'm

13   assuming.  But I don't know.

14   Q.      Okay.  Any other medications that you're

15   aware of that he's taking?

16   A.      No, I'm not aware of any others.

17   Q.      Now, at least as of November of 2011, he

18   had -- he was on hydrocodone.  That could have

19   been through -- from the shoulder surgery or --

20   A.      Yes, I would assume so.

21   Q.      Okay.

22   A.      I would assume so.

23   Q.      All right.  Next visit that you have is

24   scheduled for, like, three months from August;

25   is that right?

Page 42

1    A.      Yes.

2    Q.      And why -- why do you have another visit

3    scheduled, and how long is -- what are your

4    plans?  What is the prognosis and plans for

5    Mr. Bliss?

6    A.      As a whole, somebody with chronic pain

7    needs to be seen at intervals -- and his

8    interval, it would probably be further apart.

9    If I saw him and he's still on Cymbalta at 60

10   or Lyrica at 100 three times a day or whatever

11   he's on and he's been stable like that for a

12   year or whatever, I'd probably extend those

13   visits to six months because there's not a

14   reason that we need to.

15          The -- the Tramadol use or things like

16   that may -- may make it so that it would be

17   valuable for him to come in sooner in a

18   situation like that.

19   Q.      Got you.

20          Do you -- strike that.

21          You didn't have an opportunity to review

22   any MRIs or --

23   A.      I have seen his MRIs before.

24   Q.      Oh, have you?

25   A.      Yes.

Page 43

1   Q.      Okay.  The MRIs that reveal the lumbar
2   disc degeneration, the facet arthropathy, the
3   lumbar spinal stenosis, again, all of those
4   things can be attributable to simply a
5   degenerative process of the spine; correct?
6   A.      Correct.
7   Q.      And you saw those, I take it, on the
8   MRIs prior to -- of those MRIs prior to
9   February 3rd of 2011; correct?
10  A.      Yes.
11  Q.      That's a yes?
12  A.      Yes.
13  Q.      Okay.  Doctor, you have been
14  identified -- and I don't know if I'm telling
15  you anything you don't know.  But you've been
16  identified as a possible expert for the
17  plaintiffs in this case at trial.  Were you
18  aware of that?
19  A.      No, I was not.
20  Q.      All right.  You -- it is -- it is
21  suggested that you have some specific opinions
22  relative to functional limitations, medication
23  requirements and job restrictions.  Is that --
24  is that -- based on what our earlier -- your
25  earlier testimony was, I take it that's not

Page 44

1    entirely accurate?

2    A.      Yeah, that is not entirely accurate.

3    Q.      Okay.  For example, do you know or do

4    you have opinions as to what his current

5    functional limitations are?

6    A.      No, I do not.

7    Q.      All right.  Do you have opinions

8    relative to what his -- what, if any, job

9    restrictions he has?

10   A.      It would only be based upon his prior

11   assessment.

12   Q.      The FCE?

13   A.      Uh-huh, yes.

14   Q.      That FCE revealed a medium to heavy

15   work?

16   A.      Correct.

17   Q.      Okay.  What about opinions as to his

18   pain?  Do you have opinions as to whether

19   that -- well, let me back up.

20           As we sit here today, do you know what

21   specifically is causing Mr. Bliss' pain and

22   where it's located?

23   A.      I would say it's multifactorial.

24   Q.      Okay.

25   A.      I would say that by the response he had

Page 45

1    from his rhizotomy, that there is definitely a

2    facet or arthritis component to his pain.

3          I would say that based upon his EMG

4    studies, he has some chronic L5 radicular --

5    radiculopathy.  And there might have been S1,

6    too.  I'm not sure.  But the EMG studies would

7    suggest.

8          So he's got both lower extremity pain

9    and back pain, which can be accounted for.  And

10   then the MRI findings suggest some chronic

11   changes that way.  Whether those are actually

12   the cause of his current pain, I'm not sure.

13   Q.      Do you know what -- to what extent he is

14   having any pain, for example, in his knees and

15   what's causing the knee pain?

16   A.      I do not.

17   Q.      Foot pain we talked about or the hand

18   pain, we don't know if that is -- if there's

19   a -- what's the word for it?  Physiological

20   reason --

21   A.      We don't know.

22   Q.      -- or if it's just -- okay.

23          What about shoulder pain?  Do we know if

24   any of his current conditions are related to

25   his shoulder problems?

Page 46

```
 1    A.      I do not know.
 2    Q.      Okay.  I'm just about done, Doctor.  Let
 3    me look for --
 4    A.      You're fine.
 5    Q.      You would agree with me that Mr. Bliss
 6    was clearly suffering from degenerative disc
 7    disease prior to February 3rd of 2011?
 8    A.      Yes.
 9    Q.      The -- I think you've already told me,
10    the FCE appeared to be a valid FCE; correct?
11    A.      Yes.
12                    MR. LUERS:  Doctor, thank you.
13    That's all the questions I have.
14                    THE WITNESS:  Thank you.
15                    CROSS-EXAMINATION
16    BY MR. McMAHON:
17    Q.      Just a few, Doctor.  Following up on
18    some of the questions regarding any opinions
19    that you might have, work restrictions or
20    whatnot.
21          Since I'm his attorney and I'm the one
22    that disclosed it, let me show you a document.
23                    MR. McMAHON:  I guess we should
24    mark this as Exhibit 52.
25                    ///
```

Page 47

1          (Exhibit No. 52 marked for

2          identification.)

3    Q.      (BY MR. McMAHON) Doctor, you recognize

4    your signature is on this document?

5    A.      Yes.

6    Q.      Okay.  Do you recall filling out this

7    document for Mr. Bliss?  I think it's dated

8    January 27th, 2012.

9    A.      Yes.

10   Q.      Okay.  And --

11   A.      I did not -- I didn't fill it out,

12   though.

13   Q.      Okay.  You didn't fill it out?

14   A.      That is actually our work comp nurse

15   that filled it out.

16   Q.      Although your name is dated in the box

17   No. 7?

18   A.      Yes, yes.

19   Q.      Your name is included in there?

20   A.      I did -- I must have read over it to

21   sign it.

22   Q.      So you must have reviewed this when you

23   signed the document?

24   A.      Yes.

25   Q.      Okay.  And do you hold the opinions that

BNSF objects to the testimony as hearsay without an exception and as not relevant. Fed. R. Evid. 402, 403, 801 and 802.
Ruling: Overruled

Page 48

1    are listed here that were submitted with this

2    form on January 27th, 2012?

3    A.        Yes.

4    Q.        And on those forms, you both gave your

5    diagnosis and the diagnosis -- working

6    diagnosis that you had at the time; is that

7    correct?

8    A.        Yes.

9    Q.        And you attached medical records that we

10   just went over in great detail to this -- to

11   this document; is that right?

12   A.        Yes.

13   Q.        And you indicated some of the past

14   surgeries and medical history that Mr. Bliss

15   had undergone; is that correct?

16   A.        Correct.

17   Q.        Box No. 3.

18             Box No. 5 was -- asked your opinion

19   regarding his ability to return to work.  And

20   on that you said that he's not able to return

21   to work but he needs light to sedentary work,

22   which agrees with the opinions that were

23   revealed in your medical records; correct?

24   A.        Yes.

25   Q.        And you stated on earlier questions that

Page 49

1    it's your understanding just through your work

2    experience, that the railroad carman position

3    doesn't have a light or sedentary work

4    assignment, but it was your opinion that he

5    could return to work at the railroad in a light

6    or sedentary position; correct?

7    A.      Yes.

8    Q.      And both -- you testified that, in fact,

9    that is good for a patient like Mr. Bliss who

10   has chronic pain to be out and doing some type

11   of employment even if it's in a sedentary type

12   of position?

13   A.      Yes.

14   Q.      And in your experience with -- in these

15   type of work comp -- work injury type of

16   situations, I should say, do you find that

17   employers are typically receptive of accepting

18   employees back with the -- with these types of

19   restrictions?

20   A.      Depends on the job.  Depends on the

21   employment.  If it's not available, it's not

22   available.  I mean, a construction worker may

23   not be able to go back to construction, and if

24   they don't have a desk job available, they may

25   need to find a different type of employment.

Page 50

1   But as a whole, try to accommodate them.

2   Q.      Okay.   And so a reasonable employer

3   would try to accommodate these types of

4   restrictions?

5   A.      Again, depends on the type of

6   employment --

7                   MR. LUERS:  Object to form of

8   the question.

9   A.      -- they have.

10  Q.      (BY MR. McMAHON) Right.   Okay.   Did you

11  know that BNSF had terminated Mr. Bliss at or

12  maybe a few days before he -- first seeing him?

13  A.      No, I wasn't aware.

14  Q.      Okay.   And -- all right.   And so Exhibit

15  52, do you still hold these opinions to a

16  reasonable degree of medical certainty, that

17  the -- the job restrictions that you would

18  place upon Mr. Bliss would be a light or

19  sedentary work assignment?

20                  MR. LUERS:  Object.   Form and

21  foundation.

22  A.      How -- just -- how the -- how this comes

23  about is we have a work comp nurse in the

24  office to review the chart and then to fill in

25  the lines.

BNSF objects to the question as to its improper form as to use of terms "reasonable employer" and "accommodate." Ruling:  Sustained, especially since the witness never answered the question as to this plaintiff and his employment.

50:10-13 is stricken--See pretrial conference order and motion in limine ruling.

Page 51

1          And I assume that she came to the light

2     to sedentary work restriction based upon the

3     note that was in the chart.

4          Do I think he is at 100 percent?  No.

5          Do I really know where he falls on that?

6     I do not.  I don't know off the top of my head.

7     I can look at a book and figure out what --

8     what the guidelines are for each of those

9     categories.

10          But she -- the person who filled out

11     this form does supposedly know both that and

12     the railroad and their normal restrictions and

13     the whole thing.  So we tend to use their

14     expertise oftentimes in some of this portion of

15     it.

16     Q.     (BY MR. McMAHON) Okay.  So the -- so the

17     typical procedure in your office when you

18     have -- when you're called upon to -- in

19     your -- in your capacity as a physician, when

20     you're called upon to offer these types of

21     opinions like you did in Exhibit 52, the way

22     your office does it is you employ someone

23     who --

24     A.     Has work comp expertise.

25     Q.     -- has work comp expertise?

50:10 --53:3
BNSF objects to
the testimony as
hearsay without
an exception and
as not relevant.
Fed. R. Evid.
402, 403, 801
and 802. *See*
subsequent
testimony at 62:1
--63:8; 65:9-15.
Ruling:
Sustained.  In
light of  7:12-8:14,
24:9-21, 44:3-16,
62:1 --63:8,
65:9-15, this
witness' testimony
as to level of work
the plaintiff can
perform and his
ability to return to
work at the
railroad is either
wholly irrelevant
for lack of
sufficient
foundation or, if
relevant at all,
more prejudicial
than probative.

1    A.        Uh-huh.

2    Q.        They review your treating notes?

3    A.        Yes.

4    Q.        And any other records they might have --

5    A.        Yes.

6    Q.        And then --

7    A.        They render kind of their understanding

8    of it.  And either we agree or disagree with

9    things.

10             And in this particular case, as I

11   understand -- well, as I understand secondhand

12   how the railroad works is that he could not be

13   a carman and that she's -- she's basically

14   saying, so less than 100 percent, the next

15   category from whatever full duty is is light

16   and -- or sedentary.  And that's how it came

17   about.

18   Q.        All right.  And so when the -- this

19   process that you just described took place, you

20   endorsed that opinion?

21   A.        Yes.  Because, again, I didn't actually

22   do a functional capacity.  I didn't actually

23   test him to figure that out.

24             But from how he presents in the office

25   and how -- what I -- my understanding of his

Page 53

1   job duties, I did not believe that he could go

2   back to his current position.  But I do think

3   he should work.

4   Q.      Right.  Absolutely.  So -- so this

5   opinion that's reflected in Exhibit 52 where he

6   should be on a light or sedentary job

7   assignment, you still hold that opinion?

8                    MR. LUERS:  Object.  Form and

9   foundation, asked and answered.

10  Q.      (BY MR. McMAHON) You still hold that to

11  this day going forward?

12                   MR. LUERS:  Asked and answered.

13  A.      As -- as of the last visit, I think it's

14  reasonable.

15  Q.      (BY MR. McMAHON) And in the beginning

16  when Mr. Luers was talking about the documents

17  you have in your chart, I believe you had some

18  records from Dr. Lodhia?

19  A.      Yes.

20  Q.      And they're in the forms of letters to

21  Dr. Kreshel?

22  A.      Yes.

23  Q.      Then that September note, Dr. Lodhia had

24  both reviewed the FCE as well as the EMG as

25  well as met with Mr. Bliss; is that correct?

53:4 --54:1 BNSF objects to question as to its improper form. BNSF objects to the testimony as there is no proper and sufficient foundation; it is hearsay without an exception and not relevant. Fed. R. Evid. 402, 403, 801 and 802. *See* subsequent testimony at 62:1 --63:8; 65:9-15.

Ruling:  Sustained as to 53:4-14 for the reasons stated as to 50:10-53:3; overruled as to 53:15-54:1

1    A.      Yes.

2                  MR. LUERS:  Object on

3    foundation, as far as what Dr. Lodhia did.

4    Q.      (BY MR. McMAHON) Okay.  That's contained

5    in his records; correct?

6    A.      Yes.

7    Q.      And is nothing unusual for you to

8    receive records from a neurosurgeon or a

9    neurologist or other treating physician and you

10   use those records as part of your care and

11   treatment for patients; correct?

12   A.      Yes.

13   Q.      Okay.  And that's what you did in this

14   case with Dr. Lodhia's records; correct?

15   A.      Yes.

16   Q.      Who was a referral physician, of course;

17   correct?

18   A.      Yes.

19   Q.      And it seems from that September 2011

20   note with Dr. Lodhia, that the FCE, as well as

21   Mr. Bliss' condition over this -- this summer

22   since the June 30th FCE, had worsened and his

23   condition -- the -- had -- he still had the

24   condition of back pain?

25                  MR. LUERS:  Object.  Form and

Page 55

1    foundation.

2    A.        I lost track of your question.

3    Q.        (BY MR. McMAHON) Sure.   It seems the --

4    after the FCE and during the months when

5    Mr. Bliss was getting the diagnostic tests that

6    Dr. Lodhia had ordered, his back condition

7    had -- didn't improve?   It was still -- he was

8    still symptomatic; correct?

9                    MR. LUERS:   Same objection,

10   foundation, form.

11   A.        Yes.

12   Q.        (BY MR. McMAHON) And Dr. Lodhia, in

13   fact, in that September 2011 visit recommended

14   that Mr. Bliss be in a light and -- light-duty

15   job assignment; correct?

16   A.        Yes.

17   Q.        In a permanent capacity?

18                   MR. LUERS:   Object.   Foundation.

19   A.        I don't know about that.   But he does

20   say --

21   Q.        (BY MR. McMAHON) Okay.   All right.   Part

22   of your -- part of the practice in pain

23   management, I guess how -- what I want to

24   phrase this more is there's a -- almost a --

25   the psychological and physiological response to

54:19 --55:18 BNSF objects to the question as to its improper form. BNSF objects to the testimony as there is no proper and sufficient foundation; it is hearsay without an exception and not relevant. Fed. R. Evid. 402, 403, 801 and 802. *See* subsequent testimony at 62:1 --63:8; 65:9-15

Ruling:  Sustained for the reasons stated as to 50:10-53:3, plus the witness ultimately admitted she did not know what Dr. Lodhia recommended (55:12-20).

Page 56

1    pain; is that correct?

2    A.      Yes.

3    Q.      All right.  And while you were treating

4    Mr. Bliss, obviously there was a psychological

5    component to the chronic pain --

6    A.      Pain condition.

7    Q.      -- that he was treating; correct?

8    A.      Correct.

9    Q.      And that's -- although you're not a

10   psychiatrist or psychologist or whatnot,

11   that -- you incorporate those -- the mental

12   impacts of chronic pain in your treatment;

13   correct?

14   A.      Yes.

15   Q.      And you did that with Mr. Bliss?

16   A.      Yes.

17   Q.      All right.  And part of that wasn't just

18   the mental anguish of chronic pain with

19   Mr. Bliss, but it was also affecting his

20   personal life.  And you mentioned a little bit

21   about how that was impacting the medical care

22   and treatment, the medicine --

23   A.      Yes.

24   Q.      -- side that you were treating him with;

25   correct?

Page 57

1    A.      Yes.

2    Q.      All right.  And is that -- is that an

3    unusual type of --

4    A.      No.

5    Q.      It comes with the territory of treating

6    patients with chronic pain?

7    A.      Yes.

8    Q.      All right.  And -- and that adjusting

9    the medications and trying to find the right

10   balance of the chronic pain medication that we

11   saw that you went through with Mr. Bliss, that

12   is -- that is what, I guess, the science and

13   the medicine of pain management is all about;

14   correct?

15   A.      Yes.

16   Q.      All right.  And -- and fluctuating the

17   medications to try to help the patient deal

18   with the pain that's there on a permanent

19   basis; is that right?

20   A.      Yes.

21   Q.      And is that what you did with Mr. Bliss?

22   A.      Yes.

23   Q.      All right.  And just real small point

24   that seemed to be made about the interesting

25   software of electronic medical records.

4:12-cv-03019-CRZ  Doc # 197  Filed: 05/16/14  Page 171 of 209 - Page ID # 3621

Page 58

1   A.      Yeah, I know.

2   Q.      So --

3   A.      There will be typos in there, too, that

4   will be, like, what in the world.

5   Q.      This comes up a lot nowadays as EMR --

6   A.      Unfortunately.

7   Q.      Actually, I've been corrected.  It's not

8   EMR.  It's --

9   A.      EHR.

10  Q.      EHR.  Stand corrected.

11  A.      Yes.  It's a health record now.

12  Q.      So this work history reviewed, no

13  changes required, he works as a -- at BNSF as a

14  carman, this no changes required, that's not a

15  function of Mr. Bliss telling somebody, whether

16  it's you or the nurse, that no changes are

17  required from his perspective as a work

18  ability?

19  A.      The no changes required comes up.  What

20  happens is they are -- they're supposed to ask,

21  is -- is -- you still on the same medications,

22  has anything changed in terms of your social

23  status or your work status.  And they say, no,

24  everything's the same from however they want to

25  recall it.

Veritext Corporate Services

800-567-8658                                          973-410-4040

```
 1          And then you click a box.  And it says,
 2   no change.  And it fills that part out.  And it
 3   says, no change is required.
 4   Q.      So it's automatic?
 5   A.      So it's not somebody saying don't change
 6   anything.  It's just what it is.
 7   Q.      So if he came in and he got a job --
 8   A.      They should have taken that, and --
 9   Q.      Right.
10   A.      -- it should have changed.
11   Q.      Right.
12   A.      He is now employed at blah, blah, blah.
13   Q.      Blah, blah, blah.  And that's when that
14   no change required would have changed and would
15   have --
16   A.      Exactly.  And it wouldn't be there then,
17   yes.
18   Q.      Right.  Okay.  And the same for --
19   there's a -- there's a part -- I don't even
20   think it's a typo.  It's more like a --
21   A.      Unfortunately.
22   Q.      It's a -- it's in the expectations line.
23   A.      Uh-huh.
24   Q.      And it seems to be more -- there must
25   have been, like, an update to the software.
```

Page 60

1          It states here, "David further states,"
2    like, for example, on the --
3    A.      Like, expectations, focus on remedy and
4    long-term effects or something?
5    Q.      Yes.
6    A.      Yes.
7    Q.      So it seems like there's a second half
8    that's sort of filled in, but that first half
9    of the sentence is sort of -- is asked of the
10   patient, and it's just a way of tracking where
11   the patient is on that particular day?
12   A.      It depends.  Actually, sometimes it's
13   how the nurse chooses to fill in that line.
14   But we -- what -- what we require of them is
15   that the expectations for the visit because
16   sometimes patients will want to talk about
17   medication, or sometimes patients have a new
18   problem, I have a new pain complaint, my
19   shoulder hurts or something, I want to address
20   this instead of what -- what we expected them
21   to come in for.
22          So -- or I want an injection today.  So
23   we know when we see them, this is what they
24   want.  And whether we can accommodate or not is
25   another story.  But that's what that line is.

Page 61

1    Q.      Good.

2    A.      Is an expectation.

3    Q.      Like another -- another way to flush out

4    all of the patient's needs and --

5    A.      Absolutely.

6    Q.      -- for a --

7    A.      Try to make them happy however -- what

8    they want addressed.

9    Q.      All right.  Okay.

10                   MR. McMAHON:  Thank you, Doctor.

11   That's all I have.

12                   REDIRECT EXAMINATION

13   BY MR. LUERS:

14   Q.      Doctor, I have a few more.

15   A.      I thought you might.

16   Q.      Surprise.  Certainly by the time you

17   signed Exhibit 52 --

18   A.      Yes.

19   Q.      -- you had seen the patient twice;

20   correct?

21   A.      Yes.

22   Q.      And both of those times your general

23   physical examination was virtually good, as you

24   told me; correct?

25   A.      Yes.

1    Q.     All right.  And you told me, I believe,

2    that as of that December 21st visit, the

3    language there where you said, he's able to

4    work but not likely at full capacity and that

5    he would likely be qualified for light and

6    sedentary duty was likely the -- his words,

7    Mr. Bliss' words reporting to you; is that

8    accurate?

9    A.     That is accurate.

10    Q.     So the note that your -- that your nurse

11    or whomever was filling out, Exhibit 52, was

12    looking at is probably this note?

13    A.     Based upon that.

14    Q.     Okay.  And I think you told me that your

15    belief was, at least -- or is, is that he's not

16    100 percent so he -- so he may not be able to

17    return to his normal employment; correct?

18    A.     Yes.

19    Q.     You're not analyzing based upon physical

20    demands of a job and the categories that --

21    that identify light, medium or heavy work in

22    your note of Exhibit 52; is that correct?

23    A.     That's correct.

24    Q.     And what you're saying is he -- he might

25    be -- or he'd likely be qualified for light or

Page 63

1    sedentary duty.  You're not saying there that

2    he would not necessarily be qualified for

3    medium duty?

4    A.       That's correct too.

5    Q.       All right.  And you're just not

6    rendering opinions based upon functionality; is

7    that right?

8    A.       That's correct.

9    Q.       And we're still -- you're still -- it's

10   still your testimony that the only valid FCE

11   that you're aware of is that WorkWell FCE

12   and --

13   A.       What -- but as an aside, when I get an

14   FCE and I've seen a patient and I've evaluated

15   him over time and I don't necessarily agree

16   with the FCE, the best time to have that

17   discussion or to state that is soon after it's

18   occurred.

19           And in his particular case, I think

20   after his FCE, he experienced more pain.  And

21   that is when Dr. Lodhia saw him and kind of

22   assessed him and felt that maybe it's a little

23   different than how he presented at his FCE,

24   which is to say is that just a flare-up of his

25   condition or is it something more -- hard to

Page 64

1    say.

2         Mine is just another blip in time, quite

3    a bit separate from the FCE.  So, again, I'm

4    rendering opinion based on something current at

5    that moment.

6         So a functional capacity I always find

7    is a very helpful thing because you can

8    definitely -- most helpful when it's invalid

9    because you can kind of say -- but when it's a

10   valid FCE and the patient does their best and

11   then they walk away and they have more pain,

12   how long that pain lasts or what it is is --

13   sometimes it's reasonable to get or repeat if

14   you feel like something's changed.

15        Over the course of his history or his

16   physical exams, he -- when he came to us, he

17   was in pretty good shape.  He didn't want a

18   spinal cord stimulator.  He thought he could do

19   pretty well.

20        He started off doing really well in

21   terms of medication, despite the side effects

22   and pretty -- seemed fairly functional.

23        And then in the last couple of visits,

24   something kind of changed in terms of needing a

25   cane, wanting to figure out if he's just not

Page 65

1    physically active.  There's definitely some

2    depression and marital strife in all of that.

3    Something changed a little bit there.

4           Whether that's enough to warrant another

5    FCE, hard for me to say.  But sometimes if

6    there's a question as to its validity from

7    prior to current, it may be reasonable to get

8    another one.

9    Q.      I fully understand.  And as you sit here

10   today, you're not going to render an opinion

11   that he's capable of returning to heavy-duty.

12   I understand that.  But --

13   A.      But the medium to light to sedentary

14   category, that's -- I'm not rendering an

15   opinion that way either.

16   Q.      All right.  And you don't know what it

17   is that in the last three months or why it is

18   in the last three months that maybe his

19   condition or functionality may have

20   deteriorated?

21   A.      I don't.  I don't.

22   Q.      Okay.  And you don't have any reason to

23   attribute that deterioration to an incident

24   that happened in February in 2011, do you?

25   A.      No, that's not for me to say.

Page 66

1    Q.      Okay.

2    A.      The one thing that is possible is that

3    he had the rhizotomy.  He was doing pretty

4    well.  Rhizotomy lasts on average six months to

5    two years, eighteen months average.  It might

6    be the increased back pain or increased pain

7    that he's having, if he's mainly describing

8    back pain, may require another rhizotomy.

9    Q.      Okay.  But that wouldn't -- that

10   wouldn't result in a -- further reduction of

11   functionality, would it?

12   A.      It should not.

13   Q.      Okay.  Right now his biggest limitation

14   is pain, I assume?

15   A.      As I understand it.

16   Q.      Okay.

17                   MR. LUERS:  Thank you, Doctor.

18   That's all I have.

19                   THE WITNESS:  Thank you.

20                   MR. McMAHON:  That's all I have.

21   Thank you, Doctor.

22                   THE WITNESS:  Thank you.

23                   MR. LUERS:  Oh, you know what,

24   can we get copies?

25                   THE WITNESS:  Yeah.

Page 67

1                    MR. LUERS:  Could you make me a
2      quick copy of those?
3                    THE WITNESS:  Yeah.
4                    MR. McMAHON:  I don't have them
5      either.
6                    THE WITNESS:  Yeah, definitely.
7                    MR. LUERS:  Make two copies.
8      Make three copies.  And we'll mark it real
9      quick so we know what we're talking about here.
10                    THE WITNESS:  These are these
11     pain diagrams.
12                    MR. LUERS:  Yes.
13                    MR. McMAHON:  With the --
14                    MR. LUERS:  The intake,
15     whatever.
16             (A short recess was taken.)
17                      (Exhibit No. 53 marked for
18                      identification.)
19     Q.    (BY MR. LUERS) We're back on the record.
20     Doctor, I'm going to hand you what's been
21     marked as Exhibit 53.  It's my understanding
22     that these were the -- sort of the intake notes
23     and then the -- what do you call these?
24     Clinical -- what do you call them?
25     A.    It is a -- it is a patient intake and a

Page 68

1   questionnaire.

2   Q.      Okay.  Fine.  And that comes out of your

3   file today; is that right?

4   A.      Correct.

5                   MR. LUERS:  That's all I have,

6   Doctor.  Thank you.

7                   MR. McMAHON:  Fifty-three.

8                   MR. LUERS:  Doctor, you have a

9   right to read and review, or you can waive

10  that.

11                  THE WITNESS:  Waive.

12          (Deposition concluded at 2:21 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 69

1                C-E-R-T-I-F-I-C-A-T-E

2    STATE OF NEBRASKA        )

                             :  ss.

3    COUNTY OF LANCASTER      )

4         I, Lori J. McGowan, General Notary Public

5    in and for the State of Nebraska and Registered

6    Professional Reporter, hereby certify that DR.

7    LIANE DONOVAN was by me duly sworn to testify

8    the truth, the whole truth and nothing but the

9    truth, that the deposition by her as above set

10   forth was reduced to writing by me.

11        That the within and foregoing deposition

12   was taken by me at the time and place herein

13   specified and in accordance with the within

14   stipulations; the reading and signing of the

15   deposition having been waived.

16        That the foregoing deposition is a true

17   and accurate reflection of the proceedings

18   taken in the above case.

19        That I am not counsel, attorney, or

20   relative of either party or otherwise

21   interested in the event of this suit.

22        IN TESTIMONY WHEREOF, I place my hand and

23   notarial seal this   day of October, 2012.

24

25

**[& - assignment]** Page 1

**&**

**&** 2:6

**0**

**0** 3:22,22

**1**

**10** 29:10 30:13,21
 30:22 31:1,1 35:1
 40:13
**100** 7:23 39:15 40:3
 40:10,15,16 42:10
 51:4 52:14 62:16
**11-7-11** 10:10
**12** 2:7 16:12 17:8
 40:8
**12-21** 20:6 22:13
**1248** 1:21
**14** 17:17
**15** 29:18 40:13
**18** 20:8
**18th** 17:16 19:9 20:2
**19** 22:17
**19th** 25:17
**1:05** 1:12

**2**

**2** 38:15
**20** 29:18
**200** 1:18
**2003** 4:19 11:5,15
**201** 1:13 3:24
**2011** 11:20 12:11,25
 13:21 16:25 19:14
 20:2 41:17 43:9
 46:7 54:19 55:13
 65:24
**2012** 1:11 27:9 37:7
 47:8 48:2 69:23
**20th** 24:25
**21st** 20:18 21:20
 27:9 29:13 37:7
 62:2
**22** 25:3
**22nd** 31:14,15 37:7

**24** 40:8
**26** 25:24
**27th** 47:8 48:2
**28** 27:16
**2:21** 68:12

**3**

**3** 2:3 29:9 30:13
 35:1 48:17
**30** 29:22
**30th** 12:11 54:22
**32** 36:5
**3rd** 19:14 43:9 46:7

**4**

**4** 1:11
**46** 2:3
**47** 2:8
**4:12cv3019** 1:4

**5**

**5** 14:23 48:18
**50** 40:12
**51** 2:6 12:18,23
**52** 2:8 46:24 47:1
 50:15 51:21 53:5
 61:17 62:11,22
**53** 2:9 67:17,21
**542** 1:18
**5th** 21:17

**6**

**6-30-11** 9:11 11:2
**60** 42:9
**60605** 1:19
**61** 2:3
**67** 2:10
**68508** 1:22
**6940** 1:13 3:24

**7**

**7** 47:17
**7-13-11** 10:21
**7th** 16:12,25

**8**

**80** 25:10 35:1
**800** 1:21

**9**

**9-19** 14:22
**9-2-11** 10:14
**9-26** 15:3
**9-9** 13:21
**90** 25:10 35:1
**94** 4:12
**95** 16:17
**9th** 12:25

**a**

**ability** 27:2 48:19
 58:18
**able** 22:23 23:9,20
 24:18 26:18 32:4
 48:20 49:23 62:3,16
**absent** 14:6
**absolutely** 34:21
 53:4 61:5
**accepting** 49:17
**accommodate** 50:1
 50:3 60:24
**accounted** 45:9
**accurate** 17:18 26:9
 26:14 30:17,24 31:6
 31:11 44:1,2 62:8,9
 69:17
**acquainted** 5:18
 6:25
**active** 65:1
**activities** 8:12 27:1
 32:16 36:3,7
**activity** 26:19,23
 29:4 35:20 36:10
**acute** 25:14
**add** 18:15,19,22
**additional** 17:1
**address** 3:23 21:2,8
 21:9 60:19
**addressed** 61:8

**adjusting** 57:8
**adls** 26:25
**afternoon** 3:18
**age** 3:13
**agree** 14:6 46:5 52:8
 63:15
**agreed** 3:2
**agrees** 48:22
**alleged** 19:17
**alleviated** 16:4
**alpha** 38:15
**alternating** 15:7
**amazed** 40:9
**amount** 39:17
**analog** 30:18
**analysis** 32:22 36:1
**analyze** 30:16,18
**analyzing** 62:19
**anguish** 56:18
**answered** 53:9,12
**anticipate** 8:15
**anticonvulsant**
 38:14,21
**antidepressant**
 37:21
**anybody** 7:16
**apart** 42:8
**appearances** 1:16
**appeared** 46:10
**appears** 12:11,24
**april** 25:17 26:24
**aquatherapy** 37:4
**area** 21:6
**arthritis** 15:13
 16:20 28:7,17 45:2
**arthropathy** 43:2
**aside** 63:13
**asked** 22:4 48:18
 53:9,12 60:9
**asking** 39:3
**assessed** 63:22
**assessment** 17:12
 36:6 44:11
**assignment** 49:4
 50:19 53:7 55:15

**associated** 5:10
37:24
**assume** 7:15 41:11
41:20,22 51:1 66:14
**assuming** 41:13
**assumption** 26:12
**attached** 48:9
**attend** 36:7
**attention** 21:14
**attorney** 1:17,20 7:1
46:21 69:19
**attributable** 43:4
**attribute** 65:23
**attributed** 14:14
**august** 31:14,15
37:7,7 41:24
**automatic** 59:4
**available** 49:21,22
49:24
**average** 66:4,5
**aware** 7:5,8,22
10:24 11:15,16,23
14:21 21:10,16 22:5
22:12 37:13 39:7
41:15,16 43:18
50:13 63:11

**b**

**b** 1:20
**back** 14:11 15:9,12
15:25 26:10 29:23
30:4,12 32:17 36:13
36:15 44:19 45:9
49:18,23 53:2 54:24
55:6 66:6,8 67:19
**balance** 33:4 57:10
**balls** 32:18
**based** 23:6,8,12
24:11,16 31:4 43:24
44:10 45:3 51:2
62:13,19 63:6 64:4
**basically** 35:19
52:13
**basis** 57:19

**bed** 28:8
**began** 4:19
**beginning** 34:10
53:15
**begins** 14:23
**behalf** 1:6
**belief** 27:6 62:15
**believe** 24:18 25:2
33:6 53:1,17 62:1
**believed** 18:20,21
**benefit** 34:21
**best** 24:6 26:13
63:16 64:10
**better** 22:21 25:11
**big** 34:18,18 36:17
**biggest** 66:13
**bilateral** 33:9
**bit** 17:20 31:6,10
56:20 64:3 65:3
**blah** 59:12,12,12,13
59:13,13
**blip** 64:2
**bliss** 1:3 5:21,24 6:9
7:1,7 9:5 11:14
12:12,25 13:17
14:20 19:3 20:3,7
34:8 37:9,15 40:22
42:5 44:21 46:5
47:7 48:14 49:9
50:11,18 53:25
54:21 55:5,14 56:4
56:15,19 57:11,21
58:15 62:7
**block** 15:24 38:18
**bnsf** 1:6 18:1 27:7
50:11 58:13
**board** 4:7
**body** 21:5
**book** 51:7
**bottom** 17:10
**bought** 33:1
**box** 47:16 48:17,18
59:1
**branch** 15:24

**brought** 21:14
**burn** 15:8
**button** 26:8

**c**

**c** 69:1,1
**calcium** 38:18
**call** 67:23,24
**called** 38:15 51:18
51:20
**cane** 32:10 33:1,7
36:13 64:25
**capabilities** 12:13
**capable** 65:11
**capacity** 8:19 11:1
22:24 23:23 24:3,6
24:19 51:19 52:22
55:17 62:4 64:6
**car** 29:4,6 30:9
**care** 38:2 39:6,13
41:5,12 54:10 56:21
**care's** 41:5
**carman** 8:3 18:1,22
19:10,11 27:7 49:2
52:13 58:14
**case** 1:4 7:6 8:16
26:24 35:9 43:17
52:10 54:14 63:19
69:18
**categories** 24:12
51:9 62:20
**category** 52:15
65:14
**cause** 40:7 45:12
**causes** 28:15 33:15
**causing** 34:12 44:21
45:15
**cautioned** 3:13
**centers** 2:6 4:21
**centimeters** 31:1
**certain** 40:7
**certainly** 16:23
61:16
**certainty** 50:16

**certified** 3:14 4:7
**certify** 69:6
**chair** 35:4
**change** 18:16,17,18
19:6 20:13 23:7
26:13 34:21 59:2,3
59:5,14
**changed** 23:1 27:5
36:18 58:22 59:10
59:14 64:14,24 65:3
**changes** 17:25 18:5
18:8 31:23 33:19
45:11 58:13,14,16
58:19
**changing** 4:16 34:19
**channel** 38:19
**chart** 50:24 51:3
53:17
**chicago** 1:19
**chooses** 60:13
**chronic** 23:24 39:1
42:6 45:4,10 49:10
56:5,12,18 57:6,10
**clearly** 46:6
**click** 59:1
**client** 11:19
**clinic** 4:13 5:5
**clinical** 2:9 67:24
**come** 9:18 13:12,14
30:4 34:13 41:2,3
42:17 60:21
**comes** 26:16 36:11
50:22 57:5 58:5,19
68:2
**comment** 23:2
**comments** 22:18
23:5
**comp** 9:22 47:14
49:15 50:23 51:24
51:25
**company** 1:6
**compilation** 12:21
**complaining** 16:6
**complaint** 33:9
60:18

**complaints** 15:1
20:4,16
**complete** 12:21
**component** 45:2
56:5
**concentrate** 22:8
**concern** 23:9 39:23
41:8
**concerning** 40:23
**concluded** 68:12
**condition** 14:24
16:21 27:24 54:21
54:23,24 55:6 56:6
63:25 65:19
**conditions** 45:24
**conduct** 32:21
**conducted** 9:4
**conducting** 8:19
**confirmed** 31:19
**conjunction** 38:23
**considerably** 22:21
25:11 31:24
**construction** 49:22
49:23
**consult** 41:4
**contained** 54:4
**continue** 23:10,22
24:5,8,19
**controlled** 31:12
**copies** 66:24 67:7,8
**copy** 67:2
**cord** 6:4 64:18
**correct** 4:1,2,4 8:8,9
9:12 13:19 15:1
17:2,3,14,19 18:24
19:15,18 20:13,14
25:1,11,12,20 35:19
37:9,10 39:20 43:5
43:6,9 44:16 46:10
48:7,15,16,23 49:6
53:25 54:5,11,14,17
55:8,15 56:1,7,8,13
56:25 57:14 61:20
61:24 62:17,22,23
63:4,8 68:4

**corrected** 58:7,10
**correctly** 35:18
40:10
**counsel** 33:25 34:16
69:19
**counseling** 35:16
**county** 69:3
**couple** 64:23
**course** 54:16 64:15
**court** 1:1
**covered** 21:5
**crafts** 7:20
**cross** 2:2 46:15
**cs1336570** 1:25
**current** 15:7 44:4
45:12,24 53:2 64:4
65:7
**currently** 18:14,14
18:16
**cymbalta** 37:16,17
37:18 42:9

**d**

**d** 2:1 3:22
**daily** 27:1 39:16
**date** 1:11 10:6 12:10
19:14 20:18 21:23
37:6,14
**dated** 9:8,10 10:20
10:21 47:7,16
**david** 1:3 5:20,21
60:1
**day** 28:3,4,13,14
29:17 35:6 38:1
40:15,16 42:10
53:11 60:11 69:23
**days** 50:12
**deal** 34:18,19 57:17
**dearborn** 1:18
**december** 20:18
21:17,20 62:2
**decrease** 15:17
**decreased** 31:17
32:13,23 35:10

**defendant** 1:6,7,22
**deficiency** 33:15
**definite** 39:10
**definitely** 45:1 64:8
65:1 67:6
**degenerates** 16:9
**degeneration** 14:12
14:15 15:21 43:2
**degenerative** 15:20
43:5 46:6
**degree** 50:16
**delivery** 3:5
**delta** 38:15
**demands** 62:20
**depends** 49:20,20
50:5 60:12
**depleted** 37:20
**deposition** 1:5,10
3:4,5 5:12 9:15 10:3
68:12 69:9,11,15,16
**depositions** 9:25
**depression** 33:19
37:24 65:2
**described** 18:10
34:25 35:10 52:19
**describing** 35:11
66:7
**desk** 49:24
**despite** 64:21
**detail** 48:10
**detailed** 32:8
**deteriorated** 65:20
**deterioration** 65:23
**determine** 32:22
**devney** 5:4 11:18
12:15,22,24 13:3,4
13:12,23 14:19
**devney's** 11:16
13:18
**diabetic** 33:13
**diagnosis** 48:5,5,6
**diagnostic** 15:24
55:5
**diagram** 20:22

**diagrams** 67:11
**dictate** 19:6
**different** 32:11
49:25 63:23
**direct** 2:2 3:16
**direction** 35:17
**directions** 17:11
**disable** 23:25
**disabled** 18:14,16
18:22
**disagree** 52:8
**disc** 14:12 16:3
28:14 43:2 46:6
**disclosed** 46:22
**discomfort** 17:12
**discuss** 21:2
**discussion** 35:8
63:17
**disease** 46:7
**distance** 25:6,7
**distress** 25:14
**district** 1:1,2
**doctor** 3:18,25 5:12
12:20 14:7 15:6
26:4 29:25 43:13
46:2,12,17 47:3
61:10,14 66:17,21
67:20 68:6,8
**doctor's** 2:8
**document** 46:22
47:4,7,23 48:11
**documents** 11:6
53:16
**doing** 22:20 25:13
25:15 27:3 31:25
32:3 34:17 36:15
39:13 40:14 49:10
64:20 66:3
**donovan** 1:10 2:3
3:12,22 69:7
**dorn** 1:13 3:24
**dose** 29:1 39:21
**dosing** 38:7
**dr** 1:10 2:3 3:12 5:4
6:19,21 10:4,7,11

10:15 11:4,16,18
12:15,22,24 13:3,4
13:4,11,18,23 14:19
27:12 41:6,11 53:18
53:21,23 54:3,14,20
55:6,12 63:21 69:6
**draw** 20:23
**driving** 30:7
**drug** 38:23
**drugs** 38:24
**duly** 3:13 69:7
**duties** 7:20 53:1
**duty** 23:15 24:4,15
52:15 55:14 62:6
63:1,3 65:11
**dwell** 33:22
**dysfunction** 34:15

**e**

**e** 1:10 2:1 3:12 69:1
69:1
**earlier** 43:24,25
48:25
**edema** 17:13
**effect** 34:20
**effects** 34:12 35:12
60:4 64:21
**ehr** 58:9,10
**eighteen** 66:5
**either** 18:20 31:19
52:8 65:15 67:5
69:20
**electronic** 26:6
57:25
**eligible** 24:12
**emg** 10:5,19,24 45:3
45:6 53:24
**employ** 51:22
**employed** 59:12
**employees** 7:13
49:18
**employer** 50:2
**employers** 49:17
**employment** 17:21
19:14 49:11,21,25

50:6 62:17
**emr** 58:5,8
**encouraging** 35:22
36:6
**endorsed** 52:20
**engage** 8:13 34:3
**engaging** 36:3
**entirely** 44:1,2
**erectile** 34:15
**essay** 5:3
**evaluate** 9:1
**evaluated** 63:14
**evaluation** 6:3 11:2
12:12 31:18 32:21
**evaluations** 8:20
**evening** 27:22
**event** 69:21
**everything's** 58:24
**exacerbated** 25:5
28:21
**exactly** 24:21 59:16
**exam** 14:2,7 23:6
25:14,18
**examination** 3:16
46:15 61:12,23
**examined** 3:15
**example** 8:2 44:3
45:14 60:2
**exams** 36:2 64:16
**exception** 14:4
**excuse** 37:7
**exercise** 25:22 26:1
26:2,19,23 34:3
**exhibit** 12:17,18,23
46:24 47:1 50:14
51:21 53:5 61:17
62:11,22 67:17,21
**exhibits** 2:5
**expectation** 61:2
**expectations** 59:22
60:3,15
**expected** 60:20
**experience** 49:2,14
**experienced** 63:20

**expert** 8:7 43:16
**expertise** 51:14,24
51:25
**expresses** 36:22
**extend** 42:12
**extended** 40:4,11
**extent** 45:13
**extremities** 17:14
**extremity** 45:8

**f**

**f** 69:1
**facet** 14:12 15:9,12
15:13,21 16:6,8
43:2 45:2
**facets** 28:10
**fact** 32:23 49:8
55:13
**factor** 28:2
**fairly** 12:21 64:22
**fall** 36:17
**falls** 51:5
**familiar** 5:15 7:17
7:20 8:22
**family** 6:12,13 17:21
**far** 17:4,6 32:25
54:3
**fce** 12:2 44:12,14
46:10,10 53:24
54:20,22 55:4 63:10
63:11,14,16,20,23
64:3,10 65:5
**fces** 8:18
**february** 19:14 43:9
46:7 65:24
**feel** 35:7 64:14
**feeling** 27:2,22
**feels** 15:16
**feet** 32:18 33:3,9
**felt** 35:20 36:9 63:22
**fifty** 68:7
**figure** 51:7 52:23
64:25
**figuring** 31:22

**file** 68:3
**fill** 47:11,13 50:24
60:13
**filled** 47:15 51:10
60:8
**filling** 47:6 62:11
**fills** 59:2
**find** 39:10 49:16,25
57:9 64:6
**finding** 23:7 26:20
**findings** 45:10
**fine** 22:9 46:4 68:2
**fingers** 32:17
**first** 3:13 5:19 6:2,3
12:24 17:17 23:2
27:21 50:12 60:8
**flag** 39:6,11
**flare** 63:24
**fluctuating** 57:16
**flush** 61:3
**focus** 21:6 34:23
60:3
**focused** 22:4
**follow** 2:9 37:2
**following** 46:17
**follows** 3:15
**foot** 14:5 29:24 33:6
45:17
**foregoing** 69:11,16
**form** 3:10 9:19
26:16 32:20 40:13
48:2 50:7,20 51:11
53:8 54:25 55:10
**forms** 2:10 48:4
53:20
**forth** 69:10
**forward** 53:11
**foundation** 3:10
19:3 50:21 53:9
54:3 55:1,10,18
**four** 21:21,22 39:16
**fourth** 16:16
**frankly** 27:11
**full** 3:20 17:11
22:24 24:3 52:15

62:4

**fully** 65:9

**function** 58:15

**functional** 8:19 11:1 34:25 35:2,7 36:12 43:22 44:5 52:22 64:6,22

**functionality** 31:17 32:1,13,23 35:10 63:6 65:19 66:11

**further** 42:8 60:1 66:10

## g

**gait** 26:14

**general** 7:23 14:1 28:5 61:22 69:4

**generally** 9:1 14:24

**getting** 28:2 29:16 33:21 34:16 38:1 55:5

**give** 21:19 32:7,13 40:12

**given** 39:12

**giving** 39:9 40:15

**go** 17:16 20:6 22:23 25:17 29:21 32:5 49:23 53:1

**goes** 32:16

**going** 12:16 23:22 26:7 33:14 36:20,24 53:11 65:10 67:20

**good** 3:18 11:6 13:9 15:25 25:19 49:9 61:1,23 64:17

**great** 27:22 48:10

**greater** 34:20

**grinding** 32:19

**guess** 22:3 28:21 33:11 39:5,22 46:23 55:23 57:12

**guidelines** 51:8

## h

**half** 60:7,8

**hand** 32:16 45:17 67:20 69:22

**handling** 41:6

**hands** 33:9

**happened** 36:14 65:24

**happens** 58:20

**happy** 61:7

**hard** 7:24 41:1 63:25 65:5

**hardening** 35:22

**head** 51:6

**health** 58:11

**heavy** 24:15 44:14 62:21 65:11

**heels** 32:18

**help** 31:5 57:17

**helped** 34:11

**helpful** 35:13 64:7,8

**hereinafter** 3:14

**high** 35:20 39:21

**history** 11:14,24 17:22,23 18:10 20:13 22:14 25:4 27:10,18 48:14 58:12 64:15

**hold** 47:25 50:15 53:7,10

**home** 24:1

**hope** 12:21

**hour** 29:22 40:8,8

**house** 34:13

**huh** 13:24 16:14 17:9 27:17 44:13 52:1 59:23

**hurt** 32:4,17

**hurts** 60:19

**hydrocodone** 38:9 41:18

## i

**identification** 12:19 47:2 67:18

**identified** 43:14,16

**identify** 62:21

**il** 1:19

**impacting** 56:21

**impacts** 56:12

**implies** 26:17

**impose** 14:19 17:1 24:23

**imposed** 37:8

**imposing** 18:7

**impression** 14:10 34:24

**improve** 55:7

**improved** 22:15

**improvement** 35:2

**incapable** 36:3

**inches** 31:1

**incident** 65:23

**included** 14:10 47:19

**incorporate** 56:11

**increase** 36:7,9

**increased** 66:6,6

**increases** 37:19

**independent** 5:24

**indicate** 27:4

**indicated** 48:13

**indication** 16:24 20:1,15 21:20 35:25 36:4,8 37:22

**indicative** 16:19

**individual** 8:11,12

**information** 18:3 19:4 30:5

**initial** 13:22 14:18 19:23 20:1 40:2

**initially** 40:2

**injection** 60:22

**injury** 19:17 49:15

**instance** 19:8

## intake

**intake** 19:12 20:20 29:15,25 32:19 39:3 67:14,22,25

**intent** 15:14

**intents** 38:11

**interest** 24:7 36:22

**interested** 69:21

**interesting** 26:5 57:24

**interval** 42:8

**intervals** 42:7

**invalid** 64:8

**involved** 7:14 8:18 11:18

**involving** 7:6

## j

**j** 1:17 69:4

**james** 1:20

**january** 47:8 48:2

**jim** 3:18

**job** 1:25 7:20 8:3 23:20,21 24:4 43:23 44:8 49:20,24 50:17 53:1,6 55:15 59:7 62:20

**john** 5:3

**joined** 37:3

**joint** 15:8,9,16 16:1 16:6,8

**judge** 39:19

**judgment** 40:18

**jumps** 12:5

**june** 12:11 54:22

## k

**keep** 23:21

**keeps** 4:16

**kind** 16:23 23:21 27:24 28:9,11 30:22 31:24 33:18 36:11 39:14 52:7 63:21 64:9,24

**kinds** 8:16 27:23 35:23

kitchen  32:6
knee  45:15
knees  45:14
know  4:16 5:18 6:16
  6:17 8:1,2 13:7 17:4
  17:6 22:9 26:15
  29:12 30:5,22 31:1
  33:1,4,15 34:16
  35:3 36:19 37:3
  41:9,13 43:14,15
  44:3,20 45:13,18,21
  45:23 46:1 50:11
  51:5,6,11 55:19
  58:1 60:23 65:16
  66:23 67:9
knowledge  7:12
known  6:11 22:6
kreshel  10:11,15
  41:11 53:21

**l**

l  2:3 3:1
l5  45:4
lancaster  69:3
land  36:21
language  62:3
lasts  64:12 66:4
law  1:17,20
lawful  3:13
lawsuit  7:6
lawsuits  7:14
learn  30:19,19
leave  29:23 40:19
led  33:2
left  14:5
letter  10:10,14
letters  53:20
level  15:20,21 35:20
liane  1:10 3:12,22
  69:7
life  56:20
lift  24:17
light  23:15 24:4,13
  24:20 48:21 49:3,5
  50:18 51:1 52:15

53:6 55:14,14 62:5
  62:21,25 65:13
limit  29:18
limitation  66:13
limitations  18:7
  43:22 44:5
limited  27:2
lincoln  1:14,22 4:3
  8:5
line  17:22 31:4,8
  59:22 60:13,25
lines  50:25
listed  48:1
litigation  22:2,5
little  17:20 31:6,10
  36:19 39:7 56:20
  63:22 65:3
live  22:22
living  27:1
located  44:22
lodhia  6:19,21 10:7
  13:11 27:12 41:6
  53:18,23 54:3,20
  55:6,12 63:21
lodhia's  10:4 54:14
long  4:10 25:5,7
  29:4,6 30:9 42:3
  60:4 64:12
longstanding  14:14
look  9:1 13:21 22:17
  25:3 26:10 28:11
  33:12 46:3 51:7
looking  28:9,10
  62:12
looks  9:10 11:19
  14:1 22:14 32:10
  36:22
loosens  29:17
lori  69:4
loss  14:4,5
lost  55:2
lot  21:3 30:18 31:21
  32:7 34:12 35:21
  38:11 58:5

low  14:11 32:17
lower  17:13 45:8
luers  1:20 3:17,19
  12:16,20 19:4 46:12
  50:7,20 53:8,12,16
  54:2,25 55:9,18
  61:13 66:17,23 67:1
  67:7,12,14,19 68:5
  68:8
lumbar  14:11,12
  17:10 43:1,3
lying  28:8
lyrica  37:16 38:13
  42:10
lyrica's  38:14

**m**

ma'am  7:5 29:14
mailbox  32:5
main  34:14,23
management  55:23
  57:13
march  24:25
marital  65:2
mark  12:16 16:13
  20:23 46:24 67:8
marked  2:5 12:18
  12:23 21:7 47:1
  67:17,21
massey  5:3
matter  13:15
mcgowan  69:4
mcmahon  1:17 19:2
  46:16,23 47:3 50:10
  51:16 53:10,15 54:4
  55:3,12,21 61:10
  66:20 67:4,13 68:7
mean  18:15 21:7
  26:23 34:25 41:10
  49:22
means  31:22
meant  29:5
measured  31:3,3
medial  15:23

mediated  15:13
  28:15
medical  2:6 11:14
  11:23,24 13:18 26:6
  48:9,14,23 50:16
  56:21 57:25
medication  28:25
  34:19,22 35:12 38:4
  39:9 40:4,9,11
  43:22 57:10 60:17
  64:21
medications  34:11
  35:13 40:23 41:14
  57:9,17 58:12
medicine  4:6 56:22
  57:13
medium  24:13,20
  44:14 62:21 63:3
  65:13
meds  25:10 28:21,22
  33:5 37:14
members  6:11,12
memorize  31:7
mental  56:11,18
mentioned  56:20
mentions  30:8
met  6:2,3 53:25
midday  29:23
mild  17:12
milligram  40:10,13
  40:16
milligrams  39:15
  40:3,16
mind  26:3
mine  64:2
minute  13:6
minutes  29:18,22
moment  64:5
monitor  38:22 39:3
monitoring  41:5
months  36:2,14
  41:24 42:13 55:4
  65:17,18 66:4,5
morning  27:21 28:6
  28:7,11 29:17

**motion** 15:16 17:11
**moving** 34:17 36:21
**mri** 45:10
**mris** 42:22,23 43:1,8
  43:8
**multi** 15:20,21
**multifactorial** 44:23
**multiple** 22:2
**musculoskeletal**
  25:23

**n**

**n** 2:1 3:1,22,22
**name** 3:20,21 4:20
  5:19 47:16,19
**name's** 3:18
**names** 5:2
**narcotic** 38:5,12,23
  40:23
**narcotics** 39:1
**ne** 1:22
**nebraska** 1:2,14 4:3
  4:21 69:2,5
**necessarily** 18:11
  21:7 23:5,6 39:5
  41:4 63:2,15
**need** 35:4 36:19
  42:14 49:25
**needing** 64:24
**needs** 42:7 48:21
  61:4
**negative** 14:25
**nerve** 15:8 38:17
**neurological** 17:12
**neurologist** 54:9
**neuropathic** 37:22
  38:20
**neuropathy** 33:13
  33:16
**neurosurgeon** 41:3
  54:8
**neurotransmitters**
  37:20
**never** 7:3 21:14 22:8
  34:23 35:9 39:12

**40:12**
**new** 26:20 33:8,13
  60:17,18
**noble** 11:4
**noon** 27:21
**norepinephrine**
  37:19
**normal** 14:8 16:10
  17:14 26:8,14,19,23
  36:3 51:12 62:17
**normally** 26:25
**notarial** 69:23
**notary** 69:4
**note** 25:14 51:3
  53:23 54:20 62:10
  62:12,22
**noted** 10:7 17:13
**notes** 3:8 10:4,7,17
  11:16 12:22 52:2
  67:22
**notice** 3:4,5 33:23
**notices** 29:1
**november** 16:12,25
  17:16 19:9 20:2
  41:17
**nowadays** 58:5
**npc** 2:9
**number** 30:20 31:11
  32:3 39:20
**nurse** 9:22 20:21
  47:14 50:23 58:16
  60:13 62:10

**o**

**o** 1:21 3:1
**object** 50:7,20 53:8
  54:2,25 55:18
**objection** 19:2 55:9
**objections** 3:9
**objective** 13:25 17:7
**obviously** 18:1 56:4
**occurred** 19:17
  63:18
**october** 1:11 69:23

**offer** 51:20
**offered** 2:5
**offering** 8:15
**office** 3:23 6:5 12:22
  38:10 50:24 51:17
  51:22 52:24
**officially** 4:18
**oftentimes** 41:2
  51:14
**oh** 9:16 22:7 42:24
  66:23
**okay** 4:13,17,22 5:4
  5:9 6:5 7:9,12,19
  8:1,7 9:4,21,23
  10:12,16,25 11:10
  11:22 12:15 14:17
  15:22 16:2 17:7,20
  18:19 19:8,22 20:25
  21:10,19,25 22:7,13
  23:11 24:9,20,22
  25:9,17 26:22 27:4
  27:15 28:1,20 29:8
  29:20 30:12 31:13
  31:16 32:25 35:15
  36:13,20,21 37:6,14
  38:13 39:15 40:1,20
  40:25 41:14,21 43:1
  43:13 44:3,17,24
  45:22 46:2 47:6,10
  47:13,25 50:2,10,14
  51:16 54:4,13 55:21
  59:18 61:9 62:14
  65:22 66:1,9,13,16
  68:2
**old** 11:3,14
**omaha** 5:8
**one's** 10:10 32:2
**ones** 40:2
**onset** 33:13
**op** 11:3
**operation** 11:15
**opinion** 23:21 24:10
  39:18 48:18 49:4
  52:20 53:5,7 64:4
  65:10,15

**opinions** 8:10,16
  43:21 44:4,7,17,18
  46:18 47:25 48:22
  50:15 51:21 63:6
**opportunity** 11:13
  12:2 42:21
**ordered** 55:6
**original** 15:1
**outrageous** 39:17
**overview** 19:23

**p**

**p** 3:1
**p.m.** 1:12 68:12
**page** 13:25 14:23
  16:12 17:8,17 20:8
  22:17 25:3,24 27:16
  36:5
**pages** 13:22 16:13
  30:1
**pain** 2:6 4:6,14,14
  4:21 6:23 14:11
  15:12,12,13,17,25
  16:4,5,17,23 19:23
  20:4,16,22 21:4
  22:15,21 23:24 24:6
  25:5,11 27:20,22
  28:3,5,6,12,13,13,15
  28:17,18,20 29:2,9
  29:23,24 30:13,20
  30:22 31:5,12 32:18
  33:3,6,16,17,23,23
  35:1 37:20,22,23
  38:4,17,19,20 39:2
  39:9,12 42:6 44:18
  44:21 45:2,8,9,12
  45:14,15,17,18,23
  49:10 54:24 55:22
  56:1,5,6,12,18 57:6
  57:10,13,18 60:18
  63:20 64:11,12 66:6
  66:6,8,14 67:11
**paragraph** 19:25
  25:4 27:10,18

**part**  41:6 54:10
55:21,22 56:17 59:2
59:19
**participate**  26:2
**particular**  11:19
35:9 52:10 60:11
63:19
**parties**  3:3
**party**  69:20
**patient**  12:15 13:3,5
17:18 18:13,21 21:8
29:11 30:3,16 33:25
39:3 49:9 57:17
60:10,11 61:19
63:14 64:10 67:25
**patient's**  24:6 61:4
**patients**  6:23 15:19
21:4 37:1 54:11
57:6 60:16,17
**pending**  7:6,14
**people**  23:21 28:5
30:19 37:23 38:9
40:12
**percent**  7:23 16:17
25:10 35:1 51:4
52:14 62:16
**perchance**  25:6
**perform**  24:3
**period**  33:24 40:7
**peripheral**  33:12,15
**permanent**  55:17
57:18
**person**  35:3 40:12
51:10
**personal**  39:18
56:20
**perspective**  58:17
**phil**  5:3
**phrase**  55:24
**physical**  12:12,13
14:1,7 21:21 22:11
23:6 25:13,18 33:2
36:2 61:23 62:19
64:16

**physically**  65:1
**physician**  3:25
51:19 54:9,16
**physicians**  21:11
**physiological**  45:19
55:25
**picture**  20:22
**pill**  39:13 40:17
**place**  1:13 29:3
50:18 52:19 69:12
69:22
**places**  21:7
**plaintiff**  1:4,19
**plaintiffs**  43:17
**plans**  42:4,4
**please**  3:21 10:6
**point**  18:6 21:1
25:15 36:9 39:24
57:23
**portion**  15:15,25
17:7 51:14
**position**  49:2,6,12
53:2
**possible**  13:14 43:16
66:2
**pounds**  24:17
**practice**  4:22 5:1,7
8:19 55:22
**practicing**  4:3,10
**precipitating**  28:1
**prescribe**  39:1
**prescribed**  40:10
**prescribing**  37:15
41:7,7,10
**prescription**  38:1
**presence**  3:7
**present**  29:11
**presented**  30:15
63:23
**presents**  52:24
**pretty**  14:8 17:14
25:15,19 31:12 32:9
34:10 35:2 64:17,19
64:22 66:3

**primary**  38:2 39:6
39:13 41:5,12
**prior**  6:9 9:25,25
10:3,23 11:4,8,10
11:10 43:8,8 44:10
46:7 65:7
**proactively**  36:25
**probable**  23:11
**probably**  7:15 14:12
26:10,20 31:6 35:20
42:8,12 62:12
**problem**  20:17 33:2
34:9,9 60:18
**problems**  20:3
21:12 22:10 34:12
45:25
**procedure**  51:17
**proceeded**  15:3
**proceedings**  69:17
**process**  5:16 16:10
43:5 52:19
**professional**  69:6
**prognosis**  42:4
**program**  25:22 26:3
**progresses**  28:3,13
**prove**  15:24
**provided**  9:12,21
10:3,22 11:7 13:18
18:2 19:5
**psychiatrist**  56:10
**psychological**  55:25
56:4
**psychologist**  56:10
**public**  69:4
**purpose**  15:10 38:12
**push**  26:7 36:19
**put**  12:20 26:8 31:2
31:7

**q**

**qualified**  23:15 62:5
62:25 63:2
**question**  3:11 13:9
30:12 39:19,23
40:18 50:8 55:2

65:6
**questionnaire**  68:1
**questions**  46:13,18
48:25
**quick**  67:2,9
**quit**  35:5
**quite**  27:10 64:2

**r**

**r**  69:1
**radicular**  45:4
**radiculopathy**  45:5
**radiofrequency**
11:17
**railroad**  7:13,21
24:3 49:2,5 51:12
52:12
**railway**  1:6
**random**  33:18
**range**  15:16 17:11
**rarely**  8:21
**rate**  13:16 29:10
**read**  47:20 68:9
**reading**  31:4 69:14
**real**  57:23 67:8
**really**  9:16 30:24
35:9 39:21 41:1
51:5 64:20
**reason**  16:25 18:20
33:20 39:7,11 42:14
45:20 65:22
**reasonable**  50:2,16
53:14 64:13 65:7
**recall**  23:2,18 25:6,8
40:21 47:6 58:25
**receive**  54:8
**receptive**  49:17
**receptor**  38:5,15
**recess**  67:16
**recognize**  47:3
**recognizes**  36:23
**recollection**  5:24
29:5
**recommend**  24:7

**recommended** 6:17
   55:13
**recommending**
   25:23
**record** 10:9 26:6,7
   26:11 58:11 67:19
**records** 2:7 9:20
   10:1,2 11:23 13:18
   48:9,23 52:4 53:18
   54:5,8,10,14 57:25
**recross** 2:2
**red** 39:6,11
**redirect** 2:2 61:12
**reduced** 69:10
**reduction** 16:17,24
   66:10
**refer** 13:4
**reference** 20:12
   36:6
**referenced** 25:7
**referral** 6:18 27:11
   54:16
**referrals** 6:21
**reflected** 53:5
**reflection** 69:17
**reflexes** 14:6
**refuted** 31:19
**regarding** 11:16
   46:18 48:19
**regards** 12:1 27:5
   30:13
**registered** 69:5
**regulated** 38:11
**related** 15:12,25
   16:6,20 28:7,18
   33:19 45:24
**relative** 43:22 44:8
   69:20
**relatively** 25:19
**release** 40:4,11
**released** 40:5
**relief** 25:10
**remains** 17:13 29:24
**remedy** 60:3

**remember** 9:14
   13:10 38:6
**remove** 15:15 18:17
**render** 8:10 52:7
   65:10
**rendering** 24:10
   63:6 64:4 65:14
**repeat** 64:13
**report** 9:1 11:3
   13:22 14:19,22
   19:25 20:15 31:21
   31:22 32:8
**reported** 32:12
**reporter** 69:6
**reporting** 31:16
   62:7
**reports** 16:17
**request** 9:24,25
**require** 60:14 66:8
**required** 17:25 18:5
   18:9,16 58:13,14,17
   58:19 59:3,14
**requirements** 8:3
   43:23
**reserved** 3:9
**response** 44:25
   55:25
**restricted** 18:25
**restriction** 51:2
**restrictions** 14:20
   17:1,5 18:7,11
   24:23 37:9 43:23
   44:9 46:19 49:19
   50:4,17 51:12
**result** 66:10
**return** 7:24 8:11
   18:21 19:10 27:23
   28:16 48:19,20 49:5
   62:17
**returning** 65:11
**reveal** 43:1
**revealed** 44:14
   48:23
**review** 11:13 12:3
   42:21 50:24 52:2

   68:9
**reviewed** 47:22
   53:24 58:12
**rhizotomy** 15:4,14
   45:1 66:3,4,8
**rides** 29:4,6 30:9
**right** 5:9,15 6:1,6,15
   6:25 7:3 8:22 9:7
   10:2 11:20 12:1,10
   14:22 17:16 20:12
   24:25 28:20 29:3,8
   31:14 35:25 36:5
   40:20,25 41:23,25
   43:20 44:7 48:11
   50:10,14 52:18 53:4
   55:21 56:3,17 57:2
   57:8,9,16,19,23
   59:9,11,18 61:9
   62:1 63:5,7 65:16
   66:13 68:3,9
**rule** 28:5
**run** 8:23

**s**

**s** 3:1,1
**s1** 45:5
**samples** 38:10
**saw** 12:15,24 17:18
   42:9 43:7 57:11
   63:21
**saying** 28:23,24,25
   36:24 52:14 59:5
   62:24 63:1
**says** 16:16 17:10,22
   18:5,8 25:4 26:11
   28:20 29:15 36:12
   37:25 59:1,3
**scale** 29:9 30:13,19
   30:25 31:2
**schedule** 38:6,6
**scheduled** 41:24
   42:3
**science** 57:12
**score** 32:2

**seal** 69:23
**second** 13:25 25:4
   25:24 27:10,18 39:5
   60:7
**secondhand** 52:11
**secretary** 18:13,13
**security** 24:11 30:20
**sedentary** 23:15
   48:21 49:3,6,11
   50:19 51:2 52:16
   53:6 62:6 63:1
   65:13
**see** 13:13 21:5 22:1
   33:17 35:6 36:11
   39:6 40:2 60:23
**seeing** 50:12
**seen** 9:4 37:12 42:7
   42:23 61:19 63:14
**self** 31:22
**send** 8:21,25
**sends** 38:17
**sensation** 14:5
**sensory** 15:15
**sent** 13:3
**sentence** 16:16,16
   24:10 60:9
**separate** 64:3
**september** 11:20
   12:25 53:23 54:19
   55:13
**serotonin** 37:19
**set** 69:9
**sexual** 34:11
**shape** 64:17
**shops** 8:5
**short** 67:16
**shoulder** 20:3,16,16
   20:23 21:12,17,23
   22:10 41:19 45:23
   45:25 60:19
**shoulders** 20:4
**show** 46:22
**side** 34:12,20 35:11
   56:24 64:21

**sign** 47:21
**signal** 38:17
**signature** 47:4
**signed** 47:23 61:17
**significantly** 36:18
**signify** 33:10
**signing** 69:14
**simply** 43:4
**sit** 5:23 7:19 8:1
  24:1 29:21,22 30:10
  31:5 32:6 33:22
  44:20 65:9
**sitting** 30:4
**situation** 42:18
**situations** 49:16
**six** 37:25 39:16
  40:16 42:13 66:4
**skips** 29:1
**slight** 14:5
**slow** 29:16
**slowly** 40:5
**small** 57:23
**social** 17:21 24:11
  30:20 58:22
**software** 57:25
  59:25
**solemnly** 3:14
**somebody** 15:15
  34:24 35:6 42:6
  58:15 59:5
**something's** 64:14
**somewhat** 40:14
**son** 36:24
**soon** 63:17
**sooner** 33:21 42:17
**sore** 27:20
**sorry** 13:4
**sort** 14:1 24:5 26:15
  28:10 32:6 33:14
  60:8,9 67:22
**south** 1:18
**specialists** 4:23 5:1
**specialty** 4:5,8
**specific** 7:20 24:16
  33:2 37:8 40:22

43:21
**specifically** 44:21
**specifics** 32:14
**specified** 69:13
**spell** 3:20
**spend** 35:7,21
**spinal** 6:4 14:13
  43:3 64:18
**spine** 2:6 4:14,21
  14:14 15:13,20
  28:18 43:5
**spoken** 7:3
**ss** 69:2
**stabilize** 38:16
**stable** 42:11
**stand** 58:10
**standing** 29:3,17
  30:11
**standpoint** 41:4
**start** 36:20
**started** 64:20
**starting** 27:22
**starts** 28:2
**state** 3:20 63:17
  69:2,5
**stated** 48:25
**statement** 2:8 23:8
  23:12 26:9
**states** 1:1 60:1,1
**station** 26:15
**status** 58:23,23
**stenosis** 14:13 43:3
**stenotype** 3:8
**stiff** 27:20 28:8
  29:16
**stiffness** 32:17
**stimulator** 6:4 64:18
**stipulated** 3:2
**stipulations** 69:14
**story** 60:25
**street** 1:13,18,21
**strife** 65:2
**strike** 13:8 42:20
**studies** 45:4,6

**study** 10:5
**subjective** 16:15
**submitted** 48:1
**substance** 40:6
**success** 34:7
**suffering** 15:19 46:6
**suggest** 12:6 28:16
  45:7,10
**suggested** 43:21
**suggests** 28:14
**suit** 69:21
**suite** 1:13,18,21
  3:24
**summer** 54:21
**supplemental** 2:8
**supposed** 38:16 40:5
  58:20
**supposedly** 51:11
**sure** 10:9 13:11 26:9
  31:9,9 41:10 45:6
  45:12 55:3
**surgeries** 48:14
**surgery** 21:16 22:10
  41:19
**surgical** 41:3
**surprise** 61:16
**swelling** 32:17
**sworn** 3:14 69:7
**symptomatic** 55:8
**symptoms** 29:24

**t**

**t** 3:1,1 69:1,1
**tablets** 39:16
**take** 18:6 28:22 43:7
  43:25
**taken** 1:5 5:13 12:8
  59:8 67:16 69:12,18
**talk** 17:20 18:11
  21:3 60:16
**talked** 45:17
**talking** 34:14 53:16
  67:9
**talks** 27:20

**teeth** 32:19
**tell** 6:1 10:6 15:6
  29:10 30:15
**telling** 23:17 43:14
  58:15
**tend** 22:3 28:6 30:3
  38:25,25 39:2 51:13
**tends** 24:6 31:5
**term** 60:4
**terminated** 50:11
**terms** 8:13 31:18
  58:22 64:21,24
**territory** 57:5
**test** 52:23
**testified** 3:15 49:8
**testify** 69:7
**testimony** 43:25
  63:10 69:22
**testing** 26:2
**tests** 55:5
**thank** 46:12,14
  61:10 66:17,19,21
  66:22 68:6
**therapy** 21:21 22:11
**thing** 7:22 23:16,25
  25:18 26:5,13,14,16
  27:21 28:11 32:7
  33:11,14 34:14 41:1
  51:13 64:7 66:2
**things** 21:3 27:3
  34:17 35:23 38:10
  42:15 43:4 52:9
**think** 4:19 6:18 7:16
  10:23 13:13 16:15
  19:22 20:6 25:22
  28:24 46:9 47:7
  51:4 53:2,13 59:20
  62:14 63:19
**thinks** 19:3
**third** 16:15
**thought** 61:15 64:18
**three** 21:22,22 31:11
  36:14 40:15 41:24
  42:10 65:17,18 67:8
  68:7

**time** 1:12 3:9 12:7
16:9 17:17 18:6
21:10 24:2,17,22
26:11 27:5 28:4
33:25 34:13 35:8,22
36:9 37:11,23 48:6
61:16 63:15,16 64:2
69:12
**times** 7:10 21:4,22
21:22,22 22:2 30:18
32:7 33:17 42:10
61:22
**today** 5:23 7:19 8:2
30:21 44:20 60:22
65:10 68:3
**told** 18:2 23:12 46:9
61:24 62:1,14
**top** 51:6
**track** 55:2
**tracking** 60:10
**tramadol** 32:16
37:25 38:3,4 39:15
42:15
**transcription** 3:8
**treated** 6:12 7:13
**treating** 21:11 22:10
52:2 54:9 56:3,7,24
57:5
**treatment** 6:8 54:11
56:12,22
**trial** 3:10 43:17
**true** 23:16 69:16
**truth** 69:8,8,9
**try** 31:19 34:5 39:5
39:18 50:1,3 57:17
61:7
**trying** 13:9 36:23,25
38:24 57:9
**tv** 35:5
**twice** 61:19
**two** 5:1 66:5 67:7
**type** 21:4 49:10,11
49:15,15,25 50:5
57:3

**types** 8:12 49:18
50:3 51:20
**typical** 51:17
**typically** 6:20 8:10
8:23 49:17
**typo** 59:20
**typos** 58:3

**u**

**u** 3:1
**uh** 13:24 16:14 17:9
27:17 44:13 52:1
59:23
**unable** 18:21
**unchanged** 17:13
25:19
**uncommon** 27:23
**undergo** 26:1,19
**undergone** 48:15
**understand** 30:6
35:18 39:22 40:20
41:9 52:11,11 65:9
65:12 66:15
**understanding** 13:1
14:18 15:11 19:9,20
24:4 49:1 52:7,25
67:21
**understood** 7:25
**unfortunately** 58:6
59:21
**united** 1:1
**unsure** 23:19
**unusual** 37:1 54:7
57:3
**update** 59:25
**updated** 18:9
**use** 30:24 31:21,25
32:16 37:21 38:21
38:22 40:7 42:15
51:13 54:10
**usually** 15:21 18:15
21:2 23:4,7 34:19
34:24

**v**

**v** 3:22
**vague** 32:9
**valid** 12:7,7,11
46:10 63:10 64:10
**validity** 65:6
**valuable** 42:17
**van** 1:13 3:24
**variety** 14:11
**vas** 29:9 32:1
**virtually** 61:23
**visit** 2:10 20:2,7,10
22:13 24:25 25:18
27:9 31:13 35:11
36:15 41:23 42:2
53:13 55:13 60:15
62:2
**visits** 40:22 42:13
64:23
**visual** 30:18
**vitamin** 33:14
**voc** 8:7
**vs** 1:5

**w**

**wait** 13:5
**waive** 68:9,11
**waived** 3:5,6,8
69:15
**walk** 64:11
**walking** 25:5 29:21
32:10
**want** 21:3 33:12
40:6 55:23 58:24
60:16,19,22,24 61:8
64:17
**wanting** 64:25
**warrant** 65:4
**watch** 31:24
**watching** 35:5
**water** 36:20
**way** 5:10 18:18 23:7
26:21 30:17,24
38:16 39:2 40:4
45:11 51:21 60:10

61:3 65:15
**week** 11:8,11 12:3
**went** 48:10 57:11
**whatnot** 46:20
56:10
**whereof** 69:22
**william** 1:17
**wishes** 21:8
**witness** 2:2 3:7
46:14 66:19,22,25
67:3,6,10 68:11
**word** 45:19
**words** 33:3 62:6,7
**work** 7:24 8:11,13
9:22 17:23 18:10,22
19:11 20:13 22:24
23:10,20,22 24:5,5
24:11,19 27:7 33:21
34:5 35:22 44:15
46:19 47:14 48:19
48:21,21 49:1,3,5
49:15,15 50:19,23
51:2,24,25 53:3
58:12,17,23 62:4,21
**worker** 49:22
**workers** 7:21
**working** 19:10 27:7
48:5
**works** 15:23 17:25
38:5,14 40:4 52:12
58:13
**workwell** 9:8 12:1
63:11
**world** 58:4
**worse** 32:15
**worsened** 54:22
**worst** 23:24 30:21
**worth** 34:19
**write** 29:15 30:4,6
**writes** 32:15
**writing** 19:13 69:10
**written** 13:10 22:1
**wrong** 35:19
**wrote** 32:19

**[x - ymca]** Page 12

| x |
|---|
| **x**  2:1 31:2 |

| y |
|---|
| **y**  36:24 37:3 |
| **yeah**  19:1 22:8 |
|   27:14 36:11 44:2 |
|   58:1 66:25 67:3,6 |
| **year**  42:12 |
| **years**  66:5 |
| **ymca**  36:7 |

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

DAVID BLISS,                ) CASE NO. 4:12-CV3019
                            )
    PLAINTIFF,   ) DEPOSITION OF
                 ) MICHAEL H. MCGUIRE, M.D.
VS.              )
                 ) TAKEN ON BEHALF OF
BNSF RAILWAY COMPANY,   ) PLAINTIFF
                 )
    DEFENDANT.   )

- - - - - - - - - - - - - -

    VIDEOTAPED DEPOSITION OF MICHAEL H.
MCGUIRE, M.D., taken before Gretchen Thomas,
Certified Court Reporter, Registered Professional
Reporter, Certified Realtime Reporter, General
Notary Public within and for the State of Nebraska,
beginning at 12:41 p.m., on June 18, 2013, at the
Professional Offices of Thomas & Thomas Court
Reporters, 1321 Jones Street, Omaha, Nebraska 68108,
pursuant to the Federal Rules of Civil Procedure.

Page 2

1       A P P E A R A N C E S
2   FOR THE PLAINTIFF:
    MR. WILLIAM MCMAHON
3   HOEY & FARINA, P.C.
    542 S. Dearborn Avenue, Suite 200
4   Chicago, Illinois 60605
    (312)229-7581 FAX (312)939-7842
5   wmcmahon@hoeyfarina.com
6   FOR THE DEFENDANT:
    MR. THOMAS C. SATTLER
7   MS. KATHERINE Q. MARTZ
    SATTLER & BOGEN
8   701 P Street, Suite 301
    Lincoln, Nebraska 68508
9   (402)475-9400
    tcs@sattlerbogen.com
10
11      ALSO PRESENT
12  MR. JOHN J. THOMAS, JR., CLVS
    Thomas & Thomas Court Reporters
13  and Certified Legal Video, L.L.C
    1321 Jones Street
14  Omaha, Nebraska 68102
    (402)556-5000 FAX (402)556-2037
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           I N D E X
2   CASE CAPTION ........................ Page    1
    APPEARANCES ........................ Page    2
3   INDEX ................................. Page   3
    TESTIMONY .......................... Page   4
4   REPORTER CERTIFICATE ................. Page   60
5   DIRECT EXAMINATION:
        By Mr. McMahon ................... Page    4
6
    CROSS-EXAMINATION:
7       By Mr. Sattler ................... Page   31
8   EXHIBITS:
9   80. CURRICULUM VITAE
                        MARKED OFFERED
10                          4
11  81. MEDICAL RECORDS
                        MARKED OFFERED
12                          4
13  82. COLOR PHOTOGRAPHS
                        MARKED OFFERED
14                          35
15
16
17
18
19
20
21
22
23
24
25

Page 4

1           (Whereupon, the following proceedings were
2   had, to-wit:)
3               (Exhibit Nos. 80-81
4               marked for identification.)
5           VIDEOGRAPHER:  Please stand by.
6   Counsel, we are on the record.
7       This is Tape No. 1 to the Videotape
8   Deposition of Michael McGuire, M.D., in a deposition
9   qtaken by the plaintiff in a case entitled David
10  Bliss versus BNSF Railway Company; Case No.
11  4:12-CV-3019.
12      This deposition is being held at the
13  offices of Thomas & Thomas Court Reporters,
14  1321 Jones Street in Omaha, Nebraska.
15      Today's date is June 18th, 2013.  The
16  approximate time is 12:41 p.m.
17      My name is John Thomas, Videotape
18  Specialist, from the office of Thomas and Thomas.
19      Our court reporter this afternoon is
20  Gretchen Thomas.
21      Will counsel please identify themselves
22  for the record.
23          MR. MCMAHON:  William J. McMahon for
24  the plaintiff, Mr. Bliss.
25          MR. SATTLER:  Tom Sattler, BNSF

Page 5

1    Railway Company.
2          MICHAEL H. MCGUIRE, M.D.
3          having been first duly sworn,
4       was examined and testified as follows:
5          DIRECT EXAMINATION
6    BY MR. MCMAHON:
7       Q.  Good afternoon, Doctor.
8       A.  Good afternoon.
9       Q.  Could you please state your name for the
10   members of the jury.
11      A.  My name is Michael H. McGuire, M.D.
12      Q.  And do you have a profession or occupation
13   that you specialize in?
14      A.  Yes.  I'm an orthopedic surgeon.
15      Q.  And what does it mean to be an "orthopedic
16   surgeon"?
17      A.  Orthopedic surgery is defined as the
18   medical specialty that provides evaluation and
19   treatment for conditions of the spine and
20   extremities.  Generally speaking, we're the bone and
21   joint doctors.
22      Q.  Okay.  And could you tell the jury a
23   little bit about your education and training to be
24   an orthopedic surgeon.
25      A.  Yes.  I attended Creighton University here

Page 6

1    in Omaha, and earned a bachelor of science in
2    chemistry degree in 1971 -- May of 1971.
3          I continued at Creighton for my medical
4    degree and earned an M.D. in May of 1975.  I then
5    served a five-year orthopedic surgery residency at
6    St. Louis University in St. Louis, and completed
7    that residency in -- on June 30th, 1980.
8       Q.  And could you tell the jury a little bit
9    about the current nature of your practice; what type
10   of patients you see, what type of conditions you
11   treat.
12      A.  I'm a -- I practice as an orthopedic
13   surgeon in Columbus, Nebraska, a town of 22,000
14   people about 90 miles from here.  I practice a
15   general orthopedic surgery with two other surgeons.
16         I do a number of joint replacements, do a
17   number of fracture work.  And my interest for many
18   years in orthopedics -- or my special interest has
19   been tumors of the musculoskeletal system, so I
20   continue to see a number of patients referred for my
21   treatment.
22      Q.  And have you been on the staff of any
23   hospitals, whether here in Omaha or Columbus?
24      A.  Yes, I have.  I'm currently -- I practice
25   at the Columbus Community Hospital -- actually as a

Page 7

1    full-time employee of that hospital for many years,
2    about 25 years.  I have headed the orthopedic
3    service at the Creighton University Hospital here in
4    Omaha, and I continue to hold privileges at
5    Creighton.
6       Q.  Okay.  And are you board certified in that
7    field?
8       A.  Yes, I am.  I'm certified by the American
9    Board of Orthopedic Surgery.
10      Q.  What does that mean, to be "board
11   certified"?
12      A.  It means that you've met the educational
13   and training requirements as we just discussed.
14   You've successfully mastered the fund of knowledge
15   necessary to practice orthopedic surgery and have
16   passed a written test for that.  And then finally,
17   you've demonstrated your abilities in the practice
18   of orthopedic surgery, both by a review of your
19   practice and by an oral examination of, um -- of
20   that practice.  If you meet all those things, you
21   are granted certification by the American Board of
22   Orthopedic Surgery.
23      Q.  And I take it over the past -- over three
24   decades of -- in your career, you've treated other
25   patients with similar back conditions as Mr. Bliss?

Page 8

1       A.  That is true.
2       Q.  And have you performed back surgeries on
3    those types of patients?
4       A.  In a very limited fashion.
5          My practice of orthopedics does not
6    include routine discectomies or spinal fusions, but
7    on the occasion when tumors have affected the spine,
8    then I've worked with spine surgeons, either
9    orthopedists or neurosurgeons, to do that type of
10   surgery.
11      Q.  Okay.  And in the field of orthopedics, do
12   you have to do continuing medical education courses
13   to keep up with the certification in the field?
14      A.  Yes.
15      Q.  Okay.  And do you regularly do that type
16   of continuing education and attend conferences in
17   the field?
18      A.  Yes.  Actually, the orthopedic community
19   has developed a -- a whole range of opportunities
20   for that, and I participate for a number of reasons,
21   including the fact that in the state of Nebraska, we
22   must demonstrate some level of continuing medical
23   education to maintain our license.
24      Q.  Okay.  Doctor, at my request, did you
25   perform a medical records review, as well as a -- an

Page 9

1  examination of Mr. David Bliss?
2      A.  Yes, I did.
3      Q.  And, um, have you done this type of review
4  before?
5      A.  Yes, I have.
6      Q.  Is it possible to estimate how many times,
7  either per year or a period of time, that you
8  perform this kind of medical/legal consultation?
9      A.  Um, specific to a case like yours, it
10  would be a handful of times per year.  For many
11  years, I -- I've done, um, similar work, perhaps 30
12  or 40 or 50 patients evaluated per year.
13      Q.  Okay.  And when you did this review, what
14  materials did you review in helping you to formulate
15  your opinions and conclusions in this matter?
16      A.  Can I --
17      Q.  Sure.
18      A.  Then you or your office was good enough to send
19  me this box of records.  I haven't weighed it, but
20  it's this box of records (indicating).
21      Q.  Okay.  And are those the medical records
22  for Mr. Bliss?
23      A.  Yes, they are.
24      Q.  Both the medical records that exist after
25  the February 2011 reported work-related injury, as

Page 10

1  well as -- that predate that?
2      A.  Yes, I believe that's true.  I'd have to
3  look -- on the predated ones, I'd have to look
4  through.  But yes, there's a complete set of records
5  there.
6      Q.  And you also had a chance to do a physical
7  examination upon Mr. Bliss?
8      A.  That is correct.
9      Q.  And do you remember the date of that?
10      A.  I saw Mr. Bliss on the 31st of May, 2012.
11      Q.  All right.  And is a review of these types
12  of documents and -- as well as a physical
13  examination of the patient, is that the type of
14  information and documentation that you and other
15  physicians and orthopedic surgeons typically rely
16  upon to assist them in formulating opinions and
17  conclusions as to the cause of a current medical
18  condition of a person?
19      A.  Yes.
20      Q.  Okay.  And, in fact, did you rely upon
21  these medical records in your own review --
22  examination of Mr. Bliss in formulating your own
23  opinions and conclusions in this matter?
24      A.  Yes, I did.
25      Q.  Before we get to those, what findings --

Page 11

1  pertinent findings did you gather from your review
2  of the medical records of Mr. Bliss's orthopedic
3  history?
4      A.  Well, in my report to you, I attached from
5  that box of records a small collection of medical
6  records that I found to be most pertinent to the
7  case of Mr. Bliss.  I can list those, if you'd like
8  me to.
9      Q.  If you could, yeah.
10      A.  I hope to do this in the correct order.
11      So the first would be an office note, a
12  note of the evaluation by Anthony Cox, PA-Certified,
13  dated 4 February 2011, in reference to David Bliss.
14      So this would have been his office
15  evaluation the day -- the day after the injury.
16      Q.  Okay.
17      A.  So that would be the first one.
18      Then there is a report of -- of MR imaging
19  of Mr. David Bliss's lumbar spine, and the MR images
20  were obtained on the 18th of March, 2011, so about
21  six weeks later.
22      And the next is the -- the report of the
23  operation -- the operative report of -- of surgery
24  performed by Daniel Noble for the patient David
25  Bliss, and that's dated 6 April 2011.

Page 12

1      And then -- and then there -- and then
2  there's a set of records for further evaluation of
3  Mr. Bliss, and these records are authored by Keith
4  Lodhia, L-O-D-H-I-A, M.D., of Midwest Neurosurgery
5  and Spine Specialists, 8 June 2011, to September
6  2011, and 7 November 2011.
7      And then finally again attached to my
8  report for you is a report of Mr. Bliss's operation
9  by Daniel Noble, a lumbar spine operation, from the
10  6th of May, 2010, so prior to his injury.
11      And a report from the Lincoln Physical
12  Therapy Associates date 3 October 2008 in the form
13  of a letter to Dr. David Clare, C-L-A-R-E.
14      And finally the report of Mr. Bliss from
15  the Spine and Pain Center of Nebraska from
16  21 December 2011.  And this is authored by Dr. Liane
17  Donovan.
18      Q.  Thank you, Doctor.
19      Before we move on, maybe if we could
20  define a few medical terms that might be helpful
21  before we move on.
22      Doctor, what does the term radiculopathy
23  mean?
24      A.  In medical terms, it -- it refers to the
25  way pain travels or radiates out through an

Page 13

1　extremity.
2　　　　So as an example, if one has a herniated
3　disc in their low back, that disc may push against
4　the -- a nerve root as it leaves the spine, and that
5　nerve travels entirely down the extremity. Low
6　back, it travels down the lower extremity, of
7　course. And from neck, it travels through the upper
8　extremity.
9　　　　So we make reference to a radiculopathy,
10　we're really referring to pain radiating out or
11　traveling out through the length of an extremity.
12　　Q.　Okay. And what difference is there, if
13　any, between the term disc extrusion and herniated
14　disc?
15　　A.　Probably no -- no difference.
16　　　　A disc extrusion may be a little bit more
17　dramatic thing, that the disc -- a portion of the
18　disc was actually squirted out. But -- but I think
19　for purposes of this discussion, a herniation or
20　extrusion of the disc would be the same.
21　　Q.　All right. And the medical procedure
22　discectomy, what's that?
23　　A.　It's an operation, a form of surgery, and
24　the goal is to remove the herniated or extruded
25　portion of the disc and, therefore, take pressure

Page 14

1　off the nerve root where it's being pinched.
2　　Q.　And another medical procedure,
3　rhizotomy -- a fiset rhizotomy?
4　　A.　Yes.
5　　Q.　What's that?
6　　A.　Hard to know.
7　　　　The spine -- we commonly think of the
8　spine as a series of blocks; and, in fact, it is a
9　series of blocks, separated in each way between a
10　cushioning disc.
11　　　　But, in fact, if we reach to -- any of
12　us -- and feel our spine, feel our back, we're not
13　feeling those blocks, but we're feeling the roof,
14　um, of the spine that protects the spinal cord and
15　the nerve roots. And there are joints back there to
16　allow the spine to move and move.
17　　　　And people are -- certainly a potential
18　cause of back pain is wearing out those joints, much
19　like an arthritis or something. And so one can
20　destroy the nerves that supply those little joints
21　and perhaps no pain would come from there. And
22　that -- the procedure to destroy the nerves
23　surrounding these little joints where the back of
24　the spine hooks together is known as a rhizotomy.
25　　Q.　Okay. And then how is it that a

Page 15

1　discectomy helps patients that have a disc
2　extrusion?
3　　A.　Yeah. Well, it's simply by taking the
4　pressure off the nerve root. So if you were to
5　think about -- if my arm was to be the nerve root --
6　obviously much bigger than a true nerve root -- and
7　a disc was pushing against it, any of us could stand
8　that for a while, but after some length of time,
9　we'd want the disc to be removed. So it's to take
10　pressure off the nerve root or to remove the
11　offending cause of the pinched nerve root.
12　　Q.　And, um, how is it that a fiset rhizotomy
13　is used after a micro discectomy for patients that
14　still have pain?
15　　A.　Well, I think the key phrase there in your
16　question -- who still have pain.
17　　　　So if a patient -- if a patient has
18　undergone surgery to remove a herniated disc, and
19　hopefully the pain that is radiating through their
20　extremity, hopefully that's gone, but if they still
21　have back pain, then a rhizotomy would be a
22　reasonable attempt to relieve that part of the
23　condition.
24　　Q.　Okay. And another term, what's a spinal
25　cord stimulator?

Page 16

1　　A.　Um, the -- it's an implantable device that
2　discharges a -- small electric shocks, and I think
3　the best way to probably think about is to perhaps
4　confuse or -- confuse the brain or the pain
5　receptors, and -- if you were to tap-tap-tap-tap-
6　tap-tap-tap for- -- forever on something, maybe
7　finally you just kind of wear out its ability to
8　recognize pain. So it's a device, again, hope to
9　relieve pain.
10　　Q.　All right. And then finally the last term
11　that you use in your report is "failed back
12　syndrome."
13　　A.　Yes.
14　　Q.　What is meant by that term?
15　　A.　It's kind of a catch-all I suppose, but
16　Mr. Bliss here is a patient who's had -- I think at
17　least three operations on his spine, and a number of
18　other procedures. And despite everyone's best
19　attempts, and despite appropriate indications for
20　surgery, and despite time and everything else, the
21　fact of the matter is he remains, um -- he continues
22　to suffer back pain.
23　　　　And so if you've kind of used up all of
24　your reasonable choices and you still have pain, you
25　gather that all together into one phrase, "failed

Page 17

1  back syndrome."
2      Q.  Okay.  You were able to have a physical
3  examination of Mr. Bliss; is that right?
4      A.  Yes, I did.
5      Q.  What were your findings on your physical
6  examination?
7      A.  I report those findings on the first
8  paragraph of Page 3 of my letter to you, and for
9  completeness sake, my letter's dated 31 May 2012.
10     I will read this short paragraph.
11     (Reading):
12     On exam, I noted a pleasant, healthy
13  appearing male who moved about the office in a
14  satisfactory fashion.  The first step or two after
15  arising from a seated position in our waiting room
16  chair caused pain.  He then ambulates for short
17  distances in a normal fashion.  Mr. Bliss was able
18  to partially disrobe for the exam without
19  difficulty.  Visual examination of his lumbosacral
20  spine is remarkable for healed surgical incisions
21  consistent with his history.  I noted a pain free,
22  passive, full range of motion of both hips and
23  knees.  Mr. Bliss has bilateral pes planovalgus
24  (flatfeet) deformities.  The deep tendon reflexes
25  were measured at the knee jerk and ankle jerk level.

Page 18

1  On the right lower extremity, the reflexes were
2  noted to be 2+/4 with provocation.  On the left
3  lower extremity, the reflexes were absent and could
4  not be elicited, even with provocation.  The
5  function of the extensor hallucis longus muscle and
6  tendon to each great toe is intact, brisk, and
7  strong.  His distal pulses at the posterior tibialis
8  and dorsalis pedis levels are easily palpable
9  bilaterally.
10     And then I add that Mr. Bliss is a
11  nonsmoker.
12     Q.  And then the following paragraph, you
13  summarize some of your opinions in this matter; is
14  that right?
15     A.  Yes, I do.
16     Q.  And is that based upon both the review of
17  the medical records and documents that you had in
18  this case, as well as your examination of Mr. Bliss?
19     A.  And the history that I took from Mr. Bliss
20  on that day.  So that -- the records, the patient's
21  history, and my physical examination, yeah.
22     Q.  And what was that history that he provided
23  to you on that day?
24     A.  If we go back to Page 1, the second
25  paragraph -- and I will again read.

Page 19

1      (Reading):
2      Mr. David R. Bliss is a now 56-year-old
3  male who has been an employee of the BNSF Railroad
4  for the past 22 years.  Mr. Bliss reports the onset
5  of low back pain with radicular symptoms (especially
6  through the left lower extremity) while on the job
7  on 3 February 2011.  Mr. Bliss was repairing the
8  dented wall and bent door frame of a boxcar at that
9  time.  The project required the use of a hydraulic
10  ram that, once maneuvered into place, can be used to
11  jack the walls apart.  This returns the frame of the
12  door and wall of the boxcar to the original
13  position.  I reviewed photos of the device and how
14  it works.  The ram is estimated to weigh at least
15  150 pounds.  Mr. Bliss reports that at the moment of
16  the onset of the pain, he was not actually lifting
17  any objects.  Simply as he stood up, something
18  popped in his low back.  And the episode occurred
19  following a two- or three-hour period of repeatedly
20  maneuvering the ram into place and using that ram to
21  repair the boxcar.
22     Q.  And in the course of medical treatment
23  that Mr. Bliss received after this incident on
24  February 3rd, 2011, could you summarize that for the
25  Ladies and Gentlemen of the Jury.

Page 20

1      A.  Yes.  And this makes reference to the
2  pertinent medical records that we already reviewed.
3  But to summarize it, because of the severity of the
4  symptoms, Mr. Bliss reported the event to his
5  superiors at BNSF that day.  He then sought
6  evaluation on 4 February 2011 by Anthony Cox, PA-C.
7  MR imaging of the lumbar spine was completed on 18
8  March 2011.  Mr. Bliss underwent lumbar spine
9  surgery on 6 April 2011.  Unfortunately, his
10  post-operative report has been unsatisfactory.  He
11  has been unable to return to work.  Fasit
12  rhizotomies were performed by James Devney, D.O., in
13  October of 2011.
14     Q.  Did you also gather from your review of
15  the records, as well as your discussions with
16  Mr. Bliss, his previous surgical history, previous
17  to February 3rd, 2011?
18     A.  Yes, I did.
19     Q.  Could you summarize that for the jury as
20  well?
21     A.  I can do so in an expert fashion.
22     The next paragraph of my letter,
23  Mr. Bliss's past surgical history is significant.
24  He initially underwent a lumbar discectomy in 2003.
25  He then underwent a lumber discectomy (at a more

1  proximal level) on 6 May 2010. Following that
2  procedure, he was in an off-work status for
3  approximately four months. He reports that he
4  successfully returned to work in October of 2010.
5  Mr. Bliss did well and apparently was working
6  without restrictions until the morning of three --
7  until the morning of 3 February 2011. As noted
8  above, he has not worked since that time.
9      Q. What -- what's your understanding of the
10  surgery that Mr. Bliss had on the 6th of May, 2010?
11     A. As I understand the history from the
12  records sent by Mr. Bliss's report, I state that as
13  noted -- or excuse me. Strike --
14         I put down that the 6 May 2010 surgery was
15  not the result of an injury at work. Rather,
16  Mr. Bliss's back went out while lifting a bucket of
17  water for his dog.
18     Q. And what type of surgery was that
19  performed by Dr. Noble?
20     A. That was a lumbar discectomy, and we have
21  a copy of the operative report from that date in
22  these records.
23     Q. Okay. And what was the procedure after
24  the work-related injury of February 3rd, 2011,
25  that -- the surgical procedure that Dr. Noble

1  performed on Mr. Bliss on April 6, 2011?
2      A. I'll read from the operative report of
3  that date, 6 April 2011.
4         The operation is listed as a left L3-4
5  micro discectomy, re-exploration. And No. 2, use of
6  an operative microscope.
7         And the reason that it's listed as a
8  re-exploration is because the 6 May 2010 discectomy
9  had been at the same level, the left side of the
10  Lumbar 3-Lumbar 4 disc.
11     Q. Okay. And what does it mean to be a
12  recurrent left L3-4 disc extrusion?
13     A. Well, what it means is that Dr. Noble
14  believes -- and certainly the history suggests
15  that -- that the first time that the L3-4 disc
16  extruded or pinched out against the nerve and the
17  extruded portion -- the offending portion was
18  removed and the patient got better, but now an
19  additional extrusion, more of the disc has come out
20  of the space and is pinching the nerve. You know,
21  when we do a discectomy, we perhaps take -- most
22  half of the disc out, which leaves people at some
23  risk for recurrence or -- and Dr. Noble's listing
24  here suggests that he believes that there was a -- a
25  recurrence of that disc extrusion at that level.

1  And for that reason, required additional discectomy
2  through a re-exploration of that same level.
3      Q. And when you say, "that level," could you
4  indicate where on a person's spine is this -- the
5  re-excursion -- re-extrusion of the disc?
6      A. Sure.
7         So all of us -- or most of us, almost all
8  of us, have 12 thoracic vertebrae or the blocks, and
9  those are the vertebrae that our ribs are hooked to.
10  And then almost all of us have five low back or
11  lumbar vertebrae or blocks. And then finally we
12  have the sacrum or the tailbone. So at the 3-4
13  disc, it would be halfway down the lumbar spine.
14     Q. And then on your examination -- I think it
15  was continued on Page 3 of your report -- did
16  Mr. Bliss present to you with any symptoms on that
17  particular day?
18     A. Yes. If we go to the --
19     Q. Page 2, maybe?
20     A. Yeah. If we go to the bottom paragraph of
21  Page 2 of my 31 May 2012 report.
22         (Reading):
23         At the time of my evaluation, Mr. David R.
24  Bliss reported constant left lower extremity pain
25  that radiates to his heel and is associated with

1  numbness over the lateral aspect of his left foot.
2      Q. And his current treatment at that time was
3  what?
4      A. He was in a pain management program
5  directed by -- by Dr. Donovan.
6      Q. And did he indicate what activities, if
7  any, increased his level of pain?
8      A. He reports that he is relatively
9  comfortable while seated or lying down. He has
10  learned to stand and to bend in a slow and careful
11  fashion. Prolonged standing and walking caused his
12  lower extremity symptoms to increase.
13     Q. Okay. And Doctor, based upon your review
14  of the medical records, and also your physical
15  examination of Mr. Bliss, did you have an opinion,
16  to a reasonable degree of orthopedic certainty, what
17  the cause of the constant left lower extremity pain
18  that radiated into Mr. Bliss's heel and associated
19  numbness over the lateral aspect of his left foot,
20  what that was caused from?
21         MR. SATTLER: I'll object to the form
22  of the question as it relates to a history provided
23  by the patient and not his physical exam. **Overruled**
24  BY MR. MCMAHON:
25     Q. Just based upon your physical exam and the

Page 25

1   review of the records in this case, and background
2   and training as an orthopedic surgeon, do you have
3   an opinion as to what was causing the lower
4   extremity radiating pain in Mr. Bliss as reported?
5       A.   Yes, I do.
6       Q.   And what is that?
7       A.   I think I best tried to provide that by
8   the statement that I would characterize his current
9   status as a failed back syndrome.  And certainly his
10  reports of pain radiating to the heel of his foot
11  and my findings suggest that there's ongoing
12  irritation or pinching of some or one of the nerve
13  roots exiting the lumbar sacral spine.
14      Q.   Okay.  And based upon your physical exam,
15  your review of the records, as well as your
16  examination of Mr. Bliss, did you formulate an
17  opinion, to a reasonable degree of orthopedic
18  certainty, whether Mr. Bliss had reached a point of
19  maximum medical improvement as of May 31st, 2012?
20      A.   Yes, I did.  And I believe that Mr. Bliss
21  had reached a point of maximum medical improvement
22  effective the date of my examination, 31 May 2012.
23      Q.   And based upon that opinion, did you
24  formulate any restriction -- medical restrictions
25  that you believe were appropriate for Mr. Bliss?

Page 26

1           MR. SATTLER:  Well, I'll object to
2   the form of the question.  Also, it goes beyond the
3   disclosure made by the May 31, 2012, report.  There
4   is no such opinion or testimony.
5           MR. MCMAHON:  Very good.  I'll
6   withdraw that, Mr. Sattler, and I'll rephrase it.
7           MR. SATTLER:  I should have looked at
8   your face, Doctor.
9           THE WITNESS:  Oh, boy, they got me
10  now.  That's off...
11          MR. MCMAHON:  I'll rephrase it.
12  BY MR. MCMAHON:
13      Q.   Doctor, based upon your opinion that
14  Mr. Bliss had reached maximum medical improvement,
15  effective May 31, 2012, did you come to any opinion
16  whether Mr. Bliss had reached any -- whether
17  permanent or -- or impairment level of function,
18  based upon your review of the records, your
19  examination of Mr. Bliss, and your education and
20  training and experience in orthopedic surgery?
21          MR. SATTLER:  Hang on a second,
22  Doctor.
23      I'll object to the form of the question.
24      If the question is did you rate him under
25  the AMA guides to the evaluation of permanent

Page 27

1   impairment, do you have an opinion in that regard, I
2   don't have an objection to that.  If that's what the
3   doctor is going to address, that's fine.
4           MR. MCMAHON:  Okay.
5   BY MR. MCMAHON:
6       Q.   Doctor, I'll withdraw that previous
7   question.  Okay, Tom?
8       Doctor, did you rate Mr. Bliss based upon
9   your review of the medical records, your examination
10  of Mr. Bliss, as of May 31st, 2012?
11      A.   Yes, I did.
12      Q.   And what does that mean, first of all?
13      A.   Um, well, based on everything that we've
14  been discussing, and in these situations, the
15  physician is asked to provide a rating of a
16  permanent partial impairment of function.  And to
17  assist us in that task, the AMA has provided a
18  text -- a large text that is named the AMA Guides to
19  the Evaluation of Permanent Impairment.
20      At this time, I used the Fifth Edition of
21  that textbook.
22      And in Table 15-3 of that text, the table
23  provides criteria for rating impairment due to
24  lumbar spine injury.  And I am of the opinion that
25  Mr. Bliss and his condition is best described in the

Page 28

1   DRE lumbar category III.  And for that reason, I
2   would apply a 12 percent impairment of the whole
3   person.
4       Q.   And that phrase, "12 percent impairment of
5   the whole person," it -- is it possible for you to
6   translate that from orthopedic terminology to maybe
7   what us laypeople might understand?
8       A.   Well, I guess -- I hope this is
9   appropriate, but I -- I often point out to patients
10  that this is not a -- some sort of rating of
11  disability.
12      If -- and I use myself as an example.  I
13  happen to be a surgeon, so if I were to for some
14  reason suffer an amputation of my foot or lower leg,
15  I could be rated, according to a table in the
16  guides.
17      In fact, it would really not disable me in
18  any way according to my profession.  Other people,
19  it would be more disabling.
20      So really I guess what this means is that
21  12 percent of all the things that we think a regular
22  person like Mr. Bliss can do, he can no longer do.
23  So he's lost -- or he's suffered a significant
24  impairment of the normal function that we would
25  expect of a 56-year-old man.

Page 29

1    Q.  All right.  And then based upon that, did
2    you come to any conclusions of whether Mr. Bliss
3    could return to his prior position with the railroad
4    as railroad carman?
5            MR. SATTLER: I'll object to the form
6    of the question as no proper and sufficient
7    foundation.                    **Overruled**
8    BY MR. MCMAHON:
9    Q.  Okay.
10   A.  At the completion of -- at the completion
11   of my letter, I offer the opinion, finally, I find
12   it unlikely that Mr. Bliss can or will return to the
13   duties required of his previous position at the
14   BNSF Railroad.
15           MR. SATTLER: And again, I'll move to
16   strike: Without sufficient foundation. **Overruled**
17   BY MR. MCMAHON:
18   Q.  Okay.  And Doctor, what's the basis for
19   your opinion regarding that he will not return to
20   his previous position with the railroad?
21   A.  Um, he -- it's my understanding that he
22   did hard physical labor, such as jacking apart
23   railroad cars to repair them.  And his combination
24   of clinical problems, as I've said, summarized as a
25   failed back syndrome, make it particularly painful

Page 30

1    for him to do heavy labor.
2            Q.  All right.  And lastly, Doctor, do you
3    have an opinion, to a reasonable degree of medical
4    certainty, as to whether the reported February 3rd,
5    2011, work incident was a cause in whole or in part
6    to the -- to the injury to Mr. Bliss's spine and the
7    subsequent medical treatment?
8            A.  Yes, I do.
9            Q.  And the basis for that opinion?
10           A.  My -- the -- all the things that we've
11   covered in this letter.
12           Q.  Okay.  And I guess I should close the loop
13   there.
14           So you believe it was connected, to a
15   reasonable degree of medical certainty, to the
16   February 3rd, 2011, work injury?
17           A.  Yes.
18           MR. SATTLER: Hang on a second
19   Doctor.
20           I'll object: No proper, sufficient
21   foundation.  Also object to the form of the
22   question.                        **Overruled**
23   BY MR. MCMAHON:
24   Q.  Okay.
25   A.  I believe that the 3 February 2011 injury

Page 31

1    is the cause of the treatment and outcome as we've
2    described -- or reported in my letter.
3            Q.  Okay.  And the basis for that, again?
4    Sorry.
5            A.  The patient's history, my review of his
6    medical records, and my findings at physical
7    examination.
8            MR. SATTLER: Same objection. Move
9    to strike.                       **Overruled**
10           MR. MCMAHON:  Thank you, Doctor.
11   That's all.
12           CROSS-EXAMINATION
13   BY MR. SATTLER:
14   Q.  Now, Dr. McGuire, you saw the patient,
15   Mr. Bliss, at the request of his lawyer; is that
16   right?
17   A.  That is true.
18   Q.  It was not a referral for another
19   health-care provider?
20   A.  That is correct.
21   Q.  And it was not intended for purposes of
22   examining Mr. Bliss as a patient for treatment?
23   A.  That is correct.
24   Q.  And in other words, this was a specific
25   arrangement made so that you could offer opinions,

Page 32

1    not unlike those that have just been provided by you
2    in direct examination?
3    A.  That is correct.
4    Q.  Now, did this examination occur at your
5    office, then?
6    A.  Yes, it did.
7    Q.  In Columbus?
8    A.  Yes.
9    Q.  Correct.
10        And this would have been on May 31st of
11   2012?
12   A.  Correct.
13   Q.  This would have been roughly 16 months
14   after the incident alleged to have occurred on
15   February 3rd of 2011, right?
16   A.  Correct.
17   Q.  In terms of the actual time that you would
18   have spent with Mr. Bliss, how much time would that
19   have taken?
20   A.  With Mr. Bliss, about 30 minutes.
21   Q.  In terms of the physical exam of
22   Mr. Bliss, how much time was spent in the physical
23   exam part? I'm talking about the clinical exam
24   where you've got him in the room and you're looking
25   at him.

Page 33

1    A.   Well, we were in a room -- the two of us
2    in an exam room for those 30 minutes.  The actual
3    touching, checking, doing reflexes would be 5 or 7
4    or 8 minutes of that.
5    Q.   And in terms of the records review in
6    preparing your report, approximately how much time
7    was involved there?
8    A.   Um, probably 3 hours.
9    Q.   Have you billed counsel for plaintiff in
10   this case yet?
11   A.   Yes, I have.
12   Q.   And what amount was that?
13   A.   Today, there's a bill for $1800 for this
14   deposition.  I'm sure there was a bill on -- for the
15   May 31st, but I must admit I don't know what it is.
16   Q.   All right.  Now, was this done through the
17   auspices of the hospital, or is this a business
18   that's handled on the side or...
19   A.   This is a side business.
20   Q.   All right.  And you had not seen the
21   plaintiff, Mr. Bliss, before this visit on May 31st?
22   A.   Correct.
23   Q.   And you haven't seen him since?
24   A.   Correct.
25   Q.   And the only information that you would

Page 34

1    have had regarding his past medical history or any
2    history after you saw him would have been provided
3    by his lawyer?
4    A.   Yes.  The box of records, yes.
5    Q.   Right.  I mean, you haven't consulted with
6    any of his treating physicians, you haven't -- in
7    other words, not being a health-care provider for
8    Mr. Bliss, you're not in the loop discussing
9    treatment plans or anything like that?
10   A.   That is correct, I am not.
11   Q.   Now, you refer in your report to your
12   physical examination as a neuro-musculoskeletal exam
13   focused on his lumbar spine and his lower
14   extremities; is that right?
15   A.   That is right.
16   Q.   In terms of the interview that you had
17   with Mr. Bliss, I take it that you're -- the only
18   basis that you had as reflected in your report in
19   terms of the -- his background with the railroad or
20   the circumstances of the incident on February of
21   2011 would have been based solely on that
22   information provided to you by Mr. Bliss?
23   A.   Correct.
24        I suppose I should add the caveat, and I
25   have the medical records, but Mr. Bliss re- -- that

Page 35

1    reported to me.
2    Q.   Right.
3        I noticed also, Doctor, we obtained copies
4    of everything that was provided to you through a
5    request to counsel for Mr. Bliss, and in the
6    materials were included a number of photographs.  Do
7    you recall seeing photographs like this in the
8    materials that you would have received?
9    A.   Yes, I do recall.
10        (Exhibit No. 82
11        marked for identification.)
12   BY MR. SATTLER:
13   Q.   For the record, I've asked, and the court
14   reporter has marked as Exhibit 82, a series of four
15   photographs.  Also for the record these are Bates
16   marked DID000759, -760, -761 and -762.
17        Doctor, if you could take a look at those
18   photographs.
19        With respect to those four photos in
20   Exhibit 82, do those look like the photos that were
21   provided to you by counsel?
22   A.   Yes, they're the same.
23   Q.   Okay.  I note in your report you said, "I
24   reviewed photos of the device and how it works."
25        You were talking about this hydraulic ram?

Page 36

1    A.   Exactly.
2    Q.   What you left off in your testimony, which
3    appears in your report, is that it is maneuvered
4    into place.  And I want to make sure that you
5    recognize that -- or accept that the photos here in
6    Exhibit 82 -- was it your understanding that this
7    was how it was maneuvered by Mr. Bliss at the time
8    of the accident?
9    A.   Yes.
10   Q.   Okay.  And you've had a chance to look at
11   those?  All right.
12        So these four photographs showing him
13   leaning over, grabbing the device and maneuvering
14   it, you understood that that was taking place on the
15   date of the incident?
16   A.   Correct.
17   Q.   And that formed, at least in part, the
18   basis for your opinions here today?
19   A.   Yes.
20   Q.   Now, interestingly, you note in your
21   report that the episode occurred when he simply, as
22   he stood up, something popped in his low back.  Do
23   you recall putting that in your report?
24   A.   Yes, that's what he reported to me.
25   Q.   Right.  And for those of us who are not

Page 37

1  physics majors, I'm going to use a term, but I'd
2  like you to explain it to the jury. One can load
3  the spine --
4      A.  Correct.
5      Q.  -- by lifting heavy objects or maneuvering
6  heavy objects, et cetera.
7          Can you explain what the difference is
8  between just standing up versus moving with some
9  type of a heavy object in terms of loading of the
10 spine?
11     A.  Yeah. I'm not sure that I can.
12     Q.  Okay.
13     A.  But this -- the spine, as I have been
14 demonstrating, is a series of bony blocks separated
15 by cushions or -- that we call discs. And certainly
16 going from a bent-over position to standing back up
17 changes forces across the spine.
18         And as a physician, of course, I'm -- I
19 start with what the patient tells me, and he says --
20 he reports, simply, as he stood up, something popped
21 in his low back, which is -- it was actually not an
22 unusual report.
23     Q.  There are reports of people who just bend
24 over to pick up the newspaper --
25     A.  Exactly,

Page 38

1      Q.  -- and will have a disc problem, right?
2      A.  Right. Or sneeze.
3      Q.  Actually, if you look back at Dr. Noble's
4  operative report -- or the reports around the time
5  that he had the first discectomy, this is the one
6  back in 2010, I think it's in May of 2010, you
7  report the patient telling you that he was picking
8  up a bucket of water for his dog.
9          You'll note in Noble's report, he got a
10 history of just bending over to pick up a sock; do
11 you remember that?
12     A.  I didn't discover that.
13     Q.  Okay.
14     A.  Perhaps Dr. Noble was confused.
15     Q.  Well, either that or the history has
16 changed, right?
17     A.  Yeah, or I'm -- or my report's confused.
18 I'd be happy to look at that, if I can...
19     Q.  Do you have the operative report from the
20 May incident -- or the May surgery, I should say?
21     A.  Yes, I do.
22     Q.  Okay.
23     A.  I have it.
24     Q.  I've got one from -- and for the record,
25 this is Bates marked NSC00020. This is from Noble's

Page 39

1  spine center.
2          He says, "He bent over to pick up a
3  socks -- a sock, when he felt a pop and felt a sharp
4  stabbing in the left side of his low back and into
5  his buttocks."
6      A.  So that's different than what I learned.
7      Q.  Right.
8          What I'm more interested in, rather than
9  the disparity in the history, is the fact that
10 events to the spine can occur as a result of just
11 fairly minimal movement of the body; isn't that
12 correct?
13     A.  That's true.
14     Q.  Now, I want to talk a little bit about
15 your referral to this situation as a "failed back
16 syndrome."
17         Now, this failed back syndrome is
18 terminology that's used in your field. It's a term
19 of art used in your field, is it not?
20     A.  That's true.
21     Q.  And it refers to chronic pain experienced
22 after unsuccessful surgery for back pain; isn't that
23 how it's typically defined?
24     A.  That's very good, yes.
25     Q.  Now, surgery for back pain is conducted

Page 40

1  when there is an identifiable source of the pain,
2  and I think you actually used language in your
3  direct examination that the best attempts at fixing
4  the problem through surgery were made and that there
5  were appropriate indications for the surgery when
6  the surgeries occurred. I think that's the language
7  you used.
8      A.  Correct.
9      Q.  But back pain can also have a number of
10 causes, and accurate identification of a source of
11 pain is complicated. And I notice when you also
12 gave your testimony about the failed back syndrome,
13 I think you used the term he had "ongoing irritation
14 over one or more of the nerve roots of the spine."
15 I think that's the language you used.
16     A.  Yeah. I think I -- toward the end --
17 counsel asked me why -- what was the source of -- of
18 his continued complaints of pain, and based on
19 Mr. Bliss's description of his pain and my findings
20 at the time of my physical exam, it would suggest
21 that he has ongoing problems or something causing
22 pinched nerves.
23     Q.  Right. And you're using the term plural,
24 "nerves."
25         You're talking about -- he's got a -- when

Page 41

1   we talk about a failed back syndrome, the real issue
2   is trying to figure out where the pain source is,
3   right?
4       A.  That's true.
5       Q.  And the difficulty is that when you try
6   all these surgical approaches, you do the best you
7   can, based upon the diagnostic tools that you
8   typically would use, like MRIs, discography,
9   whatever it might be, to isolate an area that may be
10  the pain generator?
11      A.  That's correct.
12      Q.  But when you're in a failed back syndrome
13  situation, what you have is a number of different
14  levels that are deteriorating over time -- and by
15  the way, this gentleman has degenerative disc
16  disease; does he not?
17      A.  That's correct.
18      Q.  That's a progressive disease that's been
19  ongoing for many years?
20      A.  It can be a progressive disease.
21      Q.  Have you compared his MRI studies from the
22  2010 time frame to the more recent ones?
23      A.  I have not seen those.
24      Q.  And then, of course, the symptoms that
25  we're talking about, when we talk about complaints

Page 42

1   of pain, that's a subjective symptom, right?
2       A.  That is correct.
3       Q.  And while we have these diagnostic tools
4   to try to find out objectively where the pain
5   generator is, it doesn't always work out that way?
6       A.  That is true.
7       Q.  Okay.  Now, causes of failed back
8   syndrome, um, that can be the original cause of
9   pain, in terms of recurrence, it can even be
10  complications that occur during surgery; isn't that
11  true?
12      A.  Correct.
13      Q.  And when the surgery occurs, a nerve root
14  causing the pain can be inadequately decompressed,
15  right?
16      A.  Correct.
17      Q.  Joints or nerves may become irritated
18  actually during the surgical procedure itself?
19      A.  Correct.
20      Q.  Scar tissue can form and cause recurring
21  pain?
22      A.  Correct.
23      Q.  And also inadequate or incomplete
24  rehabilitation or physical therapy, especially in
25  patients whose back muscles are deconditioned, can

Page 43

1   cause chronic pain?
2       A.  Correct.
3       Q.  Now, there was a point at which during
4   direct examination you were reading from your
5   report, and I'm assuming that was just the -- to
6   refresh your memory as to your exam and your
7   analysis.
8       But, um, this testimony that you gave
9   about Mr. Bliss having pain radiating into his heel
10  and associated with numbness over the lateral aspect
11  of his foot, that was by his report to you?
12      A.  Correct.
13      Q.  Now, on your examination -- and again, I
14  take it that this examination that you conducted,
15  Dr. McGuire, is in the context of doing what you
16  were asked to do, which was essentially put together
17  an impairment rating for this guy?
18      A.  Correct.
19      Q.  Now, you understand we're not in a
20  workers' compensation setting?
21      A.  Correct.
22      Q.  You also understand, and I think you
23  actually testified, that when we talk about
24  impairment, we're not -- that doesn't equate with
25  disability under the AMA guides; that's a distinct

Page 44

1   issue?
2       A.  That is correct.
3       Q.  Now, I want to talk a little bit about the
4   approach that a physician in your position would
5   take.  Doing a rating under the AMA guides, and the
6   type of physical examination that you would
7   undertake -- and as a matter of fact, the AMA guides
8   actually list and identify the type of physical
9   examination for lumbar spine rating under the
10  guides.
11      A.  Correct.
12      Q.  They talk about a standing position
13  examination for posture, palpation, gait, range of
14  motion, muscle strength screening.  They talk about
15  a sitting position, with neurological and nerve
16  tension testing.  These are all kind of a guideline
17  under the AMA guides for how you do the lumbar exam,
18  right?
19      A.  Correct.
20      Q.  Now, in looking at the -- at your report,
21  you did a physical -- or excuse me, a visual
22  examination of the lumbar spine, correct?
23      A.  Correct.
24      Q.  There's no mention here in terms of these
25  various positions that one might have a patient

Page 45

1  in --
2      A.  Well, I --
3      Q.  -- like, recumbent supine, recumbent
4  prone, sitting position, or the exam's in a standing
5  position?
6      A.  I guess I could fill that in for you.
7      Q.  Well, but it's not reported here is the
8  point.
9      A.  I can tell you that he was standing during
10  the visual examination of the lumbosacral spine.
11      Q.  All right.  And there's no mention of
12  posture in your report?
13      A.  Well, that's not true.
14          On the first sentence of my paragraph of
15  the report, I note that he moved about the office in
16  a satisfactory fashion, and that -- that reflects
17  his posture.
18      Q.  Okay.  There's no negative note regarding
19  his posture?
20      A.  Correct.
21      Q.  In other words, there's no issue of
22  lordosis, kyphosis, nothing like that?
23      A.  Correct.
24      Q.  So his posture was normal?
25      A.  Correct.

Page 46

1      Q.  All right.  Now, in terms of palpation of
2  the spine, no mention of that?
3      A.  Correct.
4      Q.  Now, you didn't check for muscle spasm,
5  guarding?
6      A.  No.
7      Q.  But if he had normal posture, that would
8  tend to suggest that he didn't have muscle spasm or
9  guarding?
10      A.  Correct.
11      Q.  Now, what is the significance of that in
12  terms of the Ladies and Gentlemen of the Jury, the
13  fact that there isn't a change in the posture caused
14  by muscle spasm or guarding?
15      A.  Well, you note that at the beginning, in
16  my opening paragraph, I state that I performed a
17  neuro-musculoskeletal exam, and you are making
18  reference at this moment to muscle function -- or
19  muscle findings.
20      Q.  Well, but that's only because we're
21  looking at the AMA guides as to how you do the
22  impairment rating for the lumbar spine.
23      A.  Right.  And I'm not suggesting that there
24  are any muscle problems.
25      Q.  Okay.  But what I to make sure is is --

Page 47

1  let me ask you a different way.
2          Did you follow the AMA guides in terms of
3  your physical examination?
4      A.  I used a combination of my training,
5  experience, and the Table 15-3 in the -- in the
6  guides.
7      Q.  Well, the Table 15-3 is just punching up
8  the numbers.  It's not the physical exam
9  recommendations made by the AMA?
10      A.  No.  I do my physical exam.
11      Q.  So you didn't follow those recommended?
12      A.  Well, actually I did, but perhaps not the
13  way you hoped I had.
14      Q.  Okay.  But in terms of posture, in terms
15  of gait, range of motion, and whatever muscle
16  strength screening that you did, there was nothing
17  out of the ordinary?
18      A.  Correct.
19      Q.  All right.
20          VIDEOGRAPHER:  Counsel, we are off
21  the record.
22          The time is 1:39 p.m.
23              (1:39 p.m. - Recess taken.)
24
25

Page 48

1          (At 1:42 p.m., with parties present
2  as before, the following proceedings were had,
3  to-wit:)
4          VIDEOGRAPHER:  Please stand by.
5  Counsel, we are back on the record.
6          The time is 1:42 p.m.
7  BY MR. SATTLER:
8      Q.  Doctor, when we broke, we were going over
9  your physical examination of the plaintiff,
10  Mr. Bliss, and I was going through the AMA guides in
11  terms of the physical exam for the lumbar spine.  We
12  had just talked a little bit about this muscle
13  issue.
14          Did you do any measurements of his lower
15  extremities to determine if there was any atrophy of
16  his lower extremity?
17      A.  No, I did not.
18      Q.  You didn't find any objective signs of
19  loss of motor function or loss of innervation to the
20  muscles?
21      A.  No, I did not.
22      Q.  Are you aware of whether or not at any
23  time anyone has done any electromyographic
24  diagnostic studies on this radiculopathy that has
25  been discussed here today?

Page 49

1    A.  Not by memory.  I guess I could not
2  guarantee that there is or is not a report in that
3  box.
4    Q.  You didn't rely on any EMG studies --
5    A.  No.
6    Q.  -- or any other electrodiagnostic studies
7  to come up with some objective evidence of the basis
8  for the radiculopathy complaints?
9    A.  No, I did not.
10    Q.  Let's talk about this pain-free passive
11  full range of motion of both hips and knees.
12    Could you describe for the jury what
13  passive range of motion is, and what you're really
14  looking at in terms of range of motion as it relates
15  to the hips and knees?
16    A.  Yes.  So in this part of the exam, the
17  patient is seated on an examining table.  And, um,
18  if -- we're trying to learn or rule out another
19  cause for pain through the extremity.  And certainly
20  an arthritic hip and/or arthritic knee can cause
21  radicular pain through the extremity.
22    In Mr. Bliss's part, I was able to
23  demonstrate a full range of motion.  And by passive,
24  it means that the examiner is moving the joint
25  rather than the -- in an active sense, the patient

Page 50

1  is moving.
2    So to my movement of the extremity, to
3  stimulate a range of motion, both of his hips and
4  both of his knees, that was all done without causing
5  any pain.  Essentially, in a 56-year-old male,
6  ruling out arthritis of the joint as a possible
7  cause.
8    Q.  All right.  With respect to range of
9  motion of the spine, can you test that?  Can you
10  measure it?
11    A.  Yes, you can.
12    Q.  Did you do that?
13    A.  Well, I noted that he was able to
14  partially disrobe for the exam without difficulty.
15  That required some bending and twisting and moving,
16  but I did not -- I did not list any direct
17  measurements.
18    Q.  There's actually a device called -- what
19  is it, an inclinometer?
20    A.  Yeah.  I don't use that.
21    Q.  And you understand the AMA guides, the
22  difference between the approach you took for
23  measuring impairment on the lumbar spine, there's
24  another one where they use range of motion, right?
25    A.  Yes.

Page 51

1    Q.  And you didn't use that methodology?
2    A.  That is correct.
3    Q.  Now, in terms of reflexes, you did note
4  that reflexes were absent in the left lower
5  extremity, and could not be elicited, even with
6  provocation.  "With provocation," we're talking
7  about what, the little hammer, the mallet?
8    A.  No.
9    Q.  What are you talking about?
10    A.  I was hoping you'd ask me.
11    The -- as it turns out, many of us,
12  perhaps around this table, our reflexes would not
13  fire even just with a tap of a hammer.  But if
14  patients are asked to grab their fingers like this
15  (indicating), it kind of sets everything, and then
16  the reflexes fire with a tap of a hammer.
17    So what I noted then in the right lower
18  extremity, the reflexes were two-plus over four with
19  this provocation.  And by that, I mean they were
20  normal.
21    On the left lower extremity, I could not
22  elicit -- get any of the -- you know, you think of
23  kick the leg out, excuse me, even with the -- this
24  act of provocation.
25    Q.  But you did note that the function of this

Page 52

1  hallucis longus muscle and the tendon of each great
2  toe was intact --
3    A.  Yes.
4    Q.  -- brisk and strong.
5    Now, in terms of radicular syndrome and
6  the nerve roots, this extensor hallucis longus is
7  related to lumbar disc level L4-5, right?
8    A.  Correct.
9    Q.  And that's the L5 nerve root?
10    A.  Yes.
11    Q.  And that was based on your -- your testing
12  here would seem to be unimpaired?
13    A.  Correct.
14    Q.  Was any of your other findings on physical
15  exam consistent with a specific -- or involvement of
16  a specific nerve root?
17    A.  Well, actually, yes, because the -- on the
18  right lower -- excuse me.  On the left lower exam --
19  left lower extremity, the absence of an ankle jerk
20  is -- makes reference to the S1 nerve root.
21    Q.  That's the ankle plantar flexors?
22    A.  Correct.
23    And the absence of a knee jerk is more
24  proximal, either the 3rd or 4th lumbar.
25    Q.  So we're talking about involvement high --

Page 53

1  relatively high in the spine and relatively low in
2  the spine?
3      A. Correct.
4      Q. Okay.
5      A. Well, I suppose -- I don't know if -- I
6  mean --
7      Q. Well, at 3-4 or L5, S1?
8      A. Yeah, of the lumbar spine.
9      Q. Yeah, we're just talking lumbar spine?
10     A. Correct.
11     Q. But as you mentioned, that's five
12  different levels?
13     A. Correct.
14     Q. Now, you did mention this in your report,
15  the fact that Mr. Bliss had preexisting lumbosacral
16  spine degenerative disease. Can you describe for
17  the jury what that is.
18     A. Well, he's a 56-year-old male, who in
19  February of 2003, underwent surgery at the L5, S1 --
20     Q. It wasn't in February -- or February of
21  2003?
22     A. Correct.
23     Q. Okay. I'm with you.
24     A. At least on this op report.
25     Q. I'm with you.

Page 54

1      A. All right.
2          So if we look at his op report from
3  April of 2011, Dr. Noble was good enough to list as
4  No. 4 diagnosis, "Status post right side L5-S1 micro
5  discectomy, 2003."
6          So we know that for eight years prior to
7  February of 2011, he's had an absence of at least
8  part of the disc -- the cushioning between the fifth
9  lumbar and first sacro segment, and that that can be
10  connected. I don't know if it's absolutely so, but
11  it certainly can be connected to the fact that his
12  ankle jerk, deep tendon reflex, no longer works.
13         And then, as we know in 2010, he then went
14  on -- a discectomy at the L3, L4 level. So again,
15  he's had absence of normal cushioning effect.
16         And then he happens to be overweight, and
17  he's worked for the railroad for 22 years, or
18  whatever that means, and his spine is kind of
19  wearing out.
20     Q. Okay. Also, if you're on the operative
21  report for April 6 of 2011, I'm looking at the
22  St. Elizabeth Regional Medical Center operative
23  report for Dr. Noble, the surgery of --
24     A. Correct.
25     Q. Okay. I note in your -- in your report,

Page 55

1  you say the diagnosis of a recurrent disc extrusion
2  at the left side of the L3, L4 level was
3  established.
4          Actually, Dr. Noble indicates that after
5  the May 6, 2010, micro discectomy, he was advised to
6  achieve more optimal body weight to decrease stress
7  on the spine, as well as to help reduce his chance
8  of recurrent herniation. Unfortunately, he was
9  unable to lose any weight; and somewhat predictably,
10  he is back as a result of recurrent herniation.
11     A. I see that.
12     Q. Okay. Is that generally consistent with
13  the experience you've had over time?
14     A. Well, I know that I've not been able to
15  lose any weight since 2010.
16     Q. Let's talk about your patients.
17     A. Well, I see. I thought perhaps you were
18  being critical of me.
19         Well, you know, I mean, people -- I don't
20  know the numbers, but obesity contributes to -- to
21  low back problems, yeah.
22     Q. Now, finally, Doctor, in terms of what
23  we're really referring to under these -- under the
24  AMA guides, and this analysis that you undertook for
25  the impairment rating -- by the way, before we move

Page 56

1  off of that, I want to just tie up what I left off
2  on the physical examination.
3          There was no evidence of -- of any loss of
4  bowel or bladder with Mr. Bliss?
5      A. That is correct.
6      Q. Any function.
7          So we -- in terms of other sensory loss,
8  other than his report, did you test for any sensory
9  loss?
10     A. No, I did not.
11     Q. Now, going back to the AMA guides in terms
12  of the impairment, this refers to a loss or decline
13  of functional capacity as a result of a medical
14  condition or a symptom, right?
15     A. Correct.
16     Q. Whereas a limitation is something that an
17  individual cannot perform due to a medical
18  condition. These limitations can be objectively
19  measured, and tests have been devised to assess
20  these limits of physical capacities. And I think
21  the jury is going to hear about functional capacity
22  evaluations. All right?
23     A. Okay.
24     Q. Now, a restriction is not what a patient
25  cannot do it, it's what a patient should not do

Page 57

1  because there is a substantial or immediate risk of
2  harm to him or others, correct?
3      A.  Correct.
4      Q.  Now, with respect to this impairment
5  rating that you've arrived at in this case, these
6  guides from the AMA attempt to standardize an
7  objective approach to evaluating medical impairments
8  focused on perceived interference with activities of
9  daily living.
10     I think you referred -- without using that
11  terminology, I think you referred to these -- our
12  normal activities in life?
13     A.  Correct.
14     Q.  Right.  But again, the guide offers that
15  just because a person may be assessed with an
16  impairment that may interfere with these activities
17  of daily living, there may be no corresponding
18  diminution and ability to perform productive work?
19     A.  Correct.  In fact, I used myself as an
20  example.
21     Q.  As an example.
22     Determining whether a patient is impaired
23  is a medical opinion, whereas whether or not someone
24  is actually disabled is not a medical opinion?
25     A.  That is correct.

Page 58

1      Q.  And the medical role is to determine
2  functional limitations or medically reasonable
3  restrictions, and not to make occupational
4  determinations?
5      A.  I'm sorry, say that again?
6      Q.  The medical rule, your role --
7      A.  Yes.
8      Q.  -- is to determine functional limitations
9  or medically reasonable restrictions and not to make
10  occupational determinations?
11     A.  That is correct.
12     Q.  And you've not had any specific training
13  in making occupational determinations?
14     A.  That is correct.
15     Q.  And the only information that you had
16  available to you as to what he did at the BNSF
17  Railway time -- at the BNSF Railway was his
18  description of him maneuvering this -- this
19  hydraulic jack, as depicted in these photographs in
20  Exhibit 82, for a two- or three-hour period?
21     A.  Correct.
22     Q.  That's the only thing you know about his
23  job?
24     A.  I think that's fair.
25     Q.  Okay.

Page 59

1          MR. SATTLER:  I think those are all
2  the questions I have, Dr. McGuire.  Thank you.
3          MR. MCMAHON:  I have nothing.  Thank
4  you, Doctor.
5          VIDEOGRAPHER:  Counsel, we are off
6  the record.
7          The time is 1:56 p.m.
8          (1:56 p.m. - Recess taken.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 60

1          C E R T I F I C A T E
2  STATE OF NEBRASKA   )
                        ) ss.
3  COUNTY OF DOUGLAS    )
4      I, Gretchen Thomas, Registered
5  Professional Reporter, General Notary Public within
6  and for the State of Nebraska, do hereby certify
7  that the foregoing testimony of Michael McGuire,
8  M.D., was taken by me in shorthand and thereafter
9  reduced to typewriting by use of Computer-Aided
10  Transcription, and the foregoing fifty-nine (59)
11  pages contain a full, true and correct transcription
12  of all the testimony of said witness, to the best of
13  my ability;
14     That I am not a kin or in any way
15  associated with any of the parties to said cause of
16  action, or their counsel, and that I am not
17  interested in the event thereof.
18     IN WITNESS WHEREOF, I hereunto affix my
19  signature and seal this 1st day of July, 2013.
20
21
          _____
22        GRETCHEN THOMAS, CCR, RPR, CRR
          GENERAL NOTARY PUBLIC
          Certified Court Reporter
23        Registered Professional Reporter
          Certified Realtime Reporter
24
25  My Commission Expires: